IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

---

BRAY, *et al.*

        Plaintiffs,

v.

QFA ROYALTIES LLC, a Delaware limited liability company,

        Defendant.

---

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR FORTHWITH HEARING

---

**COME NOW** the plaintiffs, by and through their counsel, Gregory R. Stross, in support of their *Motion For Preliminary Injunction And Request For Forthwith Hearing*, pursuant to Fed. R. Civ. P. 65, and state as follows:

### SUMMARY

Plaintiffs are a group of restaurant operators whose franchise agreements have been terminated by the franchisor, QFA Royalties LLC, and whose day-to-day operations are in immediate jeopardy if their supply chains are interrupted by the defendant, as threatened. The termination of the plaintiffs' franchise agreements is purportedly based upon the publication of a memorial page on an association website that was intended to raise funds for the family of a former franchise operator who took his own life. The plaintiffs are entitled to temporary

Dockets.Justia.com

injunctive relief in order to maintain the status quo during the pendency of this action, as they will otherwise suffer severe and irreparable harm.

### FACTUAL BACKGROUND AND CURRENT
### CIRCUMSTANCES WARRANTING RELIEF

1.      Each plaintiff has an ownership interest in or otherwise operates one or more Quiznos restaurants.  These Quiznos restaurants are operated pursuant to Franchisee Agreements entered into by certain of the plaintiffs and defendant QFA Royalties LLC ("Quiznos").

2.      In approximately December 2001, plaintiff Chris Bray and a group of other Quiznos restaurant franchisees established the Toasted Subs Franchisee Association, Inc. ("TSFA").  The purpose of the association was to unite Quiznos franchisees and alert them to the problems, concerns and issues within their franchise system, as well as to streamline the Quiznos business model, maximize franchisee profits and to enhance the corporate culture.  The TSFA, which is headed by plaintiff Bray, has assisted hundreds of franchisees with operational issues and consistently provides advice to franchisees with regard to running the franchise efficiently.

3.      The TSFA board of directors consists of ten individuals, eight of which are plaintiffs in this action (Chris Bray, Jehad Majed, Brad Fix, Richard Newkirk, Allison Abid, Daniel G. Carter, Jr., Anne Keane and David Tate).[1]  Each of these plaintiff board members has been notified by Quiznos that the Franchisee Agreements under which they operate their restaurants have been terminated by Quiznos.  Some of those terminations are subject to a period in which the franchisee has the right to cure, others are effective immediately.  (TPI Franchise Agreements excerpts, Bray Decl. Exhs. A-B; Majed Franchise Agreement excerpts, Majed Decl. Exh. A; Fix Franchise Agreement excerpts, Fix Decl. Exh. A; BJ&F Franchise Agreement

excerpts, Fix Decl. Exh. B; Newkirk Franchise Agreements excerpts, Newkirk Decl. Exhs. A-B; Abid Franchise Agreements excerpts, Abid Decl. Exhs. A-B; Carter Franchise Agreements excerpts, Carter Decl. Exhs. A-B; LKB Franchise Agreement, Keane Decl. Exh. A; Big Little Franchise Agreement excerpts, Tate Decl. Exh. A; CTH Franchise Agreement excerpts, Tate Decl. Exh. B.)

4.    The other named plaintiffs are not members of the TSFA board of directors, but share an ownership interest in the stores that have been terminated; typically these other plaintiffs are family members who have jointly invested in the restaurants or corporate entities doing business on behalf of various individuals with Quiznos.  (*Id*.)

5.    While there can be a symbiotic and mutually beneficial relationship between a franchisor and franchisee, the relationship that Quiznos has with most of its five-thousand operating franchisees is extremely adversarial in nature.  This is due to a practice and pattern of abusive and illegal conduct by Quiznos that is now resulting in a plethora and growing number of lawsuits and other complaints filed by franchisees against Quiznos throughout the United States and Canada.[2]

6.    In an effort to short-circuit public criticism Quiznos has recently taken to preemptively suing its own franchisees who in any way complain or otherwise object to the company's management practices.  In fact, the Bray Plaintiffs, the Majed Plaintiffs and the TSFA itself are all subject to separate Quiznos-filed actions, pending in Colorado state and

---

[1] Two TSFA board members are former Quiznos restaurant operators and no longer work in the system.

[2]  *See  2038724 Ontario Ltd. and 2036250 Ontario Inc. vs. Quizno's Canada Restaurant Corporation, Quiz-Can LLC, The Quizno's Master LLC, Gordon Food Service, Inc. and GFS Canada Company Inc; Westerfield et al., v. Quizano's Franchise Company LLC, et. al.*, 06-C-1210, E.D. Wisc.; Baber v. Quiznos, et al.; NC036893, Superior Court, Los Angeles, South District, CA.

federal courts, based upon their purported activities related to the TSFA. [3] (Similarly to this case, neither Ali Majed nor Sabine Bray are TSFA board members, nor have they ever actively participated in any TSFA activities, yet are subject to this litigation with Quiznos).

