IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Case No. 06-CV-02528-JLK-CBS


CHRIS BRAY, *et al.* v. QFA ROYALTIES LLC,


EXHIBITS A THROUGH D TO THE DECLARATION OF CHRIS BRAY

| | | |
|---|---|---|
| A | Franchise Agreement excerpts | 14 Pages |
| B | Franchise Agreement excerpts | 12 Pages |
| C | Cohen letter | 2 Pages |
| D | Cohen letter | 2 Pages |

Dockets.Justia.com

C-3

**Exhibit A**

Property of
Chris Bray
1378 Pecan Creek RD.
Killeen, TX
76549

## THE QUIZNO'S CORPORATION

## FRANCHISE AGREEMENT

Franchisee: **Training Pros, Inc.**

Date: **April 30, 1997**

Franchised Location: **Willow Springs Dr.**
**Killeen, Texas**

THE QUIZNO'S CORPORATION
FRANCHISE AGREEMENT
TABLE OF CONTENTS

Page

1. PURPOSE ............................................................................................................. 1

2. GRANT OF FRANCHISE ..................................................................................... 1

    2.1.    Grant of Franchise ..................................................................................... 1
    2.2.    Scope of Franchise Operations ................................................................. 1

3. FRANCHISED LOCATION AND DESIGNATED AREA ..................................... 1

    3.1.    Franchised Location .................................................................................. 1
    3.2.    Limitation on Franchise Rights ................................................................ 1
    3.3.    Express Restaurants. ................................................................................. 2
    3.4.    Cheeze Louise. .......................................................................................... 2
    3.5.    Special Products. ....................................................................................... 2
    3.6.    Franchisor's Reservation of Rights ......................................................... 2

4. INITIAL FRANCHISE FEE .................................................................................. 2

    4.1.    Initial Franchise Fee ................................................................................. 2

5. ROYALTIES ......................................................................................................... 2

    5.1.    Royalty ...................................................................................................... 2
    5.2.    Gross Sales ................................................................................................ 2
    5.3.    Royalty Payments ..................................................................................... 2
    5.4.    Application of Payments ........................................................................... 2

6. DEVELOPMENT OF FRANCHISED LOCATION .............................................. 3

    6.1.    Approval of Franchised Location. ............................................................ 3
    6.2.    Approval of Lease ..................................................................................... 3
    6.3.    Schedule .................................................................................................... 3
    6.4.    Conversion and Design ............................................................................ 3
    6.5.    Signs ......................................................................................................... 3
    6.6.    Equipment ................................................................................................. 3
    6.7.    Permits and Licenses ................................................................................ 3
    6.8.    Commencement of Operations ................................................................. 4

7. TRAINING ........................................................................................................... 4

    7.1.    Initial Training Program ........................................................................... 4
    7.2.    Additional Training Programs ................................................................. 4

8. OPERATIONS MANUAL ..................................................................................... 4

    8.1.    Operations Manual ................................................................................... 4
    8.2.    Changes to Operations Manual ................................................................ 4

9. DEVELOPMENT ASSISTANCE .......................................................................... 4

    9.1.    Franchisor's Development Assistance ...................................................... 4
    9.2.    Responsibilities of Area Director ............................................................ 5

TABLE OF CONTENTS (Continued)

Page

10. OPERATING ASSISTANCE ........................................................................ 5

    10.1.   Franchisor's Assistance ................................................................ 5

11. FRANCHISEE'S OPERATIONAL COVENANTS ................................................ 5

    11.1.   Business Operations ................................................................... 5

12. ADVERTISING ...................................................................................... 6

    12.1.   Approval of Advertising ............................................................... 6
    12.2.   Grand Opening. ....................................................................... 7
    12.3.   Marketing and Promotion Fee ....................................................... 7
    12.4.   Local Advertising. .................................................................... 7
    12.5.   Regional Advertising Programs ..................................................... 7

13. QUALITY CONTROL ............................................................................. 8

    13.1.   Standards and Specifications ......................................................... 8
    13.2.   Inspections ............................................................................. 8
    13.3.   Restrictions on Services and Products .............................................. 8
    13.4.   Approved Suppliers .................................................................. 8
    13.5.   Request for Change of Supplier ..................................................... 8

14. MARKS, TRADE NAMES AND PROPRIETARY INTERESTS ................................ 8

    14.1.   Marks ................................................................................... 8
    14.2.   Licensed Methods .................................................................... 8
    14.3.   Trademark Infringement ............................................................. 9
    14.4.   Franchisee's Business Name ......................................................... 9
    14.5.   Change of Marks ..................................................................... 9

15. REPORTS, RECORDS AND FINANCIAL STATEMENTS ...................................... 9

    15.1.   Franchisee Reports ................................................................... 9
    15.2.   Financial Records Use and Access. ................................................. 9
    15.3.   Books and Records ................................................................... 9
    15.4.   Audit of Books and Records ......................................................... 9

16. TRANSFER .......................................................................................... 10

    16.1.   Transfer by Franchisee .............................................................. 10
    16.2.   Pre-Conditions to Franchisee's Transfer .......................................... 10
    16.3.   Franchisor's Approval of Transfer .................................................. 10
    16.4.   Right of First Refusal ................................................................ 10
    16.5.   Types of Transfers ................................................................... 10
    16.6.   Transfer by Franchisor ............................................................... 10
    16.7.   Franchisee's Death or Disability .................................................... 10

17. TERM AND RENEWAL ........................................................................... 11

    17.1.   Term .................................................................................... 11
    17.2.   Renewal ................................................................................ 11
    17.3.   Exercise of Renewal ................................................................. 11

TABLE OF CONTENTS (Continued)

Page

18. DEFAULT AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    18.1.   Termination by Franchisee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    18.2.   Termination by Franchisor - Effective Upon Notice . . . . . . . . . . . . . . . . 11
    18.3.   Termination by Franchisor - Thirty Days Notice . . . . . . . . . . . . . . . . . . 12
    18.4.   Failure to Comply with Reporting Requirements . . . . . . . . . . . . . . . . . 12
    18.5.   Right to Repurchase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    18.6.   Obligations of Franchisee Upon Termination or Expiration . . . . . . . . . . 13
    18.7.   State and Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

19. BUSINESS RELATIONSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    19.1.   Independent Businesspersons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    19.2.   Payment of Third Party Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    19.3.   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

20. RESTRICTIVE COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    20.1.   Non-Competition During Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    20.2.   "Branded Business" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    20.3.   Post-Termination Covenant Not to Compete . . . . . . . . . . . . . . . . . . . 15
    20.4.   Additional Remedies for Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    20.5.   Confidentiality of Proprietary Information . . . . . . . . . . . . . . . . . . . . . 15
    20.6.   Confidentiality Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21. DISPUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    21.1.   Governing Law/Consent to Venue and Jurisdiction. . . . . . . . . . . . . . . . 15
    21.2.   Waiver of Jury Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    21.3.   Remedies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

22. SECURITY INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    22.1.   Collateral. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    22.2.   Indebtedness Secured. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    22.3.   Additional Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    22.4.   Possession of Collateral. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    22.5.   Remedies of Franchisor in Event of Default. . . . . . . . . . . . . . . . . . . . . 16
    22.6.   Special Filing as Financing Statement. . . . . . . . . . . . . . . . . . . . . . . . . 17

23. MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    23.1.   Modification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.2.   Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.3.   Delegation by Franchisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.4.   Agreement Effective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.5.   Review of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.6.   Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.7.   Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.8.   No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.9.   No Right to Set Off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.10.  Invalidity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    23.11.  Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    23.12.  Acknowledgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

<u>EXHIBITS</u>

B-1    Addendum to Franchise Agreement

B-2    Addendum -- QUIZNO'S Classic Subs Express Facility

B-3    Addendum -- CHEEZE LOUISE Program

B-4    Addendum -- Special Products Program

B-5    Authorization Agreement for Prearranged Payments

B-6    Statement of Ownership

B-7    Guaranty and Assumption of Franchisee's Obligations

B-8    Addendum to Franchise Agreement -- Bookkeeping Services

THE QUIZNO'S CORPORATION

FRANCHISEE: __Training Pros, Inc.__

ADDRESS: c/o Mr. Christopher E. Bray
              7132 Pecan Creek Rd.
              Killeen, TX  76542

EFFECTIVE
DATE: _____5_____  __12__ , 19 __97__

THIS AGREEMENT (the "Agreement") is between **THE QUIZNO'S CORPORATION**, a Colorado corporation, located at Denver Place, Plaza Tower, 1099 18th Street, Suite 2850, Denver, Colorado  80202 ("Franchisor") and the franchisee listed above ("Franchisee"), who agree as follows:

## 1. PURPOSE

**1.1.**     Franchisor has developed methods for establishing, operating and promoting restaurants offering submarine sandwiches, salads, other food products and beverages and related restaurant and carry out services ("QUIZNO'S Restaurants" or  "Restaurants") which include the use and license of proprietary rights in certain valuable trade names, service marks and trademarks owned by Franchisor (the "Marks"), including the service mark "QUIZNO'S," and Franchisor's distinctive techniques, expertise and knowledge in the establishment, operation and promotion of restaurants and related licensed methods of doing business (the "Licensed Methods").

**1.2.**     Franchisor grants the right to others to establish and operate Restaurants, under the Marks and pursuant to the Licensed Methods.

**1.3.**     Franchisee recognizes and acknowledges the benefits to be derived from being identified and associated with Franchisor and being able to utilize the Restaurant system and concepts, and therefore desires to establish a Restaurant at a location identified herein or to be later identified. Franchisor is willing to grant Franchisee the right to operate a Restaurant under the terms and conditions which are contained in this Agreement.

