IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Case No. 06-CV-02528-JLK-CBS


CHRIS BRAY, *et al.* v. QFA ROYALTIES LLC,


EXHIBITS A THROUGH G TO THE DECLARATION OF JEHAD MAJED

A            Franchise Agreement excerpts                    55 Pages

document2

Dockets.Justia.com

Exhibit

# QUIZNO'S FRANCHISING LLC

# FRANCHISE AGREEMENT

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 |

# QUIZNO'S FRANCHISING LLC
# FRANCHISE AGREEMENT
# TABLE OF CONTENTS

**Page**

1.    PURPOSE ................................................................................................1

2.    GRANT OF FRANCHISE ......................................................................1
    2.1    Grant of Franchise............................................................................1
    2.2    Scope of Franchise Operations ........................................................1

3.    FRANCHISED LOCATION AND TARGET AREA................................2
    3.1    Franchised Location..........................................................................2
    3.2    Limitation on Franchise Rights.........................................................2
    3.3    Express Restaurants ..........................................................................2
    3.4    Special Products ...............................................................................2
    3.5    Franchisor's Reservation of Rights ..................................................2

4.    INITIAL FEES.........................................................................................3
    4.1    Initial Franchise Fee.........................................................................3

5.    ROYALTIES ...........................................................................................3
    5.1    Royalty.............................................................................................3
    5.2    Gross Sales.......................................................................................3
    5.3    Royalty Payments ............................................................................3
    5.4    Application of Payments...................................................................4

6.    DEVELOPMENT OF FRANCHISED LOCATION ...............................4
    6.1    Approval of Franchised Location .....................................................4
    6.2    Lease Approval .................................................................................4
    6.3    Lease Assistance Program ................................................................5
    6.4    Schedule...........................................................................................5
    6.5    Conversion and Design ....................................................................5
    6.6    Signs.................................................................................................5
    6.7    Equipment ........................................................................................6
    6.8    Permits and Licenses........................................................................6
    6.9    Commencement of Operations .........................................................6

7.    TRAINING ..............................................................................................7
    7.1    Initial Training Program ..................................................................7
    7.2    Additional Training Programs ..........................................................7

8.    OPERATIONS MANUAL .......................................................................8
    8.1    Operations Manual...........................................................................8
    8.2    Changes to Operations Manual.........................................................8

i

Page

9.    DEVELOPMENT ASSISTANCE.................................................................8
      9.1    Franchisor's Development Assistance ........................................8
      9.2    Responsibilities of Area Director ...............................................9

10.   OPERATING ASSISTANCE....................................................................9
      10.1   Franchisor's Assistance .............................................................9

11.   FRANCHISEE'S OPERATIONAL COVENANTS...................................10
      11.1   Business Operations...................................................................10

12.   ADVERTISING.........................................................................................12
      12.1   Approval and Use of Advertising ............................................12
      12.2   Grand Opening............................................................................12
      12.3   Marketing and Promotion Fee ..................................................12
      12.4   Local Advertising.......................................................................13
      12.5   Regional Advertising Programs.................................................13

13.   QUALITY CONTROL...............................................................................14
      13.1   Standards and Specifications ....................................................14
      13.2   Inspections ..................................................................................14
      13.3   Restrictions on Services and Products .....................................14
      13.4   Approved Suppliers ....................................................................15
      13.5   Request for Change of Supplier.................................................15

14.   MARKS, TRADE NAMES AND PROPRIETARY INTERESTS...................15
      14.1   Marks ...........................................................................................15
      14.2   Licensed Methods.......................................................................16
      14.3   Trademark Infringement ............................................................16
      14.4   Franchisee's Business Name ......................................................16
      14.5   Change of Marks.........................................................................16

15.   REPORTS, RECORDS AND FINANCIAL STATEMENTS ....................16
      15.1   Franchisee Reports......................................................................16
      15.2   Financial Records Use and Access ...........................................17
      15.3   Books and Records .....................................................................18
      15.4   Audit of Books and Records ......................................................18

16.   TRANSFER ...............................................................................................18
      16.1   Transfer by Franchisee...............................................................18
      16.2   Pre-Conditions to Franchisee's Transfer ..................................18
      16.3   Franchisor's Approval of Transfer............................................20
      16.4   Right of First Refusal.................................................................20
      16.5   Transfer by Franchisor...............................................................20
      16.6   Franchisee's Death or Disability ...............................................21

17.   TERM AND RENEWAL ...........................................................................21

ii

**Page**

17.1   Term ................................................................................................21
17.2   Renewal ...........................................................................................21
17.3   Exercise of Renewal .......................................................................22

18.   DEFAULT AND TERMINATION .............................................................22
18.1   Termination by Franchisee ............................................................22
18.2   Termination by Franchisor - Effective Upon Notice .....................22
18.3   Termination by Franchisor - Thirty Days Notice ..........................24
18.4   Late Fee ...........................................................................................24
18.5   Failure to Comply with Reporting Requirements .........................24
18.6   Right to Repurchase ........................................................................25
18.7   Obligations of Franchisee Upon Termination or Expiration .........26
18.8   State and Federal Law ....................................................................27
18.9   Assumption of Management ...........................................................27

19.   BUSINESS RELATIONSHIP .....................................................................27
19.1   Independent Businesspersons ........................................................27
19.2   Payment of Third Party Obligations .............................................28
19.3   Indemnification ...............................................................................28

20.   RESTRICTIVE COVENANTS ....................................................................28
20.1   Non-Competition During Term .....................................................28
20.2   Branded Business ............................................................................29
20.3   Post-Termination Covenant Not to Compete .................................29
20.4   Additional Remedies for Breach ....................................................30
20.5   Confidentiality of Proprietary Information ....................................30
20.6   Confidentiality Agreement .............................................................30

21.   DISPUTES ...................................................................................................30
21.1   Governing Law/Consent to Venue and Jurisdiction .....................30
21.2   Waiver of Jury Trial .......................................................................31
21.3   Remedies ..........................................................................................31
21.4   Limitation of Claims .......................................................................31

22.   SECURITY INTEREST ...............................................................................32
22.1   Collateral .........................................................................................32
22.2   Indebtedness Secured ......................................................................32
22.3   Additional Documents .....................................................................32
22.4   Possession of Collateral ..................................................................32
22.5   Remedies of Franchisor in Event of Default ..................................32
22.6   Special Filing as Financing Statement ...........................................33

23.   MISCELLANEOUS PROVISIONS .............................................................33
23.1   Modification/Exercise of Judgment ...............................................33
23.2   Entire Agreement ............................................................................33
23.3   Delegation by Franchisor ...............................................................34

23.4    Agreement Effective ........................................................................................34
23.5    Review of Agreement ......................................................................................34
23.6    Attorneys' Fees................................................................................................34
23.7    Injunctive Relief..............................................................................................34
23.8    No Waiver........................................................................................................34
23.9    No Right to Set Off..........................................................................................34
23.10  Invalidity .........................................................................................................35
23.11  Notices ............................................................................................................35
23.12  Acknowledgment .............................................................................................35

EXHIBITS

1    Addendum -- Location and Initial Franchise Fee
2    Addendum -- QUIZNO'S Classic Subs Express Facility
3    Addendum -- Special Products Program
4    Authorization Agreement for Prearranged Payments
5    Statement of Ownership
6    Guaranty and Assumption of Franchisee's Obligations
7    Addendum -- Bookkeeping Services
8    Addendum -- Maximum Borrowing Commitment

QUIZNO'S FA 1/2003
~CHGO1:3024 2059.v2

**FRANCHISEE:** _Jehad Majed   Ali M Majed_
**ADDRESS:** _7621 W. Morrow Cir  Dearborn, MI. 48126_

**EFFECTIVE**
**DATE:** _August 29 2003_

THIS AGREEMENT (the "Agreement") is between **QUIZNO'S FRANCHISING LLC**, a Colorado limited liability company located at 1475 Lawrence Street, Suite 400, Denver, Colorado 80202 ("**Franchisor**"), and the franchisee listed above ("**Franchisee**"), who agree as follows:

## 1. PURPOSE

1.1    Franchisor and its affiliates have developed methods for establishing, operating, and promoting restaurants offering submarine sandwiches, salads, other food products and beverages, and related restaurant and carry out services ("**QUIZNO'S Restaurants**" or "**Restaurants**"), which include the use and license of certain valuable trade names, service marks, and trademarks (the "**Marks**") owned by an affiliate of Franchisor and licensed to Franchisor, including the Mark "QUIZNO'S," and the affiliate's distinctive techniques, expertise, and knowledge in establishing, operating, and promoting restaurants and related licensed methods of doing business (the "**Licensed Methods**").

1.2    Franchisor grants the right to others to establish and operate Restaurants under the Marks and using the Licensed Methods.

1.3    Franchisee recognizes and acknowledges the benefits to be derived from being identified and associated with Franchisor, and being able to utilize the Restaurant system and concepts, and therefore desires to establish a Restaurant at an approved location. Franchisor is willing to grant Franchisee the right to operate a Restaurant under the terms and conditions contained in this Agreement.

## 2. GRANT OF FRANCHISE

2.1    **Grant of Franchise**.  Franchisor grants to Franchisee, and Franchisee accepts from Franchisor, the right to use the Marks and Licensed Methods in connection with establishing and operating a Restaurant at the location described in Section 3. Franchisee agrees to use the Marks and Licensed Methods, as they are changed, improved, and further developed by Franchisor and its affiliates from time to time, only in accordance with the terms and conditions of this Agreement.

2.2    **Scope of Franchise Operations**.  Franchisee agrees at all times faithfully, honestly, and diligently to perform its obligations under this Agreement, to use best efforts to promote its Restaurant, and not to engage in any other business or activity that conflicts with the

operation of the Restaurant in compliance with this Agreement. Franchisee agrees to utilize the Marks and Licensed Methods to operate all aspects of Franchisee's Restaurant in accordance with the methods and systems developed and prescribed from time to time by Franchisor, all of which are a part of the Licensed Methods. Franchisee's Restaurant shall offer all products and services designated by Franchisor. Franchisee shall implement any additions and changes to the products and services offered by its Restaurant that Franchisor requires.

## 3. FRANCHISED LOCATION AND TARGET AREA

3.1    **Franchised Location**.  Franchisee is granted the right to own and operate a Restaurant at a specific address and location (**"Franchised Location"**).  Franchisee shall choose and acquire a location for its Restaurant within the nonexclusive Target Area set forth in Exhibit 1.  Franchisee shall select and propose to Franchisor for approval a specific site for the Franchised Location in the Target Area, which Franchisor shall have the right to approve or disapprove in accordance with both the terms set forth in this Agreement and Franchisor's site selection and approval criteria and procedures.  Franchisee acknowledges and agrees that the Franchised Location will be a specific numbered street or mall address at which Franchisee's Restaurant will be physically located.  The "Franchised Location" cannot and will not under any circumstances be defined as a geographic area or be described in terms other than a specific numbered street or mall address.  During the term of this Agreement, the Franchised Location shall be used exclusively to operate a Restaurant.

3.2    **Limitation on Franchise Rights**.  The rights granted to Franchisee are for the specific Franchised Location and cannot be transferred to any other location, except with Franchisor's prior written approval.  The Marks and Licensed Methods are licensed only for the Franchised Location.

3.3    **Express Restaurants**.  Franchisee may not operate a Restaurant located within a host facility (such as a gas station, convenience store, or hotel), in another "non-traditional" venue, or at any other location where the operation of the Restaurant will, because of its location, vary from the operation of a traditional Restaurant (all referred to as **"Express Restaurants"**), except with Franchisor's prior written consent, in which case Franchisor and Franchisee shall execute Exhibit 2 (if this Agreement governs the operation of a traditional Restaurant, the Express Restaurant(s) shall be governed by a separate Franchise Agreement).  Franchisor will determine whether a proposed Restaurant should be classified as an Express Restaurant.

3.4    **Special Products**.  From time to time, Franchisor may offer supplemental programs to be incorporated in certain Restaurants (**"Special Products"**).  Franchisee may not offer a Special Product except with Franchisor's prior written permission, in which case Franchisor and Franchisee shall execute Exhibit 3.

3.5    **Franchisor's Reservation of Rights**.  Franchisee acknowledges that the franchise granted under this Agreement is nonexclusive, that Franchisee has no territorial protection, and that Franchisor and all of its affiliates retain the right: (1) to use, and to license others to use, the Marks and Licensed Methods for the operation of Restaurants at any location other than the Franchised Location; (2) to use the Marks and Licensed Methods in connection with services and

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 |

products, in connection with promotional and marketing efforts or related items, or in alternative channels of distribution, without regard to location; (3) to use and license the use of alternative proprietary marks or methods in connection with the operation of restaurants or other businesses under names which are not the same as or confusingly similar to the Marks, which businesses may be the same as, or similar to, or different from Restaurants; and (4) to engage in any other activities not expressly prohibited in this Agreement.

## 4. INITIAL FEES

4.1    **Initial Franchise Fee**.  Franchisee agrees to pay to Franchisor, concurrently with signing this Agreement, an initial franchise fee ("Initial Franchise Fee") in the amount set forth in Exhibit 1. Franchisee acknowledges and agrees that the Initial Franchise Fee represents payment for the initial grant of the right to use the Marks and Licensed Methods, that Franchisor has earned the Initial Franchise Fee upon receipt, and that the Initial Franchise Fee is not refundable to Franchisee after it is paid.

## 5. ROYALTIES

5.1    **Royalty**.  Franchisee will pay to Franchisor a weekly royalty ("Royalty") equal to seven percent (7%) of the total amount of its Gross Sales, defined in Section 5.2, generated from or through its Restaurant.

5.2    **Gross Sales**.  "Gross Sales" is defined as sales of any kind for all services or products from or through the Restaurant, including any sale of services or products made for cash or upon credit, or partly for cash and partly for credit, regardless of collection of charges for which credit is given, and regardless of whether such sale is conducted in compliance with or in violation of the terms of this Agreement, or whether such sale is at the Franchised Location or off-site, but exclusive of discounts, sales taxes, or other similar taxes and credits. Gross Sales also include the fair market value of any services or products received by Franchisee in barter or exchange for its services and products and all insurance proceeds received by Franchisee for loss of business due to a casualty or similar event at the Franchised Location.