7.    Currently, there are also a number of class actions pending against Quiznos which assert a pattern and practice of illegal activity, that include, among other things, civil RICO claims and Sherman Act anti-tying activity.[4] Additionally, core claims in these other actions involve a pattern of misrepresentation and fraudulent inducement by Quiznos when selling franchises.

8.    In April of 2005, Bhupinder "Bob" Baber and his wife Ratti Baber filed a civil action against Quiznos and several related companies in California state court.[5] The Babers owned and operated two Quiznos restaurants. After investing roughly $500,000.00 into the two stores, Bhupinder Baber came to understand that Quiznos had misrepresented many material facts to him and fraudulently induced him to open these stores, each of which lost money. Frustrated that Quiznos had duped him and then abandoned him once his stores were operating, he formed an association similar to the TSFA. Bhupinder Baber's organization was a called Quiznos Subs Franchise Association ("QSFA").

---

[3] *See QFA Royalties LLC et al v. Majed*, Case No. 06-CV-01506-LTB-MEH (United States District Court for the District of Colorado); *QFA Royalties LLC et al v. Bray*, Case No. 06-CV-6641 (District Court for the City and County of Denver, Colorado).

[4] *See e.g., Westerfield et al. v. The Quizno's Franchise Company LLC et al*, Case No. 06-C-1210 (United States District Court for the Eastern District of Wisconsin, Green Bay Division); *Bonnano et al v. Quiznos et al.*, Case No. 06-1415 (United States District Court for the District of New Jersey).

[5] *See* Complaint *in Baber et al. v. Quizno's et al.*, Case No. NC036893, Exhibit 1(California Superior Court, Los Angeles County, South District)(asserting seven causes of action, which included wrongful termination; breach of contract; fraud; intentional infliction of emotional distress, negligent infliction of emotional distress and interference with prospective business advantage.

9.      For his efforts in forming the QSFA and using "Quiznos" as part of the name of his organization, he was targeted and attacked by Quiznos, who eventually terminated his franchise agreements upon pretextual bases.  In addition to the Babers' action against Quiznos, Quiznos filed two separate actions against the Babers, one in the U.S. District Court of Colorado (05-CV-007639-RPM) and the other in the U.S. District Court of California (06-CV-00941-JFW-VBK).  Ultimately, it was determined that the Babers' claims against Quiznos should be determined through arbitration, pursuant to an arbitration clause in each of his franchise agreements.

10.      After litigating the validity of the venue and arbitration clauses of the Babers' franchise agreements for approximately 18 months, and at a cost to the Babers of roughly $100,000, on October 31, 2006 the California Court of Appeals ruled that the action should proceed in arbitration in Denver, Colorado.[6]  Mr. Baber, without any further funds to continue to litigate, felt the decision of the Court of Appeals was the practical death knell to any chance he and his wife had of recovering the huge losses he had suffered as a result of Quiznos' improper actions against him.

11.      On November 27, 2006 Mr. Baber went into a Quiznos restaurant located in Whittier, California.  This was not a restaurant that he previously owned, but was apparently chosen at random.  He went inside and spent a short time talking with the manager of the restaurant and drank a soda.  By the accounts given, he did not appear to be despondent or in an agitated state.  After speaking with the manager for several minutes he excused himself to use

---

[6] *Baber et. al v. Quizno's et al.*, California Court of Appeals, Second Appellate District, Division One, B186235, Slip Opinion, October 31, 2006.

the restroom.  Mr. Baber stepped into the restroom, removed a gun that he had concealed under his clothing, and shot himself in the chest three times.  His wounds were fatal.

12.    Mr. Baber left several suicide notes.  One note, of a personal nature, was left to his family, and a second note was directed to other Quiznos franchise owners, the media and the public at large.  Copies of this latter suicide note was found both on his body and on his computer.  The note read as follows:

> **Life goes on and we pass through**
> **Days of sunlight days of tears**
> **It's the way life comes to you**
> **Foolish wasting precious years**

> I am not a fool. My wife is not a fool

> I even refuse to call myself gullible. I am not a gullible. My wife is not a gullible

> We trusted in Quiznos. They promised us success, help and everything else to get us to buy into the "dream" they were selling. They had a private secret unannounced agenda! To trap you and screw you, the franchisee!

> We are not fools. But, we have been fooled

> We are like so many others who also bought into this dream and lost a substantial portion of their life's savings.