## 2. GRANT OF FRANCHISE

**2.1.**     __Grant of Franchise.__  Franchisor grants to Franchisee, and Franchisee accepts from Franchisor, the right to use the Marks and Licensed Methods in connection with the establishment and operation of a Restaurant, at the location described in Section 3. Franchisee agrees to use the Marks and Licensed Methods, as they may be changed, improved, and further developed by Franchisor from time to time, only in accordance with the terms and conditions of this Agreement.

**2.2.**     __Scope of Franchise Operations.__  Franchisee agrees at all times to faithfully, honestly and diligently perform Franchisee's obligations hereunder, to use best efforts to promote its Restaurant and to not engage in any other business or activity that conflicts with the operation of the Restaurant in compliance with this Agreement. Franchisee agrees to utilize the Marks and Licensed Methods to operate all aspects of Franchisee's Restaurant in accordance with the methods and systems developed and prescribed from time to time by Franchisor, all of which are a part of the Licensed Methods. Franchisee's Restaurant shall offer all products and services designated by Franchisor, which may include, without limitation, restaurant services offered in conjunction with a distinctive theme and decor and a uniform menu offering specialty submarine and other sandwiches, salads and other food and beverages. Franchisee shall implement any additions and changes to the products and services offered by its Restaurant required by Franchisor.

## 3. FRANCHISED LOCATION AND DESIGNATED AREA

**3.1.**     __Franchised Location.__  Franchisee is granted the right to own and operate a Restaurant at the address and location ("Franchised Location") set forth in the Addendum attached as __Exhibit B-1__. If, at the time of execution of this Agreement, the Franchised Location has not been selected by Franchisee and approved by Franchisor, then Franchisee shall choose and acquire a location for its Restaurant within the nonexclusive Designated Area set forth in __Exhibit B-1__. In such circumstances, Franchisee shall select and propose to Franchisor for approval a specific site for the Franchised Location in the Designated Area which, which Franchisor shall have the right to approve in accordance with the terms set forth herein. During the term of this Agreement, the Franchised Location shall be used exclusively for the purpose of operating a Restaurant.

**3.2.**     __Limitation on Franchise Rights.__  The rights granted to Franchisee are for the specific Franchised Location and cannot be transferred to any other location, except with the prior written approval of Franchisor. The Marks and Licensed Methods are licensed to Franchisee for the operation of a Restaurant only at the Franchised Location. Franchisee may offer delivery and/or catering services from the Franchised Location only in the manner and within the geographic boundaries prescribed by Franchisor.

## 17. TERM AND RENEWAL

**17.1.** _Term._ The primary term of this Agreement is for a period of 15 years from the Effective Date, unless sooner terminated as provided herein.

**17.2.** _Renewal._ At the end of the primary term, Franchisee shall have the option to renew its franchise rights for an additional 15-year term, so long as Franchisee:

(a)     Has complied with all provisions of this Agreement during the primary term, including the payment on a timely basis of all Royalties and other fees. "Compliance" shall mean, at a minimum, that Franchisee has not received any written notification from Franchisor of breach hereunder more than four times during the primary term;

(b)     Is not in default or under notification of breach of this Agreement at the time it gives notice under Section 17.3;

(c)     Agrees to upgrade and remodel the Restaurant at Franchisee's sole expense (the necessity of which shall be at the sole discretion of Franchisor) to conform with the then-current Operations Manual;

(d)     Executes a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, employees and agents arising out of or relating to this Agreement; and

(e)     Executes the then-current form of Franchise Agreement, which agreement may contain terms materially different than those in this Agreement including terms changing the Royalty and other fee amounts; provided that Franchisee shall not be required to pay a new Initial Franchise Fee. For purposes of this Section, the renewed franchised rights shall constitute successor franchise rights.

**17.3.** _Exercise of Renewal._ Franchisee may exercise its option to renew by giving written notice of such exercise to Franchisor not more than one year nor less than 180 days prior to the expiration of the primary term. Franchisee must also pay a $1,000 renewal fee to Franchisor concurrently with the execution of the then-current Franchise Agreement, to cover Franchisor's expenses related to reviewing Franchisee's operations and approving the renewal. If Franchisee fails to comply with any of the conditions listed above (other than execution of the new Franchise Agreement or payment of the renewal fee), Franchisor shall give notice to that effect to Franchisee no later than 90 days before expiration of the primary term.

## 18. DEFAULT AND TERMINATION

**18.1.** _Termination by Franchisee._ Franchisee shall have the right to terminate this Agreement, if Franchisor materially fails to comply with this Agreement and fails to cure its default within 30 days after written notice of the default from Franchisee. Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot be reasonably cured within such 30-day period and Franchisor has commenced and is continuing to make good faith efforts to cure the breach during such 30-day period, Franchisor shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

**18.2.** _Termination by Franchisor - Effective Upon Notice._ Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee hereunder, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, where state law shall prevail), effective upon receipt of notice by Franchisee, upon the occurrence of any of the following events:

(a)     _Unauthorized Disclosure._ If Franchisee or any person under Franchisee's control intentionally or negligently discloses to any unauthorized person, or copies or reproduces, the contents of or any part of the Operations Manual or any other trade secrets or confidential information of Franchisor;

(b)     _Abandonment.._ If Franchisee ceases to operate the Restaurant or otherwise abandons the Restaurant for a period of 5 consecutive days, or any shorter period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire, flood, earthquake or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(c)     _Insolvency; Assignments._ If Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee under any insolvency, bankruptcy or reorganization act, (this provision may not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 et seq.), or if Franchisee makes an assignment for the benefit of creditors, or a receiver is appointed by Franchisee;

(d)     _Unsatisfied Judgments; Levy; Foreclosure._ If any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for 30 days or longer (unless a supersedeas or other appeal bond has been filed); or if execution is levied against Franchisee's business or any of the property used in the operation of the Restaurant and is not

discharged within 5 days; or if the real or personal property of Franchisee's business shall be sold after levy thereupon by any sheriff, marshall or constable;

       **(e)**    **Criminal Conviction.**  If Franchisee (or any of its shareholders, partners, or members) is convicted of a felony, a crime involving moral turpitude, or any crime or offense reasonably likely, in the sole opinion of Franchisor, to materially and unfavorably affect the nsed Methods, Marks, and the associated goodwill and reputation thereof;

       **(f)**    **Failure to Make Payments.**  If Franchisee fails to pay any amounts due Franchisor or affiliates within 10 days after receiving notice that such fees or amounts are overdue;

       **(g)**    **Financial Reporting.**  If Franchisee intentionally under reports Gross Sales in any amount, or negligently under reports Gross Sales by 5% or more during any reporting period.

       **(h)**    **Failure to Complete Training or Open.**  If Franchisee fails to complete the initial training program to Franchisor's satisfaction or to commence operations of the Restaurant within the time specified herein.

       **(i)**    **Misuse of Marks.**  If Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within 10 days after notification from Franchisor;

       **(j)**    **Repeated Noncompliance.**  If Franchisee has received three notices of material default from Franchisor within a 12-month period, regardless of whether the defaults were cured by Franchisee;

       **(k)**    **Right to Possession of Property.**  If Franchisee loses the right to occupy the Restaurant's premises because of a default under the Franchisee's lease, or defaults under any other agreement related to use or operation of the Restaurant; or

       **(l)**    **Unauthorized Transfer.**  If Franchisee sells, transfers or otherwise assigns the franchise, an interest in the franchise or Franchisee entity, this Agreement, the Restaurant or a substantial portion of the assets of the Restaurant owned by Franchisee without complying with the provisions of Section 16.

**18.3.**    **Termination by Franchisor - Thirty Days Notice.**  Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, where state law shall prevail), effective upon 30 days written notice to Franchisee, if Franchisee breaches any other ision of this Agreement, including but not limited to, if Franchisee fails to substantially comply with the Operations Manual, and fails to cure the default during such 30 day period.  In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the 30 day period.  Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot be reasonably cured within such 30 day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach during such 30 day period, Franchisee shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

**18.4.**    **Failure to Comply with Reporting Requirements.**  If Franchisee fails to prepare and submit any statement or report as required under Section 15, then Franchisor shall have the right to treat Franchisee's failure as good cause for termination of this Agreement.  In addition to all other remedies available to Franchisor, in the event that Franchisee fails to prepare and submit any statement or report required under Section 15 for two consecutive reporting periods, Franchisor shall be entitled to make an audit, at the expense of Franchisee, of Franchisee's books, records and accounts, including Franchisee's bank accounts, which in any way pertain to the Gross Sales of the Restaurant.  The statements or reports not previously submitted shall be prepared by or under the direction and supervision of an independent certified public accountant selected by Franchisor.

**18.5.**    **Right to Repurchase.**  Except in the case of a renewal under Section 17, upon termination or expiration of this Agreement for any reason, Franchisor shall have the option to purchase the Restaurant, or a portion of the assets of the Restaurant, which may include, at Franchisor's option, all of Franchisee's interest, leasehold or otherwise, in and to the real estate upon which the Restaurant is located, and all buildings and other improvements related thereto.  The purchase price for the assets to be transferred will be 30% of the Gross Sales of the Restaurant during the 12 calendar months immediately proceeding the date of termination or expiration, and will be adjusted by setting off any amount then owing by Franchisee to Franchisor, including any amounts paid by Franchisor to cure Franchisee's defaults with third parties such as landlords (the decision to pay such cure amounts to be in the sole and absolute discretion of Franchisor).  The following additional terms shall apply to Franchisor's exercise of this option:

       **(a)**    Franchisor's option hereunder shall be exercisable by providing Franchisee with written notice of its intention to exercise the option no later than the effective date of termination, in the case of termination (unless Franchisee terminates without notice or Franchisor terminates for cause, in which case Franchisor shall have 30 days after receipt of actual notice of the termination or such additional time as is nably necessary given the circumstances), or at least 30 days prior to the expiration of the term of the franchise, in circumstances where no successor franchise is granted.