5.3    **Royalty Payments**.  Royalty payments will be paid weekly and sent to Franchisor or for Franchisor's benefit by electronic funds transfer, due on Thursday (for the preceding Monday through Sunday period) or such other specific day of the week which Franchisor designates from time to time ("Due Date"). Upon the request of Franchisor and in no event later than thirty (30) days before the Restaurant opens, Franchisee shall execute an Authorization Agreement, in the form attached to this Agreement as Exhibit 4, for preauthorized payment of Royalty payments, and other amounts due from Franchisee under this Agreement or otherwise, by electronic transfer of funds from Franchisee's bank account to the bank account that Franchisor designates.  On the Due Date each week, Franchisee shall report by telephone, electronic means, or in written form, as Franchisor directs (as more fully described in Section 15), Franchisee's Gross Sales and such additional information requested by Franchisor. Franchisor shall have the right to verify such Royalty payments from time to time as it deems necessary in any reasonable manner.  If Franchisee fails to have sufficient funds in its account or otherwise fails to pay any Royalties due as of the Due Date, Franchisee shall owe, in addition to

3

such Royalties, a late charge equivalent to two percent (2%) per month of any late Royalty payment; provided, however, in no event shall Franchisee be required to pay a late payment at a rate greater than the maximum commercial contract interest rate permitted by applicable law.

Franchisor may require Franchisee to pay the Royalty and other amounts due under this Agreement by means other than automatic debit whenever Franchisor deems appropriate, and Franchisee agrees to comply with Franchisor's payment instructions.

5.4    **Application of Payments**.  Notwithstanding any designation Franchisee might make, Franchisor may apply any payments made by Franchisee to any of Franchisee's past due indebtedness to Franchisor or its affiliates.  Franchisee acknowledges that Franchisor has the right to set-off any amounts Franchisee owes  Franchisor or its affiliates against any amounts Franchisor or its affiliates might owe Franchisee.

## 6. DEVELOPMENT OF FRANCHISED LOCATION

6.1    **Approval of Franchised Location**.  Franchisee may operate a QUIZNO'S Restaurant only at a site approved by Franchisor, which approval will not be unreasonably withheld if the site meets Franchisor's site selection criteria. Franchisee shall follow Franchisor's site selection procedures in locating a Franchised Location for the Restaurant.  Franchisee shall submit a completed site submittal package, including demographics and other materials requested by Franchisor, containing all information reasonably required by Franchisor to assess a proposed Franchised Location.

6.2    **Lease Approval**.  Franchisee shall obtain Franchisor's prior written approval before executing any lease or purchase agreement for the Franchised Location.  Prior to its execution, Franchisee's proposed Franchised Location lease must be reviewed and certified as acceptable by Franchisor. Such review is for the benefit of Franchisor, and Franchisee acknowledges that Franchisor's review and approval of a lease for the Franchised Location do not constitute a recommendation, endorsement, or guarantee by Franchisor of the suitability of the Franchised Location or the lease, and Franchisee should take all steps necessary to ascertain whether such Franchised Location and lease are acceptable to Franchisee. Upon submission of a proposed Franchised Location for the Restaurant, Franchisee shall pay Franchisor or its designated supplier (which may be an affiliate of Franchisor) a lease review fee of One Thousand Four Hundred Fifty Dollars ($1,450) ("**Lease Review Fee**"). The Lease Review Fee pays the expenses incurred to review and (if Franchisor so chooses) to negotiate certain provisions of the lease. Franchisee is not a third-party beneficiary of the lease negotiation or review. Franchisee agrees that Franchisor does not guarantee that the terms, including rent, will represent the most favorable terms available in that market.  Franchisor shall charge Franchisee only one (1) Lease Review Fee unless Franchisee refuses to sign a lease that Franchisor has certified as acceptable for the Franchised Location, and Franchisor then is required to engage in one or more additional lease reviews for the Franchised Location, in which case Franchisee shall pay Franchisor or its designated supplier a Lease Review Fee for the first lease review as well as a Lease Review Fee for each additional lease review.

4

6.3    **Lease Assistance Program**. If Franchisee participates in the "**Lease Assistance Program**," then, once Franchisor has approved the Franchised Location, Franchisor or one of its affiliates will enter into negotiations with the Franchised Location's landlord ("**Master Landlord**") and, assuming such negotiations are successful, enter into a lease for the Franchised Location ("**Master Lease**"). The Lease Review Fee will be Two Thousand Two Hundred Dollars ($2,200). Franchisee then agrees to enter into a sublease with Franchisor or its designated affiliate ("**Sublease**") in substantially the same form as attached to Franchisor's Uniform Franchise Offering Circular ("**UFOC**"). The Sublease shall incorporate the terms and conditions of the Master Lease, including rent and other charges. Default of the Sublease will constitute default of this Agreement, and default of this Agreement will constitute default of the Sublease. Franchisee acknowledges that Franchisor's approval of a lease for the Franchised Location, and Franchisor's or one of its affiliates' execution of the Sublease, do not constitute a recommendation, endorsement, or guarantee by Franchisor or the affiliate of the suitability of the Franchised Location or the terms of the Master Lease, and Franchisee should take all steps necessary to ascertain whether such Franchised Location and lease terms are acceptable to Franchisee. Franchisor shall charge Franchisee only one (1) Lease Review Fee unless Franchisee refuses to sign a lease that Franchisor has certified as acceptable for the Franchised Location, and Franchisor then is required to engage in one or more additional lease reviews for the Franchised Location, in which case Franchisee shall pay Franchisor or its designated affiliate a Lease Review Fee for the first lease review as well as a Lease Review Fee for each additional lease review.

6.4    **Schedule**. Franchisee shall execute a lease no later than one (1) year from the date this Agreement is signed. Franchisor will extend the time which Franchisee has to obtain an executed lease for the Franchised Location for one (1) three (3) month period in the event factors beyond Franchisee's reasonable control prevent Franchisee from meeting this deadline, so long as Franchisee has made reasonable and continuing efforts to obtain and submit for approval an acceptable site and Franchisee requests in writing an extension of time before the end of the one (1) year period. Any lease for the Franchised Location shall be collaterally assigned to Franchisor as security for Franchisee's performance of its obligations under this Agreement. Franchisee shall deliver a copy of the signed lease for the Franchised Location to Franchisor within five (5) days after it is signed.

6.5    **Conversion and Design**. Franchisee acknowledges that the layout, design, decoration, and color scheme of Restaurants are an integral part of Franchisor's and its affiliates' proprietary Licensed Methods, and, accordingly, Franchisee shall convert and decorate the Franchised Location in accordance with Franchisor's plans, designs, and specifications. Franchisee also shall obtain Franchisor's written consent to any conversion, design, or decoration of the Franchised Location before remodeling or decorating begins, recognizing that such remodeling and decoration, and any related costs, are Franchisee's sole responsibility.

6.6    **Signs**. Franchisee shall purchase or otherwise obtain for use at the Franchised Location and in connection with the Restaurant the maximum number and size of signs allowed by applicable building codes, which signs shall comply with Franchisor's standards and specifications. It is Franchisee's sole responsibility to ensure that all signs comply with applicable local ordinances, building codes, and zoning regulations. Any modifications to

5

Franchisor's standards and specifications for signs due to local ordinances, codes, or regulations shall be submitted to Franchisor for prior written approval. Franchisee acknowledges that the Marks, or any other name, symbol, or identifying marks on any signs, shall be used only in accordance with Franchisor's standards and specifications and only with Franchisor's prior written approval.

6.7    **Equipment**. Franchisee shall purchase or otherwise obtain for use in connection with the Restaurant the equipment, including delivery vehicles (if utilized) and computer hardware and software, of a type and in an amount which complies with Franchisor's standards and specifications and only from suppliers or other sources approved and/or designated by Franchisor. Franchisor may designate only one supplier for certain items, and Franchisor and/or its affiliates may be an approved or the designated supplier for certain items. Franchisee acknowledges that the type, quality, configuration, capability, and performance of the Restaurant's equipment are all standards and specifications which are a part of the Licensed Methods. Franchisee shall purchase or lease for use in the Restaurant an electronic cash register or computer system, a music system, and a satellite system (the **"Systems"**) approved by Franchisor. The cash register or computer system must accurately record every sale or other transaction. Franchisee shall purchase, or Franchisor or an affiliate may license to Franchisee for the license fee it determines, software to be used by Franchisee in conjunction with the Systems. Franchisee shall submit any required reports in a format designated from time to time by Franchisor. Franchisee grants Franchisor the right to access the Systems and to obtain sales, sales mix, and revenue information directly by modem or otherwise. Franchisee acknowledges that Franchisor will use information from required reports primarily to make business and marketing decisions. Franchisee shall be obligated to upgrade or update the Systems and the software, at Franchisee's sole cost, to meet Franchisor's then-current standards and specifications and to address technological developments or events. Franchisor has no obligation to reimburse Franchisee for any of these costs.

6.8    **Permits and Licenses**. Franchisee agrees to obtain all permits and licenses required for the lawful construction and operation of its Restaurant together with all certifications from government authorities having jurisdiction over the Franchised Location that all requirements for construction and operation have been met, including, without limitation, zoning, access, sign, health, fire, and safety requirements; building and other required construction permits; licenses to do business; fictitious name registrations; sales tax permits; health and sanitation permits; and ratings and fire clearances. Franchisee agrees to obtain all customary contractors' sworn statements and partial and final lien waivers for construction, remodeling, decorating, and installation of equipment at the Franchised Location. Franchisee shall keep copies of all health department, fire department, building department, and other reports of inspections on file and available for inspection by Franchisor. Franchisee shall immediately forward to Franchisor any such reports or inspections in which Franchisee has been found not to be in compliance with the underlying regulation.

6.9    **Commencement of Operations**.    Unless otherwise agreed in writing by Franchisor and Franchisee, Franchisee has twelve (12) months from the date of this Agreement (which may be extended three (3) months as provided by Section 6.4) within which to complete the initial training program, described in Section 7.1, and commence operation of the Restaurant.

6

Franchisee shall obtain the written consent of Franchisor prior to commencing operation of the Restaurant, which consent shall not be unreasonably withheld, but cannot be granted until Franchisor has approved the Franchised Location and Franchisee has: (1) successfully completed the initial training program; (2) paid all fees and other amounts due to Franchisor; (3) furnished copies of all insurance policies required by this Agreement; (4) built out and equipped the Franchised Location in accordance with Franchisor's standards and specifications and received a QUIZNO'S certificate of occupancy from Franchisor; (5) purchased an inventory of approved products and supplies; and (6) otherwise completed all other aspects of developing the Restaurant as Franchisor has reasonably required.

## 7. TRAINING

7.1    **Initial Training Program**.    Franchisee (or, if Franchisee is a corporation, partnership, or limited liability company, its managing shareholder, partner, or member ("**Managing Owner**")) and the person designated by Franchisee to assume primary responsibility for managing the Restaurant ("**Designated Manager**") must attend and successfully complete the initial training program offered by Franchisor at one of Franchisor's designated training facilities. The Managing Owner must own at least twenty-five percent (25%) of the voting and economic interest of the franchisee entity. Franchisee acknowledges that successful completion of the initial training program will require, among other things, that each attendee be able to demonstrate that he/she can read, write, and converse in English by passing a competency test. The Managing Owner also must take and pass the competency test when Franchisee signs this Agreement, and receive a passing score. Franchisee agrees that the Designated Manager will be fluent in the English language. Up to three (3) individuals (including the Managing Owner and Designated Manager) are eligible to participate in Franchisor's initial training program without paying any tuition or fee. Franchisee shall be responsible for any and all travel and living expenses incurred in connection with attending the training program as well as wages or salaries, if any, of the person(s) receiving training. Franchisee (or its Managing Owner) and the Designated Manager must successfully complete the initial training program before Franchisee begins operating the Restaurant. Franchisor reserves the right to waive all or a portion of the training program or alter the training schedule.

Franchisee (or its Managing Owner) and its Designated Manager may request additional training during the initial training program, to be provided at no additional charge, if Franchisee (or its Managing Owner) and the Designated Manager do not feel completely trained in the operation of a QUIZNO'S Restaurant. However, if Franchisee (or its Managing Owner) and the Designated Manager satisfactorily complete Franchisor's initial training program, and do not inform Franchisor in writing at the end of the initial training program that Franchisee (or its Managing Owner) and the Designated Manager do not feel completely trained in the operation of a QUIZNO'S Restaurant, then Franchisee will be deemed to have been trained sufficiently to operate a QUIZNO'S Restaurant.

7.2    **Additional Training Programs**.    Franchisor reserves the right to conduct training programs or seminars at locations to be determined by Franchisor to discuss relevant business trends and share new information relating to the Restaurant business. Attendance at quarterly market meetings by Franchisee (or its Managing Owner) or its Designated Manager is

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 }

required. Franchisor shall not require Franchisee to attend any other on-going training programs or seminars more than four (4) times a year. Each mandatory training program and seminar shall not last more than three (3) days. All such mandatory training will be offered without tuition or a fee; provided, however, Franchisee will be responsible for any and all transportation and living expenses incurred in attending such additional training programs or seminars.

## 8. OPERATIONS MANUAL

8.1     **Operations Manual**.  Franchisor agrees to loan to Franchisee one (1) or more manuals, technical bulletins, or other written or videotaped materials (collectively referred to as "**Operations Manual**") covering the Restaurant's operating and marketing techniques and any Special Product(s) applicable to the Restaurant. Franchisee agrees that it shall comply with the Operations Manual, as amended from time to time, as an essential part of its obligations under this Agreement. Franchisee shall at all times be responsible for ensuring that its employees and all other persons under its control comply with the Operations Manual in all respects. Franchisee shall not duplicate the Operations Manual nor disclose its contents to persons other than employees or officers who need the information to perform their jobs.

8.2     **Changes to Operations Manual**.  Franchisor reserves the right to revise the Operations Manual from time to time as it deems necessary to update operating and marketing techniques or standards and specifications in any manner,  including updates contained in monthly newsletters. Franchisee, within thirty (30) days after receiving any updated information, shall in turn update its copy of the Operations Manual as instructed by Franchisor and conform its operations with the updated provisions. Franchisee acknowledges that the master copy of the Operations Manual maintained by Franchisor at its principal office controls in the event of a dispute over its contents.