> Countless individuals and families have been destroyed. Even some lives have been lost

> I have struggled hard and did the best I could to create a voice for the franchisees in the system and to create a "support system" for the franchisees, which does not exist, and to fight the injustices of this franchise system (Quiznos). Not to bring the system down, but only to make it fair.

> I hope my efforts will not go wasted. I hope the government will look into the systematic deceitful business practices of this franchisor. A serious investigation must be undertaken

> It's been a tough battle

> I have been dragged through the legal system for over 18 months by the immensely superior financial might of the franchisor, which will continue to keep justice from coming to me, and to the hundreds and thousands of franchisees who are trapped similarly in the system and are slaving for this franchisor, and those who have bought into the franchise agreement, and not yet become store operators

I have spent and sacrificed my time, money, family life. I thought of an option to leave the system quietly and fade away, but now I choose not to do that, and instead let the struggle go on

My struggle will continue after my sacrifice.

Some one must do something about what Quiznos is doing to the trapped franchisees. Everything they do is in their own self interest, with utter disregard for the interests of the franchisees, to who they sold the "dream" and put into business, only to screw them systematically from day one

The press and the media must bring out the atrocities Quiznos is carrying on with.

In this franchise system the Franchisor has all the rights and no duties or obligations, whereas it is just the opposite for the Franchisee, which is the franchisee has no rights, no remedies, only obligations

I have not been able to think well, eat well, for the past one month

My health has been going down very fast

My mental capacity, to think, to work, and carry on my daily activities normally, is severely diminished

I cannot survive like this much longer

Quiznos has killed me. Destroyed my life. Destroyed my family life for the past seven years

It has been a harrowing experience. We just could not get out of it. All doors were shut

Can some one stop this?

Can the government stop this Quiznos from destroying peoples lives? They have defrauded me and they are defrauding people. See my law suit (complaint) how they defrauded me from the very beginning, and then continued their systematic defrauding through out the period, until we left

They retaliated against me for trying to create a voice for the franchisees in the system

We were abused, we were manipulated, we were exploited,

I deeply regret getting in to Quiznos. I wish I had never heard of them

Can the media stop this?

CNN we need your help. Nancy Grace, please help! Glora Alred? Who else?

KTLA, LA Times, OC Register Please

How can a common individual like me and those like me in similar circumstances, there are thousands, with limited resources get justice?

I believe there will be justice. But it will be too late for me.

> There are a large and growing number of us who believe, unreservedly, that the handful of people who own and/or otherwise control the Quiznos Corporation should spend the rest of their lives in prison. The Quiznos Corporation is just one of the most egregious in what they do, but the entirety of franchising in America is open to this kind of abuse. The IFA (International Franchise Association) is the umbrella entity that, along with individual Franchisors, has enough money and power to buy the legislation that protects the Franchisor, and exploits the Franchisee. Fair and just legislation, that would level the playing field, never sees the light of day. Senators and Representatives, primarily Republicans, continue to sell hard working Americans down the river. STAY FAR, FAR AWAY FROM THE QUIZNOS CORPORATION. THEY ARE CRIMINAL IN WHAT THEY DO. And treat any Franchise System with deep suspicion

(Baber Suicide Note 11/27/06, Majed Decl. Exh. D.)

13.    Mr. Baber died without any type of insurance or death benefits, leaving a wife and three children.  Mr. Baber was without an estate of any value and his wife and children are virtually destitute.

14.    TSFA board members decided they would utilize the Website to raise financial contributions from members, and any others who might wish to contribute, to assist Ratti Baber in paying for Mr. Baber's memorial service and cremation.  The board members created and posted a webpage within the TSFA Website, dedicated to Mr. Baber.  (TSFA-Baber Webpage Screenshots, Majed Decl. Exh. E.)

15.    The TSFA-Baber webpage contains several distinct sections, the first section of which is entitled "Honoring The Passing of a Fellow Franchisee, Bob Baber . . . ."  The TSFA-Baber webpage contains two pictures of Mr. Baber, one by himself and a second of Mr. Baber standing next to Ratti Baber and plaintiff Chris Bray.

16.    The editorial content of the website began as follows:

**Honoring the passing of a fellow franchisee...**

Bob Baber, a fellow franchisee who spent the last years of his life working for and advocating for the rights of franchisees, has passed away in Whittier, California Monday November 27, 2006. Bob established the Q Subs Franchisee

Association (QSFA) and worked closely with the TSFA. The published story regarding his passing is below. In addition, Bob left a note to the media about his concerns for Quiznos franchisees and franchising in general. (see below)

17.      The website then reproduces the article published in the Whittier (California)

Daily News, as follows:

Local News Story...

**Man who shot himself in eatery's bathroom dies**

WHITTIER - A man who shot himself in the bathroom of a Quizno's sandwich shop in Whittier late Monday afternoon has died, police said Tuesday.