(b)    In the event that Franchisee cannot assign its leasehold rights to Franchisor, then Franchisor may elect to have Franchisee enter into a sublease with Franchisor for the remainder of the lease on the same terms (including renewal options) as the prime lease, or in the event Franchisee owns the Franchised Location, Franchisor may, rather than purchasing the Franchised Location, elect to enter into a lease with Franchisee for a term of 10 years, with two five-year renewal options, in substantially the form of Sublease attached as Exhibit H to Franchisor's Uniform Franchise Offering Circular, except with respect to the term and except that: (i) the Sublease will be revised where appropriate to reflect Franchisee ,andlord and owner of the real property and Franchisor as Tenant; (ii) any reference to "Prime Lease" or "Prime Landlord" shall be deleted; (iii) Sections 3, 13, 14, 18, and 20(i) shall be deleted; (iv) Franchisor shall have the right to assign all rights and obligations to an affiliate or approved franchisee and shall thereafter not be obligated under the Sublease; and (v) base rent shall be based on fair market value of the premises at that time, as reasonably determined by Franchisor, taking into account similar type properties in similar locations in the state and county where the property is located, and shall thereafter increase 10% every fifth anniversary of the lease date.

(c)    Franchisor and Franchisee agree that the terms and conditions of this right and option to purchase may be recorded, if deemed appropriate by Franchisor, in the real property records and Franchisor and Franchisee further agree to execute such additional documentation as may be necessary and appropriate to effectuate such recording; and

(d)    The closing for the purchase of the Restaurant will take place no later than 60 days after written notice of Franchisor's exercise of its option is given to Franchisee. Franchisor has the unrestricted right to assign this option to purchase at any time prior to such closing. Franchisor will pay the purchase price in full at the closing, or, at its option, in 24 equal consecutive monthly installments with interest at a rate equal to the prime lending rate as of the closing at Denver Norwest Bank. Franchisee must sign all documents of transfer as are reasonably necessary for purchase of the Restaurant by Franchisor, which documents shall include all customary representations and warranties from Franchisee as to ownership, condition of and title to the assets of the Restaurant being transferred.

In the event that Franchisor does not exercise Franchisor's right to repurchase Franchisee's Restaurant as set forth above, Franchisee will be free to keep or to sell, after such termination or expiration, to any third party, all of the physical assets of its Restaurant; provided, however, that all appearances of the Marks are first removed in a manner approved in writing by Franchisor.

18.6.    **Obligations of Franchisee Upon Termination or Expiration.** Franchisee is obligated upon termination or expiration of this Agreement to immediately:

(a)    Pay Franchisor all Royalties, other fees, and any and all amounts or accounts payable then owed Franchisor or its affiliates ~~rsuant to this Agreement, or pursuant to any other agreement between the parties;

(b)    Cease to identify itself as a QUIZNO'S franchisee or use any Marks, trade secrets, signs, symbols, devices, trade names, or other materials of Franchisor;

(c)    Immediately cease to identify the Franchised Location as being, or having been, associated with Franchisor, and immediately cease using any proprietary mark of Franchisor or any mark in any way associated with the Marks and Licensed Methods;

(d)    Deliver to Franchisor all signs, sign-faces, advertising materials, forms and other materials bearing any of the Marks or otherwise identified with Franchisor and obtained by and in connection with this Agreement;

(e)    Immediately deliver to Franchisor the Operations Manual and all other information, documents and copies thereof which are proprietary to Franchisor;

(f)    Promptly take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to its use of any Marks which are under the exclusive control of Franchisor or, at the option of Franchisor, assign the same to Franchisor;

(g)    Notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer thereof to Franchisor or its designee. Franchisee acknowledges that, as between Franchisee and Franchisor, Franchisor has the sole rights to and interest in all telephone, telecopy or facsimile machine numbers and directory listings associated with any Mark. Franchisee authorizes Franchisor, and hereby appoints Franchisor and any of its officers as Franchisee's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any telephone, telecopy or facsimile machine numbers and directory listings relating to the Restaurant to Franchisor or its designee, should Franchisee fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive of Franchisor's exclusive rights in such telephone numbers and directory listings and Franchisor's authority to direct their transfer; and

(h)    Abide by all restrictive covenants set forth in Section 20 of this Agreement.

18.7.    **State and Federal Law.**  THE PARTIES ACKNOWLEDGE THAT IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN FRANCHISEE'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.

## 19. BUSINESS RELATIONSHIP

19.1.    **Independent Businesspersons.**  The parties agree that each of them are independent businesspersons, their only relationship is by virtue of this Agreement and that no fiduciary relationship is created hereunder.  Neither party is liable or responsible for the other's debts or obligations, nor shall either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business authorized by or conducted pursuant to this Agreement.  Franchisor and Franchisee agree that neither of them will hold themselves out to be the agent, employer or partner of the other and that neither of them has the authority to bind or incur liability on behalf of the other.

19.2.    **Payment of Third Party Obligations.**  Franchisor shall have no liability for Franchisee's obligations to pay any third parties, including without limitation, any product vendors, or any sales, use, service, occupation, excise, gross receipts, income, property or other tax levied upon Franchisee, Franchisee's property, the Restaurant or upon Franchisor in connection with the sales made or business conducted by Franchisee (except any taxes Franchisor is required by law to collect from Franchisee with respect to purchases from Franchisor).

19.3.    **Indemnification.**  Franchisee agrees to indemnify, defend and hold harmless Franchisor, its subsidiaries and affiliates, and their respective shareholders, directors, officers, employees, agents, successors and assignees, (the "Indemnified Parties") against, and to reimburse them for all claims, obligations and damages described in this Section 19.3, any and all third party obligations described in Section 19.2 and any and all claims and liabilities directly or indirectly arising out of the operation of the Restaurant or arising out of the use of the Marks and Licensed Methods in any manner not in accordance with this Agreement.  For purposes of this indemnification, claims shall mean and include all obligations, actual and consequential damages and costs reasonably incurred in the defense of any claim against the Indemnified Parties, including, without limitation, reasonable accountants', attorneys' and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses and travel and living expenses.  Franchisor shall have the right to defend any such claim against it.  This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 20. RESTRICTIVE COVENANTS

20.1.    **Non-Competition During Term.**  Franchisee acknowledges that, in addition to the license of the Marks hereunder, Franchisor also licensed commercially valuable information which comprises and is a part of the Licensed Methods, including without limitation operations, marketing, advertising and related information and materials, and that the value of this information derives not only from the time, effort and money which went into its compilation, but from the its usage by all franchisees of Franchisor using the Marks and Licensed Methods.  Franchisee therefore agrees that other than the Restaurant licensed herein, neither Franchisee nor any of Franchisee's officers, directors, shareholders or partners, nor any spouse of Franchisee or any of these individuals ("Bound Parties"), shall during the term of this Agreement:

(a)    have any direct or indirect controlling interest as a disclosed or beneficial owner in a "Competitive Business" as defined below;

(b)    perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business; or

(c)    divert or attempt to divert any business related to, or any customer or account of the Restaurant, Franchisor's business or any other QUIZNO'S franchisee's business, by direct inducement or otherwise, or diverting or attempting to divert the employment of any employee of Franchisor or another franchisee licensed by Franchisor to use the Marks and Licensed Methods, to any Competitive Business by any direct inducement or otherwise.

The term "Competitive Business" as used in this Agreement shall mean any business operating, or granting franchises or licenses to others to operate, a restaurant or other food service business deriving more than 10% of its gross receipts, excluding gross receipts relating to the sale of alcoholic beverages, from the sale of submarine, hoagie, hero-type and/or deli-style sandwiches; provided, however, neither Franchisee nor the Bound Parties shall be prohibited from owning securities in a Competitive Business if such securities are listed on a stock exchange or traded on the over-the-counter market and represent 5% or less of that class of securities issued and outstanding.  Franchisee agrees that nothing in this Section 20 shall be construed to grant Franchisee any protected territory.

20.2.    **"Branded Business".**  During the term of this Agreement, neither Franchisee nor any other Bound Party will operate, directly indirectly, any Branded Business within a ¼ mile radius of the Restaurant without the written consent of Franchisor, which consent shall not be unreasonably withheld.  The term "Branded Business" is defined as any business marketed by a franchisor or chain under a locally, regionally, or nationally known or registered trademark or service mark.

20.3.    **Post-Termination Covenant Not to Compete.**  For a period of two years from termination or expiration of this Agreement for any reason, or the date on which Franchisee ceases to conduct business, whichever is later, neither Franchisee nor any Bound Party shall have any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity in any Competitive Business located or operating within a five-mile radius of the former Franchised Location or within a five-mile radius of any other QUIZNO'S franchised or company-owned restaurant.  The restrictions of this Section shall not be applicable to the nership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent 5% or less of the number of shares of that class of securities issued and outstanding.  Franchisee and the Bound Parties expressly acknowledge that they possess skills and abilities of a general nature and have other opportunities for exploiting such skills.  Consequently, enforcement of the covenants made in this Section will not deprive them of their personal goodwill or ability to earn a living.

20.4.    **Additional Remedies for Breach.**  In addition to any other remedies or damages allowed hereunder, if Franchisee breaches the covenants set forth in Sections 20.1, 20.2, or 20.3, Franchisee shall pay Franchisor a fee equal to Franchisor's then-current initial Franchise Fee for each Competitive Business or Branded Business opened in violation of the covenants, and eight percent of such Business' gross sales until expiration of the noncompetition period set forth in Section 20.3.

20.5.    **Confidentiality of Proprietary Information.**  Franchisee shall treat all information it receives which comprises or is a part of the Licensed Methods licensed hereunder (including without limitation the Operations Manual) as proprietary and confidential and will not use such information in an unauthorized manner or disclose the same to any unauthorized person without first obtaining Franchisor's written consent. Franchisee agrees that all such material is the sole property of Franchisor.  Franchisee acknowledges that the Marks and the Licensed Methods have valuable goodwill attached to them, that the protection and maintenance thereof is essential to Franchisor and that any unauthorized use or disclosure of the Marks and Licensed Methods will result in irreparable harm to Franchisor.