## 9. DEVELOPMENT ASSISTANCE

9.1     **Franchisor's Development Assistance**.   To assist Franchisee in establishing the Restaurant, Franchisor and/or its designated representatives shall provide the following:

(a)     Assistance related to accepting a site for the Restaurant, although Franchisee acknowledges that Franchisor has no obligation to select or acquire a site on behalf of Franchisee. Franchisor's assistance will consist of, at a minimum, providing general criteria for a satisfactory site and determining whether a proposed site fulfills the requisite criteria prior to formal acceptance of a site selected by Franchisee. Site selection, acquisition, and development shall be the sole obligation of Franchisee, except as set forth in this Agreement or any other written agreement executed by Franchisor. Franchisee acknowledges that Franchisor is under no obligation to provide additional site selection services other than as set forth in a written, executed agreement and that Franchisor's acceptance of the site does not imply or guarantee the success or profitability of the site in any manner whatsoever.

(b)     Standards and specifications for the build out, interior design, layout, floor plan, signs, designs, color, and decor of the Restaurant.

8

(c)    Advice regarding the standards and specifications for the equipment, supplies, and materials used in, and the menu items offered for sale by, the Restaurant and advice regarding selecting suppliers for and purchasing such items.

(d)    Guidance in implementing advertising and marketing programs, operating and sales procedures, and bookkeeping and accounting programs.

(e)    The initial training in accordance with Section 7.1.

(f)    Opening assistance consisting of one (1) or more representatives of Franchisor on site at the Franchised Location for not less than five (5) days to assist Franchisee in opening the Restaurant; provided, however, that Franchisee shall hire and be exclusively responsible for the training, compensation, and control of its employees.

(g)    One (1) copy of the Operations Manual, as described in Section 8, which shall be loaned to Franchisee during the term of this Agreement.

9.2    **Responsibilities of Area Director**. Franchisor reserves the right to retain the services of an area director ("**Area Director**") or other representative (including one or more of its affiliates) in the geographic area in which Franchisee's Restaurant will be located. In such event, the Area Director or other representative, on behalf of Franchisor, will perform certain sales, site assistance, and/or supervisory services directed by Franchisor. Franchisee agrees in advance to any such delegation and assignment by Franchisor of any portion or all of Franchisor's obligations and rights under this Agreement. Franchisee also acknowledges that it is not a third party beneficiary of any Area Director Marketing Agreement or other agreement between Franchisor and any Area Director or other representative.

## 10.  OPERATING ASSISTANCE

10.1    **Franchisor's Assistance**. Franchisor agrees that, during Franchisee's operation of the Restaurant, Franchisor and/or its designated representatives shall make available to Franchisee the following assistance:

(a)    Upon the reasonable request of Franchisee, telephone consultation regarding the continued operation and management of a Restaurant and advice regarding Restaurant services, product quality control, menu items, and customer relations issues.

(b)    Access to advertising and promotional materials developed by Franchisor through the Marketing and Promotion Fund (as defined below).

(c)    On-going updates of information and programs regarding menu items and their preparation, the Restaurant business, and related Licensed Methods, including information about special or new services or products developed and made available to franchisees of Franchisor.

(d)    The initial training program to replacement or additional Designated Managers during the term of this Agreement. Although Franchisor does not currently charge a

9

tuition or fee, Franchisor reserves the right to charge a tuition or fee, payable in advance, commensurate with the then-current published prices of Franchisor for such training. Franchisee shall be responsible for all travel and living expenses incurred by its personnel during the training program.

## 11. FRANCHISEE'S OPERATIONAL COVENANTS

11.1 **Business Operations**. Franchisee acknowledges that it is solely responsible for the successful operation of its Restaurant and that its successful operation depends on Franchisee's compliance with this Agreement and the Operations Manual. In addition to all other obligations contained in this Agreement and the Operations Manual, Franchisee agrees that:

(a) Franchisee shall maintain a clean, safe, and high quality Restaurant operation and promote and operate the business in accordance with the Operations Manual so as not to detract from or adversely reflect upon the name and reputation of Franchisor and the goodwill associated with the QUIZNO'S name and Marks.

(b) Franchisee will conduct itself and operate its Restaurant in compliance with all applicable laws, regulations, and other ordinances and in such a manner so as to promote a good public image in the business community. Franchisee will be solely and fully responsible for obtaining any and all licenses to operate the Restaurant. Franchisee shall keep copies of all health department, fire department, building department, and other similar reports of inspections on file and available for inspection by Franchisor. Franchisee shall immediately forward to Franchisor any such reports or inspections in which Franchisee has been found not to be in compliance with the underlying regulation.

(c) Franchisee acknowledges that proper management of the Restaurant is important and shall ensure that Franchisee (or its Managing Owner) or a Designated Manager who has completed the initial training program will be responsible for managing the Restaurant after commencement of operations and be present at the Franchised Location during its operation.

(d) Franchisee acknowledges that the franchise requires and authorizes Franchisee to offer only authorized products and services as described in the Operations Manual, which may include, without limitation, submarine and other sandwiches, salads, other authorized food and beverage products, and related restaurant and carry out or delivery services. Franchisee shall maintain at all times a sufficient supply of all menu items and related food and paper products to ensure, insofar as possible, that such items are at all times available to its customers. Franchisee shall offer all types of services and products from time to time prescribed by Franchisor and shall not offer any other types of services or products, or operate or engage in any other type of business or profession, from or through the Restaurant, unless Franchisor's written consent is first obtained.

(e) Franchisee shall promptly pay when due all taxes and other obligations owed to third parties, including, without limitation, all federal, state, and local taxes and any and all accounts payable or other indebtedness incurred by Franchisee in operating the Restaurant.

10

(f)     Franchisee shall comply with all agreements with third parties related to the Restaurant, including, in particular, all provisions of any premises lease or Sublease.

(g)     Franchisee agrees to renovate, refurbish, remodel, or replace, at its own expense, the real and personal property and equipment used in operating the Restaurant when reasonably required by Franchisor in order to comply with the image, standards of operation, and performance capability established by Franchisor from time to time. If Franchisor changes its image or standards of operation, it shall give Franchisee a reasonable period of time within which to comply with such changes.

(h)     Franchisee shall at all times during the term of this Agreement own and control the Restaurant. Upon request of Franchisor, Franchisee shall promptly provide satisfactory proof of such ownership to Franchisor. Franchisee represents that the Statement of Ownership attached as <u>Exhibit 5</u> is true, complete, accurate, and not misleading. Franchisee shall promptly provide Franchisor with a written notification if the information contained in the Statement of Ownership changes at any time during the term of this Agreement and shall comply with the applicable transfer provisions contained in Section 16. Franchisee acknowledges that, if Franchisee is other than an individual(s), Franchisor may require that the individual owners or members of Franchisee guarantee the performance of Franchisee and sign the Guaranty and Assumption of Franchisee's Obligations attached to this Agreement as <u>Exhibit 6</u>.

(i)     Franchisee shall at all times during the term of this Agreement keep its Restaurant open during the business hours designated by Franchisor from time to time in the Operations Manual. Any deviations from the required hours first must be approved in writing by Franchisor.

(j)     Franchisee shall procure, maintain, and provide evidence of insurance for the Restaurant and its operations of the types, in the amounts, and with such terms and conditions as Franchisor from time to time prescribes in the Operations Manual or otherwise. All of the required policies of insurance shall name Franchisor, and any affiliates of Franchisor that Franchisor periodically designates, as additional insureds and provide for thirty (30) days' advance written notice to Franchisor of their cancellation or modification. If Franchisee participates in the Lease Assistance Program, it shall use an insurance carrier approved by Franchisor.

(k)     Franchisee will provide proof of insurance to Franchisor before beginning operations at its Restaurant. This proof will show that the insurer has been authorized to inform Franchisor in the event any policies lapse or are canceled or modified. Franchisor has the right to change the insurance Franchisee is required to maintain by giving Franchisee reasonable prior notice. Noncompliance with these insurance provisions shall be deemed a material breach of this Agreement. If Franchisee fails to provide proof of insurance or in the event of any lapse in insurance coverage:     (i) Franchisor may obtain insurance coverage for Franchisee, and Franchisee must pay the premiums by electronic funds transfer from Franchisee's bank account; and (2) in addition to all other remedies, Franchisor may demand that Franchisee cease operations of the Restaurant until coverage is reinstated.

11

## 12. ADVERTISING

12.1    **Approval and Use of Advertising**.  Franchisee shall obtain Franchisor's prior written approval of all written advertising or other marketing or promotional programs not previously approved by Franchisor regarding the Restaurant, including, without limitation, "Yellow Pages" advertising, newspaper ads, flyers, brochures, coupons, direct mail pieces, specialty and novelty items, radio and television advertising, Internet "web" pages, and other home pages or domain names on any common carrier electronic delivery system.  Any proposed uses not previously approved by Franchisor shall be submitted to Franchisor at least ten (10) days prior to publication, broadcast, or use.  Franchisee acknowledges that advertising and promoting the Restaurant in accordance with Franchisor's standards and specifications are essential aspects of the Licensed Methods, and Franchisee agrees to comply with all advertising standards and specifications.  Franchisee also agrees to participate in any promotion campaigns and advertising and other programs that Franchisor periodically establishes.

12.2    **Grand Opening**.  Franchisee agrees to conduct a grand opening advertising and promotional program for the Restaurant at the time and in the manner specified by Franchisor and agrees to spend a minimum of Six Thousand Dollars ($6,000) for the grand opening program. Franchisee agrees to provide Franchisor with a summary of grand opening program expenditures within one hundred twenty (120) days after the Restaurant opens. Franchisee's grand opening program will utilize the marketing and public relations programs and media and advertising materials that Franchisor has either developed or approved.

12.3    **Marketing and Promotion Fee**.  Franchisee agrees to pay to Franchisor, in addition to Royalties, a Marketing and Promotion fee ("**Marketing and Promotion Fee**") of one percent (1%) of the total amount of Franchisee's Gross Sales. The Marketing and Promotion Fee shall be in addition to and not in lieu of Franchisee's Local Advertising Fee. The following terms and conditions will apply to the Marketing and Promotion Fee payment:

(a)    The Marketing and Promotion Fee shall be payable weekly, concurrently with the payment of the Royalties, based on Gross Sales (as defined in Section 5.2) for the immediately preceding reporting period. Franchisee shall execute an Authorization Agreement for preauthorized payment of Marketing and Promotion Fees by electronic transfer of funds from Franchisee's bank account to the bank account designated by Franchisor. Any Marketing and Promotion Fee collected by or for Franchisor will be deposited in one (1) or more separate accounts (referred to collectively as the "**Fund**"), all designated as "**QUIZNO'S Marketing and Promotion Fund**."  The Marketing and Promotion Fees will be subject to the same late charges as the Royalties. Upon written request by Franchisee, Franchisor will make available to Franchisee, no later than one hundred twenty (120) days after the end of each calendar year, an annual unaudited financial statement for the Fund which indicates how deposits to the Fund have been spent.  Franchisor has the right to deposit into the Fund any advertising, marketing, or similar allowances paid by suppliers who deal with Restaurants and with whom Franchisor has agreed that it will (or if Franchisor otherwise chooses to) so deposit these allowances. QUIZNO'S Restaurants that Franchisor or its affiliates own will contribute to the Fund on the same basis as franchisees.

12

(b)    The Fund will be administered and controlled by Franchisor or its designated representative and may be used for production and placement of media advertising, direct response literature, direct mailings, brochures, collateral advertising material, surveys of advertising effectiveness, other advertising or public relations expenditures relating to advertising QUIZNO'S Restaurants services and products, providing professional services, materials, and personnel to support the marketing function, and creating, producing, and implementing websites for Franchisor and/or its franchisees. Franchisor may reimburse itself or its designated representative for administrative costs, independent audits, reasonable accounting, bookkeeping, reporting, and legal expenses, taxes, and other reasonable direct and indirect expenses incurred by Franchisor or its representatives in connection with the programs funded by the Fund. The Fund will not be Franchisor's asset. Franchisor will not be liable for any act or omission that is consistent with this Agreement and done in good faith. Franchisor may spend in any fiscal year more or less than the aggregate contribution of all Restaurants to the Fund in that year, and the Fund may borrow from Franchisor or others to cover deficits or invest any surplus for future use. All interest earned on monies contributed to the Fund will be used to pay advertising costs before other assets of the Fund are expended. Franchisor may cause the Fund to be incorporated or operated through a separate entity at such time as Franchisor deems appropriate, and such successor entity, if established, will have all rights and duties specified in this Section. Franchisor undertakes no obligation to ensure that the Fund benefits each Restaurant in proportion to its respective contributions. The Fund's primary purpose is to support sales by the entire QUIZNO'S System and to build brand identity. Franchisee agrees to participate in any promotion campaigns and advertising and other programs that the Fund periodically establishes.

(c)    Franchisor has the right, but no obligation, to use collection agents and institute legal proceedings to collect Fund contributions at the Fund's expense. Franchisor also may forgive, waive, settle, and compromise all claims by or against the Fund. Franchisor may at any time defer or reduce contributions of a franchisee and, upon thirty (30) days' prior written notice to Franchisee, reduce or suspend Fund contributions and operations for one (1) or more periods of any length and terminate (and, if terminated, reinstate) the Fund. If Franchisor terminates the Fund, it will distribute all unspent monies to the contributors in proportion to their respective Fund contributions during the preceding twelve (12) month period.

12.4    **Local Advertising**. Franchisee agrees to spend not less than three percent (3%) of the total amount of its Gross Sales each calendar quarter for local advertising ("**Local Advertising Fee**"). Franchisor may request that Franchisee prepare and submit a quarterly report to Franchisor which accounts for the use of the Local Advertising Fee no later than ten (10) days following the end of each calendar quarter during the term of this Agreement. Franchisor may collect and designate all or a portion of the Local Advertising Fee for the Marketing and Promotion Fund.

12.5    **Regional Advertising Programs**. Although not obligated to do so, Franchisor may create a regional advertising program ("**Regional Advertising**") for the benefit of the Restaurants located within a particular region. Franchisor has the right to (i) allocate any portion of the Marketing and Promotion Fund to the Regional Advertising program; and (ii) collect and designate all or a portion of the Local Advertising Fee for a Regional Advertising program. If a

13

Regional Advertising program is established, Franchisor may increase the Local Advertising Fee by one percent (1%); provided that in no event shall Franchisee be required to spend more than a total of five percent (5%) of its Gross Sales, in the aggregate, for the Local Advertising Fee, Regional Advertising, and Marketing and Promotion Fee contributions, including Yellow Pages advertising. Franchisor has the right to determine the composition of all geographic territories and market areas for the implementation of Regional Advertising and promotion campaigns and to require that Franchisee participate in such Regional Advertising programs as and when established by Franchisor. The fees designated to the Regional Advertising programs may be used to pay regional, multi-regional or national marketing expenses.   If a Regional Advertising program is implemented on behalf of a particular region, Franchisor reserves the right to establish an advertising cooperative for a particular region to enable the cooperative to self-administer the Regional Advertising program, and Franchisee agrees to participate in such cooperative according to the cooperative's then current rules and procedures and to abide by the cooperative's then current decisions. Franchisor may at any time, upon thirty (30) days' prior written notice to Franchisee, suspend a Regional Advertising program or cooperative operations for one (1) or more periods of any length and terminate (and, if terminated, reinstate) the Regional Advertising program or cooperative.