Police identified the man as 55-year-old Baber Vhupinder (sic) of Long Beach. He died Monday night at St. Francis Medical Center, Whittier Police Department spokesman Officer Jason Zhulke said.

Paramedics were called to 14153 E. Whittier Blvd. at 4:16 p.m., where employees heard gunshots after the man went inside the bathroom, Zuhlke said. He had three apparently self-inflicted gunshot wounds to his chest, said Zuhlke.

The man entered the store 15 minutes earlier and asked to speak to the owner, said store employee and Whittier resident Anthony Garcia. He did not show any signs of being upset or distressed, said Garcia.

After talking to the manager and sipping a drink for about five minutes, the man stood up and casually excused himself to the restroom, said Garcia. About 30 seconds after entering the bathroom, employees heard a shot ring out. Investigators were still trying to determine why the man shot himself three times in the chest, he said, as no motive was immediately clear.

Article extracted from **http://www.whittierdailynews.com/**

(11/27/06 News Article, Majed Decl. Exh. C.)

18.      The next section of the TSFA-Baber webpage then provided the text of the

suicide note, as recounted above, with the following introduction:

Bob's Letter To The Media...

Whittier, CA detectives found a paper copy of this letter along with a digital copy on a USB drive in Bob's possession. Bob had also saved a copy on his computer where his wife could easily find it along with a separate letter to his children and

wife.

To view the original letter <u>click here</u>

<u>(TSFA-Baber Webpage Screenshots, Majed Decl. Exh. E.)</u>

19.    Finally, the TSFA-Baber webpage provided the following request for financial

assistance to be provided to Mr. Baber's family:

**Donate To The Bob Baber Memorial Fund**

All proceeds will go to Bob's wife and his 3 children to help them pay the bills at home during these difficult times. These funds will be recorded and handled in an account separate from the TSFA accounts. The TSFA will not use these funds for anything else.

**Make check or money orders payable to:**
The TSFA - Bob Baber Memorial fund

**Mail to:**
The TSFA - Bob Baber Memorial Fund
P.O. Box 180784
Utica, MI 48318

(*Id.*)

20.    The TSFA-Baber Webpage first posted on the TSFA Website on approximately

December 2, 2006. (Majed Decl. – Filed separately.) On December 8, 2006, Quiznos issued

termination notices to each TSFA board member with operating Quiznos restaurants.  In each

case the termination provided absolutely no factual basis for the termination other than a

reference to the section of the franchisee agreement that had allegedly been violated.

21.    By way of example, Dan Carter's termination letter reads as follows,

Daniel Carter, Sr.
Daniel Carter, Jr.
Jody Carter
Madeleine Carter
Carter Group LLC
19454 Willoway Drive
Macomb, Michigan 48044

Quiznos Sub
24955 Gratiot Avenue
Eastpointe, Michigan 48021

RE:    Notice of Termination; Franchise Agreement dated September 27, 2002
("Agreement") Between Carter Group LLC ("You') and QFA Royalties
LLC, as successor in interest to Qulzno's Franchising LLC ("Quizno's")
for the Qulznos Sub No. 4199 Located at 24955 Gratiot Avenue,
Eastpointe, Michigan 48021 ("Restaurant)

Dear Messrs. Carter and Mss. Carter:

You are hereby advised that your franchise rights under the Agreement are
terminated, effective five (5) days following receipt of this notice, pursuant to Section
18.2(c) of the Agreement, for engaging in conduct that, in the sole judgment of Quiznos,
materially impairs the goodwill associated with the Marks, unless such conduct is cured
within such five (5) day period.

Please refer to Section 18.7 of the Agreement regarding your continuing
obligations upon termination. Such obligations include, but are not limited to:

1.    Pay Quizno's all royalties, other fees, and any and all amounts or
accounts payable then owed Quiznos or its affiliates;

2.    Cease to identify yourself as a Quizno's franchisee and use any marks,
trade secrets, signs, symbols, devices, trade names, and other materials of Quizno's;

3.    Immediately cease to identify the franchised location as being, or having
been, associated with Quizno's, and immediately cease using any proprietary mark of
Quizno's or any mark in any way associated with the marks and licensed methods;

4.    Deliver to Quizno's all signs, sign-faces, advertising materials, forms and
other materials bearing any of the marks or otherwise identified with Quizno's and
obtained by and in connection with the Agreement

5.    Immediately deliver to Quiznos the Operations Manual and all other
information, documents and copies thereof which are proprietary to Quizno's;

6.    Promptly take action as may be required to cancel all fictitious or
assumed names or equivalent registrations relating to your use of any marks;

7.    Immediately notify the telephone company and all telephone directory
publishers of the termination of your right to use any telephone number and any regular,
classified or other telephone director listing associated with any Mark and to authorize
transfer thereof to Quizno's or its designee; and

8.    Abide by all restrictive covenants set forth in Section 20 of the
Agreement.

All capitalized terms not otherwise defined herein shall have their meanings as
set forth in the Agreement. Please be reminded that as specified in the Agreement, all of
your obligations which expressly or by their nature survive their termination of the

Agreement, including the non-competition and non-disclosure provisions, will continue in full force and effect despite the Agreement being terminated.