20.6.    **Confidentiality Agreement.**  Franchisor reserves the right to require that Franchisee cause each of its officers, directors, partners, shareholders, and Designated Manager, and, if applicable, the spouse of Franchisee and any of these named individuals, to execute a Nondisclosure and Noncompetition Agreement containing the above restrictions, in a form approved by Franchisor.

## 21. DISPUTES

21.1.    **Governing Law/Consent to Venue and Jurisdiction.**  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other federal law, this Agreement shall be interpreted under the laws of the State of Colorado d any dispute between the parties shall be governed by and determined in accordance with the substantive laws of the State of Colorado, which vs shall prevail in the event of any conflict of law.  The Franchisee and the Franchisor have negotiated regarding a forum in which to resolve any disputes which may arise between them and have agreed to select a forum in order to promote stability in their relationship.  Therefore, if a claim is asserted in any legal proceeding involving the Franchisee or any Bound Party and the Franchisor, the parties agree that the exclusive venue for disputes between them shall be in the District Court for the City & County of Denver, Colorado, or the United States District Court for the District of Colorado, and the parties each waive any objection they may have to the personal jurisdiction of or venue in such courts.

21.2.    **Waiver of Jury Trial.**  Franchisor, Franchisee and the Bound Parties each waive their right to a trial by jury.  Franchisee and Franchisor acknowledge that the parties' waiver of jury rights provides the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the parties' relationship created by this Agreement.  Franchisee and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

21.3.    **Remedies.**  Except as set forth in Section 21.4, the court will have the right to award any relief which it deems proper in the circumstances, including without limitation money damages (with interest on unpaid amounts from the date due), lost profits, specific performance, injunctive relief and attorneys' fees and costs.  The parties agree that any claim for lost earnings or profits by Franchisee shall be limited to a maximum amount equal to the net profits of the Restaurant for the prior year as shown on Franchisee's federal income tax return.  The parties further agree that, in addition to such other damages as may be awarded by the court, if this Agreement is terminated because of a Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the Royalties and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for the Franchisee's default.  Royalties and Marketing and Promotion Fees for purposes of this Section shall be calculated based on the Restaurant's average monthly Gross Sales for the prior year.

21.4.    **Limitation of Claims.**  Franchisee and the Bound Parties agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid.  Any claims between the parties must be commenced within one year from the occurrence of the facts giving rise to such claim, or such claim shall be barred.  The parties understand that such time limit may be shorter than otherwise allowed by law.  Franchisee agrees that its sole recourse for claims arising between the parties shall be against Franchisor or its successors and assigns.  Franchisee agrees that the shareholders, directors, officers, and employees and agents of the Franchisor and its affiliates shall not be personally liable nor named as a party ny action between the Franchisor and Franchisee; provided that this shall not preclude claims Franchisee may have directly against an Area Director.  Franchisor and Franchisee further agree that, in connection with any such proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to

which it relates. Any such claim which is not submitted or filed as described above will be forever barred. Franchisor and Franchisee agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that a proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with any other proceeding between Franchisor and any other person or entity. No party will be entitled to an award of punitive or exemplary damages (provided that this limitation shall not apply to statutory penalties such as those set forth in 15 U.S.C. § 1117(a)). No previous course of dealing shall be admissible to explain, modify, or contradict the terms of this Agreement. No implied covenant of good and fair dealing shall be used to alter the express terms of this Agreement.

## 22. SECURITY INTEREST

22.1.    **Collateral.** Franchisee hereby grants Franchisor a security interest ("Security Interest") in all of the furniture, fixtures, equipment, signage, and realty (including Franchisee's interests under all real property and personal property leases) and together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds and products thereof, wherever located and used in connection with the Restaurant. All items in which a security interest is granted hereby are referred to as the "Collateral."

22.2.    **Indebtedness Secured.** The Security Interest is to secure payment of the following (the "Indebtedness"):

(a)    All amounts due under this Agreement including without limitation Royalty Fees and Marketing and Promotion Fees, together with interest, fees and other charges provided for herein;

(b)    All sums which Franchisor may, at its option, expend or advance for the maintenance, preservation and protection of the Collateral, including without limitation, payment of rent, taxes, levies, assessments, insurance premiums and discharge of liens, together with interest thereon, or in any other property given as security for payment of the Indebtedness;

(c)    All expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with collection of any or all Indebtedness secured hereby or in enforcement or protection of its rights hereunder;

(d)    All other present or future, direct or indirect, absolute or contingent, liabilities, obligations and indebtedness of Franchisee to Franchisor or third-parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement whether or not Franchisee executes any extension agreement or renewal instruments.

22.3.    **Additional Documents.** Franchisee will from time to time as required by Franchisor join with Franchisor in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions or modifications thereof) in form satisfactory to Franchisor.

22.4.    **Possession of Collateral.** Upon default and termination of Franchisee's rights hereunder, Franchisor shall have the immediate right to possession and use of the Collateral.

22.5.    **Remedies of Franchisor in Event of Default.** Franchisee agrees that upon the occurrence of any default set forth above, the full amount remaining unpaid on the Indebtedness secured hereby shall, at the option of Franchisor and without notice, be and become due and payable forthwith, and Franchisor shall then have the rights, options, duties and remedies of a secured party under, and Franchisee shall have the rights and duties of a debtor under, the Uniform Commercial Code of Colorado, including without limitation Franchisor's right to take possession of the Collateral and of anything found therein, and the right without legal process to enter any premises where the Collateral may be found. Any sale of the Collateral may be conducted in the Franchisor's sole discretion, and the conduct of such sale is agreed to be commercially reasonable. Reasonable notification of the time and place of any sale shall be satisfied by mailing to Franchisee pursuant to the notice provisions set forth below.

22.6.    **Special Filing as Financing Statement.** This Agreement shall be a deemed a Security Agreement and a Financing Statement. This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated, and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code, as in effect in the appropriate jurisdiction.

## 23. MISCELLANEOUS PROVISIONS

23.1.    **Modification.** No amendment, waiver or modification of this Agreement shall be effective unless it is in writing and signed by the Franchisor and Franchisee. Franchisee acknowledges that Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent in which Franchisor, in its sole discretion, deems necessary to protect, promote, or improve the Marks and the quality of the Licensed Methods, but under no circumstances will such modifications ade arbitrarily without such determination.

**23.2.    Entire Agreement.** This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements concerning the subject matter hereof. Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution hereof or for claims of negligent or fraudulent misrepresentation and that no modifications of this Agreement shall be effective except those in writing and signed

by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor regarding projected sales volumes, market potential, revenues, profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives.

**23.3.    Delegation by Franchisor.** From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties hereunder to third parties, whether the same are agents of Franchisor or Area Directors or independent contractors which Franchisor has contracted with to provide such services. Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations hereunder. Franchisee acknowledges and agrees that Franchisor may not be bound and this Agreement may not be modified by any Area Director without Franchisor's prior written consent. Franchisee acknowledges and agrees that any such delegation of Franchisor's duties and obligations to Area Directors does not assign or confer any rights under this Agreement upon Area Directors and that Area Directors are not third party beneficiaries of this Agreement.

**23.4.    Agreement Effective.** This Agreement shall not be effective until accepted by Franchisor as evidenced by dating and signing by an officer of Franchisor.

**23.5.    Review of Agreement.** Franchisee acknowledges it had a copy of Franchisor's Uniform Franchise Offering Circular in its possession for not less than 10 full business days, and this Agreement in its possession for not less than 5 full business days, during which time Franchisee has had the opportunity to submit same for professional review and advice of Franchisee's choosing prior to freely executing this Agreement.

**23.6.    Attorneys' Fees.** In the event of any default on the part of either party to this Agreement, in addition to all other remedies, the party in default will pay the aggrieved party all amounts due and all damages, costs and expenses, including reasonable attorneys' fees, incurred by the aggrieved party in any legal action or other proceeding as a result of such default, plus interest at the lesser of 2% per month or the highest rate allowable by law, accruing from the date of such default. Additionally, if Franchisee withholds any amounts due Franchisor, Franchisee shall reimburse Franchisor's costs of collecting such amounts including reasonable attorney fees and expenses.

**23.7.    Injunctive Relief.** Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief to prevent irreparable harm, in addition to all other remedies.

**23.8.    No Waiver.** No waiver of any condition or covenant contained in this Agreement or failure to exercise a right or remedy by Franchisor or Franchisee shall be considered to imply or constitute a further waiver by Franchisor or Franchisee of the same or any other condition, covenant, right, or remedy.

**23.9.    No Right to Set Off.** Franchisee shall not be allowed to set off amounts owed to Franchisor for Royalties, fees or other amounts due hereunder, against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

**23.10.    Invalidity.** If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element and, as so modified, such provision shall be deemed a part of this Agreement as though originally included. The remaining provisions of this Agreement shall not be affected by such modification.

**23.11.    Notices.** All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by an overnight delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement or at such other addresses as Franchisor or Franchisee may designate from time to time, and shall be effectively given when deposited in the United States mails, postage prepaid, or when received via overnight delivery, as may be applicable.

**23.12.    Acknowledgment.** BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL. FRANCHISEE ACKNOWLEDGES THAT:

(A)    THE SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED HEREIN INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

(B)    NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND

(C)    NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT, AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above set forth.