## 13.  QUALITY CONTROL

13.1    **Standards and Specifications**.  Franchisor will make available to Franchisee standards and specifications for services and products offered at or through the Restaurant and the uniforms, recipes, materials, forms, menus, items, and supplies used in connection with the franchised business. Franchisor reserves the right to change standards and specifications for services and products offered at or through the Restaurant or for uniforms, recipes, materials, forms, items, and supplies upon thirty (30) days' prior written notice to Franchisee.

13.2    **Inspections**.  Franchisor shall have the right to interview customers or examine the Franchised Location and to examine and copy its books, records, and documents, including, without limitation, the inventory, products, equipment, materials, or supplies, to ensure compliance with all standards and specifications set by Franchisor.  Franchisor shall conduct such inspections without prior notice to Franchisee.

13.3    **Restrictions on Services and Products**.  Franchisee is prohibited from offering or selling any services or products from or through the Restaurant that have not been previously authorized by Franchisor. However, if Franchisee proposes to offer, conduct, or utilize any services, products, materials, forms, items, or supplies in connection with or for sale through the Restaurant that are not approved by Franchisor, Franchisee shall first notify Franchisor in writing requesting approval. Franchisor may withhold such approval; however, in order to make such determination, Franchisor may require submission of specifications, information, or samples of such services, products, materials, forms, items, or supplies. Franchisor will advise Franchisee within a reasonable time whether such products, supplies, or services meet its specifications.  A charge not to exceed the actual cost of the review may be made by Franchisor and shall be paid by Franchisee.

14

13.4    **Approved Suppliers**.    Franchisee shall purchase all equipment, products, services, supplies, and materials required for the operation of the Restaurant from manufacturers, suppliers, or distributors designated by Franchisor or, if there is no designated supplier for a particular product, equipment, service, supply, or material, from such other suppliers who meet all of Franchisor's specifications and standards as to quality, composition, finish, appearance, and service and adequately demonstrate their capacity and facilities to supply Franchisee's needs in the quantities, at the times, and with the reliability requisite to an efficient operation. Franchisor reserves the right to designate, from time to time, a single supplier for any services, products, equipment, supplies, or materials and to require Franchisee to use such a designated supplier exclusively, which exclusive designated supplier may be Franchisor or its affiliates. Franchisor and its affiliates may receive payments from suppliers on account of such suppliers' dealings with Franchisee and other franchisees and may use all amounts so received without restriction and for any purpose Franchisor and its affiliates deem appropriate (unless Franchisor and its affiliates agree otherwise with the supplier).

13.5    **Request for Change of Supplier**.    In the event Franchisee desires to purchase equipment, products, services, supplies, or materials from manufacturers, suppliers, or distributors other than those previously approved by Franchisor, Franchisee shall, prior to purchasing any such equipment, products, services, supplies, or materials, give Franchisor a written request to change supplier. Franchisor shall notify Franchisee in writing of its approval or rejection of the proposed supplier within a reasonable time after Franchisor's completion of its investigation of the proposed supplier.    Franchisor may from time to time inspect any manufacturer's, supplier's, or distributor's facilities and products to assure proper production, processing, storing, and transportation of equipment, products, services, supplies, or materials to be purchased from the manufacturer, supplier, or distributor by Franchisee. Permission for such inspection shall be a condition of the continued approval of such manufacturer, supplier, or distributor.    Franchisor may, for any reason whatsoever, elect to withhold approval of the manufacturer, supplier, or distributor; however, in order to make such determination, Franchisor may require that samples from a proposed new supplier be delivered to Franchisor for testing prior to approval and use. A charge not to exceed the actual cost of the test may be made by Franchisor and shall be paid by Franchisee. Franchisee acknowledges that Franchisor is likely to reject Franchisee's request for a new supplier without conducting any investigation if Franchisor already has designated an exclusive supplier for the equipment, products, services, supplies, or materials proposed to be offered by the new supplier, as permitted in Section 13.4 above.

## 14. MARKS, TRADE NAMES AND PROPRIETARY INTERESTS

14.1    **Marks**.    Franchisee acknowledges that Franchisor and its affiliates have the sole right to license and control Franchisee's use of the Marks and that such Marks shall remain under the sole and exclusive ownership and control of Franchisor and its affiliates.    Franchisee acknowledges that it does not acquire any right, title, or interest in the Marks except for the right to use the Marks in operating its Restaurant under this Agreement. Franchisee shall display the Marks prominently at the Restaurant, on packaging and serving materials, and in connection with forms, advertising, and marketing, all in the manner Franchisor prescribes. Franchisee further agrees that no Marks other than "QUIZNO'S," "QUIZNO'S CLASSIC SUBS," or such other trademarks specified by Franchisor shall be used in the marketing, promotion, identification, or

operation of the Restaurant, except with Franchisor's prior written consent.  Franchisee may not use any of the Marks, except as allowed by Franchisor in writing, as part of any domain name or electronic address it maintains on the Internet, the World Wide Web, or any other similar proprietary or common carrier electronic delivery system.

14.2    **Licensed Methods**.  Franchisee hereby acknowledges that one or more of Franchisor's affiliates own and control the distinctive plan for establishing, operating, and promoting Restaurants and all related licensed methods of doing business, previously defined as the Licensed Methods, which include, but are not limited to, recipes, menu items, and cooking methods; technical restaurant equipment standards; order and take-out fulfillment methods; customer relations; marketing techniques; written promotional materials and Operations Manual contents; advertising; and accounting systems; all of which constitute trade secrets of such affiliate(s) and have been licensed to Franchisor, and Franchisee acknowledges that Franchisor and its affiliates have valuable rights in and to such trade secrets.  Franchisee further acknowledges that it has not acquired any right, title, or interest in the Licensed Methods, except for the right to use the Licensed Methods in operating the Restaurant, and that any and all innovations, additions, or improvements made to the Licensed Methods, even if by Franchisee, shall belong to Franchisor and its affiliates.

14.3    **Trademark Infringement**.  Franchisee agrees to notify Franchisor in writing of any possible infringement of a Mark or use by others of a trademark confusingly similar to the Marks coming to its attention.  Franchisee acknowledges that Franchisor and its affiliates shall have the sole right to determine whether any action will be taken in response to any possible infringement or illegal use and to control any action taken.  Franchisee agrees to fully cooperate with Franchisor and its affiliates in any litigation or other action.

14.4    **Franchisee's Business Name**.  Franchisee acknowledges that Franchisor and its affiliates have a prior and superior claim to the QUIZNO'S trade name.  Franchisee shall not use the word "QUIZNO'S" in the legal name of its corporation, partnership, or any other business entity.  Franchisee also agrees not to register or attempt to register a trade name using the word "QUIZNO'S" or any portion thereof in Franchisee's name or that of any other person or business entity.

14.5    **Change of Marks**.  In the event Franchisor decides to modify or discontinue use of any proprietary Marks, or to develop additional or substitute marks, Franchisee shall, within a reasonable time after receipt of written notice, take such action, at Franchisee's sole expense, necessary to comply with such modification, discontinuation, addition, or substitution. Franchisor need not reimburse Franchisee for its direct expenses of changing the Restaurant's signs, for any loss of revenue due to any modified or discontinued Mark, or for its expenses of promoting a modified or substitute trademark or service mark.

## 15.  REPORTS, RECORDS AND FINANCIAL STATEMENTS

15.1    **Franchisee Reports**.  Franchisee shall use the bookkeeping services described in and shall execute <u>Exhibit 7</u> for the first twelve (12) months Franchisee's first Restaurant is operating.  After that, Franchisee may discontinue the bookkeeping service ninety (90) days

16

following completion of the following: Franchisee retains a full-time professional accountant (approved in writing by Franchisor) to provide bookkeeping services (at Franchisee's expense), and that accountant agrees in writing (on a form acceptable to Franchisor) to provide timely financial statements required by this Section 15. If Franchisee fails to provide such financial statements more than two (2) times in any twelve (12) month period, then, in addition to any other remedies, Franchisor may require Franchisee to use Franchisor's bookkeeping services at the then-current fee. Franchisee also shall provide to Franchisor financial and accounting reports in the manner and form Franchisor requires, including:

      (a)     Weekly summary reports, submitted by no later than the Due Date each week (defined in Section 5.3) and containing information relative to the previous weekly reporting period operations;

      (b)     Any other data, information, and supporting records reasonably requested by Franchisor from time to time (including, without limitation, daily and weekly reports of product sales by category);

      (c)     Within fifteen (15) days after the end of each month, an income statement of Franchisee's Restaurant for such month and for the fiscal year to date, prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied, in Franchisor's recommended format;

      (d)     By July 15 and January 15 of each calendar year, reports on the status of any loans outstanding as of the previous June 30 and December 31, respectively, for which the Restaurant or any of the Restaurant's equipment is collateral. Franchisee also must deliver to Franchisor, within five (5) days after receipt, copies of any default notices received by Franchisee from any of its lenders. Franchisee agrees that Franchisor may contact Franchisee's bank and other lenders to obtain information regarding the status of Franchisee's loan(s) (including, without limitation, payment histories and any defaults), and Franchisee hereby authorizes its bank and other lenders to provide such information to Franchisor; and

      (e)     Within ninety (90) days after the end of Franchisee's fiscal year, which shall be the calendar year, an income statement and balance sheet of Franchisee's Restaurant for such fiscal year (reflecting all year-end adjustments) and a statement of changes in cash flow of the Restaurant, prepared in accordance with GAAP consistently applied and in Franchisor's recommended format. Franchisor reserves the right to require that Franchisee have reviewed financial statements prepared on an annual basis.

    15.2   **Financial Records Use and Access**. Franchisor reserves the right to disclose data derived from all financial and accounting reports received from Franchisee. Franchisor reserves the right to require that Franchisee install and maintain a telephone modem and dedicated line at the Restaurant which Franchisor or its authorized representatives may access to obtain sales information and data of the System (defined in Section 6.7), and Franchisee agrees to cooperate with Franchisor's procedures regarding the System. With respect to the operation and financial condition of the Restaurant, Franchisee agrees to furnish the required financial and

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 1

accounting reports in the form prescribed by Franchisor, which may include, without limitation, computer diskette, electronic mail, and facsimile transmission.

15.3    **Books and Records**.  Franchisee shall maintain all books and records for its Restaurant in accordance with GAAP consistently applied and preserve such records, including cash register tapes, shift reports, weekly operating summaries, and sales tax returns, for at least three (3) years after the fiscal year to which they relate.

15.4    **Audit of Books and Records**.  Franchisee shall permit Franchisor or its representatives to inspect and audit the books and records of the Restaurant at any reasonable time at Franchisor's expense. If any audit discloses a deficiency in amounts owed to Franchisor, then such amounts shall become immediately payable to Franchisor by Franchisee, with interest from the date such payments were due at the lesser of two percent (2%) per month or the maximum commercial contract interest rate allowed by law. In addition, if such audit discloses that the Gross Sales of the Restaurant have been understated by two (2%) or more during the audit period, Franchisee shall pay all reasonable costs and expenses that Franchisor incurred in connection with such audit.

## 16. TRANSFER

16.1    **Transfer by Franchisee**.  Franchisee agrees that the rights and duties created by this Agreement are personal to Franchisee (or its shareholders, partners, members, or owners, if Franchisee is a corporation, partnership, limited liability company, or other business entity) and that Franchisor has entered into this Agreement in reliance upon Franchisor's perceptions of the individual or collective character, skill, aptitude, attitude, business ability, and financial capacity of Franchisee (or its shareholders, partners, members, or owners).    Accordingly, without Franchisor's prior written consent, which will not be unreasonably withheld, neither this Agreement (or any interest in this Agreement), any part or all of the ownership of Franchisee, nor the Restaurant or all or a substantial portion of its assets may be transferred.    Any unauthorized transfer is a breach of this Agreement, void, and of no effect.    As used in this Agreement, the term **"transfer"** includes Franchisee's (or an owner's) voluntary, involuntary, direct, or indirect assignment, sale, gift, or other disposition of any interest in:    (1) this Agreement; (2) the Franchisee entity; (3) the Restaurant governed by this Agreement; or (4) all or a substantial portion of the assets of the Restaurant.    It also includes an assignment of day-to-day operational responsibilities for the Restaurant pursuant to an operating agreement or otherwise.  A transfer of the Restaurant's ownership, possession, or control, or all or a substantial portion of its assets, may be made only with a transfer of this Agreement.

16.2    **Pre-Conditions to Franchisee's Transfer**.  Franchisee agrees that there may be no transfers before the Restaurant has opened for business.  Franchisor shall not be obligated to approve a proposed transfer unless Franchisee (and its owners) are in full compliance with this Agreement.  Franchisor shall not unreasonably withhold its approval of a proposed transfer that meets all the applicable requirements of this Section.  The proposed transferee and its owners must be individuals of good moral character and otherwise meet Franchisor's then applicable standards for franchisees.