Please contact me at (312) 388-4000 should you require further information with respect to curing your conduct or, alternatively, ending your franchise operations.

Sincerely,

DLA Piper US LLP


s/Fredric A. Cohen
Fredric A. Cohen

(12/8/06 Cohen Letter, Carter Decl. Exhs. C-D.)

22.    Attorney Cohen sent nearly identical termination notices to the seven other TSFA board members who maintain one or more Quiznos stores - effecting his termination strategy store-by-store and letter-by-letter. (12/8/06 Cohen Letters, Bray Decl. Exh. C-D; 12/8/06 Cohen Letter, Majed Decl. Exh. B; 12/8/06 Cohen Letters, Fix Decl. Exhs. C-E; 12/8/06 Cohen Letters, Newkirk Decl. Exhs. C-D; 12/8/06 Cohen Letters, Abid Decl. Exhs. C-D; 12/8/06 Cohen Letter, Keane Decl. Exh. B; 12/8/06 Cohen Letters, Tate Decl. Exhs. C-D.)  In a state of confusion and concern, several of the plaintiffs attempted to immediately contact Attorney Cohen, but were informed that he was unavailable.

23.    Plaintiffs Anne and Glenn Keane (collectively the "Keanes"), sent the following email to Attorney Cohen, attempting to obtain an indication as to why these termination notices had been served upon them:

From: keanecrew [mailto:keanecrew@sbcglobal.net]
Sent: Monday, December 11, 2006 4:14 PM
To: Cohen, Fredric A.
Subject: Termination Notice Received 12/11/06 - Store #7081 - Derby, CT
Monday, December 11, 2006

Mr. Cohen,

We received a Fed Ex package today which contained a Termination Notice of our
franchise agreement for store #7081 in Derby, CT.  We are unaware of any issues with
regard to our store operations or any other reason that would have prompted this letter.
We are hereby requesting a detailed explanation in writing of the issue(s) so that we can
correct whatever has prompted this letter.

Thank you,
Anne & Glenn Keane
Owners Store #7081
Derby, CT

(12/11/06 Keane Email, Keane Decl. Exh. C.)

24.    The Keanes did eventually reach Attorney Cohen, who subsequently provided the

following email to memorialize Quiznos demands upon them:

"Cohen, Fredric A." <Fredric.Cohen@dlapiper.com> wrote:
Subject: RE: Termination Notice Received 12/11/06 - Store #7081 - Derby, CT
Date: Wed, 13 Dec 2006 11:24:07 -0600
From: "Cohen, Fredric A." <Fredric.Cohen@dlapiper.com>
To: "keanecrew" <keanecrew@sbcglobal.net>
Ms. Keane:

Thank you for taking the time to speak with me this morning.  This will confirm our
conversation concerning the steps that must be taken by you, Glenn Keane, and LKB,
LLC, to cure the default upon which the December 8, 2006 termination notice is based.

First, you must cause the immediate retraction of the material on the TSFA website
relating to Mr. Baber, including the letter allegedly drafted by Mr. Baber.

Second, you must cause to be posted on the TSFA website an acknowledgment that the
posting of that material was both morally reprehensible and in violation of your
contractual commitments under your franchise agreement, and harmed the Quiznos
brand and damaged the goodwill associated with the Quiznos name and marks.

Third, you must cause to be posted on the TSFA website an apology to your fellow
franchisees and to Quiznos for the harm and damage caused by the posting of that
material.

Fourth, you must execute a written reaffirmation and acknowledgment of your existing
contractual obligations not to engage in conduct that harms the Quiznos brand or impairs
the goodwill associated with the Quiznos names and marks, including by means of TSFA
website postings, press releases, or any other communication intended to or that you
reasonably should know will harm the Quiznos brand or damage the Quiznos names and
marks.  This reaffirmation will also include a general release of any and all claims against
Quiznos.  The reaffirmation is not intended to inhibit or prevent any right of association or
of expression that may or may not exist under state law or otherwise, but only to reaffirm
your <u>existing</u> contractual obligations under your franchise agreement, and to protect the
brand, name and marks upon which the livelihoods of thousands of Quiznos franchisees
across the country and abroad depend.

Should you have any questions concerning the foregoing, please feel free to call or to respond to this e-mail.