THE QUIZNO'S CORPORATION

By: _____

Its: ___ **VICE PRESIDENT/GENERAL COUNSEL**

Date: ___ 5/12/97 _____

**FRANCHISEE:**

_____

Individually

Date:_____

OR:

(if a corporation, limited liability company,  or partnership)

___ Training Pros, Inc. _____
Company Name

By: ___ Christopher E Bray _____
              Christopher E. Bray

Its:___ President _____

Date:___ April 30, 1997 _____

(4/1/97)

Exhibit B

THE QUIZNO'S CORPORATION

FRANCHISE AGREEMENT

Franchisee: **Training Pros, Inc.**

Date: *10/7/98*

Franchised Location: **Willow Springs Dr.**
**Killeen, TX**

THE QUIZNO'S CORPORATION
FRANCHISE AGREEMENT
TABLE OF CONTENTS

Page

1. PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. GRANT OF FRANCHISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      2.1.    Grant of Franchise . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      2.2.    Scope of Franchise Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3. FRANCHISED LOCATION AND DESIGNATED AREA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      3.1.    Franchised Location . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      3.2.    Limitation on Franchise Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      3.3.    Express Restaurants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      3.4.    Territorial Development Program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      3.5.    Special Products. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      3.6.    Franchisor's Reservation of Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4. INITIAL FRANCHISE FEE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      4.1.    Initial Franchise Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

5. ROYALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      5.1.    Royalty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      5.2.    Gross Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      5.3.    Royalty Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      5.4.    Application of Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6. DEVELOPMENT OF FRANCHISED LOCATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.1.    Approval of Franchised Location. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.2.    Lease Approval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.3.    Lease Assistance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.4.    Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.5.    Conversion and Design . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.6.    Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.7.    Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      6.8.    Permits and Licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      6.9.    Commencement of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7. TRAINING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      7.1.    Initial Training Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      7.2.    Additional Training Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8. OPERATIONS MANUAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      8.1.    Operations Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      8.2.    Changes to Operations Manual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9. DEVELOPMENT ASSISTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      9.1.    Franchisor's Development Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      9.2.    Responsibilities of Area Director . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10. OPERATING ASSISTANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      10.1.    Franchisor's Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11. FRANCHISEE'S OPERATIONAL COVENANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
      11.1.    Business Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12. ADVERTISING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TABLE OF CONTENTS (Continued)

Page

12.1.   Approval of Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
12.2.   Grand Opening. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
12.3.   Marketing and Promotion Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
12.4.   Local Advertising. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
12.5.   Regional Advertising Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13.  QUALITY CONTROL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
13.1.   Standards and Specifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
13.2.   Inspections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
13.3.   Restrictions on Services and Products . . . . . . . . . . . . . . . . . . . . . . . . . . 8
13.4.   Approved Suppliers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
13.5.   Request for Change of Supplier . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14.  MARKS, TRADE NAMES AND PROPRIETARY INTERESTS . . . . . . . . . . . . 9
14.1.   Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
14.2.   Licensed Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
14.3.   Trademark Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
14.4.   Franchisee's Business Name . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
14.5.   Change of Marks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

15.  REPORTS, RECORDS AND FINANCIAL STATEMENTS . . . . . . . . . . . . . . . 9
15.1.   Franchisee Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
15.2.   Financial Records Use and Access. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
15.3.   Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
15.4.   Audit of Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

16.  TRANSFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16.1.   Transfer by Franchisee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16.2.   Pre-Conditions to Franchisee's Transfer . . . . . . . . . . . . . . . . . . . . . . . . 1
16.3.   Franchisor's Approval of Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16.4.   Right of First Refusal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16.5.   Types of Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16.6.   Transfer by Franchisor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16.7.   Franchisee's Death or Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

17.  TERM AND RENEWAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
17.1.   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
17.2.   Renewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
17.3.   Exercise of Renewal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18.  DEFAULT AND TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18.1.   Termination by Franchisee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18.2.   Termination by Franchisor - Effective Upon Notice . . . . . . . . . . . . . . . . 1
18.3.   Termination by Franchisor - Thirty Days Notice . . . . . . . . . . . . . . . . . . 1
18.4.   Late Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18.5.   Failure to Comply with Reporting Requirements . . . . . . . . . . . . . . . . . . 1
18.6.   Right to Repurchase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18.7.   Obligations of Franchisee Upon Termination or Expiration . . . . . . . . . . 1
18.8.   State and Federal Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

19.  BUSINESS RELATIONSHIP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
19.1.   Independent Businesspersons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
19.2.   Payment of Third Party Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
19.3.   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

TABLE OF CONTENTS (Continued)

Page

| 0. RESTRICTIVE COVENANTS | 15 |
| 20.1. Non-Competition During Term | 15 |
| 20.2. "Branded Business" | 16 |
| 20.3. Post-Termination Covenant Not to Compete | 16 |
| 20.4. Additional Remedies for Breach | 16 |
| 20.5. Confidentiality of Proprietary Information | 16 |
| 20.6. Confidentiality Agreement | 16 |

| 21. DISPUTES | 16 |
| 21.1. Governing Law/Consent to Venue and Jurisdiction. | 16 |
| 21.2. Waiver of Jury Trial. | 16 |
| 21.3. Remedies. | 16 |
| 21.4. Limitation of Claims | 17 |

| 22. SECURITY INTEREST | 17 |
| 22.1. Collateral. | 17 |
| 22.2. Indebtedness Secured. | 17 |
| 22.3. Additional Documents. | 17 |
| 22.4. Possession of Collateral. | 17 |
| 22.5. Remedies of Franchisor in Event of Default. | 17 |
| 22.6. Special Filing as Financing Statement. | 18 |

| 23. MISCELLANEOUS PROVISIONS | 18 |
| 23.1. Modification | 18 |
| 23.2. Entire Agreement | 18 |
| 23.3. Delegation by Franchisor | 18 |
| 23.4. Agreement Effective | 18 |
| 23.5. Review of Agreement | 18 |
| 23.6. Attorneys' Fees | 18 |
| 23.7. Injunctive Relief | 18 |
| 23.8. No Waiver | 18 |
| 23.9. No Right to Set Off | 19 |
| 23.10. Invalidity | 19 |
| 23.11. Notices | 19 |
| 23.12. Acknowledgment | 19 |

FRANCHISEE:  **Training Pros, Inc.**

ADDRESS:     c/o Christopher E. Bray
             7132 Pecan Creek Rd.
             Killeen, TX   76542

EFFECTIVE
DATE:        _____ /0   7 , 19 98

THIS AGREEMENT (the "Agreement") is between THE QUIZNO'S CORPORATION, a Colorado corporation, located at Denver Place, Plaza Tower, 1099 18th Street, Suite 2850, Denver, Colorado 80202 ("Franchisor") and the franchisee listed above ("Franchisee"), who agree as follows:

## 1. PURPOSE

1.1.    Franchisor has developed methods for establishing, operating and promoting restaurants offering submarine sandwiches, salads, other food products and beverages and related restaurant and carry out services ("QUIZNO'S Restaurants" or "Restaurants") which include the use and license of proprietary rights in certain valuable trade names, service marks and trademarks owned by Franchisor (the "Marks"), including the service mark "QUIZNO'S," and Franchisor's distinctive techniques, expertise and knowledge in the establishment, operation and promotion of restaurants and related licensed methods of doing business (the "Licensed Methods").

1.2.    Franchisor grants the right to others to establish and operate Restaurants, under the Marks and pursuant to the Licensed Methods.

1.3.    Franchisee recognizes and acknowledges the benefits to be derived from being identified and associated with Franchisor and being able to utilize the Restaurant system and concepts, and therefore desires to establish a Restaurant at a location identified herein or to be later identified. Franchisor is willing to grant Franchisee the right to operate a Restaurant under the terms and conditions which are contained in this Agreement.

## 2. GRANT OF FRANCHISE

2.1.    <u>Grant of Franchise</u>.  Franchisor grants to Franchisee, and Franchisee accepts from Franchisor, the right to use the Marks and Licensed Methods in connection with the establishment and operation of a Restaurant, at the location described in Section 3. Franchisee agrees to use the Marks and Licensed Methods, as they may be changed, improved, and further developed by Franchisor from time to time only in accordance with the terms and conditions of this Agreement.

2.2.    <u>Scope of Franchise Operations</u>.  Franchisee agrees at all times to faithfully, honestly and diligently perform Franchisee's obligations hereunder, to use best efforts to promote its Restaurant and to not engage in any other business or activity that conflicts with the operation of the Restaurant in compliance with this Agreement. Franchisee agrees to utilize the Marks and Licensed Methods to operate all aspects of Franchisee's Restaurant in accordance with the methods and systems developed and prescribed from time to time by Franchisor all of which are a part of the Licensed Methods. Franchisee's Restaurant shall offer all products and services designated by Franchisor which may include, without limitation, restaurant services offered in conjunction with a distinctive theme and decor and a uniform menu offering specialty submarine and other sandwiches, salads and other food and beverages. Franchisee shall implement any additions and changes to the products and services offered by its Restaurant required by Franchisor.

## 3. FRANCHISED LOCATION AND DESIGNATED AREA

3.1.    <u>Franchised Location</u>.  Franchisee is granted the right to own and operate a Restaurant at the address and location ("Franchised Location") set forth in the Addendum attached as <u>Exhibit B-1</u>. If, at the time of execution of this Agreement, the Franchised Location has not been selected by Franchisee and approved by Franchisor, then Franchisee shall choose and acquire a location for its Restaurant within the nonexclusive Designated Area set forth in <u>Exhibit B-1</u>. In such circumstances, Franchisee shall select and propose to Franchisor for approval a specific site for the Franchised Location in the Designated Area which, which Franchisor shall have the right to approve in accordance with the terms set forth herein. During the term of this Agreement, the Franchised Location shall be used exclusively for the purpose of operating a Restaurant.

(d)    Executes a general release, in a form satisfactory to Franchisor and its affiliates, and their respective officers, directors, employees and agents arising out of or relating to this Agreement; and

(e)    Executes the then-current form of Franchise Agreement, which agreement may contain terms materially different than those in this Agreement including terms changing the Royalty and other fee amounts; provided that Franchisee shall not be required to pay a new Initial Franchise Fee. For purposes of this Section, the renewed franchised rights shall constitute successor franchise rights.