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 |

If the proposed transfer is of this Agreement and the Restaurant, day-to-day operational responsibilities for the Restaurant, or a controlling interest in Franchisee, or is one of a series of transfers (regardless of the time period over which these transfers take place) which in the aggregate transfer this Agreement and the Restaurant or a controlling interest in Franchisee, all of the following conditions must be met before or concurrently with the effective date of the transfer: (a) All amounts due and owing pursuant to this Agreement or otherwise by Franchisee to Franchisor, its affiliates, or third parties whose debts or obligations Franchisor has guaranteed on behalf of Franchisee, if any, are paid in full; Franchisee has submitted all required reports and statements; and Franchisee has not violated any provision of this Agreement, the Restaurant's lease, or any other agreement with Franchisor during both the sixty (60) day period before Franchisee requested Franchisor's consent to the transfer and the period between Franchisee's request and the effective date of the transfer; (b) the proposed transferee agrees to operate the Restaurant as a QUIZNO'S Restaurant, signs the then-current form of franchise agreement, the provisions of which may differ materially from any and all of those contained in this Agreement, passes the competency test, and satisfactorily completes the initial training program; (c) Franchisee provides written notice to Franchisor at least thirty (30) days prior to the proposed effective date of the transfer and includes information reasonably detailed to enable Franchisor to evaluate the terms and conditions of the proposed transfer, which at a minimum includes a written offer from the proposed transferee; (d) the proposed transferee provides information to Franchisor sufficient for Franchisor to assess the proposed transferee's business experience, aptitude, and financial qualification, and Franchisor approves the proposed transferee as a franchisee; (e) neither the transferee nor its owners or affiliates have an ownership interest in, or perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for, a Competitive Business (defined in Section 20.1); (f) the proposed transferee agrees to renovate, refurbish, remodel, or replace, at its own cost, the real and personal property and equipment used in operating the Restaurant within the timeframe specified by Franchisor in order to comply with Franchisor's then current image, standards of operation, and performance capability; (g) Franchisee's landlord allows Franchisee to transfer the Restaurant's lease to the transferee; (h) if Franchisee or its owners finance any part of the purchase price, Franchisee and/or its owners agree that all of the transferee's obligations under promissory notes, agreements, or security interests reserved in the Restaurant are subordinate to the transferee's obligation to pay fees and other amounts due to Franchisor and otherwise to comply with this Agreement; (i) Franchisee executes a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, its affiliates, and their respective shareholders, officers, directors, employees, and agents; (j) Franchisee abides by all post-termination covenants, including, without limitation, the covenant not to compete set forth in Section 20.3; and (k) if Franchisee is an individual transferring this Agreement and the Restaurant to an entity wholly-owned by Franchisee, Franchisee agrees both to remain personally responsible for the entity's performance of its obligations under this Agreement and to continue to comply personally with all obligations under this Agreement.

If Franchisor approves the proposed transfer, Franchisee or the proposed transferee will pay Franchisor a transfer fee in an amount equal to fifty percent (50%) of the then-current Initial Franchise Fee for the type of Restaurant being transferred, which fee is required to cover Franchisor's reasonable expenses related to the transfer, including training; provided, however, that no transfer fee will be charged (and Franchisor's right of first refusal will not apply) for a

19

transfer by Franchisee to an entity wholly-owned by Franchisee, between owners of a Franchisee entity, or to a spouse of Franchisee (or owner of the Franchisee) upon the death or disability of Franchisee (or the owner) so long as the transfer does not result in a change of control of the Franchisee.

A person will be deemed to have a controlling interest in Franchisee if that person has the right to vote twenty-five percent (25%) or more of the voting securities or other forms of ownership interest of a corporation, partnership, or other form of entity, or is entitled to receive twenty-five percent (25%) or more of the net profits of any such entity, or is otherwise able to direct or cause the direction of that entity's management or policies.

16.3    **Franchisor's Approval of Transfer**.  Franchisor has thirty (30) days from the date of the written notice to approve or disapprove, in writing, Franchisee's proposed transfer. Franchisee acknowledges that the proposed transferee shall be evaluated by Franchisor based on the same criteria as those currently being used to assess new franchisees and that the proposed transferee shall be provided with such disclosures required by state or federal law.  Franchisor may review all information regarding the Restaurant that Franchisee gives the transferee, and Franchisor may give the transferee copies of any reports that Franchisee has given Franchisor or Franchisor has made regarding the Restaurant.

16.4    **Right of First Refusal**.  Franchisee grants to Franchisor a thirty (30) day right of first refusal to purchase such rights, interest, or assets on the same terms and conditions as are contained in the written notice set forth in Section 16.2(c); provided, however, the following additional terms and conditions shall apply: (a) the right of first refusal will be effective for each proposed transfer, and any material change in the terms or conditions of the proposed transfer shall be deemed a separate offer for which Franchisor shall have a new thirty (30) day right of first refusal; (b) the thirty (30) day right of first refusal period will run concurrently with the period in which the Franchisor has to approve or disapprove the proposed transferee; (c) if the consideration or manner of payment offered by a proposed transferee is such that Franchisor cannot reasonably be expected to furnish the same, then Franchisor may purchase the interest proposed to be sold for the reasonable cash equivalent. If the parties cannot agree within a reasonable time on the cash consideration, an independent appraiser shall be designated by Franchisor, whose determination will be binding upon the parties; all expenses of the appraiser shall be paid for equally by Franchisor and Franchisee; and, despite subparagraph (b), Franchisor will have fifteen (15) days after determination of the cash consideration to exercise its right of first refusal; and (d) if Franchisor chooses not to exercise its right of first refusal, Franchisee shall be free to complete the transfer subject to compliance with Sections 16.2 and 16.3. Franchisor has the unrestricted right to assign this right of first refusal to a third party, who then will have the rights described in this Section.

16.5    **Transfer by Franchisor**.  Franchisee acknowledges that Franchisor maintains a staff to manage and operate the QUIZNO'S System and that staff members can change from time to time.  Franchisee represents that it has not signed this Agreement in reliance on any shareholder, member, director, officer, or employee remaining with Franchisor in that capacity. Franchisor may change its ownership or form and/or assign this Agreement and any other agreement without restriction.

20

16.6 **Franchisee's Death or Disability**. Upon the death or permanent disability of Franchisee (or an individual controlling a Franchisee entity), the personal representative of such person shall transfer Franchisee's interest in this Agreement or such interest in the Franchisee entity to an approved third party. Such disposition of this Agreement or such interest (including, without limitation, transfer by bequest or inheritance) shall be completed within a reasonable time, not to exceed one hundred twenty (120) days from the date of death or permanent disability (unless extended by probate proceedings), and shall be subject to all terms and conditions applicable to transfers contained in this Section 16; provided, however, that for purposes of this Section, there shall be no transfer fee charged by Franchisor. Failure to transfer the interest within said period of time shall constitute a breach of this Agreement. The term **"permanent disability"** shall mean a mental or physical disability, impairment, or condition that is reasonably expected to prevent or actually does prevent Franchisee (or an owner controlling a Franchisee entity) from supervising the management and operation of the Restaurant for a period of one hundred twenty (120) days from the onset of such disability, impairment, or condition. In any event, the Restaurant shall at all times be managed by a Designated Manager who has complied with all of Franchisor's training requirements, regardless of any death or permanent disability covered by this Section.

## 17. TERM AND RENEWAL

17.1 **Term**. The primary term of this Agreement is for a period of fifteen (15) years from the Effective Date, unless sooner terminated.

17.2 **Renewal**. At the end of the primary term, Franchisee shall have the option to renew its franchise rights for an additional fifteen (15) year term, so long as Franchisee:

(a) Has complied with all provisions of this Agreement during the primary term, including the payment on a timely basis of all Royalties and other fees. **"Compliance"** shall mean, at a minimum, that Franchisee has not received written notification from Franchisor of a breach more than four (4) times during the primary term;

(b) Is not in default or under notification of breach of this Agreement at the time it gives notice under Section 17.3;

(c) Agrees to upgrade and remodel the Restaurant at Franchisee's sole expense (the necessity of which shall be at Franchisor's option) to conform with the then-current Operations Manual requirements;

(d) Executes a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates and their respective shareholders, officers, directors, employees, and agents arising out of or relating to this Agreement or the parties' relationship; and

(e) Executes Franchisor's then-current form of Franchise Agreement, any and all of the terms of which may differ materially from those in this Agreement, including terms

changing the Royalty and other fee amounts; provided that Franchisee shall not be required to pay a new Initial Franchise Fee.

17.3    **Exercise of Renewal**.  Franchisee may exercise its option to renew by giving written notice of such exercise to Franchisor not more than one (1) year nor less than one hundred eighty (180) days prior to the expiration of the primary term. Franchisee must also pay a One Thousand Dollar ($1,000) renewal fee to Franchisor concurrently with the execution of the then-current Franchise Agreement to cover Franchisor's expenses related to reviewing Franchisee's operations and approving the renewal. If Franchisee fails to comply with any of the conditions listed above (other than execution of the new Franchise Agreement or payment of the renewal fee), Franchisor shall give notice to that effect to Franchisee no later than ninety (90) days before expiration of the primary term.

## 18.  DEFAULT AND TERMINATION

18.1    **Termination by Franchisee**.  Franchisee shall have the right to terminate this Agreement if Franchisor materially fails to comply with this Agreement and fails to cure its default within thirty (30) days after delivery of written notice of the default from Franchisee. Notwithstanding the foregoing, if the breach is curable but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisor has commenced and is continuing to make good faith efforts to cure the breach, Franchisor shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.  Any termination by Franchisee other than in accordance with this Section will be deemed a termination by Franchisee without cause.

18.2    **Termination by Franchisor - Effective Upon Notice**.  Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery to Franchisee of a termination notice, upon the occurrence of any of the following events:

(a)    **Unauthorized Opening**.  If Franchisee begins operating the Restaurant without having obtained Franchisor's prior written consent, as required in Section 6.9;

(b)    **Unauthorized Disclosure**.  If Franchisee or any person under Franchisee's control intentionally or negligently discloses to any unauthorized person, or copies or reproduces, the contents or any part of the Operations Manual or any other trade secrets or confidential information of Franchisor or its affiliates;

(c)    **Fraud or Conduct Affecting the Marks**. If Franchisee commits fraud in connection with the purchase or operation of the Restaurant or otherwise engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill associated with the Marks;

(d)    **Abandonment**.  If Franchisee ceases to operate the Restaurant or otherwise abandons the Restaurant for a period of five (5) consecutive days, or any shorter

22

period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire, flood, earthquake, or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(e)    **Insolvency; Assignments**.    If Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee, under any insolvency, bankruptcy, or reorganization act (this provision might not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 et seq.); or if Franchisee makes an assignment for the benefit of creditors; or a receiver is appointed for Franchisee;

(f)    **Unsatisfied Judgments; Levy; Foreclosure**.    If any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas or other appeal bond has been filed); or if execution is levied against Franchisee's business or any of the property used in operating the Restaurant and is not discharged within five (5) days; or if the real or personal property of Franchisee's business shall be sold after levy by any sheriff, marshall, or constable;

(g)    **Criminal Conviction**.    If Franchisee (or any of its Bound Parties, as defined in Section 20.1) is convicted of a felony, a crime involving moral turpitude, or any crime or offense reasonably likely, in the sole opinion of Franchisor, to materially and unfavorably affect the Licensed Methods, Marks, and associated goodwill and reputation;

(h)    **Failure to Make Payments**.    If Franchisee fails to pay any amounts due Franchisor or its affiliates within ten (10) days after delivery of notice that such fees or amounts are overdue;

(i)    **Financial Reporting**.    If Franchisee intentionally underreports Gross Sales in any amount or negligently underreports Gross Sales by five percent (5%) or more during any reporting period;

(j)    **Failure to Complete Training or Open**.    If Franchisee (or its Managing Owner and Designated Manager) fails to complete the initial training program to Franchisor's satisfaction or to commence operations of the Restaurant within the required time period;

(k)    **Misuse of Marks**.    If Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within ten (10) days after delivery of notice from Franchisor;

(l)    **Repeated Noncompliance**.    If Franchisee has received three (3) notices of default from Franchisor within a twelve (12) month period, regardless of whether the defaults were cured by Franchisee;

(m)    **Right to Possession of Property**.    If Franchisee loses the right to occupy the Restaurant's premises because of its default under the lease or Sublease or defaults under any agreement related to use or operation of the Restaurant;

(n)     **Unauthorized Transfer**.  If Franchisee sells, transfers, or otherwise assigns the franchise, an interest in the franchise or Franchisee entity, this Agreement, the Restaurant, or a substantial portion of the assets of the Restaurant without complying with the provisions of Section 16;

(o)     **Termination of Other Franchise Agreement**.  If Franchisor or any of its affiliates issues a notice of termination with respect to any other franchise agreement between Franchisor or any such affiliate and Franchisee (or any other legal entity in which Franchisee, or one of its owners with at least a twenty-five percent (25%) ownership interest in Franchisee, is the sole owner or managing owner) governing the operation of another Quizno's Restaurant;

(p)     **Loan Default**.  If Franchisee commits a default under any loan from or equipment lease with Franchisor, its affiliates, or a third party and fails to cure that default by the date specified by the lender or equipment lessor; or

(q)     **Unsafe or Unsanitary Conditions**.  If Franchisee creates or allows to exist any condition in or at the Restaurant, or on or about the Restaurant's premises, which Franchisor reasonably believes presents health or safety concerns for the Restaurant's customers or employees.

18.3     **Termination by Franchisor – Thirty Days Notice**.  Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery of thirty (30) days' prior written notice to Franchisee, if Franchisee breaches any other provision of this Agreement, including, but not limited to, if Franchisee fails to comply with the Operations Manual, and fails to cure the default during such thirty (30) day period. In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the thirty (30) day period.  Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach, Franchisee shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

18.4     **Late Fee**.  In addition to its other rights and remedies, Franchisor may charge Franchisee a late fee of one hundred dollars ($100) per violation by Franchisee of any term or condition of this Agreement, including, without limitation, failure to pay (or to have adequate amounts available for electronic transfer for) amounts owed Franchisor or its affiliates or failure to timely provide required reports. This fee may be changed or eliminated by Franchisor.

18.5     **Failure to Comply with Reporting Requirements**.  If Franchisee fails to prepare and submit any statement or report required under Section 15, then Franchisor shall have the right to treat Franchisee's failure as good cause for termination of this Agreement.  In addition to all other remedies available to Franchisor, in the event that Franchisee fails to prepare and submit any statement or report required under Section 15 for two (2) consecutive reporting periods, Franchisor shall be entitled to make an audit, at the expense of Franchisee, of Franchisee's books, records, and accounts, including Franchisee's bank accounts. The statements or reports not previously submitted shall be prepared by or under the direction and supervision of

24

an independent certified public accountant selected by Franchisor. In addition to its other rights and remedies, if Franchisee fails to comply with the reporting requirements under Section 15, Franchisor shall have the right to collect, in addition to the late fee, Six Hundred Fifty Dollars ($650) per week for Royalty payments and One Hundred Dollars ($100) per week for advertising payments (or a greater amount if Franchisor reasonably estimates that the Restaurant is generating higher Gross Sales), provided that any amounts will be reconciled and adjusted as needed when Franchisor receives actual Gross Sales amounts.