**Fredric A. ("Ric") Cohen**

Partner

**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
T 312.368.7066
F 312.630.5377
M 312.749.9057
fredric.cohen@dlapiper.com
www.dlapiper.com

(12/13/06 Cohen Email, Keane Decl. Exh. D.)

25.    The plaintiffs are each now presented with the imminent loss of hundreds of thousand of dollars in investment and years of hard work to build their stores. The threatened terminations are based upon perceived franchise agreement violations related to a website, to which only several of the named plaintiffs actively provided content. Many of the plaintiffs in this action are not involved in the TSFA in any manner or otherwise participate in its activities, yet face complete loss of their investments. Further, the threatened franchise terminations are based upon Quiznos' unilateral assumption that the posting of public, factually accurate, and previously published material, was conduct that harmed the Quiznos brand.

26.    Most significantly, as evidenced by Attorney Cohen's December 13, 2006 email to the Keanes, the purported cure to this violation requires the plaintiffs execute a "general release of any and all claims against Quiznos." If Quiznos honestly believed that the plaintiffs' actions had been harmful, would not a resolution require that it be *Quiznos who will provide a release of legal claims against the plaintiffs*? This reversal of the expected roles is strange until placed into the context of other existing litigation, wherein Quiznos has repeatedly and consistently attempted to obtain all-encompassing releases from franchisees to preclude their

14

right to sue for claims related to RICO, the Sherman Act, fraudulent misrepresentation, fraud in the inducement, violation of state laws relating to franchisee rights, and breach of contract, among others.

27.    This demand for release of plaintiffs' right to sue on unrelated potential claims lays bare the actual intent of Quiznos in their recent termination scheme:  brute intimidation. The message sent to these store owners is, in effect, your actions must be absolutely circumspect and if we judge you to be out of line, judged by our "sole-discretion" standard, we will unilaterally announce and enforce the corporate death penalty of franchise agreement termination.

28.    There is here a truly horrible irony that Quiznos has chosen to again take this type of action against people who were only paying homage to a man, Bhupinder Baber, against whom this very tactic not only succeeded, but eventually contributed his death.  Clearly, Quiznos and its legal representative cavalierly use the phrase "morally reprehensible" without true comprehension of that term.  Indeed, the phrase distorts reality given that the TSFA's public aim was to raise money for the Baber Family.  The use of the phrase as a sword against the TSFA is even more incredible given Quiznos' representation to some 4,500 franchisees on December 8, 2006 that "We were and continue to be deeply saddened by Mr. Baber's death. Upon learning of the tragedy, Quiznos expressed its condolences to the family and took additional steps to provide comfort and support to the other members of our franchisee community who were directly affected by this situation." (12/8/06 Corporate Communications Fascimile, Majed Decl. Exh. F.) Quiznos, however, never "expressed its condolences" to Ratti Baber or the family.

29.    On December 14, 2006 Quiznos sent to a memorandum to each of the roughly 4,500 Quiznos stores, concerning the posting of the memorial information about Bhupinder Baber on the TSFA Website.  It states as follows,

### Memorandum

Date:          December 14, 2006

To:            Franchise Owners

From:          Corporate Communications                    5432

Re:            Protecting FOs and the Quiznos Brand

In our communication to you last week, we told you how disappointed we were that a small group of franchise owners continue to slander and defame Quiznos and use the media to exploit a tragic situation. While this group states that their "mission" is to work with Quiznos to "participate in cooperative communications, coordinated efforts and a focus on common issues", they in fact promote only their own agenda through their repeated and hostile efforts to publicly damage the goodwill and reputation of the Quiznos brand and all of you who have worked so hard to build that brand and your business. We recognize that franchise owners have legitimate concerns and questions, and have always been willing to discuss individual Franchise Owner concerns to help make them more successful. However, we take our responsibility to protect the brand and the system seriously, and will take the actions necessary to uphold that responsibility.

As a result, we have terminated eight franchise owners for engaging in conduct that we consider (and believe that any reasonable person would consider) to be not just violations their contractual obligations under their franchise agreements, but morally reprehensible as well. We strongly believe that we and our franchise owners, working together, will continue the Quiznos success story. From time to time, we need to take the steps necessary to protect the brand, as we have in this case.

We thank you for your hard work and ongoing efforts to am great Quiznos restaurants.

(12/14/06 Corporate Communication Fascimile, Majed Decl. Exh. G.)

30.    There can be little question that Quiznos termination of TSFA board members stores and proud, public declaration of its actions, is intended to serve as a warning to all other franchisees who might dare complain.  The manner by which Quiznos elected to terminate the

TSFA board members demonstrates the Defendant's belief that the franchisee agreements provide them with unfettered authoritarian rule over its franchisees.