17.3.    <u>Exercise of Renewal</u>. Franchisee may exercise its option to renew by giving written notice of such exercise to Franchisor not more than one year nor less than 180 days prior to the expiration of the primary term. Franchisee must also pay a $1,000 renewal fee to Franchisor concurrently with the execution of the then-current Franchise Agreement, to cover Franchisor's expenses related to reviewing Franchisee's operations and approving the renewal. If Franchisee fails to comply with any of the conditions listed above (other than execution of the new Franchise Agreement or payment of the renewal fee), Franchisor shall give notice to that effect to Franchisee no later than 90 days before expiration of the primary term.

## 18. DEFAULT AND TERMINATION

18.1.    <u>Termination by Franchisee</u>. Franchisee shall have the right to terminate this Agreement, if Franchisor materially fails to comply with this Agreement and fails to cure its default within 30 days after written notice of the default from Franchisee. Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot be reasonably cured within such 30-day period, and Franchisor has commenced and is continuing to make good faith efforts to cure the breach during such 30-day period, Franchisor shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

18.2.    <u>Termination by Franchisor - Effective Upon Notice</u>. Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee hereunder, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, where state law shall prevail), effective upon receipt of notice by Franchisee, upon the occurrence of any of the following events:

(a)    <u>Unauthorized Disclosure</u>. If Franchisee or any person under Franchisee's control intentionally or negligently discloses to any unauthorized person, or copies or reproduces, the contents of or any part of the Operations Manual or any other trade secret or confidential information of Franchisor;

(b)    <u>Fraud or Conduct Effecting the Marks</u>. If Franchisee commits fraud in connection with the purchase or operation of the Restaurant or otherwise engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill associated with the Marks;

(c)    <u>Abandonment</u>. If Franchisee ceases to operate the Restaurant or otherwise abandons the Restaurant for a period of 5 consecutive days, or any shorter period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire, flood, earthquake or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(d)    <u>Insolvency; Assignments</u>. If Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee under any insolvency, bankruptcy or reorganization act, (this provision may not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 <u>et seq.</u>), or if Franchisee makes an assignment for the benefit of creditors, or a receiver is appointed by Franchisee;

(e)    <u>Unsatisfied Judgments; Levy; Foreclosure</u>. If any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for 30 days or longer (unless a supersedeas or other appeal bond has been filed); or if execution is levied against Franchisee's business or any of the property used in the operation of the Restaurant and is not discharged within 5 days; or if the real or personal property of Franchisee's business shall be sold after levy thereupon by any sheriff, marshall or constable;

(f)    <u>Criminal Conviction</u>. If Franchisee (or any of its shareholders, partners, or members) is convicted of a felony, a crime involving moral turpitude, or any crime or offense reasonably likely, in the sole opinion of Franchisor, to materially and unfavorably affect the Licensed Methods, Marks, and the associated goodwill and reputation thereof;

(g)    <u>Failure to Make Payments</u>. If Franchisee fails to pay any amounts due Franchisor or affiliates within 10 days after receiving notice that such fees or amounts are overdue;

(h)    <u>Financial Reporting</u>. If Franchisee intentionally under reports Gross Sales in any amount, or negligently under reports Gross Sales by 5% or more during any reporting period;

(i)    <u>Failure to Complete Training or Open</u>. If Franchisee fails to complete the initial training program to Franchisor's satisfaction or to commence operations of the Restaurant within the time specified herein;

(j)    <u>Misuse of Marks</u>. If Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within 10 days after notification from Franchisor;

(k)    <u>Repeated Noncompliance</u>. If Franchisee has received three notices of default from Franchisor within a 12-month period, regardless of whether the defaults were cured by Franchisee;

(l)    <u>Right to Possession of Property</u>. If Franchisee loses the right to occupy the Restaurant's premises because of a default under the Franchisee's lease or Sublease, or defaults under any other agreement related to use or operation of the Restaurant; or

(m)    <u>Unauthorized Transfer</u>. If Franchisee sells, transfers or otherwise assigns the franchise, an interest in the franchise or Franchisee entity, this Agreement, the Restaurant or a substantial portion of the assets of the Restaurant owned by Franchisee without complying with the provisions of Section 16.

18.3.    <u>Termination by Franchisor - Thirty Days Notice</u>. Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, where state law shall prevail), effective upon 30 days written notice to Franchisee, if Franchisee breaches any other provision of this Agreement, including but not limited to, if Franchisee fails to substantially comply with the Operations Manual, and fails to cure the default during such 30 day period. In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the 30 day period. Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot be reasonably cured within such 30 day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach during such 30 day period, Franchisee shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

18.4.    <u>Late Fee</u>. In addition to its other rights and remedies hereunder, Franchisor may charge Franchisee a late fee of $100 per violation by Franchisee of any term or condition of this Agreement, including without limitation failure to pay (or to have adequate amounts available for electronic transfer for) amounts owed Franchisor, or failure to timely provide required reports. This fee may be changed or eliminated by Franchisor, in its sole discretion, in the future.

18.5.    <u>Failure to Comply with Reporting Requirements</u>. If Franchisee fails to prepare and submit any statement or report as required under Section 15, then Franchisor shall have the right to treat Franchisee's failure as good cause for termination of this Agreement. In addition to all other remedies available to Franchisor, in the event that Franchisee fails to prepare and submit any statement or report required under Section 15 for two consecutive reporting periods, Franchisor shall be entitled to make an audit, at the expense of Franchisee, of Franchisee's books, records and accounts, including Franchisee's bank accounts, which in any way pertain to the Gross Sales of the Restaurant. The statements or reports not previously submitted shall be prepared by or under the direction and supervision of an independent certified public accountant selected by Franchisor. In addition to its other rights and remedies, if Franchisee fails to comply with the reporting requirements under Section 15, Franchisor shall have the right to collect, in addition to the late fee, $500 per week for Royalty payments and $100 per week for advertising payment (or a greater amount if Franchisor reasonably estimates that the Restaurant is generating higher Gross Sales), provided that any amounts will be reconciled and adjusted as needed when Franchisor receives actual Gross Sales amounts.

18.6.    <u>Right to Repurchase</u>. Except in the case of a renewal under Section 17, upon termination or expiration of this Agreement for any reason, Franchisor shall have the option to purchase the Restaurant, or a portion of the assets of the Restaurant, which may include, at Franchisor's option, all of Franchisee's interest, leasehold or otherwise, in and to the real estate upon which the Restaurant is located, and all buildings and other improvements related thereto. The purchase price for the assets to be transferred will be 30% of the Gross Sales of the Restaurant during the 12 calendar months immediately proceeding the date of termination or expiration, and will be adjusted by setting off any amount then owing by Franchisee to Franchisor, including any amounts paid by Franchisor to cure Franchisee's defaults with third parties such as landlords (the decision to pay such cure amounts to be in the sole and absolute discretion of Franchisor). The following additional terms shall apply to Franchisor's exercise of this option:

(a)    Franchisor's option hereunder shall be exercisable by providing Franchisee with written notice of its intention to exercise the option no later than the effective date of termination, in the case of termination (unless Franchisee terminates without notice or Franchisor terminates for cause, in which case Franchisor shall have 30 days after receipt of actual notice of the termination or such additional time as is reasonably necessary given the circumstances), or at least 30 days prior to the expiration of the term of the franchise, in circumstances where no successor franchise is granted;

-13-

(b)     Franchisor and Franchisee agree that the terms and conditions of this right and option to purchase may be recorded if deemed appropriate by Franchisor, in the real property records and Franchisor and Franchisee further agree to execute such additional documentation as may be necessary and appropriate to effectuate such recording; and

(c)     The closing for the purchase of the Restaurant will take place no later than 60 days after written notice of Franchisor's exercise of its option is given to Franchisee. Franchisor has the unrestricted right to assign this option to purchase at any time prior to such closing. Franchisor will pay the purchase price in full at the closing, or, at its option, in 24 equal consecutive monthly installments with interest at a rate equal to the prime lending rate as of the closing at Franchisor's primary bank. Franchisee must sign all documents of transfer as are reasonably necessary for purchase of the Restaurant by Franchisor, which documents shall include all customary representations and warranties from Franchisee as to ownership, condition of and title to the assets of the Restaurant being transferred.

In the event that Franchisor does not exercise Franchisor's right to repurchase Franchisee's Restaurant as set forth above, Franchisee will be free to keep or to sell, after such termination or expiration, to any third party, all of the physical assets of its Restaurant, provided, however, that all appearances of the Marks are first removed in a manner approved in writing by Franchisor.

18.7.    Obligations of Franchisee Upon Termination or Expiration. Franchisee is obligated upon termination or expiration of this Agreement to immediately:

(a)     Pay Franchisor all Royalties, other fees, and any and all amounts or accounts payable then owed Franchisor or its affiliates pursuant to this Agreement, or pursuant to any other agreement between the parties;

(b)     Cease to identify itself as a QUIZNO'S franchisee or use any Marks, trade secrets, signs, symbols, devices, trade names, or other materials of Franchisor;

(c)     Immediately cease to identify the Franchised Location as being, or having been, associated with Franchisor and immediately cease using any proprietary mark of Franchisor or any mark in any way associated with the Marks and Licensed Methods;

(d)     Deliver to Franchisor all signs, sign-faces, advertising materials, forms and other materials bearing any of the Marks or otherwise identified with Franchisor and obtained by and in connection with this Agreement;

(e)     Immediately deliver to Franchisor the Operations Manual and all other information, documents and copies thereof which are proprietary to Franchisor;

(f)     Promptly take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to its use of any Marks which are under the exclusive control of Franchisor or, at the option of Franchisor, assign the same to Franchisor;

(g)     Notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use any telephone number and any regular, classified or other telephone directory listings associated with any Mark and to authorize transfer thereof to Franchisor or its designee. Franchisee acknowledges that, as between Franchisee and Franchisor, Franchisor has the sole rights to and interest in all telephone, telecopy or facsimile machine numbers and directory listings associated with any Mark. Franchisee authorizes Franchisor, and hereby appoints Franchisor and any of its officers as Franchisee's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any telephone, telecopy or facsimile machine numbers and directory listings relating to the Restaurant to Franchisor or its designee, should Franchisee fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive of Franchisor's exclusive rights in such telephone numbers and directory listings and Franchisor's authority to direct their transfer; and

(h)     Abide by all restrictive covenants set forth in Section 20 of this Agreement.