18.6    **Right to Repurchase**. Except in the case of a renewal under Section 17, upon termination or expiration of this Agreement for any reason, Franchisor shall have the option to purchase the Restaurant, or a portion of the assets of the Restaurant (including any furniture, fixtures, equipment and improvements), and which may include, at Franchisor's option, all of Franchisee's leasehold interest in and to the real estate upon which the Restaurant is located, but not including any other interest in real property. The purchase price for the assets to be transferred will be thirty percent (30%) of the Gross Sales of the Restaurant during the twelve (12) calendar months immediately preceding the date of termination or expiration and will be adjusted by setting off and reducing the purchase price by any amount then owing by Franchisee to Franchisor or its affiliates, including any amounts paid by Franchisor to cure Franchisee's defaults with third parties such as landlords (the decision to pay such cure amounts to be the sole decision of Franchisor). The following additional terms shall apply to Franchisor's exercise of this option:

(a)    Franchisor's option shall be exercisable by providing Franchisee with written notice of its intention to exercise the option no later than the effective date of termination, in the case of termination (unless Franchisee terminates without notice or Franchisee terminates for cause, in which case Franchisor shall have thirty (30) days after receipt of actual notice of the termination or such additional time as is reasonably necessary given the circumstances), or at least thirty (30) days prior to the expiration of the term of the franchise, in circumstances where no renewal is granted;

(b)    Franchisor and Franchisee agree that the terms and conditions of this right and option to purchase may be recorded, if deemed appropriate by Franchisor, in the real property records, and Franchisor and Franchisee further agree to execute such additional documentation as may be necessary and appropriate to effectuate such recording;

(c)    The closing for the purchase will take place no later than sixty (60) days after delivery to Franchisee of written notice of Franchisor's exercise of its option. Franchisor has the unrestricted right to assign this option to purchase at any time to a third party, who then will have the rights described in this Section. Franchisor will pay the purchase price in full at the closing or, at its option, in twenty-four (24) equal consecutive monthly installments, with interest at a rate equal to the prime lending rate as of the closing at Franchisor's primary bank. Franchisee must sign all documents of transfer reasonably necessary for purchase of the Restaurant by Franchisor, which documents shall include all customary representations and warranties from Franchisee as to ownership and condition of, and title to, the assets of the Restaurant being transferred. All assets must be transferred free and clear of all liens and encumbrances, with all sales and transfer taxes paid by Franchisee. Franchisee and its owners

25

further agree to sign general releases, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates and their respective shareholders, officers, directors, employees, agents, successors, and assigns; and

(d)     Franchisee agrees that it shall be obligated to operate the Restaurant, according to this Agreement's terms, during the period in which Franchisor is deciding whether to exercise its option to purchase and until the closing takes place, and that a condition to closing is that the Restaurant has remained open during that time period. Franchisor may decide not to exercise its option to purchase at any time before closing if it determines that any of the conditions noted above have not been or cannot be satisfied.

In the event that Franchisor does not exercise its right to repurchase Franchisee's Restaurant as set forth above, Franchisee will be free, after such termination or expiration, to keep or to sell to any third party all of the physical assets of its Restaurant; provided, however, that all Marks are first removed in a manner approved in writing by Franchisor.

18.7    **Obligations of Franchisee Upon Termination or Expiration**.  Franchisee is obligated upon termination or expiration of this Agreement to immediately:

(a)     Pay all Royalties and other amounts then owed Franchisor or its affiliates pursuant to this Agreement or otherwise;

(b)     Cease identifying itself as a QUIZNO'S franchisee and cease using any Marks, trade secrets, signs, symbols, devices, trade names, or other materials of Franchisor and its affiliates;

(c)     Immediately cease to identify the Franchised Location as being, or having been, associated with Franchisor and immediately cease using the Marks and Licensed Methods;

(d)     Deliver to Franchisor all signs, sign-faces, advertising materials, forms, and other materials bearing any of the Marks or otherwise identified with Franchisor;

(e)     Immediately deliver to Franchisor the Operations Manual and all other information, documents, and copies which are proprietary to Franchisor and its affiliates;

(f)     Promptly take such action required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any Marks or, at the option of Franchisor, assign the same to Franchisor;

(g)     Notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use any telephone number and any regular, classified, or other telephone directory listings associated with any Mark and authorize their transfer to Franchisor or its designee. Franchisee acknowledges that, as between Franchisee and Franchisor, Franchisor has the sole rights to and interest in all telephone, telecopy, or facsimile machine numbers and directory listings associated with any Mark. Franchisee authorizes Franchisor, and hereby appoints Franchisor and any of its officers as Franchisee's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 |

telephone, telecopy, or facsimile machine numbers and directory listings relating to the Restaurant to Franchisor or its designee, should Franchisee fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive of Franchisor's exclusive rights in such telephone numbers and directory listings and Franchisor's authority to direct their transfer; and

(h)    Abide by all restrictive covenants set forth in Section 20 of this Agreement.

18.8    **State and Federal Law**. THE PARTIES ACKNOWLEDGE THAT, IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN FRANCHISEE'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.

18.9    **Assumption of Management**. Franchisor has the right (but not the obligation), under the circumstances described below, to enter the Restaurant and assume the Restaurant's management (or to appoint a third party to assume its management) for any time period it deems appropriate. If Franchisor (or a third party) assumes the Restaurant's management, Franchisee must pay Franchisor (in addition to the Royalty and Marketing and Promotion Fee) three percent (3%) of the Restaurant's Gross Sales, plus Franchisor's (or the third party's) direct out-of-pocket costs and expenses, during this time. If Franchisor (or a third party) assumes the Restaurant's management, Franchisee acknowledges that Franchisor (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Restaurant incurs, or to any of Franchisee's creditors for any supplies or services the Restaurant purchases, while Franchisor (or the third party) manages it.

Franchisor (or a third party) may assume the Restaurant's management under the following circumstances:

(a)    if Franchisee abandons the Restaurant; or

(b)    if Franchisee fails to comply with any provision of this Agreement and does not cure the failure within the time period Franchisor specifies in its notice to Franchisee.

The exercise of Franchisor's rights under subparagraphs (a) or (b) will not affect Franchisor's right to terminate this Agreement.

## 19. BUSINESS RELATIONSHIP

19.1    **Independent Businesspersons**. The parties agree that each of them is an independent businessperson, their only relationship is by virtue of this Agreement, and no fiduciary relationship is created under this Agreement. Neither party is liable or responsible for the other's debts or obligations, nor shall either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business. Franchisor and Franchisee agree that neither of them will hold themselves out to be the agent,

employer, or partner of the other and that neither of them has the authority to bind or incur liability on behalf of the other (unless expressly provided in this Agreement).

19.2    **Payment of Third Party Obligations**.  Franchisor shall have no liability for Franchisee's obligations to pay any third parties, including, without limitation, any product vendors, or for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes levied upon Franchisee, Franchisee's property, the Restaurant, or Franchisor in connection with the sales made or business conducted by Franchisee (except any taxes Franchisor is required by law to collect from Franchisee with respect to purchases from Franchisor and Franchisor's income taxes).

19.3    **Indemnification**.  Franchisee agrees to indemnify, defend, and hold harmless Franchisor and its affiliates, and their respective shareholders, directors, officers, employees, agents, successors, and assignees (the **"Indemnified Parties"**), against, and to reimburse them for, all claims, obligations, and damages described in this Section 19.3, any and all third party obligations described in Section 19.2, and any and all claims and liabilities directly or indirectly arising out of the operation of the Restaurant or the use of the Marks and Licensed Methods in any manner, including, without limitation, those alleged to be or found to have been caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims and liabilities are determined to be caused solely by the Indemnified Party's gross negligence or willful misconduct in a final, unappealable ruling issued by a court or arbitrator with competent jurisdiction. For purposes of this indemnification, claims shall mean and include all obligations, actual and consequential damages, and costs reasonably incurred in the defense of any claim against the Indemnified Parties, including, without limitation, reasonable accountants', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, other litigation expenses, and travel and living expenses. Each Indemnified Party shall have the right to defend any such claim against it at Franchisee's expense and agree to settlements or take any other remedial, corrective, or other actions.  This indemnity shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

## 20.  RESTRICTIVE COVENANTS

20.1    **Non-Competition During Term**.  Franchisee acknowledges that, in addition to the license of the Marks, Franchisor also has licensed commercially valuable information which comprises the Licensed Methods, including, without limitation, operations, marketing, advertising, and related information and materials, and that the value of this information arises not only from the time, effort, and money which went into its compilation but also from the usage by all franchisees. Franchisee therefore agrees that, other than the Restaurant, neither Franchisee nor any of Franchisee's officers, directors, shareholders, members, partners or other owners, nor any spouse or other immediate family members of Franchisee or any of these individuals (collectively, **"Bound Parties"**), shall during the term of this Agreement:

(a)    have any direct or indirect interest as a disclosed or beneficial owner in a "Competitive Business," as defined below, wherever located or operating;

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 ]

(b)    perform services as a director, officer, manager, employee, consultant, representative, agent, or otherwise for a Competitive Business, wherever located or operating;

(c)    divert or attempt to divert any business related to the Restaurant, Franchisor's business, or any other QUIZNO'S franchisee by direct inducement or otherwise, or divert or attempt to divert the employment of any employee of Franchisor, any of its affiliates, or another franchisee, to any Competitive Business; or

(d)    directly or indirectly solicit or employ any person who is employed by Franchisor, any of Franchisor's affiliates, or another franchisee without obtaining the employer's prior written consent.

The term **"Competitive Business,"** as used in this Agreement, shall mean any business operating, or granting franchises or licenses to others to operate, a restaurant or other food service business deriving more than ten percent (10%) of its gross receipts, excluding gross receipts relating to the sale of alcoholic beverages, from the sale of submarine, hoagie, hero-type, and/or deli-style sandwiches (other than another QUIZNO'S Restaurant operated by Franchisee); provided, however, neither Franchisee nor the other Bound Parties shall be prohibited from owning securities in a Competitive Business if such securities are listed on a stock exchange or traded on the over-the-counter market and represent five percent (5%) or less of that class of securities issued and outstanding.  Franchisee agrees that nothing in this Section 20 shall be construed to grant Franchisee any protected territory.

20.2    **Branded Business**.  During the term of this Agreement, neither Franchisee nor any other Bound Party will operate, directly or indirectly, any Branded Business within a one-quarter ($1/4$) mile radius of the Restaurant without the written consent of Franchisor, which consent shall not be unreasonably withheld.  The term **"Branded Business"** means any business marketed by a franchisor or chain under a locally, regionally, or nationally known or registered trademark or service mark.

20.3    **Post-Termination Covenant Not to Compete**.  For a period of two (2) years from the effective date of termination or expiration of this Agreement for any reason, or the date on which Franchisee and all other Bound Parties begin to comply with this Section, whichever is later, neither Franchisee nor any other Bound Party shall have any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative, agent, or in any other capacity in any Competitive Business located or operating within a five (5) mile radius of the former Franchised Location (including at the former Franchised Location) or within a five (5) mile radius of any other QUIZNO'S Restaurant existing on the later of the effective date of termination or expiration of this Agreement or the date on which Franchisee and all other Bound Parties begin to comply with this Section. The restrictions of this Section shall not be applicable to the ownership of shares of a class of securities listed on a stock exchange or traded on the over-the-counter market that represent five percent (5%) or less of the number of shares of that class of securities issued and outstanding. Franchisee and the other Bound Parties expressly acknowledge that they possess skills and abilities of a general nature and have other opportunities for exploiting such skills. Consequently, enforcement of the

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2  |

covenants made in this Section will not deprive them of their personal goodwill or ability to earn a living.

20.4  **Additional Remedies for Breach**.  In addition to any other remedies or damages allowed under this Agreement, if Franchisee breaches the covenants set forth in Sections 20.1, 20.2, or 20.3, Franchisee shall pay Franchisor a fee equal to Franchisor's then-current Initial Franchise Fee for each Competitive Business or Branded Business opened in violation of the covenants, plus eight percent (8%) of such Business's gross sales until expiration of the noncompetition period set forth in Section 20.3.

20.5  **Confidentiality of Proprietary Information**.  Franchisee shall treat all information it receives which comprises the Licensed Methods (including, without limitation, the Operations Manual) as proprietary and confidential and not use such information in an unauthorized manner or disclose the same to any unauthorized person. Franchisee agrees that all such material is the sole property of Franchisor and its affiliates. Franchisee acknowledges that the Marks and the Licensed Methods have valuable goodwill attached to them, that their protection and maintenance are essential to Franchisor and its affiliates, and that any unauthorized use or disclosure of the Marks and Licensed Methods will result in irreparable harm to Franchisor and its affiliates. All ideas, concepts, techniques, or materials concerning a QUIZNO'S Restaurant, whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to Franchisor and will be deemed Franchisor's and its affiliates' sole and exclusive property, part of the QUIZNO'S System, and works made-for-hire for Franchisor and its affiliates. To the extent any item does not qualify as a "work made-for-hire" for Franchisor and its affiliates, Franchisee assigns ownership of that item, and all related rights to that item, to Franchisor and its affiliates and must sign whatever assignment or other documents Franchisor and its affiliates request to show ownership or to help Franchisor and its affiliates obtain intellectual property rights in the item.

20.6  **Confidentiality Agreement**.  Franchisor reserves the right to require that Franchisee cause each of its Bound Parties and Designated Managers (and, if applicable, the spouse of a Designated Manager) to execute a Nondisclosure and Noncompetition Agreement containing the above restrictions in a form approved by Franchisor.

## 21. DISPUTES

21.1  **Governing Law/Consent to Venue and Jurisdiction**.  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other federal law, this Agreement shall be interpreted under the laws of the State of Colorado, and any dispute between the parties, whether arising under this Agreement or from any other aspect of the parties' relationship, shall be governed by and determined in accordance with the substantive laws of the State of Colorado, which laws shall prevail in the event of any conflict of law. Franchisee and Franchisor have negotiated regarding a forum in which to resolve any disputes arising between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving Franchisee or any Bound Party and Franchisor, the parties agree that the exclusive venue for disputes between them shall be in the District Court for the City & County of Denver, Colorado, or the

30

United States District Court for the District of Colorado, and each party waives any objection it might have to the personal jurisdiction of or venue in such courts.