### DECLARATIONS OF THE PLAINTIFFS

31.    Shortly after the filing of the Complaint and Motion For Preliminary Injunction And Request For Forthwith Hearing, Plaintiffs will filed Declarations from the eight TSFA board members who Quiznos has singled out for punishment.  Each one attests that they have received a notice of termination from Attorney Cohen. Each Declaration will contain appropriate excerpts from the relevant Franchise Agreement, if the not the entire agreement.   Each Declaration will include the termination notices sent by Attorney Cohen.  These Declarations are expected to be filed and served upon defendant and its counsel by the end of the day Monday, December 18, 2006.

### LEGAL STANDARD FOR TEMPORARY INJUNCTIVE RELIEF

32.    Pursuant to Fed. R. Civ. P. 65, a plaintiff, with notice to the adverse parties, may obtain preliminary injunctive relief when (1) the movant will suffer irreparable harm unless the injunction issues; (2) there is a substantial likelihood the movant ultimately will prevail on the merits; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, ¶ 23 (10th Cir. 2004); *Kiowa Indian Tribe of Oklahoma v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998).

33.    The Supreme Court has indicated that the primary "limited purpose" of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *O Centro*

*Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir.2004) (en banc) (10th Cir. 2004).

34.    **Burden of Persuasion for Movant**.    Generally, a preliminary injunction is considered an extraordinary and drastic remedy, therefore the movant carries a burden to clearly show that relief is warranted.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir.2004) (*en banc*); *SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).  Three types of preliminary injunctions, however, are disfavored: (1) those that disturb the status quo; (2) those that are mandatory as opposed to prohibitory; and (3) those that afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.  *Schrier v. University of Colorado*, 427 F.3d 1253 (10th Cir. 2005).    A movant seeking one of these types of injunctions must show that the four factors weigh heavily and compelling in his favor.  *Id.*

35.    The injunctive relief sought by the plaintiffs in this case is expressly intended to maintain the status quo of the existing relationships between the parties.  Similarly, plaintiffs' request is not for a mandatory injunction that would require the defendant to act in a particular way.  Nor would the relief sought in the temporary injunction provide substantially all of the relief that could be achieved through a full trial on the merits.  As a result, the burden of persuasion upon the plaintiffs is to clearly show that relief is warranted, with no need to demonstrate that the four factors weigh heavily and compellingly in their favor.

36.    **Irreparable Harm**.    The demonstration of probable irreparable harm is considered by the courts to be the single most important prerequisite for the issuance of a preliminary injunction.  *Dominion*, 356 F.3d at ¶23 (10th Cir. 2004) *citing Reuters Ltd. v. United*

*Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190

F.3d 924, 926 (8th Cir. 1999) (per curiam); *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F.

Supp. 2d 228, 233 (S. D. N. Y. 2002); *Paradise Distribs., Inc. v. Evansville Brewing Co.*, Inc.,

906 F. Supp. 619, 622 (N.D. Okla. 1995).

37.     Grossly apparent in this case is Quiznos' effort to silence its critics (or, in this

case, what Quiznos' misperceives to be its critics). Thus, the present litigation necessarily

presents a question regarding plaintiffs' right to free speech and the companion right to freely

associate under the First Amendment.  Likely to be at issue at the trial in this case will be the

extent to which the Franchisee Agreements legally prohibit the plaintiffs' ability to exercise

these rights. In addition, the Court will need to make a factual determination of whether the

plaintiffs' actions here: posting public, previously-published, factually correct information, was a

violation of any such legally-sustainable limitation under the Franchise Agreements.  Plaintiffs

believe that Quiznos' cure requirements for the alleged violation of the Franchise Agreements

unlawfully restrict their constitutionally-guaranteed rights to free speech and to freely associate

and constitute an irreparable injury, incapable of being remedied with an adequate legal remedy.

(Bray Decl. – Filed separately; Majed Decl. – Filed separately; Fix Decl. – Filed separately;

Newkirk Decl. – Filed separately; Abid Decl. – Filed separately; Carter Decl. – Filed separately;

Keane Decl. – Filed separately; Tate Decl. – Filed separately.)

38.     Regardless of the ultimate determination of these questions, it is black letter law

that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, (1976) (plurality); *accord id.*

at 374-75 (Stewart, J., Concurring); *see also Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.

1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (*citing Elrod*); *id.* ("Violations of first amendment rights constitute per se irreparable injury.") (*quoting Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978)). Quiznos' demand that the information contained on the TSFA Website be removed under threat of closure of TSFA board members' restaurants is blatant coercion for the singular purpose of curtailing speech. So, too, is Quiznos' efforts to force speech upon the plaintiffs (Attorney Cohen's assertion that to cure the Franchise Agreement breach the plaintiffs must post on the TSFA Website that their conduct was "morally reprehensible" and apologize to their fellow franchisees for the posting). Injunctive relief is required here to prevent irreparable harm based upon the coercive infringement on the plaintiffs' First Amendment rights.