18.8.    State and Federal Law. THE PARTIES ACKNOWLEDGE THAT IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN FRANCHISEE'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.

## 19.  BUSINESS RELATIONSHIP

19.1.    Independent Businesspersons. The parties agree that each of them are independent businesspersons, their only relationship is by virtue of this Agreement and that no fiduciary relationship is created hereunder. Neither party is liable or responsible for the other's

20.3.    Post-Termination Covenant Not to Compete. For a period of two years from termination or expiration of this Agreement for any reason, or the date on which Franchisee ceases to conduct business, whichever is later, neither Franchisee nor any Bound Party shall have any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity in any Competitive Business located or operating within a five-mile radius of the former Franchised Location or within a five-mile radius of any other QUIZNO'S franchised or company-owned restaurant. The restrictions of this Section shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent 5% or less of the number of shares of that class of securities issued and outstanding. Franchisee and the Bound Parties expressly acknowledge that they possess skills and abilities of a general nature and have other opportunities for exploiting such skills. Consequently, enforcement of the covenants made in this Section will not deprive them of their personal goodwill or ability to earn a living.

20.4.    Additional Remedies for Breach. In addition to any other remedies or damages allowed hereunder, if Franchisee breaches the covenants set forth in Sections 20.1, 20.2, or 20.3, Franchisee shall pay Franchisor a fee equal to Franchisor's then-current Initial Franchise Fee for each Competitive Business or Branded Business opened in violation of the covenants, and eight percent of such Business' gross sales until expiration of the noncompetition period set forth in Section 20.3.

20.5.    Confidentiality of Proprietary Information. Franchisee shall treat all information it receives which comprises or is a part of the Licensed Methods licensed hereunder (including without limitation the Operations Manual) as proprietary and confidential and will not use such information in an unauthorized manner or disclose the same to any unauthorized person without first obtaining Franchisor's written consent. Franchisee agrees that all such material is the sole property of Franchisor. Franchisee acknowledges that the Marks and the Licensed Methods have valuable goodwill attached to them, that the protection and maintenance thereof is essential to Franchisor and that any unauthorized use or disclosure of the Marks and Licensed Methods will result in irreparable harm to Franchisor. All ideas, concepts, techniques or materials concerning a Quizno's Restaurant, whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to Franchisor and will be deemed Franchisor's sole and exclusive property, part of the Quizno's system, and works made-for-hire for Franchisor. To the extent any item does not qualify as a "work made-for-hire" for Franchisor, Franchisee assigns ownership of that item, and all related rights to that item, to Franchisor and must sign whatever assignment or other documents Franchisor requests to show ownership or to help Franchisor obtain intellectual property rights in the item.

20.6.    Confidentiality Agreement. Franchisor reserves the right to require that Franchisee cause each of its officers, directors, partners, shareholders, and Designated Manager, and, if applicable, the spouse of Franchisee and any of these named individuals, to execute a Nondisclosure and Noncompetition Agreement containing the above restrictions, in a form approved by Franchisor.

## 21. DISPUTES

21.1.    Governing Law/Consent to Venue and Jurisdiction. Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other federal law, this Agreement shall be interpreted under the laws of the State of Colorado and any dispute between the parties shall be governed by and determined in accordance with the substantive laws of the State of Colorado, which laws shall prevail in the event of any conflict of law. The Franchisee and the Franchisor have negotiated regarding a forum in which to resolve any disputes which may arise between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving the Franchisee or any Bound Party and the Franchisor, the parties agree that the exclusive venue for disputes between them shall be in the District Court for the City & County of Denver, Colorado, or the United States District Court for the District of Colorado, and the parties each waive any objection they may have to the personal jurisdiction of or venue in such courts.

21.2.    Waiver of Jury Trial. Franchisor, Franchisee and the Bound Parties each waive their right to a trial by jury. Franchisee and Franchisor acknowledge that the parties' waiver of jury trail rights provides the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the parties' relationship created by this Agreement. Franchisee and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

21.3.    Remedies. Except as set forth in Section 21.4, the court will have the right to award any relief which it deems proper in the circumstances, including without limitation money damages (with interest on unpaid amounts from the date due), lost profits, specific performance, injunctive relief and attorneys' fees and costs. The parties agree that any claim for lost earnings or profits by Franchisee shall be limited to a maximum amount equal to the net profits of the Restaurant for the prior year as shown on Franchisee's federal income tax return. The parties further agree that, in addition to such other damages as may be awarded by the court, if this Agreement is terminated because of a Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the Royalties and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for the Franchisee's default. Royalties and Marketing and Promotion Fees for purposes of this Section shall be calculated

based on the Restaurant's average monthly Gross Sales for the prior year.

21.4.    Limitation of Claims. Franchisee and the Bound Parties agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid. Except with regard to Franchisee's obligations to pay to Franchisor Royalty payments, the Marketing and Promotion Fee and other advertising fees, and other payments due Franchisor and its affiliates pursuant to this Agreement, any claims between the parties must be commenced within one year from the occurrence of the facts giving rise to such claim, or such claim shall be barred. The parties understand that such time limit may be shorter than otherwise allowed by law. Franchisee agrees that its sole recourse for claims arising between the parties shall be against Franchisor or its successors and assigns. Franchisee agrees that the shareholders, directors, officers, and employees and agents of the Franchisor and its affiliates shall not be personally liable nor named as a party in any action between the Franchisor and Franchisee; provided that this shall not preclude claims Franchisee may have directly against an Area Director. Franchisor and Franchisee further agree that, in connection with any such proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed as described above will be forever barred. Franchisor and Franchisee agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that a proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with any other proceeding between Franchisor and any other person or entity. No party will be entitled to an award of punitive or exemplary damages (provided that this limitation shall not apply to statutory penalties such as those set forth in 15 U.S.C. § 1117(a)). No previous course of dealing shall be admissible to explain, modify, or contradict the terms of this Agreement. No implied covenant of good faith and fair dealing shall be used to alter the express terms of this Agreement.

## 22.  SECURITY INTEREST

22.1.    Collateral. Franchisee hereby grants Franchisor a security interest ("Security Interest") in all of the furniture, fixtures, equipment, signage, and realty (including Franchisee's interests under all real property and personal property leases) and together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds and products thereof, wherever located and used in connection with the Restaurant. All items in which a security interest is granted hereby are referred to as the "Collateral."

22.2.    Indebtedness Secured. The Security Interest is to secure payment of the following (the "Indebtedness"):

(a)    All amounts due under this Agreement including without limitation Royalty Fees and Marketing and Promotion Fees, together with interest, fees and other charges provided for herein;

(b)    All sums which Franchisor may, at its option, expend or advance for the maintenance, preservation and protection of the Collateral, including without limitation, payment of rent, taxes, levies, assessments, insurance premiums and discharge of liens together with interest thereon, or in any other property given as security for payment of the Indebtedness;

(c)    All expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with collection of any or all Indebtedness secured hereby or in enforcement or protection of its rights hereunder; and

(d)    All other present or future, direct or indirect, absolute or contingent, liabilities, obligations and indebtedness of Franchisee to Franchisor or third-parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement whether or not Franchisee executes any extension agreement or renewal instruments.

22.3.    Additional Documents. Franchisee will from time to time as required by Franchisor join with Franchisor in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions or modifications thereof) in form satisfactory to Franchisor.

22.4.    Possession of Collateral. Upon default and termination of Franchisee's rights hereunder, Franchisor shall have the immediate right to possession and use of the Collateral.

22.5.    Remedies of Franchisor in Event of Default. Franchisee agrees that upon the occurrence of any default set forth above, the full amount remaining unpaid on the Indebtedness secured hereby shall, at the option of Franchisor and without notice, be and become due and payable forthwith, and Franchisor shall then have the rights, options, duties and remedies of a secured party under, and Franchisee shall have the rights and duties of a debtor under, the Uniform Commercial Code of Colorado, including without limitation Franchisor's right to take possession of the Collateral and of anything found therein, and the right without legal process to enter any premises where the Collateral may be found. Any sale of the Collateral may be conducted in the Franchisor's sole discretion, and the conduct of such sale is agreed to be commercially reasonable. Reasonable notification of the time and place of any sale shall be satisfied by mailing to Franchisee pursuant to the notice provisions set forth below.

22.6.    Special Filing as Financing Statement. This Agreement shall be a deemed a Security Agreement and a Financing Statement. This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code, as in effect in the appropriate jurisdiction.

## 23.  MISCELLANEOUS PROVISIONS

23.1.    Modification. No amendment, waiver or modification of this Agreement shall be effective unless it is in writing and signed by the Franchisor and Franchisee. Franchisee acknowledges that Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent in which Franchisor, in its sole discretion, deems necessary to protect, promote, or improve the Marks and the quality of the Licensed Methods, but under no circumstances will such modifications be made arbitrarily without such determination.

23.2.    Entire Agreement. This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements concerning the subject matter hereof. Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution hereof or for claims of negligent or fraudulent misrepresentation and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor regarding projected sales volumes, market potential revenues, profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives.