21.2  **Waiver of Jury Trial**. Franchisor, Franchisee, and the Bound Parties each waive their right to a trial by jury. Franchisee, the Bound Parties, and Franchisor acknowledge that the parties' waiver of jury trial rights provides the parties with the mutual benefit of uniform interpretation of this Agreement and resolution of any dispute arising out of this Agreement or any aspect of the parties' relationship. Franchisee, the Bound Parties, and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

21.3  **Remedies**. Except as set forth in Section 21.4, the court will have the right to award any relief which it deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), lost profits, specific performance, injunctive relief, and attorneys' fees and costs. The parties agree that any claim for lost earnings or profits by Franchisee shall be limited to a maximum amount equal to the net profits of the Restaurant for the prior year as shown on Franchisee's federal income tax return. The parties further agree that, in addition to such other damages awarded by the court, if this Agreement is terminated because of a Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the net present value of the Royalties and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for Franchisee's default. Royalties and Marketing and Promotion Fees for purposes of this Section shall be calculated based on the Restaurant's average monthly Gross Sales for the twelve (12) months preceding the termination date.

21.4  **Limitation of Claims**. Franchisee and the Bound Parties agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid. Except with regard to Franchisee's obligation to pay Franchisor and its affiliates Royalty payments, the Marketing and Promotion Fee and other advertising fees, and other payments due from Franchisee pursuant to this Agreement or otherwise, any claims between the parties must be commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claim, or such claim shall be barred. The parties understand that such time limit might be shorter than otherwise allowed by law. Franchisee and the Bound Parties agree that their sole recourse for claims arising between the parties shall be against Franchisor or its successors and assigns. Franchisee and the Bound Parties agree that the shareholders, directors, officers, employees, and agents of Franchisor and its affiliates shall not be personally liable nor named as a party in any action between Franchisor and Franchisee or any Bound Party; provided that this shall not preclude claims Franchisee has directly against an Area Director. Franchisor, Franchisee, and the Bound Parties further agree that, in connection with any such proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed as described above will be forever barred. The parties agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that a proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with another proceeding between Franchisor and any other person or entity. No party will be entitled to an award of punitive or exemplary damages

31

(provided that this limitation shall not apply to statutory penalties such as those set forth in 15 U.S.C. § 1117(a)).   No previous course of dealing shall be admissible to explain, modify, or contradict the terms of this Agreement. No implied covenant of good faith and fair dealing shall be used to alter the express terms of this Agreement.

## 22. SECURITY INTEREST

22.1    **Collateral**.  Franchisee grants Franchisor a security interest ("**Security Interest**") in all of the furniture, fixtures,  equipment, signage, and realty (including Franchisee's interests under all real property and personal property leases) of the Restaurant, together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds, and products thereof, wherever located, used in connection with the Restaurant.  All items in which a security interest is granted are referred to as the "**Collateral**."

22.2    **Indebtedness Secured**.   The Security Interest is to secure payment of the following (the "**Indebtedness**"):

(a)    All amounts due under this Agreement or otherwise by Franchisee;

(b)    All sums which Franchisor may, at its option, expend or advance for the maintenance, preservation, and protection of the Collateral, including, without limitation, payment of rent, taxes, levies, assessments, insurance premiums, and discharge of liens, together with interest, or any other property given as security for payment of the Indebtedness;

(c)    All expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with collecting any or all Indebtedness secured hereby or in enforcing or protecting its rights under the Security Interest and this Agreement; and

(d)    All other present or future, direct or indirect, absolute or contingent, liabilities, obligations, and indebtedness of Franchisee to Franchisor or third-parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement, whether or not Franchisee executes any extension agreement or renewal instruments.

22.3    **Additional Documents**.   Franchisee will from time to time as required by Franchisor join with Franchisor in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions, or modifications thereof) in form satisfactory to Franchisor.

22.4    **Possession of Collateral**.  Upon default and termination of Franchisee's rights under this Agreement, Franchisor shall have the immediate right to possession and use of the Collateral.

22.5    **Remedies of Franchisor in Event of Default**.  Franchisee agrees that, upon the occurrence of any default set forth above,  the full amount remaining unpaid on the Indebtedness secured shall, at the option of Franchisor and without notice, become due and payable immediately, and Franchisor shall then have the rights, options, duties, and remedies of a secured

party under, and Franchisee shall have the rights and duties of a debtor under, the Uniform Commercial Code of Colorado, including, without limitation, Franchisor's right to take possession of the Collateral and without legal process to enter any premises where the Collateral may be found. Any sale of the Collateral may be conducted by Franchisor in a commercially reasonable manner. Reasonable notification of the time and place of any sale shall be satisfied by mailing to Franchisee pursuant to the notice provisions set forth below.

22.6    **Special Filing as Financing Statement**. This Agreement shall be deemed a Security Agreement and a Financing Statement. This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code as in effect in the appropriate jurisdiction.

## 23. MISCELLANEOUS PROVISIONS

23.1    **Modification/Exercise of Judgment**. No amendment, waiver, or modification of this Agreement shall be effective unless it is in writing and signed by Franchisor and Franchisee. Franchisee acknowledges that Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent to which Franchisor deems necessary to protect, promote, or improve the Marks and the quality of the Licensed Methods as long as such modifications are not specifically prohibited by this Agreement.

Whenever Franchisor has reserved in this Agreement a right to take or to withhold an action, or to grant or decline to grant Franchisee a right to take or omit an action, Franchisor may, except as otherwise specifically provided in this Agreement, make its decision or exercise its rights based on information readily available to Franchisor and its judgement of what is in its and/or the system's best interests at the time Franchisor's decision is made, without regard to either whether Franchisor could have made other reasonable or even arguably preferable alternative decisions or whether Franchisor's decision promotes its financial or other individual interest.

23.2    **Entire Agreement**. This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements concerning its subject matter. Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution of this Agreement or for claims of negligent or fraudulent misrepresentation, and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor or its affiliates regarding projected sales volumes, market potential, revenues, profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives. Any policies that the Franchisor adopts and implements from time to time to guide it in its decision-

making are subject to change, are not a part of this Agreement, and are not binding on Franchisor.

23.3   **Delegation by Franchisor**. From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties under this Agreement to third parties, whether the same are agents or affiliates of Franchisor or Area Directors or independent contractors with which Franchisor has contracted to provide such services. Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations under this Agreement. Franchisee acknowledges and agrees that Franchisor may not be bound, and this Agreement may not be modified, by any Area Director without Franchisor's prior written consent.   Franchisee acknowledges and agrees that any such delegation of Franchisor's duties and obligations to Area Directors does not assign or confer any rights under this Agreement upon Area Directors and that Area Directors are not third party beneficiaries of this Agreement.

23.4   **Agreement Effective**. This Agreement shall not be effective until accepted by Franchisor as evidenced by dating and signing by an officer of Franchisor.

23.5   **Review of Agreement**.  Franchisee acknowledges that it has had a copy of Franchisor's Uniform Franchise Offering Circular in its possession for not less than ten (10) full business days, and this Agreement in its possession for not less than five (5) full business days, during which time Franchisee has had the opportunity to submit same for professional review and advice of Franchisee's choosing prior to freely executing this Agreement.

23.6   **Attorneys' Fees**.  In the event of any default on the part of either party to this Agreement, in addition to all other remedies, the party in default will pay the prevailing party (as determined by the decision-maker in the proceeding) all amounts due and all damages, costs, and expenses, including reasonable attorneys' fees, incurred by the prevailing party in any legal action or other proceeding as a result of such default, plus interest at the lesser of two percent (2%) per month or the highest commercial contract interest rate allowable by law accruing from the date of such default.  Additionally, if Franchisee withholds any amounts due Franchisor, Franchisee shall reimburse Franchisor's costs of collecting such amounts, including reasonable attorneys' fees and expenses.

23.7   **Injunctive Relief**.  Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief in appropriate cases to prevent irreparable harm.

23.8   **No Waiver**.  No waiver of any condition or covenant contained in this Agreement, or failure to exercise a right or remedy, by Franchisor or Franchisee shall be considered to imply or constitute a further waiver by Franchisor or Franchisee of the same or any other condition, covenant, right, or remedy.

23.9   **No Right to Set Off**.  Franchisee shall not be allowed to set off amounts owed to Franchisor or its affiliates for Royalties, fees, or other amounts due against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

34

23.10  **Invalidity**. If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element, and, as so modified, such provision shall be deemed a part of this Agreement as though originally included. The remaining provisions of this Agreement shall not be affected by such modification.

23.11  **Notices**. All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by any delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement, or at the Franchised Location's address (after Franchisee's Restaurant has first opened for business), or at such other addresses as Franchisor or Franchisee may designate from time to time, and shall be deemed delivered (a) on the date shown on the return receipt or in the courier's records as the date of delivery or (b) on the date of first attempted delivery, if actual delivery cannot for any reason be made.

23.12  **Acknowledgment**. BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL. FRANCHISEE ACKNOWLEDGES THAT:

(A)  THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

(B)  NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND

(C)  NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

[Signatures on Following Page]

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2

**IN WITNESS WHEREOF,** the parties have executed this Franchise Agreement as of the Effective Date shown on the first page hereof.

**QUIZNO'S FRANCHISING LLC**

By: _____

Title: _____

Date: _____

**FRANCHISEE:**

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**
(Note: use these blocks if you marked on Exhibit 5 that you are an individual or a partnership but the partnership is not a separate <u>legal</u> entity)

_____
Signature
Print Name: _ALI M MAJED_
Date: _8-7-03_

_____
Signature
Print Name: _Jehad Majed_
Date: _8-7-03_

_____
Signature
Print Name: _____
Date: _____

_____
Signature
Print Name: _____
Date: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
Signature

Print Name: _____
Title: _____
Date: _____

36

**EXHIBIT 1 TO**
**FRANCHISE AGREEMENT**

**ADDENDUM TO QUIZNO'S**
**FRANCHISE AGREEMENT**

1.    **Target Area**.  The **Target Area**, referred to in Section 3.1 of the Agreement, shall be:

Metro Detroit, MI

The Franchised Location shall be deemed approved upon approval by Franchisor of the site and lease pursuant to Section 6 of the Agreement.

Franchisee acknowledges and warrants (1) that Franchisor's approval does not constitute a guarantee, recommendation, or endorsement of the Franchised Location or Target Area and that the success of the Restaurant to be operated at a Franchised Location is dependent upon Franchisee's abilities as an independent businessperson; and, when a Franchised Location is approved by Franchisor, (2) that Franchisor has complied with its obligations under the Agreement to assist Franchisee by providing criteria for the Franchised Location and determining fulfillment of the requisite criteria for the Franchised Location, such determination based on information provided by Franchisee.

2.    **Initial Franchise Fee**.  Franchisee shall pay to Franchisor an Initial Franchise Fee, referenced in Section 4.1 of the Agreement, of: $ 25,000.00 .

3.    **Lease Assistance Program**.  (Referenced in Section 6.3 of the Agreement). Check One:

☒    Not Participating

☐    Participating (Lease Review Fee: $2,200; Franchisee required to execute Sublease)

4.    **Training**.  The following individuals shall attend Franchisor's initial training program, as described in Section 7.1 of the Agreement: Jehad Majed , and, of these individuals, the **Designated Manager** shall be: Jehad Majed .

5.    **Managing Owner**.  The following individual is designated as the Managing Owner (if Franchisee is a corporation, partnership, or limited liability company, the Managing Owner must own 25%): Jehad Majed

**IN WITNESS WHEREOF**, the parties have executed this Addendum to Franchise Agreement as of the Effective Date.

**QUIZNO'S FRANCHISING LLC**

By: _____

Title: _____

**FRANCHISEE:**

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**

(Note: use these blocks if you marked on Exhibit 5 that you are an individual or a partnership but the partnership is not a separate <u>legal</u> entity)

_____
Signature

Print Name: ALI M MATED

Date: 8-7-03

_____
Signature

Print Name: Jehad Majed

Date: 8-7-03

_____
Signature

Print Name: _____

Date: _____

_____
Signature

Print Name: _____

Date: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
**Signature**

Print Name: _____

Title: _____

Date: _____

Exhibit 1-2

EXHIBIT 4
TO FRANCHISE AGREEMENT

AUTHORIZATION AGREEMENT FOR PREARRANGED PAYMENTS
(DIRECT DEBITS)

The undersigned depositor ("**Depositor**") hereby (1) authorizes Quizno's Franchising LLC or its affiliates ("**Company**") to initiate debit entries and/or credit correction entries to the undersigned's checking and/or savings account indicated below and (2) authorizes the depository designated below ("**Depository**") to debit such account pursuant to Company's instructions.

_____    _____
Depository                          Branch

_____    _____    _____
City                State            Zip Code

_____    _____
Bank Transit/ABA Number             Account Number

This authority is to remain in full force and effect until Depository has received joint written notification from Company and Depositor of the Depositor's termination of such authority in such time and in such manner as to afford Depository a reasonable opportunity to act on it. Notwithstanding the foregoing, Depository shall provide Company and Depositor with thirty (30) days' prior written notice of the termination of this authority.  If an erroneous debit entry is initiated to Depositor's account, Depositor shall have the right to have the amount of such entry credited to such account by Depository, if (a) within fifteen (15) calendar days following the date on which Depository sent to Depositor a statement of account or a written notice pertaining to such entry or (b) forty-five (45) days after posting, whichever occurs first, Depositor shall have sent to Depository a written notice identifying such entry, stating that such entry was in error, and requesting Depository to credit the amount thereof to such account.  These rights are in addition to any rights Depositor may have under federal and state banking laws.

_____    _Jehad Majed  Ali M Majed_____
DEPOSITORY (Print Name)             DEPOSITOR (Print Name)


By:_____    By:_Jehad Majed  Ali Majed_____
Title:_____    Title:_____

Exhibit 4-1

**EXHIBIT 5**
**TO FRANCHISE AGREEMENT**

**STATEMENT OF OWNERSHIP**

Form of Ownership
(Check One)

✓ Individual(s)                    _____ Legal Entity (check one):

_____ Partnership
_____ Corporation
_____ Limited Liability Company

If a legal entity, attach a copy of the certificate of formation or articles of partnership and provide the following information:

(A) the name, address and percentage of ownership of each owner, member or partner and indicate whether each such person will be active in the business:

Jehad Majed                    50%        Active
7621 W. Morrow Cir
Dearborn, MI 48126

Ali M Majed                    50%
7621 W. Morrow Cir.
Dearborn, MI 48126

(B) the date and state in which the legal entity was formed:

(C) if a corporation, the name and address of each officer and director:

Exhibit 5-1

Provide the address where Franchisee's financial records and partnership, corporate, or company records, as applicable, are maintained (Restaurant location will be deemed to be the address unless otherwise stated below):

_____

_____

_____

Franchisee acknowledges that this Statement of Ownership applies to the Restaurant authorized under the Franchise Agreement.