39.    The parties have long-standing relationships pursuant to their Franchise Agreements. Each of the stores owned by plaintiffs has a dependence upon the defendant and related Quiznos' companies for supplies (mandated by the Franchise Agreements) for their continued day-to-day operations. Quiznos has threatened to unilaterally act to disrupt those supplies and otherwise force the immediate cessation of restaurant operations. In fact, it has already done so with respect to one of the stores owned by plaintiffs Chris and Sabine Bray. (Bray Decl. – Filed separately.)

40.    An inability to calculate damages, harm to a business' goodwill, or diminishment of competitive positions in marketplace will each support a determination of irreparable harm. *See e.g., Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995). A

temporary interruption in the ongoing operations of each of plaintiffs' stores would substantially destroy the goodwill developed in the market and community. (Bray Decl. – Filed separately; Majed Decl. – Filed separately; Fix Decl. – Filed separately; Newkirk Decl. – Filed separately; Abid Decl. – Filed separately; Carter Decl. – Filed separately; Keane Decl. – Filed separately; Tate Decl. – Filed separately.) The loss of that goodwill would be extremely difficult to quantify for purposes of determining damages. Similarly, there would be a diminishment of a competitive position in the marketplace caused by a wrongful termination that resulted in temporary closing of the Plaintiffs' restaurants. (*Id.*)

41.    **Substantial Likelihood Of Ultimately Prevailing On The Merits**. Based upon the facts set forth above and discussion of relevant law, plaintiffs have established a likelihood of success on the merits.

42.    **Threatened Injury To The Movant Outweighs Potential Harm Of Proposed Injunction To Opposing Party**. There will be no material harm to the opposing parties if the temporary injunction is granted. Defendant cannot reasonably assert that the Quiznos brand will suffer diminution if they are enjoined from immediately closing these restaurants, *because the alleged harm does not come from the restaurants but from an unrelated website*. The termination of these franchise relationships serves only as a punitive sanction and the threatened closure of the operations themselves is intended to be coercive. Even if the stores are closed, the TSFA Website posting the information related to Mr. Baber may well continue. Thus, the basis and harm complained of by Quiznos may continue regardless of whether temporary injunctive relief is granted.

43.     While the threatened injury to the movant is to immediately deprive them of their livelihood and incurring incalculable losses, the potential "harm" of the injunction to the Quiznos is that it will continue to receive a revenue stream from these franchisees.  Simply put, there is no harm to Quiznos.

44.     **An Injunction Would Not Be Contrary To The Public Interest**.  The public interest will not be harmed by granting the stay requested herein.  If plaintiffs are correct that the termination of the Franchise Agreements is improper, then the public interest will be advanced by the continuing availability of the products in the marketplace and the economic value of uninterrupted flow of continuing commerce in the community.

45.     Further there are implicated issues concerning the First Amendment right of free speech and the extent of its limitation under the Franchise Agreements.  The interplay of this fundamental constitutional right in the franchise contract setting is of substantial public interest.

**REQUESTED RELIEF**

Plaintiffs requests that the Court order the following:

a.     A forthwith hearing to be conducted, with all parties provided the opportunity to be heard and for the Court to make an immediate determination as to the appropriateness of temporary injunctive relief;

b.     An Order restraining and enjoining defendant QFA Royalties LLC and any and all related affiliates under its control, from terminating the plaintiffs' Franchise Agreements or otherwise interfering with the continuing operations of the plaintiffs' stores, based upon any acts taken by one or more plaintiffs with relation to the posting of

information on the TSFA Website, related to the death of Bhupinder Baber, or the solicitation of charitable contributions for the support of the Baber Family;

c.    An Order restraining and enjoining the defendant's agents, employees, associated companies, and affiliated companies under its control, to include any mandated or designated suppliers of Quiznos' products, from taking any actions that would interfere with the continued operations of plaintiffs' stores, based upon any acts taken by one or more plaintiffs with relation to the posting of information on the TSFA Website, related to the death of Bhupinder Baber, or the solicitation of charitable contributions for the support of the Baber Family;

d.    Appropriate Orders as to otherwise maintain the status quo related to the operating relationship between the parties until this matter and all claims that are asserted or may be asserted may be tried.

DATED:    December 15, 2006
          Denver, Colorado

GREGORY R. STROSS
ATTORNEY AT LAW

By: _s/Gregory R. Stross_____
     Gregory R. Stross
     2940 Wells Fargo Center
     1700 Lincoln Street
     Denver, Colorado 80203
     Telephone 303-339-0647
     Facsimile 303-572-5111
     gstross@earthlink.net