23.3.    Delegation by Franchisor. From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties hereunder to third parties, whether the same are agents of Franchisor or Area Directors or independent contractors which Franchisor has contracted with to provide such services. Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations hereunder. Franchisee acknowledges and agrees that Franchisor may not be bound and this Agreement may not be modified by any Area Director without Franchisor's prior written consent. Franchisee acknowledges and agrees that any such delegation of Franchisor's duties and obligations to Area Directors does not assign or confer any rights under this Agreement upon Area Directors and that Area Directors are not third party beneficiaries of this Agreement.

23.4.    Agreement Effective. This Agreement shall not be effective until accepted by Franchisor as evidenced by dating and signing by an officer of Franchisor.

23.5.    Review of Agreement. Franchisee acknowledges it had a copy of Franchisor's Uniform Franchise Offering Circular in its possession for not less than 10 full business days, and this Agreement in its possession for not less than 5 full business days, during which time Franchisee has had the opportunity to submit same for professional review and advice of Franchisee's choosing prior to freely executing this Agreement.

23.6.    Attorneys' Fees. In the event of any default on the part of either party to this Agreement, in addition to all other remedies, the party in default will pay the prevailing party all amounts due and all damages, costs and expenses, including reasonable attorneys' fees incurred by the aggrieved party in any legal action or other proceeding as a result of such default, plus interest at the lesser of 2% per month or the highest rate allowable by law, accruing from the date of such default. Additionally, if Franchisee withholds any amounts due Franchisor, Franchisee shall reimburse Franchisor's costs of collecting such amounts including reasonable attorney fees and expenses.

23.7.    Injunctive Relief. Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief to prevent irreparable harm, in addition to all other remedies.

23.8.    No Waiver. No waiver of any condition or covenant contained in this Agreement or failure to exercise a right or remedy by Franchisor or Franchisee shall be considered to imply or constitute a further waiver by Franchisor or Franchisee of the same or any other condition, covenant, right, or remedy.

23.9.    No Right to Set Off. Franchisee shall not be allowed to set off amounts owed to Franchisor for Royalties, fees or other amounts due hereunder, against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

23.10.    Invalidity. If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element and, as so modified, such provision shall be deemed a part of this Agreement as though originally included. The remaining provisions of this Agreement shall not be affected by such

modification.

23.11.   Notices.  All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by an overnight delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement or at such other addresses as Franchisor or Franchisee may designate from time to time, and shall be effectively given when deposited in the United States mails, postage prepaid, or when received via overnight delivery, as may be applicable.

23.12.   Acknowledgment.  BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL.  FRANCHISEE ACKNOWLEDGES THAT:

(A)   THE SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED HEREIN INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

(B)   NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND

(C)   NO STATEMENT, REPRESENTATION OR OTHER ACT, EVENT OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT, AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above set forth.

THE QUIZNO'S CORPORATION

By:_____

Its:_____VICE PRESIDENT/GENERAL COUNSEL_____

Date:_____10/7/98_____

FRANCHISEE

_____

Individually

Date:_____

OR:

(if a corporation, limited liability company, or partnership)

_____Training Pros, Inc._____
Company Name

By:_____Christopher E. Bray_____
_____Christopher E. Bray_____

Its:_____President_____

Date:_____September 29, 1998_____

(7/31/98)

Exhibit **C**


**DLA PIPER**

DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1263
www.dlapiper.com

Fredric A. Cohen

December 8, 2006

*SENT VIA OVERNIGHT DELIVERY*

Nicholas P. Hansen, Esq.
Hansen Law Firm LLC
600 Grant Street, Suite 300
Denver, Colorado 80203

Justin M. Klein, Esq.
Marks & Klein LLP
63 Riverside Avenue
Red Bank, New Jersey 07701

Chris Bray
Sabrine Bray
Training Pros Inc.
7132 Pecan Creek Road
Killeen, Texas 76542

Chris Bray
Sabrine Bray
Training Pros Inc.
1378 Pecan Creek Road
Killeen, Texas 76549

Quiznos Sub
4400 East Centex Expressway, Unit 2A
Killeen, Texas 76543

> RE:   **Notice of Termination; Franchise Agreement dated April 30, 1997 ("Agreement") Between Training Pros Inc. ("You") and QFA Royalties LLC, as successor in interest to The Quizno's Franchise Company LLC and The Quizno's Corporation ("Quizno's") for the Quiznos Sub No. 370 Located at 4400 East Centex Expressway, Unit 2A, Killeen, Texas 76543 ("Restaurant")**

Ladies and Gentlemen:

You are hereby advised that TPI's franchise rights under the Agreement are terminated, effective thirty (30) days following receipt of this notice, pursuant to Section 18.3 of the Agreement, for failing to promote and operate the business in such a manner as to not detract from or adversely reflect upon the name and reputation of Quizno's and the goodwill associated with the Quizno's name and Marks as required under Section 11.1(a) of the Agreement, unless such conduct is cured within such thirty (30) day period.

Please refer to Section 18.6 of the Agreement regarding TPI's continuing obligations upon termination. Such obligations include, but are not limited to:

1.    Pay Quizno's all royalties, other fees, and any and all amounts or accounts payable then owed Quizno's or its affiliates;

CHGO1\30856151.1



**DLA PIPER**

December 8, 2006
Page Two

2.    Cease to identify itself as a Quizno's franchisee and use any marks, trade secrets, signs, symbols, devices, trade names, and other materials of Quizno's;

3.    Immediately cease to identify the franchised location as being, or having been, associated with Quizno's, and immediately cease using any proprietary mark of Quizno's or any mark in any way associated with the marks and licensed methods;

4.    Deliver to Quizno's all signs, sign-faces, advertising materials, forms and other materials bearing any of the marks or otherwise identified with Quizno's and obtained by and in connection with the Agreement;

5.    Immediately deliver to Quizno's the Operations Manual and all other information, documents and copies thereof which are proprietary to Quizno's;

6.    Promptly take action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to its use of any marks;

7.    Immediately notify the telephone company and all telephone directory publishers of the termination of its right to use any telephone number and any regular, classified or other telephone director listing associated with any Mark and to authorize transfer thereof to Quizno's or its designee; and

8.    Abide by all restrictive covenants set forth in Section 20 of the Agreement.

All capitalized terms not otherwise defined herein shall have their meanings as set forth in the Agreement.  Please be reminded that as specified in the Agreement, all of TPI's obligations which expressly or by their nature survive their termination of the Agreement, including the non-competition and non-disclosure provisions, will continue in full force and effect despite the Agreement being terminated.

Please contact me at (312) 368-4000 should you require further information with respect to curing TPI's conduct or, alternatively, ending its franchise operations.

Sincerely,

**DLA Piper US LLP**

Fredric A. Cohen

CHGO1\30856151.1

Exhibit **D**



**DLA PIPER US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1263
www.dlapiper.com

Fredric A. Cohen

December 8, 2006

**Sent Via Overnight Delivery**

Nicholas P. Hansen, Esq.
Hansen Law Firm LLC
600 Grant Street, Suite 300
Denver, Colorado 80203

Justin M. Klein, Esq.
Marks & Klein LLP
63 Riverside Avenue
Red Bank, New Jersey 07701

Chris Bray
Sabrine Bray
Training Pros Inc.
7132 Pecan Creek Road
Killeen, Texas 76542

Chris Bray
Sabrine Bray
Training Pros Inc.
1378 Pecan Creek Road
Killeen, Texas 76549

Quiznos Sub
1200 Willow Springs Road
Killeen, Texas 76549

RE:    **Notice of Termination; Franchise Agreement dated October 7, 1998
("Agreement") Between Training Pros Inc. ("TPI") and QFA Royalties
LLC, as successor in interest to The Quizno's Franchise Company
LLC and The Quizno's Corporation ("Quizno's") for the Quiznos Sub
No. 838 Located at 1200 Willow Springs Road, Killeen, Texas 76549
("Restaurant")**

Ladies and Gentlemen:

You are hereby advised that TPI's franchise rights under the Agreement are
terminated, effective immediately, pursuant to Section 18.2(b) of the Agreement, for
engaging in conduct that, in the sole judgment of Quiznos, materially impairs the
goodwill associated with the Marks.

Please refer to Section 18.7 of the Agreement regarding TPI's continuing
obligations upon termination. Such obligations include, but are not limited to:

1.    Pay Quizno's all royalties, other fees, and any and all amounts or
accounts payable then owed Quizno's or its affiliates;

2.    Cease to identify itself as a Quizno's franchisee and use any marks, trade
secrets, signs, symbols, devices, trade names, and other materials of Quizno's;



**DLA PIPER**

December 8, 2006
Page Two

3.    Immediately cease to identify the franchised location as being, or having been, associated with Quizno's, and immediately cease using any proprietary mark of Quizno's or any mark in any way associated with the marks and licensed methods;

4.    Deliver to Quizno's all signs, sign-faces, advertising materials, forms and other materials bearing any of the marks or otherwise identified with Quizno's and obtained by and in connection with the Agreement;

5.    Immediately deliver to Quizno's the Operations Manual and all other information, documents and copies thereof which are proprietary to Quizno's;

6.    Promptly take action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to its use of any marks;

7.    Immediately notify the telephone company and all telephone directory publishers of the termination of its right to use any telephone number and any regular, classified or other telephone director listing associated with any Mark and to authorize transfer thereof to Quizno's or its designee; and

8.    Abide by all restrictive covenants set forth in Section 20 of the Agreement.

All capitalized terms not otherwise defined herein shall have their meanings as set forth in the Agreement. Please be reminded that as specified in the Agreement, all of TPI's obligations which expressly or by their nature survive their termination of the Agreement, including the non-competition and non-disclosure provisions, will continue in full force and effect despite the Agreement being terminated.

Please contact me at (312) 368-4000 should you require further information with respect to ending TPI's franchise operations.

Sincerely,

**DLA Piper US LLP**

Fredric A. Cohen

CHGO1\30856151.1