Use additional sheets if necessary. Any and all changes to the above information must be reported to (and in some cases first approved by) Franchisor in writing.

## FRANCHISEE:

Sign here if you are taking the franchise as an
### INDIVIDUAL(S)
(Note: use these blocks if you marked on Exhibit 5 that you are an individual or a partnership but the partnership is not a separate _legal_ entity)

_____
**Signature**
Print Name: _ALI M MAJED_
Date: _8-7-03_

_____
**Signature**
Print Name: _Jehad Majed_
Date: _8-7-03_

_____
**Signature**
Print Name: _____
Date: _____

_____
**Signature**
Print Name: _____
Date: _____

Sign here if you are taking the franchise as a
### CORPORATION, LIMITED LIABILITY COMPANY OR PARTNERSHIP

_____
Print Name of Legal Entity

By: _____
**Signature**

Print Name: _____
Title: _____
Date: _____

## EXHIBIT 6
## TO FRANCHISE AGREEMENT

## GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution of the above Franchise Agreement (the **"Agreement"**) by Quizno's Franchising LLC (**"Franchisor"**), each of the undersigned hereby personally and unconditionally:

(a)    Guarantees to Franchisor and its successors and assigns, for the term of this Agreement, including renewals, that Franchisee as that term is defined in the Agreement (**"Franchisee"**) shall punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement; and

(b)    Agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, including, but not limited to, those specifically identified below.

Each of the undersigned waives the following:

1.    Acceptance and notice of acceptance by Franchisor of the foregoing undertaking;

2.    Notice of demand for payment of any indebtedness or nonperformance of any obligations hereby guaranteed;

3.    Protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; and

4.    Any right he or she may have to require that any action be brought against Franchisee or any other person as a condition of liability.

Each of the undersigned consents and agrees that:

1.    His or her direct and immediate liability under this guaranty shall be joint and several;

2.    He or she shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so;

3.    Such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person;

4.    Such liability shall not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty,

which shall be continuing and irrevocable during the term of the Ag
including renewals thereof;

5.  He or she shall be bound by the restrictive covenants, confidentiality pro
and indemnification provisions contained in the Agreement; and

6.  The provisions contained in Section 21, and the costs and attorneys' fees p
contained in Section 23.6, of the Agreement shall govern this Guaranty, a
provisions are incorporated into this Guaranty by this reference.

**IN WITNESS WHEREOF**, each of the undersigned has affixed his or her si
effective on the same day and year as the Agreement was executed.

**GUARANTOR(S):**

_Ali Majed_
SIGNATURE

_Jehad Majed_
SIGNATURE

_ALI M MAJED_
NAME - TYPED OR PRINTED

_Jehad Majed_
NAME - TYPED OR PRINTED

X _Inaya Majed_
SPOUSE'S SIGNATURE

_____
SPOUSE'S SIGNATURE

_Inaya Majed_
NAME - TYPED OR PRINTED

_____
NAME - TYPED OR PRINTED

_____
SIGNATURE

_____
SIGNATURE

_____
NAME - TYPED OR PRINTED

_____
NAME - TYPED OR PRINTED

_____
SPOUSE'S SIGNATURE

_____
SPOUSE'S SIGNATURE

_____
NAME - TYPED OR PRINTED

_____
NAME - TYPED OR PRINTED

**EXHIBIT 7 TO**
**FRANCHISE AGREEMENT**

**ADDENDUM TO FRANCHISE AGREEMENT -**
**BOOKKEEPING SERVICES**
**AND DIRECT DEBIT AUTHORIZATION**

**THIS ADDENDUM** to the Franchise Agreement by and between Quizno's Franchising LLC ("**Franchisor**") and the undersigned ("**Franchisee**") is made as of the Effective Date to supplement certain terms and conditions of the Franchise Agreement. In the event of any conflict between the terms of the Franchise Agreement and the terms of this Addendum, the terms of this Addendum shall control. All capitalized terms not otherwise defined in this Addendum shall have their respective meanings set forth in the Franchise Agreement. Franchisor and Franchisee agree as follows:

1. **Bookkeeping Services**. The following shall be added to supplement Section 15 of the Agreement:

A. **Services**. Franchisee shall use Franchisor or Franchisor's designated vendor (the "Service Provider") to provide certain accounting and bookkeeping services (collectively "Bookkeeping Services") to the Restaurant and for payroll services. Franchisee agrees to comply with all requirements Franchisor prescribes with regard to said services. The Bookkeeping Services do not include cash management or payroll services. Franchisor reserves the right to designate different Service Providers for various portions of the Bookkeeping Services.

Franchisor or the Service Provider will provide the following Bookkeeping Services on a period basis for the Restaurant:

| | |
|---|---|
| Period End Financial Statements: | - Balance Sheet |
| | - Profit and Loss Statement |
| Detailed General Ledger: | - Unpaid Invoice Register |
| | - Bank Reconciliation |
| | - Check Register |
| | - Printed Period Accounts Payable Checks |
| | - Prepare necessary sales tax reports |
| | - Prepare necessary personal property tax reports |
| | - Prepare necessary use tax reports |

Franchisor or the Service Provider will review all period-end financial information before issuance. A complete Franchise Bookkeeping Department Procedures Manual will be provided to Franchisee by Franchisor or the Service Provider. This manual will outline in detail all procedures and checklists followed by Franchisor or the

Service Provider. A complete Franchise Restaurant Accounting Procedures Manual will be provided to Franchisee by Franchisor or the Service Provider. This manual will outline in detail all accounting procedures that are the Restaurant's managers' responsibility.

B.    **Submission of Restaurant-Related Items**. In order for the Franchisor or a Service Provider to provide the most timely and useful information to the Restaurant, it is essential that Franchisor or the Service Provider, as applicable, receive information from Franchisee as soon as possible after the applicable accounting period closes. Franchisor or the Service Provider will provide the Bookkeeping Services to Franchisee within ten (10) working days upon receiving the last information for the relevant accounting period.

Each week, in accordance with Franchisor's procedures, Franchisee agrees to submit to Franchisor or the Service Provider: (a) completed Profit Planners worksheets; (b) payroll changes and current hours worked; (c) bank statements; (d) manual check stubs with invoice copies; (e) invoices to be paid; and (f) any other documents required to properly record all transactions affecting the Restaurant's financial activity.

C.    **Fees For Bookkeeping Services**. In consideration for the services Franchisor and the Service Provider provide to the Restaurant pursuant to this Addendum, Franchisee shall pay to Franchisor the sum of Seventy-Five Dollars ($75) per week, due and payable at the same time and in the same manner as Royalties. If the Bookkeeping Services are provided by a Service Provider, upon receipt of the approved income statement each month, Franchisor will pay to the Service Provider from the fees collected from Franchisee pursuant to this Addendum the sum of $70 for each week covered by the income statement. Franchisor will retain from such sums and for its own account (for services rendered pursuant to this Addendum) an amount equal to $5 multiplied by the number of weeks covered by the approved income statement. Franchisor may increase the fee after twelve (12) months following the date the Restaurant commences operations, and thereafter annually, to an amount equal to the market rate for similar services as determined by Franchisor.

D.    **Termination**.

(a)    <u>By Franchisor</u>. If Franchisee fails to (i) submit Restaurant-related items when required pursuant to this Section, or (ii) pay fees due to Franchisor for these services, Franchisor shall have the right to terminate the Agreement as provided in Section 18.2 of the Agreement. Franchisor also shall have the separate and independent right to terminate Bookkeeping Services provided by it upon ninety (90) days' written notice to Franchisee.

(b)    <u>By Franchisee</u>. At any time after twelve (12) months following the date the Restaurant commences operation, Franchisee may cease using Franchisor or Service Provider for Bookkeeping Services as of the 90th day following completion of all of the following: (1) Franchisee provides Franchisor with written notice of its intention to

discontinue the Bookkeeping Services by Franchisor or a Service Provider; and (2) Franchisee retains a full-time professional accountant (approved in writing by Franchisor) to provide Bookkeeping Services (at Franchisee's expense); and (3) Franchisee's full-time professional accountant agrees in writing (on a form acceptable to Franchisor) to provide timely financial statements required by Section 15 of the Agreement. If Franchisee or its full-time professional accountant fails to provide such financial statements more than two (2) times in any twelve (12) month period, in addition to any other remedies, Franchisor may require Franchisee to use Franchisor or a Service Provider to provide Bookkeeping Services at the then-current fee.

2.    **Direct Debits**.    If required by Franchisor, Franchisee shall complete such documents to authorize Franchisor to initiate debit entries and/or credit correction entries to Franchisee's checking or savings account for the payment of Royalties, Marketing and Promotion Fees, Bookkeeping Services Fees, or any other payment owed by Franchisee to Franchisor or its affiliates under the terms of the Agreement or otherwise.

[Signatures on Following Page]

Exhibit 7-3

**IN WITNESS WHEREOF**, the parties have caused this Bookkeeping Services Addendum to be executed as of the Effective Date.

**QUIZNO'S FRANCHISING LLC**

By: _____

Title: _____

**FRANCHISEE:**

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**

_____
Signature

Print Name: _____

_____
Signature

Print Name: _____

_____
Signature

Print Name: _____

_____
Signature

Print Name: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
Signature

Print Name: _____
Title: _____

Exhibit 7-4

**EXHIBIT 8 TO**
**FRANCHISE AGREEMENT**

**ADDENDUM TO QUIZNO'S**
**FRANCHISE AGREEMENT - MAXIMUM BORROWING COMMITMENT**

Franchisee acknowledges and agrees that the maximum amount of debt that the Franchised Restaurant may service shall be the lesser of seventy percent (70%) of Franchisee's initial investment in the Franchised Restaurant or One Hundred Fifty Thousand Dollars ($150,000), or such other amount that Franchisor designates in writing when approving the grant of the franchise. Franchisee shall not borrow in excess of this maximum allowed debt without Franchisor's prior written consent. Franchisee acknowledges that excess debt will adversely affect the Franchised Restaurant's operational results.

**IN WITNESS WHEREOF**, the parties have caused this Maximum Borrowing Commitment Addendum to be executed as of the Effective Date.

QUIZNO'S FRANCHISING LLC

By: _____
Title: _____

**FRANCHISEE:**

Sign here if you are taking the franchise as an

**INDIVIDUAL(S)**

_____
Signature
Print Name: ALI M MAJED

_____
Signature
Print Name: Jehad Majed

_____
Signature
Print Name: _____

_____
Signature
Print Name: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY**
**COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
Signature

Print Name: _____
Title: _____

# QUIZNO'S FRANCHISING LLC

## DISCLOSURE ACKNOWLEDGMENT STATEMENT

QUIZNO'S FRANCHISING LLC ("Franchisor"), through the use of this document, desires to ascertain (a) that the undersigned, individually and as a representative of any legal entity established to acquire the franchise rights ("Franchisee"), fully understands and comprehends that the purchase of a QUIZNO'S Restaurant franchise is a business decision, complete with its associated risks, and (b) that Franchisee is not relying upon any oral statement, representations, promises or assurances during the negotiations for the purchase of the franchise which have not been authorized by the Franchisor. In that regard, the undersigned acknowledges that:

1.      The Franchisee recognizes and understands that business risks, which exist in connection with the purchase of any business, make the success or failure of the franchise subject to many variables, including, among other things, the skills and abilities of the Franchisee, the hours worked by the Franchisee, competition, interest rates, the economy, inflation, Restaurant location, operation costs, lease terms and costs and the market place.   The Franchisee hereby acknowledges its awareness of and willingness to undertake these business risks.

2.      The Franchisee acknowledges receipt of the Franchisor's Uniform Franchise Offering Circular and Exhibits (collectively, the "UFOC"). The Franchisee acknowledges that it has had the opportunity to personally and carefully review these documents.   Furthermore, the Franchisee has been advised to seek professional assistance, to have professionals review the documents and to consult with other franchisees regarding the risks associated with the purchase of the franchise.

3.      The Franchisee agrees and states that the decision to enter into this business risk is in no manner predicated upon any oral representations, assurances, warranties, guarantees or promises made by the Franchisor or any of its officers, employees or agents (including any franchise broker) as to the likelihood of success of the franchise.   Except as contained in the Franchisor's UFOC, the Franchisee acknowledges that it has not received any information from the Franchisor or any of its officers, employees or agents (including any franchise broker) concerning actual, average, projected or forecasted franchise sales, profits or earnings.  If the Franchisee believes that it has received any information concerning actual, average, projected or forecasted franchise sales, profits or earnings other than those contained in the UFOC, please describe these in the space provided below or write "None."

_None_

The Franchisee further acknowledges that the President of the United States of America has issued Executive Order 13224 (the "Executive Order") prohibiting transactions with terrorists and terrorist organizations and that the United States government has adopted, and in the future may adopt, other anti-terrorism measures (the "Anti-Terrorism Measures"). The Franchisor therefore requires certain certifications that the parties with whom it deals are not directly or indirectly involved in terrorism. For that reason, the Franchisee hereby certifies that neither it nor any of its employees, agents, or representatives, nor any other person or entity associated with the Franchisee, is:

(a) a person or entity listed in the Annex to the Executive Order;

(b) a person or entity otherwise determined by the Executive Order to have committed acts of terrorism or to pose a significant risk of committing acts of terrorism;

(c) a person or entity who assists, sponsors, or supports terrorists or acts of terrorism; or

(d) owned or controlled by terrorists or sponsors of terrorism.

The Franchisee further covenants that neither it nor any of its employees, agents, or representatives, nor any other person or entity associated with the Franchisee, will during the term of the Franchise Agreement become a person or entity described above or otherwise become a target of any Anti-Terrorism Measure.

Acknowledged this _7th_ day of _August_, 200_3_.

**FRANCHISEE:**

Sign here if you are taking the franchise as an

INDIVIDUAL(S)

_____
Signature

Print Name: _ALI M MAJED_

_____
Signature

Print Name: _Jehad Majed_

_____
Signature

Print Name: _____

_____
Signature

Print Name: _____

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
**Signature**

Print Name: _____
Title: _____