IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 06-CV-02528-JLK-CBS

CHRIS BRAY, *et al.* v. QFA ROYALTIES LLC

EXHIBITS A THRU D OF THE DECLARATION OF
DANIEL G. CARTER, JR.

| | | | |
|---|---|---|---|
| A | Franchise Agreement excerpts | 19 Pages |
| B | Franchise Agreement excerpts | 16 Pages |
| C | 12/8/06 Cohen Letter | 2 Pages |
| D | 12/8/06 Cohen Letter | 2 Pages |

s:\quiznos franchise\braygroup\declarations\exhibit sheet.doc
dmw

Dockets.Justia.com

# QUIZNO'S FRANCHISING LLC

## FRANCHISE AGREEMENT

# QUIZNO'S FRANCHISING LLC
# FRANCHISE AGREEMENT
# TABLE OF CONTENTS

**Page**

1.  PURPOSE ................................................................................................1

2.  GRANT OF FRANCHISE ......................................................................1
    2.1  Grant of Franchise...........................................................................1
    2.2  Scope of Franchise Operations .......................................................1

3.  FRANCHISED LOCATION AND TARGET AREA..............................2
    3.1  Franchised Location.........................................................................2
    3.2  Limitation on Franchise Rights........................................................2
    3.3  Express Restaurants .........................................................................2
    3.4  Special Products...............................................................................2
    3.5  Franchisor's Reservation of Rights .................................................2

4.  INITIAL FEES.........................................................................................3
    4.1  Initial Franchise Fee........................................................................3

5.  ROYALTIES ............................................................................................3
    5.1  Royalty.............................................................................................3
    5.2  Gross Sales.......................................................................................3
    5.3  Royalty Payments.............................................................................3
    5.4  Application of Payments...................................................................4

6.  DEVELOPMENT OF FRANCHISED LOCATION ..............................4
    6.1  Approval of Franchised Location ....................................................4
    6.2  Lease Approval.................................................................................4
    6.3  Lease Assistance Program ...............................................................4
    6.4  Schedule...........................................................................................5
    6.5  Conversion and Design ....................................................................5
    6.6  Signs.................................................................................................5
    6.7  Equipment ........................................................................................6
    6.8  Permits and Licenses........................................................................6
    6.9  Commencement of Operations .........................................................6

7.  TRAINING ..............................................................................................7
    7.1  Initial Training Program ..................................................................7
    7.2  Additional Training Programs ..........................................................7

8.  OPERATIONS MANUAL.........................................................................8
    8.1  Operations Manual...........................................................................8
    8.2  Changes to Operations Manual.........................................................8

9.    DEVELOPMENT ASSISTANCE ..................................................................8
      9.1    Franchisor's Development Assistance .................................................8
      9.2    Responsibilities of Area Director ......................................................9

10.   OPERATING ASSISTANCE ......................................................................9
      10.1   Franchisor's Assistance ...................................................................9

11.   FRANCHISEE'S OPERATIONAL COVENANTS ........................................10
      11.1   Business Operations ........................................................................10

12.   ADVERTISING ........................................................................................11
      12.1   Approval and Use of Advertising .....................................................11
      12.2   Grand Opening ................................................................................12
      12.3   Marketing and Promotion Fee .........................................................12
      12.4   Local Advertising .............................................................................13
      12.5   Regional Advertising Programs .........................................................13

13.   QUALITY CONTROL ...............................................................................14
      13.1   Standards and Specifications ............................................................14
      13.2   Inspections .....................................................................................14
      13.3   Restrictions on Services and Products ...............................................14
      13.4   Approved Suppliers .........................................................................14
      13.5   Request for Change of Supplier ........................................................15

14.   MARKS, TRADE NAMES AND PROPRIETARY INTERESTS .....................15
      14.1   Marks ..............................................................................................15
      14.2   Licensed Methods ...........................................................................16
      14.3   Trademark Infringement ..................................................................16
      14.4   Franchisee's Business Name .............................................................16
      14.5   Change of Marks .............................................................................16

15.   REPORTS, RECORDS AND FINANCIAL STATEMENTS ...........................16
      15.1   Franchisee Reports ..........................................................................16
      15.2   Financial Records Use and Access ...................................................17
      15.3   Books and Records ..........................................................................17
      15.4   Audit of Books and Records .............................................................18

16.   TRANSFER ..............................................................................................18
      16.1   Transfer by Franchisee .....................................................................18
      16.2   Pre-Conditions to Franchisee's Transfer ..........................................18
      16.3   Franchisor's Approval of Transfer ....................................................20
      16.4   Right of First Refusal .......................................................................20
      16.5   Transfer by Franchisor .....................................................................20
      16.6   Franchisee's Death or Disability .......................................................20

17.   TERM AND RENEWAL ............................................................................21

QUIZNO'S AMENDED FA 07/2002
CHGO1:30161223.v1

17.1    Term.........................................................................................................21
17.2    Renewal..................................................................................................21
17.3    Exercise of Renewal ............................................................................21

18.    DEFAULT AND TERMINATION..............................................................22
18.1    Termination by Franchisee ..................................................................22
18.2    Termination by Franchisor - Effective Upon Notice ...........................22
18.3    Termination by Franchisor - Thirty Days Notice ................................24
18.4    Late Fee................................................................................................24
18.5    Failure to Comply with Reporting Requirements ................................24
18.6    Right to Repurchase.............................................................................24
18.7    Obligations of Franchisee Upon Termination or Expiration ...............26
18.8    State and Federal Law..........................................................................26
18.9    Assumption of Management .................................................................27

19.    BUSINESS RELATIONSHIP ......................................................................27
19.1    Independent Businesspersons ..............................................................27
19.2    Payment of Third Party Obligations ....................................................27
19.3    Indemnification ....................................................................................28

20.    RESTRICTIVE COVENANTS ....................................................................28
20.1    Non-Competition During Term ...........................................................28
20.2    Branded Business.................................................................................29
20.3    Post-Termination Covenant Not to Compete.......................................29
20.4    Additional Remedies for Breach..........................................................29
20.5    Confidentiality of Proprietary Information ..........................................29
20.6    Confidentiality Agreement...................................................................30

21.    DISPUTES ...................................................................................................30
21.1    Governing Law/Consent to Venue and Jurisdiction ............................30
21.2    Waiver of Jury Trial.............................................................................30
21.3    Remedies..............................................................................................30
21.4    Limitation of Claims ............................................................................31

22.    SECURITY INTEREST ...............................................................................31
22.1    Collateral..............................................................................................31
22.2    Indebtedness Secured...........................................................................32
22.3    Additional Documents..........................................................................32
22.4    Possession of Collateral.......................................................................32
22.5    Remedies of Franchisor in Event of Default........................................32
22.6    Special Filing as Financing Statement.................................................32

23.    MISCELLANEOUS PROVISIONS..............................................................33
23.1    Modification/Exercise of Judgment.....................................................33
23.2    Entire Agreement.................................................................................33
23.3    Delegation by Franchisor.....................................................................33

QUIZNO'S AMENDED FA 07/2002
CHGO1:30161223.v1

23.4    Agreement Effective ..............................................................................34
23.5    Review of Agreement ...........................................................................34
23.6    Attorneys' Fees.....................................................................................34
23.7    Injunctive Relief...................................................................................34
23.8    No Waiver.............................................................................................34
23.9    No Right to Set Off...............................................................................34
23.10   Invalidity...............................................................................................34
23.11   Notices ..................................................................................................34
23.12   Acknowledgment ..................................................................................35

## EXHIBITS

1       Addendum -- Location and Initial Franchise Fee
2       Addendum -- QUIZNO'S Classic Subs Express Facility
3       Addendum -- Special Products Program
4       Authorization Agreement for Prearranged Payments
5       Statement of Ownership
6       Guaranty and Assumption of Franchisee's Obligations
7       Addendum -- Bookkeeping Services
8       Addendum -- Maximum Borrowing Commitment

QUIZNO'S AMENDED FA 07/2002
CHGO1:30161223.v1

**FRANCHISEE:** Daniel G. Carter, Jr. Jody L. Carter, Daniel G. Carter, Sr., Madeleine V. Carti

**ADDRESS:** 19454 Willoway Dr, Macomb, MI 48044

**EFFECTIVE DATE:** 9.27.02

THIS AGREEMENT  (the "Agreement") is between **QUIZNO'S FRANCHISING LLC**, a Colorado limited liability company located at 1415 Larimer Street, Denver, Colorado 80202 ("**Franchisor**"), and the franchisee listed above ("**Franchisee**"), who agree as follows:

## 1. PURPOSE

1.1    Franchisor and its affiliates have developed methods for establishing, operating, and promoting restaurants offering submarine sandwiches, salads, other food products and beverages, and related restaurant and carry out services ("**QUIZNO'S Restaurants**" or "**Restaurants**"), which include the use and license of certain valuable trade names, service marks, and trademarks (the "**Marks**") owned by an affiliate of Franchisor and licensed to Franchisor, including the Mark "QUIZNO'S," and the affiliate's distinctive techniques, expertise, and knowledge in establishing, operating, and promoting restaurants and related licensed methods of doing business (the "**Licensed Methods**").

1.2    Franchisor grants the right to others to establish and operate Restaurants under the Marks and using the Licensed Methods.

1.3    Franchisee recognizes and acknowledges the benefits to be derived from being identified and associated with Franchisor, and being able to utilize the Restaurant system and concepts, and therefore desires to establish a Restaurant at an approved location. Franchisor is willing to grant Franchisee the right to operate a Restaurant under the terms and conditions contained in this Agreement.

## 2. GRANT OF FRANCHISE

2.1    **Grant of Franchise**.  Franchisor grants to Franchisee, and Franchisee accepts from Franchisor, the right to use the Marks and Licensed Methods in connection with establishing and operating a Restaurant at the location described in Section 3. Franchisee agrees to use the Marks and Licensed Methods, as they are changed, improved, and further developed by Franchisor and its affiliates from time to time,  only in accordance with the terms and conditions of this Agreement.

2.2    **Scope of Franchise Operations**.  Franchisee agrees at all times faithfully, honestly, and diligently to perform its obligations under this Agreement, to use best efforts to promote its Restaurant, and not to engage in any other business or activity that conflicts with the operation of the Restaurant in compliance with this Agreement. Franchisee agrees to utilize the

renewal fee), Franchisor shall give notice to that effect to Franchisee no later than ninety (90) days before expiration of the primary term.

## 18. DEFAULT AND TERMINATION

18.1    **Termination by Franchisee**.  Franchisee shall have the right to terminate this Agreement if Franchisor materially fails to comply with this Agreement and fails to cure its default within thirty (30) days after delivery of written notice of the default from Franchisee. Notwithstanding the foregoing, if the breach is curable but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisor has commenced and is continuing to make good faith efforts to cure the breach, Franchisor shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.  Any termination by Franchisee other than in accordance with this Section will be deemed a termination by Franchisee without cause.

18.2    **Termination by Franchisor - Effective Upon Notice**.  Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery to Franchisee of a termination notice, upon the occurrence of any of the following events:

(a)    **Unauthorized Opening**.  If Franchisee begins operating the Restaurant without having obtained Franchisor's prior written consent, as required in Section 6.9;

(b)    **Unauthorized Disclosure**.  If Franchisee or any person under Franchisee's control intentionally or negligently discloses to any unauthorized person, or copies or reproduces, the contents or any part of the Operations Manual or any other trade secrets or confidential information of Franchisor or its affiliates;

(c)    **Fraud or Conduct Affecting the Marks**. If Franchisee commits fraud in connection with the purchase or operation of the Restaurant or otherwise engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill associated with the Marks;

(d)    **Abandonment**.  If Franchisee ceases to operate the Restaurant or otherwise abandons the Restaurant for a period of five (5) consecutive days, or any shorter period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire, flood, earthquake, or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(e)    **Insolvency; Assignments**.  If Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee, under any insolvency, bankruptcy, or reorganization act (this provision might not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 et seq.); or if Franchisee makes an assignment for the benefit of creditors; or a receiver is appointed for Franchisee;

22

(f) **Unsatisfied Judgments; Levy; Foreclosure.** If any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas or other appeal bond has been filed); or if execution is levied against Franchisee's business or any of the property used in operating the Restaurant and is not discharged within five (5) days; or if the real or personal property of Franchisee's business shall be sold after levy by any sheriff, marshall, or constable;

(g) **Criminal Conviction.** If Franchisee (or any of its Bound Parties, as defined in Section 20.1) is convicted of a felony, a crime involving moral turpitude, or any crime or offense reasonably likely, in the sole opinion of Franchisor, to materially and unfavorably affect the Licensed Methods, Marks, and associated goodwill and reputation;

(h) **Failure to Make Payments.** If Franchisee fails to pay any amounts due Franchisor or its affiliates within ten (10) days after delivery of notice that such fees or amounts are overdue;

(i) **Financial Reporting.** If Franchisee intentionally underreports Gross Sales in any amount or negligently underreports Gross Sales by five percent (5%) or more during any reporting period;

(j) **Failure to Complete Training or Open.** If Franchisee (or its Managing Owner and Designated Manager) fails to complete the initial training program to Franchisor's satisfaction or to commence operations of the Restaurant within the required time period;

(k) **Misuse of Marks.** If Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within ten (10) days after delivery of notice from Franchisor;

(l) **Repeated Noncompliance.** If Franchisee has received three (3) notices of default from Franchisor within a twelve (12) month period, regardless of whether the defaults were cured by Franchisee;

(m) **Right to Possession of Property.** If Franchisee loses the right to occupy the Restaurant's premises because of its default under the lease or Sublease or defaults under any agreement related to use or operation of the Restaurant;

(n) **Unauthorized Transfer.** If Franchisee sells, transfers, or otherwise assigns the franchise, an interest in the franchise or Franchisee entity, this Agreement, the Restaurant, or a substantial portion of the assets of the Restaurant without complying with the provisions of Section 16;

(o) **Termination of Other Franchise Agreement.** If Franchisor or any of its affiliates issues a notice of termination with respect to any other franchise agreement between Franchisor or any such affiliate and Franchisee (or any other legal entity in which Franchisee, or one of its owners with at least a twenty-five percent (25%) ownership interest in Franchisee, is the sole owner or managing owner) governing the operation of another Quizno's Restaurant;

23

(p)    **Loan Default**.  If Franchisee commits a default under any loan from or equipment lease with Franchisor, its affiliates, or a third party and fails to cure that default by the date specified by the lender or equipment lessor; or

(q)    **Unsafe or Unsanitary Conditions**.  If Franchisee creates or allows to exist any condition in or at the Restaurant, or on or about the Restaurant's premises, which Franchisor reasonably believes presents health or safety concerns for the Restaurant's customers or employees.

18.3    **Termination by Franchisor - Thirty Days Notice**.  Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery of thirty (30) days' prior written notice to Franchisee, if Franchisee breaches any other provision of this Agreement, including, but not limited to, if Franchisee fails to comply with the Operations Manual, and fails to cure the default during such thirty (30) day period. In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the thirty (30) day period.  Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach, Franchisee shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

18.4    **Late Fee**.  In addition to its other rights and remedies, Franchisor may charge Franchisee a late fee of one hundred dollars ($100) per violation by Franchisee of any term or condition of this Agreement, including, without limitation, failure to pay (or to have adequate amounts available for electronic transfer for) amounts owed Franchisor or its affiliates or failure to timely provide required reports. This fee may be changed or eliminated by Franchisor.

18.5    **Failure to Comply with Reporting Requirements**.  If Franchisee fails to prepare and submit any statement or report required under Section 15, then Franchisor shall have the right to treat Franchisee's failure as good cause for termination of this Agreement.  In addition to all other remedies available to Franchisor, in the event that Franchisee fails to prepare and submit any statement or report required under Section 15 for two (2) consecutive reporting periods, Franchisor shall be entitled to make an audit, at the expense of Franchisee, of Franchisee's books, records, and accounts, including Franchisee's bank accounts. The statements or reports not previously submitted shall be prepared by or under the direction and supervision of an independent certified public accountant selected by Franchisor.  In addition to its other rights and remedies, if Franchisee fails to comply with the reporting requirements under Section 15, Franchisor shall have the right to collect, in addition to the late fee, Six Hundred Fifty Dollars ($650) per week for Royalty payments and One Hundred Dollars ($100) per week for advertising payments (or a greater amount if Franchisor reasonably estimates that the Restaurant is generating higher Gross Sales), provided that any amounts will be reconciled and adjusted as needed when Franchisor receives actual Gross Sales amounts.

18.6    **Right to Repurchase**.  Except in the case of a renewal under Section 17, upon termination or expiration of this Agreement for any reason, Franchisor shall have the option to purchase the Restaurant, or a portion of the assets of the Restaurant (including any furniture,

QUIZNO'S AMENDED FA 07/2002
CHGO1:30161223.v1

fixtures, equipment and improvements), and which may include, at Franchisor's option, all of Franchisee's leasehold interest in and to the real estate upon which the Restaurant is located, but not including any other interest in real property. The purchase price for the assets to be transferred will be thirty percent (30%) of the Gross Sales of the Restaurant during the twelve (12) calendar months immediately preceding the date of termination or expiration and will be adjusted by setting off and reducing the purchase price by any amount then owing by Franchisee to Franchisor or its affiliates, including any amounts paid by Franchisor to cure Franchisee's defaults with third parties such as landlords (the decision to pay such cure amounts to be the sole decision of Franchisor). The following additional terms shall apply to Franchisor's exercise of this option:

(a) Franchisor's option shall be exercisable by providing Franchisee with written notice of its intention to exercise the option no later than the effective date of termination, in the case of termination (unless Franchisee terminates without notice or Franchisee terminates for cause, in which case Franchisor shall have thirty (30) days after receipt of actual notice of the termination or such additional time as is reasonably necessary given the circumstances), or at least thirty (30) days prior to the expiration of the term of the franchise, in circumstances where no renewal is granted;

(b) Franchisor and Franchisee agree that the terms and conditions of this right and option to purchase may be recorded, if deemed appropriate by Franchisor, in the real property records, and Franchisor and Franchisee further agree to execute such additional documentation as may be necessary and appropriate to effectuate such recording;

(c) The closing for the purchase will take place no later than sixty (60) days after delivery to Franchisee of written notice of Franchisor's exercise of its option. Franchisor has the unrestricted right to assign this option to purchase at any time to a third party, who then will have the rights described in this Section. Franchisor will pay the purchase price in full at the closing or, at its option, in twenty-four (24) equal consecutive monthly installments, with interest at a rate equal to the prime lending rate as of the closing at Franchisor's primary bank. Franchisee must sign all documents of transfer reasonably necessary for purchase of the Restaurant by Franchisor, which documents shall include all customary representations and warranties from Franchisee as to ownership and condition of, and title to, the assets of the Restaurant being transferred. All assets must be transferred free and clear of all liens and encumbrances, with all sales and transfer taxes paid by Franchisee. Franchisee and its owners further agree to sign general releases, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates and their respective shareholders, officers, directors, employees, agents, successors, and assigns; and

(d) Franchisee agrees that it shall be obligated to operate the Restaurant, according to this Agreement's terms, during the period in which Franchisor is deciding whether to exercise its option to purchase and until the closing takes place, and that a condition to closing is that the Restaurant has remained open during that time period. Franchisor may decide not to exercise its option to purchase at any time before closing if it determines that any of the conditions noted above have not been or cannot be satisfied.

25

In the event that Franchisor does not exercise its right to repurchase Franchisee's Restaurant as set forth above, Franchisee will be free, after such termination or expiration, to keep or to sell to any third party all of the physical assets of its Restaurant; provided, however, that all Marks are first removed in a manner approved in writing by Franchisor.

18.7    **Obligations of Franchisee Upon Termination or Expiration**. Franchisee is obligated upon termination or expiration of this Agreement to immediately:

(a)    Pay all Royalties and other amounts then owed Franchisor or its affiliates pursuant to this Agreement or otherwise;

(b)    Cease identifying itself as a QUIZNO'S franchisee and cease using any Marks, trade secrets, signs, symbols, devices, trade names, or other materials of Franchisor and its affiliates;

(c)    Immediately cease to identify the Franchised Location as being, or having been, associated with Franchisor and immediately cease using the Marks and Licensed Methods;

(d)    Deliver to Franchisor all signs, sign-faces, advertising materials, forms, and other materials bearing any of the Marks or otherwise identified with Franchisor;

(e)    Immediately deliver to Franchisor the Operations Manual and all other information, documents, and copies which are proprietary to Franchisor and its affiliates;

(f)    Promptly take such action required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any Marks or, at the option of Franchisor, assign the same to Franchisor;

(g)    Notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use any telephone number and any regular, classified, or other telephone directory listings associated with any Mark and authorize their transfer to Franchisor or its designee. Franchisee acknowledges that, as between Franchisee and Franchisor, Franchisor has the sole rights to and interest in all telephone, telecopy, or facsimile machine numbers and directory listings associated with any Mark. Franchisee authorizes Franchisor, and hereby appoints Franchisor and any of its officers as Franchisee's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any telephone, telecopy, or facsimile machine numbers and directory listings relating to the Restaurant to Franchisor or its designee, should Franchisee fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive of Franchisor's exclusive rights in such telephone numbers and directory listings and Franchisor's authority to direct their transfer; and

(h)    Abide by all restrictive covenants set forth in Section 20 of this Agreement.

18.8    **State and Federal Law**. THE PARTIES ACKNOWLEDGE THAT, IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION

OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN FRANCHISEE'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.

18.9 **Assumption of Management**. Franchisor has the right (but not the obligation), under the circumstances described below, to enter the Restaurant and assume the Restaurant's management (or to appoint a third party to assume its management) for any time period it deems appropriate. If Franchisor (or a third party) assumes the Restaurant's management, Franchisee must pay Franchisor (in addition to the Royalty and Marketing and Promotion Fee) three percent (3%) of the Restaurant's Gross Sales, plus Franchisor's (or the third party's) direct out-of-pocket costs and expenses, during this time. If Franchisor (or a third party) assumes the Restaurant's management, Franchisee acknowledges that Franchisor (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Restaurant incurs, or to any of Franchisee's creditors for any supplies or services the Restaurant purchases, while Franchisor (or the third party) manages it.

Franchisor (or a third party) may assume the Restaurant's management under the following circumstances:

(a)    if Franchisee abandons the Restaurant; or

(b)    if Franchisee fails to comply with any provision of this Agreement and does not cure the failure within the time period Franchisor specifies in its notice to Franchisee.

The exercise of Franchisor's rights under subparagraphs (a) or (b) will not affect Franchisor's right to terminate this Agreement.

## 19. BUSINESS RELATIONSHIP

19.1 **Independent Businesspersons**.    The parties agree that each of them is an independent businessperson, their only relationship is by virtue of this Agreement, and no fiduciary relationship is created under this Agreement. Neither party is liable or responsible for the other's debts or obligations, nor shall either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business. Franchisor and Franchisee agree that neither of them will hold themselves out to be the agent, employer, or partner of the other and that neither of them has the authority to bind or incur liability on behalf of the other (unless expressly provided in this Agreement).

19.2 **Payment of Third Party Obligations**. Franchisor shall have no liability for Franchisee's obligations to pay any third parties, including, without limitation, any product vendors, or for any sales, use, service, occupation, excise, gross receipts, income, property, or other taxes levied upon Franchisee, Franchisee's property, the Restaurant, or Franchisor in connection with the sales made or business conducted by Franchisee (except any taxes Franchisor is required by law to collect from Franchisee with respect to purchases from Franchisor and Franchisor's income taxes).

27

unauthorized manner or disclose the same to any unauthorized person. Franchisee agrees that all such material is the sole property of Franchisor and its affiliates. Franchisee acknowledges that the Marks and the Licensed Methods have valuable goodwill attached to them, that their protection and maintenance are essential to Franchisor and its affiliates, and that any unauthorized use or disclosure of the Marks and Licensed Methods will result in irreparable harm to Franchisor and its affiliates. All ideas, concepts, techniques, or materials concerning a QUIZNO'S Restaurant, whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to Franchisor and will be deemed Franchisor's and its affiliates' sole and exclusive property, part of the QUIZNO'S System, and works made-for-hire for Franchisor and its affiliates. To the extent any item does not qualify as a "work made-for-hire" for Franchisor and its affiliates, Franchisee assigns ownership of that item, and all related rights to that item, to Franchisor and its affiliates and must sign whatever assignment or other documents Franchisor and its affiliates request to show ownership or to help Franchisor and its affiliates obtain intellectual property rights in the item.

20.6  **Confidentiality Agreement**.  Franchisor reserves the right to require that Franchisee cause each of its Bound Parties and Designated Managers (and, if applicable, the spouse of a Designated Manager) to execute a Nondisclosure and Noncompetition Agreement containing the above restrictions in a form approved by Franchisor.

## 21. DISPUTES

21.1  **Governing Law/Consent to Venue and Jurisdiction**.  Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other federal law, this Agreement shall be interpreted under the laws of the State of Colorado, and any dispute between the parties, whether arising under this Agreement or from any other aspect of the parties' relationship, shall be governed by and determined in accordance with the substantive laws of the State of Colorado, which laws shall prevail in the event of any conflict of law. Franchisee and Franchisor have negotiated regarding a forum in which to resolve any disputes arising between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving Franchisee or any Bound Party and Franchisor, the parties agree that the exclusive venue for disputes between them shall be in the District Court for the City & County of Denver, Colorado, or the United States District Court for the District of Colorado, and each party waives any objection it might have to the personal jurisdiction of or venue in such courts.

21.2  **Waiver of Jury Trial**.  Franchisor, Franchisee, and the Bound Parties each waive their right to a trial by jury. Franchisee, the Bound Parties, and Franchisor acknowledge that the parties' waiver of jury trial rights provides the parties with the mutual benefit of uniform interpretation of this Agreement and resolution of any dispute arising out of this Agreement or any aspect of the parties' relationship. Franchisee, the Bound Parties, and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

21.3  **Remedies**.  Except as set forth in Section 21.4, the court will have the right to award any relief which it deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), lost profits, specific

performance, injunctive relief, and attorneys' fees and costs. The parties agree that any claim for lost earnings or profits by Franchisee shall be limited to a maximum amount equal to the net profits of the Restaurant for the prior year as shown on Franchisee's federal income tax return. The parties further agree that, in addition to such other damages awarded by the court, if this Agreement is terminated because of a Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the net present value of the Royalties and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for Franchisee's default. Royalties and Marketing and Promotion Fees for purposes of this Section shall be calculated based on the Restaurant's average monthly Gross Sales for the twelve (12) months preceding the termination date.

21.4    **Limitation of Claims**. Franchisee and the Bound Parties agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid. Except with regard to Franchisee's obligation to pay Franchisor and its affiliates Royalty payments, the Marketing and Promotion Fee and other advertising fees, and other payments due from Franchisee pursuant to this Agreement or otherwise, any claims between the parties must be commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claim, or such claim shall be barred. The parties understand that such time limit might be shorter than otherwise allowed by law. Franchisee and the Bound Parties agree that their sole recourse for claims arising between the parties shall be against Franchisor or its successors and assigns. Franchisee and the Bound Parties agree that the shareholders, directors, officers, employees, and agents of Franchisor and its affiliates shall not be personally liable nor named as a party in any action between Franchisor and Franchisee or any Bound Party; provided that this shall not preclude claims Franchisee has directly against an Area Director. Franchisor, Franchisee, and the Bound Parties further agree that, in connection with any such proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim which is not submitted or filed as described above will be forever barred. The parties agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that a proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with another proceeding between Franchisor and any other person or entity. No party will be entitled to an award of punitive or exemplary damages (provided that this limitation shall not apply to statutory penalties such as those set forth in 15 U.S.C. § 1117(a)). No previous course of dealing shall be admissible to explain, modify, or contradict the terms of this Agreement. No implied covenant of good faith and fair dealing shall be used to alter the express terms of this Agreement.

## 22. SECURITY INTEREST

22.1    **Collateral**. Franchisee grants Franchisor a security interest ("**Security Interest**") in all of the furniture, fixtures, equipment, signage, and realty (including Franchisee's interests under all real property and personal property leases) of the Restaurant, together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds, and products thereof, wherever located, used in connection with the Restaurant. All items in which a security interest is granted are referred to as the "**Collateral**."

QUIZNO'S AMENDED FA 07/2002
CHGO1:30161223.v1

22.2   **Indebtedness Secured**.   The Security Interest is to secure payment of the following (the "**Indebtedness**"):

(a)   All amounts due under this Agreement or otherwise by Franchisee;

(b)   All sums which Franchisor may, at its option, expend or advance for the maintenance, preservation, and protection of the Collateral, including, without limitation, payment of rent, taxes, levies, assessments, insurance premiums, and discharge of liens, together with interest, or any other property given as security for payment of the Indebtedness;

(c)   All expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with collecting any or all Indebtedness secured hereby or in enforcing or protecting its rights under the Security Interest and this Agreement; and

(d)   All other present or future, direct or indirect, absolute or contingent, liabilities, obligations, and indebtedness of Franchisee to Franchisor or third-parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement, whether or not Franchisee executes any extension agreement or renewal instruments.

22.3   **Additional Documents**.   Franchisee will from time to time as required by Franchisor join with Franchisor in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions, or modifications thereof) in form satisfactory to Franchisor.

22.4   **Possession of Collateral**.   Upon default and termination of Franchisee's rights under this Agreement, Franchisor shall have the immediate right to possession and use of the Collateral.

22.5   **Remedies of Franchisor in Event of Default**.   Franchisee agrees that, upon the occurrence of any default set forth above, the full amount remaining unpaid on the Indebtedness secured shall, at the option of Franchisor and without notice, become due and payable immediately, and Franchisor shall then have the rights, options, duties, and remedies of a secured party under, and Franchisee shall have the rights and duties of a debtor under, the Uniform Commercial Code of Colorado, including, without limitation, Franchisor's right to take possession of the Collateral and without legal process to enter any premises where the Collateral may be found. Any sale of the Collateral may be conducted by Franchisor in a commercially reasonable manner. Reasonable notification of the time and place of any sale shall be satisfied by mailing to Franchisee pursuant to the notice provisions set forth below.

22.6   **Special Filing as Financing Statement**.   This Agreement shall be deemed a Security Agreement and a Financing Statement. This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to

QUIZNO'S AMENDED FA 07/2002
CHGO1:30161223.v1

the applicable provisions of the Uniform Commercial Code as in effect in the appropriate jurisdiction.

## 23. MISCELLANEOUS PROVISIONS

23.1  **Modification/Exercise of Judgment**. No amendment, waiver, or modification of this Agreement shall be effective unless it is in writing and signed by Franchisor and Franchisee. Franchisee acknowledges that Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent to which Franchisor deems necessary to protect, promote, or improve the Marks and the quality of the Licensed Methods as long as such modifications are not specifically prohibited by this Agreement.

Whenever Franchisor has reserved in this Agreement a right to take or to withhold an action, or to grant or decline to grant Franchisee a right to take or omit an action, Franchisor may, except as otherwise specifically provided in this Agreement, make its decision or exercise its rights based on information readily available to Franchisor and its judgement of what is in its and/or the system's best interests at the time Franchisor's decision is made, without regard to either whether Franchisor could have made other reasonable or even arguably preferable alternative decisions or whether Franchisor's decision promotes its financial or other individual interest.

23.2  **Entire Agreement**. This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements concerning its subject matter. Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution of this Agreement or for claims of negligent or fraudulent misrepresentation, and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor or its affiliates regarding projected sales volumes, market potential, revenues, profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives. Any policies that the Franchisor adopts and implements from time to time to guide it in its decision-making are subject to change, are not a part of this Agreement, and are not binding on Franchisor.

23.3  **Delegation by Franchisor**. From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties under this Agreement to third parties, whether the same are agents or affiliates of Franchisor or Area Directors or independent contractors with which Franchisor has contracted to provide such services. Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations under this Agreement. Franchisee acknowledges and agrees that Franchisor may not be bound, and this Agreement may not be modified, by any Area Director without Franchisor's prior written consent. Franchisee acknowledges and agrees that any such delegation of Franchisor's duties and obligations to Area Directors does not assign or confer any rights under

33

this Agreement upon Area Directors and that Area Directors are not third party beneficiaries of this Agreement.

23.4   **Agreement Effective**.  This Agreement shall not be effective until accepted by Franchisor as evidenced by dating and signing by an officer of Franchisor.

23.5   **Review of Agreement**.  Franchisee acknowledges that it has had a copy of Franchisor's Uniform Franchise Offering Circular in its possession for not less than ten (10) full business days, and this Agreement in its possession for not less than five (5) full business days, during which time Franchisee has had the opportunity to submit same for professional review and advice of Franchisee's choosing prior to freely executing this Agreement.

23.6   **Attorneys' Fees**.  In the event of any default on the part of either party to this Agreement, in addition to all other remedies, the party in default will pay the prevailing party (as determined by the decision-maker in the proceeding) all amounts due and all damages, costs, and expenses, including reasonable attorneys' fees, incurred by the prevailing party in any legal action or other proceeding as a result of such default, plus interest at the lesser of two percent (2%) per month or the highest commercial contract interest rate allowable by law accruing from the date of such default.  Additionally, if Franchisee withholds any amounts due Franchisor, Franchisee shall reimburse Franchisor's costs of collecting such amounts, including reasonable attorneys' fees and expenses.

23.7   **Injunctive Relief**.  Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief in appropriate cases to prevent irreparable harm.

23.8   **No Waiver**.  No waiver of any condition or covenant contained in this Agreement, or failure to exercise a right or remedy, by Franchisor or Franchisee shall be considered to imply or constitute a further waiver by Franchisor or Franchisee of the same or any other condition, covenant, right, or remedy.

23.9   **No Right to Set Off**.  Franchisee shall not be allowed to set off amounts owed to Franchisor or its affiliates for Royalties, fees, or other amounts due against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

23.10   **Invalidity**.  If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element, and, as so modified, such provision shall be deemed a part of this Agreement as though originally included.  The remaining provisions of this Agreement shall not be affected by such modification.

23.11   **Notices**.  All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by any delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement, or at the Franchised Location's address (after Franchisee's Restaurant has first opened for business), or at such other addresses as Franchisor or Franchisee may designate from time to time, and shall be deemed delivered (a) on the date shown on the return receipt or in the courier's records as the

date of delivery or (b) on the date of first attempted delivery, if actual delivery cannot for any reason be made.

23.12  **Acknowledgment**.  BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL. FRANCHISEE ACKNOWLEDGES THAT:

(A)  THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

(B)  NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND

(C)  NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

[Signatures on Following Page]

35

**IN WITNESS WHEREOF**, the parties have executed this Franchise Agreement as of the Effective Date shown on the first page hereof.

**QUIZNO'S FRANCHISING LLC**

By: _Amy Bowers_

Title: _Deputy Chief General Counsel_

Date: _9.27.02_

**FRANCHISEE:**

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**
(Note: use these blocks if you marked on Exhibit 5
that you are an individual or a partnership but the
partnership is not a separate legal entity)

_Daniel G. Carter Jr._
Signature
Print Name: _Daniel G. Carter Jr._
Date: _8/19/02_

_Judy L. Carter_
Signature
Print Name: _Judy L. Carter_
Date: _8/19/02_

_Daniel G. Carter Sr._
Signature
Print Name: _DANIEL G. CARTER SR._
Date: _8-19-2002_

_Madeleine V. Carter_
Signature
Print Name: _Madeleine V. Carter_
Date: _8-19-02_

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
**Signature**

Print Name: _____
Title: _____
Date: _____

36

Exhibit B

# #6514

## QUIZNO'S FRANCHISING LLC

## FRANCHISE AGREEMENT



Page

QUIZNO'S FRANCHISING LLC
FRANCHISE AGREEMENT
TABLE OF CONTENTS

Page

1. PURPOSE .................................................................................................................1

2. GRANT OF FRANCHISE ........................................................................................1
   2.1 Grant of Franchise.......................................................................................1
   2.2 Scope of Franchise Operations ..................................................................1

3. FRANCHISED LOCATION AND TARGET AREA................................................2
   3.1 Franchised Location ....................................................................................2
   3.2 Limitation on Franchise Rights..................................................................2
   3.3 Express Restaurants ....................................................................................2
   3.4 Special Products ..........................................................................................2
   3.5 Franchisor's Reservation of Rights ...........................................................2

4. INITIAL FEES...........................................................................................................3
   4.1 Initial Franchise Fee....................................................................................3

5. ROYALTIES ...............................................................................................................3
   5.1 Royalty...........................................................................................................3
   5.2 Gross Sales....................................................................................................3
   5.3 Royalty Payments ........................................................................................3
   5.4 Application of Payments..............................................................................4

6. DEVELOPMENT OF FRANCHISED LOCATION ................................................4
   6.1 Approval of Franchised Location ..............................................................4
   6.2 Lease Approval .............................................................................................4
   6.3 Lease Assistance Program ..........................................................................5
   6.4 Schedule........................................................................................................5
   6.5 Conversion and Design...............................................................................5
   6.6 Signs..............................................................................................................5
   6.7 Equipment.....................................................................................................6
   6.8 Permits and Licenses...................................................................................6
   6.9 Commencement of Operations ...................................................................6

7. TRAINING .................................................................................................................7
   7.1 Initial Training Program .............................................................................7
   7.2 Additional Training Programs ...................................................................7

8. OPERATIONS MANUAL .........................................................................................8
   8.1 Operations Manual......................................................................................8
   8.2 Changes to Operations Manual .................................................................8

i

9.    DEVELOPMENT ASSISTANCE ..................................................................8
      9.1    Franchisor's Development Assistance ...........................................8
      9.2    Responsibilities of Area Director...................................................9

10.   OPERATING ASSISTANCE...................................................................9
      10.1   Franchisor's Assistance ..................................................................9

11.   FRANCHISEE'S OPERATIONAL COVENANTS ...............................10
      11.1   Business Operations......................................................................10

12.   ADVERTISING.......................................................................................12
      12.1   Approval and Use of Advertising ................................................12
      12.2   Grand Opening...............................................................................12
      12.3   Marketing and Promotion Fee .....................................................12
      12.4   Local Advertising...........................................................................13
      12.5   Regional Advertising Programs....................................................13

13.   QUALITY CONTROL..............................................................................14
      13.1   Standards and Specifications .......................................................14
      13.2   Inspections .....................................................................................14
      13.3   Restrictions on Services and Products ........................................14
      13.4   Approved Suppliers .......................................................................15
      13.5   Request for Change of Supplier ...................................................15

14.   MARKS, TRADE NAMES AND PROPRIETARY INTERESTS ...................15
      14.1   Marks ..............................................................................................15
      14.2   Licensed Methods..........................................................................16
      14.3   Trademark Infringement................................................................16
      14.4   Franchisee's Business Name .........................................................16
      14.5   Change of Marks.............................................................................16

15.   REPORTS, RECORDS AND FINANCIAL STATEMENTS ....................16
      15.1   Franchisee Reports.........................................................................16
      15.2   Financial Records Use and Access ...............................................17
      15.3   Books and Records ........................................................................18
      15.4   Audit of Books and Records .........................................................18

16.   TRANSFER ...............................................................................................18
      16.1   Transfer by Franchisee...................................................................18
      16.2   Pre-Conditions to Franchisee's Transfer .....................................18
      16.3   Franchisor's Approval of Transfer ................................................20
      16.4   Right of First Refusal.....................................................................20
      16.5   Transfer by Franchisor...................................................................20
      16.6   Franchisee's Death or Disability ..................................................21

17.   TERM AND RENEWAL ...........................................................................21

ii

changing the Royalty and other fee amounts; provided that Franchisee shall not be required to pay a new Initial Franchise Fee.

17.3    **Exercise of Renewal.** Franchisee may exercise its option to renew by giving written notice of such exercise to Franchisor not more than one (1) year nor less than one hundred eighty (180) days prior to the expiration of the primary term. Franchisee must also pay a One Thousand Dollar ($1,000) renewal fee to Franchisor concurrently with the execution of the then-current Franchise Agreement to cover Franchisor's expenses related to reviewing Franchisee's operations and approving the renewal. If Franchisee fails to comply with any of the conditions listed above (other than execution of the new Franchise Agreement or payment of the renewal fee), Franchisor shall give notice to that effect to Franchisee no later than ninety (90) days before expiration of the primary term.

## 18. DEFAULT AND TERMINATION

18.1    **Termination by Franchisee.** Franchisee shall have the right to terminate this Agreement if Franchisor materially fails to comply with this Agreement and fails to cure its default within thirty (30) days after delivery of written notice of the default from Franchisee. Notwithstanding the foregoing, if the breach is curable but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisor has commenced and is continuing to make good faith efforts to cure the breach, Franchisor shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate. Any termination by Franchisee other than in accordance with this Section will be deemed a termination by Franchisee without cause.

18.2    **Termination by Franchisor - Effective Upon Notice.** Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery to Franchisee of a termination notice, upon the occurrence of any of the following events:

(a)    **Unauthorized Opening.** If Franchisee begins operating the Restaurant without having obtained Franchisor's prior written consent, as required in Section 6.9;

(b)    **Unauthorized Disclosure.** If Franchisee or any person under Franchisee's control intentionally or negligently discloses to any unauthorized person, or copies or reproduces, the contents or any part of the Operations Manual or any other trade secrets or confidential information of Franchisor or its affiliates;

(c)    **Fraud or Conduct Affecting the Marks.** If Franchisee commits fraud in connection with the purchase or operation of the Restaurant or otherwise engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill associated with the Marks;

(d)    **Abandonment.** If Franchisee ceases to operate the Restaurant or otherwise abandons the Restaurant for a period of five (5) consecutive days, or any shorter

22

period that indicates an intent by Franchisee to discontinue operation of the Restaurant, unless and only to the extent that full operation of the Restaurant is suspended or terminated due to fire, flood, earthquake, or other similar causes beyond Franchisee's control and not related to the availability of funds to Franchisee;

(e)    **Insolvency; Assignments.**    If Franchisee becomes insolvent or is adjudicated a bankrupt; or any action is taken by Franchisee, or by others against Franchisee, under any insolvency, bankruptcy, or reorganization act (this provision might not be enforceable under federal bankruptcy law, 11 U.S.C. §§ 101 et seq.); or if Franchisee makes an assignment for the benefit of creditors; or a receiver is appointed for Franchisee;

(f)    **Unsatisfied Judgments; Levy; Foreclosure.**    If any material judgment (or several judgments which in the aggregate are material) is obtained against Franchisee and remains unsatisfied or of record for thirty (30) days or longer (unless a supersedeas or other appeal bond has been filed); or if execution is levied against Franchisee's business or any of the property used in operating the Restaurant and is not discharged within five (5) days; or if the real or personal property of Franchisee's business shall be sold after levy by any sheriff, marshall, or constable;

(g)    **Criminal Conviction.**    If Franchisee (or any of its Bound Parties, as defined in Section 20.1) is convicted of a felony, a crime involving moral turpitude, or any crime or offense reasonably likely, in the sole opinion of Franchisor, to materially and unfavorably affect the Licensed Methods, Marks, and associated goodwill and reputation;

(h)    **Failure to Make Payments.**    If Franchisee fails to pay any amounts due Franchisor or its affiliates within ten (10) days after delivery of notice that such fees or amounts are overdue;

(i)    **Financial Reporting.**    If Franchisee intentionally underreports Gross Sales in any amount or negligently underreports Gross Sales by five percent (5%) or more during any reporting period;

(j)    **Failure to Complete Training or Open.**    If Franchisee (or its Managing Owner and Designated Manager) fails to complete the initial training program to Franchisor's satisfaction or to commence operations of the Restaurant within the required time period;

(k)    **Misuse of Marks.**    If Franchisee misuses or fails to follow Franchisor's directions and guidelines concerning use of the Marks and fails to correct the misuse or failure within ten (10) days after delivery of notice from Franchisor;

(l)    **Repeated Noncompliance.**    If Franchisee has received three (3) notices of default from Franchisor within a twelve (12) month period, regardless of whether the defaults were cured by Franchisee;

(m)    **Right to Possession of Property.**    If Franchisee loses the right to occupy the Restaurant's premises because of its default under the lease or Sublease or defaults under any agreement related to use or operation of the Restaurant;

23

(n)    <u>Unauthorized Transfer</u>.    If Franchisee sells, transfers, or otherwise assigns the franchise, an interest in the franchise or Franchisee entity, this Agreement, the Restaurant, or a substantial portion of the assets of the Restaurant without complying with the provisions of Section 16;

(o)    <u>Termination of Other Franchise Agreement</u>. If Franchisor or any of its affiliates issues a notice of termination with respect to any other franchise agreement between Franchisor or any such affiliate and Franchisee (or any other legal entity in which Franchisee, or one of its owners with at least a twenty-five percent (25%) ownership interest in Franchisee, is the sole owner or managing owner) governing the operation of another Quizno's Restaurant;

(p)    <u>Loan Default</u>. If Franchisee commits a default under any loan from or equipment lease with Franchisor, its affiliates, or a third party and fails to cure that default by the date specified by the lender or equipment lessor; or

(q)    <u>Unsafe or Unsanitary Conditions</u>.    If Franchisee creates or allows to exist any condition in or at the Restaurant, or on or about the Restaurant's premises, which Franchisor reasonably believes presents health or safety concerns for the Restaurant's customers or employees.

18.3    <u>Termination by Franchisor - Thirty Days Notice</u>.    Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery of thirty (30) days' prior written notice to Franchisee, if Franchisee breaches any other provision of this Agreement, including, but not limited to, if Franchisee fails to comply with the Operations Manual, and fails to cure the default during such thirty (30) day period. In that event, this Agreement will terminate without further notice to Franchisee, effective upon expiration of the thirty (30) day period.    Notwithstanding the foregoing, if the breach is curable, but is of a nature which cannot reasonably be cured within such thirty (30) day period and Franchisee has commenced and is continuing to make good faith efforts to cure the breach, Franchisee shall be given an additional reasonable period of time to cure the same, and this Agreement shall not terminate.

18.4    <u>Late Fee</u>.    In addition to its other rights and remedies, Franchisor may charge Franchisee a late fee of one hundred dollars ($100) per violation by Franchisee of any term or condition of this Agreement, including, without limitation, failure to pay (or to have adequate amounts available for electronic transfer for) amounts owed Franchisor or its affiliates or failure to timely provide required reports. This fee may be changed or eliminated by Franchisor.

18.5    <u>Failure to Comply with Reporting Requirements</u>.    If Franchisee fails to prepare and submit any statement or report required under Section 15, then Franchisor shall have the right to treat Franchisee's failure as good cause for termination of this Agreement.    In addition to all other remedies available to Franchisor, in the event that Franchisee fails to prepare and submit any statement or report required under Section 15 for two (2) consecutive reporting periods, Franchisor shall be entitled to make an audit, at the expense of Franchisee, of Franchisee's books, records, and accounts, including Franchisee's bank accounts. The statements or reports not previously submitted shall be prepared by or under the direction and supervision of

24

an independent certified public accountant selected by Franchisor. In addition to its other rights and remedies, if Franchisee fails to comply with the reporting requirements under Section 15, Franchisor shall have the right to collect, in addition to the late fee, Six Hundred Fifty Dollars ($650) per week for Royalty payments and One Hundred Dollars ($100) per week for advertising payments (or a greater amount if Franchisor reasonably estimates that the Restaurant is generating higher Gross Sales), provided that any amounts will be reconciled and adjusted as needed when Franchisor receives actual Gross Sales amounts.

18.6  **Right to Repurchase**. Except in the case of a renewal under Section 17, upon termination or expiration of this Agreement for any reason, Franchisor shall have the option to purchase the Restaurant, or a portion of the assets of the Restaurant (including any furniture, fixtures, equipment and improvements), and which may include, at Franchisor's option, all of Franchisee's leasehold interest in and to the real estate upon which the Restaurant is located, but not including any other interest in real property. The purchase price for the assets to be transferred will be thirty percent (30%) of the Gross Sales of the Restaurant during the twelve (12) calendar months immediately preceding the date of termination or expiration and will be adjusted by setting off and reducing the purchase price by any amount then owing by Franchisee to Franchisor or its affiliates, including any amounts paid by Franchisor to cure Franchisee's defaults with third parties such as landlords (the decision to pay such cure amounts to be the sole decision of Franchisor). The following additional terms shall apply to Franchisor's exercise of this option:

(a)  Franchisor's option shall be exercisable by providing Franchisee with written notice of its intention to exercise the option no later than the effective date of termination, in the case of termination (unless Franchisee terminates without notice or Franchisee terminates for cause, in which case Franchisor shall have thirty (30) days after receipt of actual notice of the termination or such additional time as is reasonably necessary given the circumstances), or at least thirty (30) days prior to the expiration of the term of the franchise, in circumstances where no renewal is granted;

(b)  Franchisor and Franchisee agree that the terms and conditions of this right and option to purchase may be recorded, if deemed appropriate by Franchisor, in the real property records, and Franchisor and Franchisee further agree to execute such additional documentation as may be necessary and appropriate to effectuate such recording;

(c)  The closing for the purchase will take place no later than sixty (60) days after delivery to Franchisee of written notice of Franchisor's exercise of its option. Franchisor has the unrestricted right to assign this option to purchase at any time to a third party, who then will have the rights described in this Section. Franchisor will pay the purchase price in full at the closing or, at its option, in twenty-four (24) equal consecutive monthly installments, with interest at a rate equal to the prime lending rate as of the closing at Franchisor's primary bank. Franchisee must sign all documents of transfer reasonably necessary for purchase of the Restaurant by Franchisor, which documents shall include all customary representations and warranties from Franchisee as to ownership and condition of, and title to, the assets of the Restaurant being transferred. All assets must be transferred free and clear of all liens and encumbrances, with all sales and transfer taxes paid by Franchisee. Franchisee and its owners

25

further agree to sign general releases, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates and their respective shareholders, officers, directors, employees, agents, successors, and assigns; and

(d)    Franchisee agrees that it shall be obligated to operate the Restaurant, according to this Agreement's terms, during the period in which Franchisor is deciding whether to exercise its option to purchase and until the closing takes place, and that a condition to closing is that the Restaurant has remained open during that time period. Franchisor may decide not to exercise its option to purchase at any time before closing if it determines that any of the conditions noted above have not been or cannot be satisfied.

In the event that Franchisor does not exercise its right to repurchase Franchisee's Restaurant as set forth above, Franchisee will be free, after such termination or expiration, to keep or to sell to any third party all of the physical assets of its Restaurant; provided, however, that all Marks are first removed in a manner approved in writing by Franchisor.

18.7   Obligations of Franchisee Upon Termination or Expiration. Franchisee is obligated upon termination or expiration of this Agreement to immediately:

(a)    Pay all Royalties and other amounts then owed Franchisor or its affiliates pursuant to this Agreement or otherwise;

(b)    Cease identifying itself as a QUIZNO'S franchisee and cease using any Marks, trade secrets, signs, symbols, devices, trade names, or other materials of Franchisor and its affiliates;

(c)    Immediately cease to identify the Franchised Location as being, or having been, associated with Franchisor and immediately cease using the Marks and Licensed Methods;

(d)    Deliver to Franchisor all signs, sign-faces, advertising materials, forms, and other materials bearing any of the Marks or otherwise identified with Franchisor;

(e)    Immediately deliver to Franchisor the Operations Manual and all other information, documents, and copies which are proprietary to Franchisor and its affiliates;

(f)    Promptly take such action required to cancel all fictitious or assumed name or equivalent registrations relating to its use of any Marks or, at the option of Franchisor, assign the same to Franchisor;

(g)    Notify the telephone company and all telephone directory publishers of the termination or expiration of Franchisee's right to use any telephone number and any regular, classified, or other telephone directory listings associated with any Mark and authorize their transfer to Franchisor or its designee. Franchisee acknowledges that, as between Franchisee and Franchisor, Franchisor has the sole rights to and interest in all telephone, telecopy, or facsimile machine numbers and directory listings associated with any Mark. Franchisee authorizes Franchisor, and hereby appoints Franchisor and any of its officers as Franchisee's attorney-in-fact, to direct the telephone company and all telephone directory publishers to transfer any

26

telephone, telecopy, or facsimile machine numbers and directory listings relating to the Restaurant to Franchisor or its designee, should Franchisee fail or refuse to do so, and the telephone company and all telephone directory publishers may accept such direction or this Agreement as conclusive of Franchisor's exclusive rights in such telephone numbers and directory listings and Franchisor's authority to direct their transfer; and

        (h)    Abide by all restrictive covenants set forth in Section 20 of this Agreement.

18.8   **State and Federal Law**. THE PARTIES ACKNOWLEDGE THAT, IN THE EVENT THAT THE TERMS OF THIS AGREEMENT REGARDING TERMINATION OR EXPIRATION ARE INCONSISTENT WITH APPLICABLE STATE OR FEDERAL LAW, SUCH LAW SHALL GOVERN FRANCHISEE'S RIGHTS REGARDING TERMINATION OR EXPIRATION OF THIS AGREEMENT.

18.9   **Assumption of Management**. Franchisor has the right (but not the obligation), under the circumstances described below, to enter the Restaurant and assume the Restaurant's management (or to appoint a third party to assume its management) for any time period it deems appropriate. If Franchisor (or a third party) assumes the Restaurant's management, Franchisee must pay Franchisor (in addition to the Royalty and Marketing and Promotion Fee) three percent (3%) of the Restaurant's Gross Sales, plus Franchisor's (or the third party's) direct out-of-pocket costs and expenses, during this time. If Franchisor (or a third party) assumes the Restaurant's management, Franchisee acknowledges that Franchisor (or the third party) will have a duty to utilize only reasonable efforts and will not be liable to Franchisee or its owners for any debts, losses, or obligations the Restaurant incurs, or to any of Franchisee's creditors for any supplies or services the Restaurant purchases, while Franchisor (or the third party) manages it.

Franchisor (or a third party) may assume the Restaurant's management under the following circumstances:

        (a)    if Franchisee abandons the Restaurant; or

        (b)    if Franchisee fails to comply with any provision of this Agreement and does not cure the failure within the time period Franchisor specifies in its notice to Franchisee.

The exercise of Franchisor's rights under subparagraphs (a) or (b) will not affect Franchisor's right to terminate this Agreement.

## 19. BUSINESS RELATIONSHIP

19.1   **Independent Businesspersons**. The parties agree that each of them is an independent businessperson, their only relationship is by virtue of this Agreement, and no fiduciary relationship is created under this Agreement. Neither party is liable or responsible for the other's debts or obligations, nor shall either party be obligated for any damages to any person or property directly or indirectly arising out of the operation of the other party's business. Franchisor and Franchisee agree that neither of them will hold themselves out to be the agent,

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2

covenants made in this Section will not deprive them of their personal goodwill or ability to earn a living.

20.4    **Additional Remedies for Breach**. In addition to any other remedies or damages allowed under this Agreement, if Franchisee breaches the covenants set forth in Sections 20.1, 20.2, or 20.3, Franchisee shall pay Franchisor a fee equal to Franchisor's then-current Initial Franchise Fee for each Competitive Business or Branded Business opened in violation of the covenants, plus eight percent (8%) of such Business's gross sales until expiration of the noncompetition period set forth in Section 20.3.

20.5    **Confidentiality of Proprietary Information**.    Franchisee shall treat all information it receives which comprises the Licensed Methods (including, without limitation, the Operations Manual) as proprietary and confidential and not use such information in an unauthorized manner or disclose the same to any unauthorized person. Franchisee agrees that all such material is the sole property of Franchisor and its affiliates. Franchisee acknowledges that the Marks and the Licensed Methods have valuable goodwill attached to them, that their protection and maintenance are essential to Franchisor and its affiliates, and that any unauthorized use or disclosure of the Marks and Licensed Methods will result in irreparable harm to Franchisor and its affiliates. All ideas, concepts, techniques, or materials concerning a QUIZNO'S Restaurant, whether or not protectable intellectual property and whether created by or for Franchisee or its owners or employees, must be promptly disclosed to Franchisor and will be deemed Franchisor's and its affiliates' sole and exclusive property, part of the QUIZNO'S System, and works made-for-hire for Franchisor and its affiliates. To the extent any item does not qualify as a "work made-for-hire" for Franchisor and its affiliates, Franchisee assigns ownership of that item, and all related rights to that item, to Franchisor and its affiliates and must sign whatever assignment or other documents Franchisor and its affiliates request to show ownership or to help Franchisor and its affiliates obtain intellectual property rights in the item.

20.6    **Confidentiality Agreement**. Franchisor reserves the right to require that Franchisee cause each of its Bound Parties and Designated Managers (and, if applicable, the spouse of a Designated Manager) to execute a Nondisclosure and Noncompetition Agreement containing the above restrictions in a form approved by Franchisor.

## 21. DISPUTES

21.1    **Governing Law/Consent to Venue and Jurisdiction**. Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq.) or other federal law, this Agreement shall be interpreted under the laws of the State of Colorado, and any dispute between the parties, whether arising under this Agreement or from any other aspect of the parties' relationship, shall be governed by and determined in accordance with the substantive laws of the State of Colorado, which laws shall prevail in the event of any conflict of law. Franchisee and Franchisor have negotiated regarding a forum in which to resolve any disputes arising between them and have agreed to select a forum in order to promote stability in their relationship. Therefore, if a claim is asserted in any legal proceeding involving Franchisee or any Bound Party and Franchisor, the parties agree that the exclusive venue for disputes between them shall be in the District Court for the City & County of Denver, Colorado, or the

30

United States District Court for the District of Colorado, and each party waives any objection it might have to the personal jurisdiction of or venue in such courts.

21.2    **Waiver of Jury Trial**. Franchisor, Franchisee, and the Bound Parties each waive their right to a trial by jury.  Franchisee, the Bound Parties, and Franchisor acknowledge that the parties' waiver of jury trial rights provides the parties with the mutual benefit of uniform interpretation of this Agreement and resolution of any dispute arising out of this Agreement or any aspect of the parties' relationship. Franchisee, the Bound Parties, and Franchisor further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

21.3    **Remedies**.  Except as set forth in Section 21.4, the court will have the right to award any relief which it deems proper in the circumstances, including, without limitation, money damages (with interest on unpaid amounts from the date due), lost profits, specific performance, injunctive relief, and attorneys' fees and costs. The parties agree that any claim for lost earnings or profits by Franchisee shall be limited to a maximum amount equal to the net profits of the Restaurant for the prior year as shown on Franchisee's federal income tax return. The parties further agree that, in addition to such other damages awarded by the court, if this Agreement is terminated because of a Franchisee default, Franchisee shall be liable to Franchisor for a lump sum amount equal to the net present value of the Royalties and Marketing and Promotion Fees that would have become due following termination of this Agreement for the period this Agreement would have remained in effect but for Franchisee's default. Royalties and Marketing and Promotion Fees for purposes of this Section shall be calculated based on the Restaurant's average monthly Gross Sales for the twelve (12) months preceding the termination date.

21.4    **Limitation of Claims**.  Franchisee and the Bound Parties agree not to bring any claim asserting that any of the Marks are generic or otherwise invalid. Except with regard to Franchisee's obligation to pay Franchisor and its affiliates Royalty payments, the Marketing and Promotion Fee and other advertising fees, and other payments due from Franchisee pursuant to this Agreement or otherwise, any claims between the parties must be commenced within one (1) year from the date on which the party asserting the claim knew or should have known of the facts giving rise to the claim, or such claim shall be barred. The parties understand that such time limit might be shorter than otherwise allowed by law.  Franchisee and the Bound Parties agree that their sole recourse for claims arising between the parties shall be against Franchisor or its successors and assigns.  Franchisee and the Bound Parties agree that the shareholders, directors, officers, employees, and agents of Franchisor and its affiliates shall not be personally liable nor named as a party in any action between Franchisor and Franchisee or any Bound Party; provided that this shall not preclude claims Franchisee has directly against an Area Director.  Franchisor, Franchisee, and the Bound Parties further agree that, in connection with any such proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any such claim which is not submitted or filed as described above will be forever barred.  The parties agree that any proceeding will be conducted on an individual, not a class-wide, basis, and that a proceeding between Franchisor and Franchisee or the Bound Parties may not be consolidated with another proceeding between Franchisor and any other person or entity.  No party will be entitled to an award of punitive or exemplary damages

31

(provided that this limitation shall not apply to statutory penalties such as those set forth in 15 U.S.C. § 1117(a)). No previous course of dealing shall be admissible to explain, modify, or contradict the terms of this Agreement. No implied covenant of good faith and fair dealing shall be used to alter the express terms of this Agreement.

## 22. SECURITY INTEREST

22.1    Collateral. Franchisee grants Franchisor a security interest ("Security Interest") in all of the furniture, fixtures, equipment, signage, and realty (including Franchisee's interests under all real property and personal property leases) of the Restaurant, together with all similar property now owned or hereafter acquired, additions, substitutions, replacements, proceeds, and products thereof, wherever located, used in connection with the Restaurant. All items in which a security interest is granted are referred to as the "Collateral."

22.2    Indebtedness Secured. The Security Interest is to secure payment of the following (the "Indebtedness"):

(a)    All amounts due under this Agreement or otherwise by Franchisee;

(b)    All sums which Franchisor may, at its option, expend or advance for the maintenance, preservation, and protection of the Collateral, including, without limitation, payment of rent, taxes, levies, assessments, insurance premiums, and discharge of liens, together with interest, or any other property given as security for payment of the Indebtedness;

(c)    All expenses, including reasonable attorneys' fees, which Franchisor incurs in connection with collecting any or all Indebtedness secured hereby or in enforcing or protecting its rights under the Security Interest and this Agreement; and

(d)    All other present or future, direct or indirect, absolute or contingent, liabilities, obligations, and indebtedness of Franchisee to Franchisor or third-parties under this Agreement, however created, and specifically including all or part of any renewal or extension of this Agreement, whether or not Franchisee executes any extension agreement or renewal instruments.

22.3    Additional Documents. Franchisee will from time to time as required by Franchisor join with Franchisor in executing any additional documents and one or more financing statements pursuant to the Uniform Commercial Code (and any assignments, extensions, or modifications thereof) in form satisfactory to Franchisor.

22.4    Possession of Collateral. Upon default and termination of Franchisee's rights under this Agreement, Franchisor shall have the immediate right to possession and use of the Collateral.

22.5    Remedies of Franchisor in Event of Default. Franchisee agrees that, upon the occurrence of any default set forth above, the full amount remaining unpaid on the Indebtedness secured shall, at the option of Franchisor and without notice, become due and payable immediately, and Franchisor shall then have the rights, options, duties, and remedies of a secured

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 1

party under, and Franchisee shall have the rights and duties of a debtor under, the Uniform Commercial Code of Colorado, including, without limitation, Franchisor's right to take possession of the Collateral and without legal process to enter any premises where the Collateral may be found. Any sale of the Collateral may be conducted by Franchisor in a commercially reasonable manner. Reasonable notification of the time and place of any sale shall be satisfied by mailing to Franchisee pursuant to the notice provisions set forth below.

22.6    **Special Filing as Financing Statement**. This Agreement shall be deemed a Security Agreement and a Financing Statement. This Agreement may be filed for record in the real estate records of each county in which the Collateral, or any part thereof, is situated and may also be filed as a Financing Statement in the counties or in the office of the Secretary of State, as appropriate, in respect of those items of Collateral of a kind or character defined in or subject to the applicable provisions of the Uniform Commercial Code as in effect in the appropriate jurisdiction.

## 23. MISCELLANEOUS PROVISIONS

23.1    **Modification/Exercise of Judgment**. No amendment, waiver, or modification of this Agreement shall be effective unless it is in writing and signed by Franchisor and Franchisee. Franchisee acknowledges that Franchisor may modify its standards and specifications and operating and marketing techniques set forth in the Operations Manual unilaterally under any conditions and to the extent to which Franchisor deems necessary to protect, promote, or improve the Marks and the quality of the Licensed Methods as long as such modifications are not specifically prohibited by this Agreement.

Whenever Franchisor has reserved in this Agreement a right to take or to withhold an action, or to grant or decline to grant Franchisee a right to take or omit an action, Franchisor may, except as otherwise specifically provided in this Agreement, make its decision or exercise its rights based on information readily available to Franchisor and its judgement of what is in its and/or the system's best interests at the time Franchisor's decision is made, without regard to either whether Franchisor could have made other reasonable or even arguably preferable alternative decisions or whether Franchisor's decision promotes its financial or other individual interest.

23.2    **Entire Agreement**. This Agreement contains the entire agreement between the parties and supersedes any and all prior agreements concerning its subject matter. Franchisee agrees and understands that Franchisor shall not be liable or obligated for any oral representations or commitments made prior to the execution of this Agreement or for claims of negligent or fraudulent misrepresentation, and that no modifications of this Agreement shall be effective except those in writing and signed by both parties. Franchisor does not authorize and will not be bound by any representation of any nature other than those expressed in this Agreement. Franchisee further acknowledges and agrees that no representations have been made to it by Franchisor or its affiliates regarding projected sales volumes, market potential, revenues, profits of Franchisee's Restaurant, or operational assistance other than as stated in this Agreement or in any disclosure document provided by Franchisor or its representatives. Any policies that the Franchisor adopts and implements from time to time to guide it in its decision-

33

making are subject to change, are not a part of this Agreement, and are not binding on Franchisor.

23.3    <u>Delegation by Franchisor</u>.  From time to time, Franchisor shall have the right to delegate the performance of any portion or all of its obligations and duties under this Agreement to third parties, whether the same are agents or affiliates of Franchisor or Area Directors or independent contractors with which Franchisor has contracted to provide such services. Franchisee agrees in advance to any such delegation by Franchisor of any portion or all of its obligations under this Agreement.  Franchisee acknowledges and agrees that Franchisor may not be bound, and this Agreement may not be modified, by any Area Director without Franchisor's prior written consent.    Franchisee acknowledges and agrees that any such delegation of Franchisor's duties and obligations to Area Directors does not assign or confer any rights under this Agreement upon Area Directors and that Area Directors are not third party beneficiaries of this Agreement.

23.4    <u>Agreement Effective</u>.  This Agreement shall not be effective until accepted by Franchisor as evidenced by dating and signing by an officer of Franchisor.

23.5    <u>Review of Agreement</u>.  Franchisee acknowledges that it has had a copy of Franchisor's Uniform Franchise Offering Circular in its possession for not less than ten (10) full business days, and this Agreement in its possession for not less than five (5) full business days, during which time Franchisee has had the opportunity to submit same for professional review and advice of Franchisee's choosing prior to freely executing this Agreement.

23.6    <u>Attorneys' Fees</u>.  In the event of any default on the part of either party to this Agreement, in addition to all other remedies, the party in default will pay the prevailing party (as determined by the decision-maker in the proceeding) all amounts due and all damages, costs, and expenses, including reasonable attorneys' fees, incurred by the prevailing party in any legal action or other proceeding as a result of such default, plus interest at the lesser of two percent (2%) per month or the highest commercial contract interest rate allowable by law accruing from the date of such default.  Additionally, if Franchisee withholds any amounts due Franchisor, Franchisee shall reimburse Franchisor's costs of collecting such amounts, including reasonable attorneys' fees and expenses.

23.7    <u>Injunctive Relief</u>.  Nothing herein shall prevent Franchisor or Franchisee from seeking injunctive relief in appropriate cases to prevent irreparable harm.

23.8    <u>No Waiver</u>.  No waiver of any condition or covenant contained in this Agreement, or failure to exercise a right or remedy, by Franchisor or Franchisee shall be considered to imply or constitute a further waiver by Franchisor or Franchisee of the same or any other condition, covenant, right, or remedy.

23.9    <u>No Right to Set Off</u>.  Franchisee shall not be allowed to set off amounts owed to Franchisor or its affiliates for Royalties, fees, or other amounts due against any monies owed to Franchisee, which right of set off is hereby expressly waived by Franchisee.

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 |

23.10  Invalidity.  If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision shall be deemed modified to eliminate the invalid element, and, as so modified, such provision shall be deemed a part of this Agreement as though originally included.  The remaining provisions of this Agreement shall not be affected by such modification.

23.11  Notices.  All notices required to be given under this Agreement shall be given in writing, by certified mail, return receipt requested, or by any delivery service providing documentation of receipt, at the address set forth in the first paragraph of this Agreement, or at the Franchised Location's address (after Franchisee's Restaurant has first opened for business), or at such other addresses as Franchisor or Franchisee may designate from time to time, and shall be deemed delivered (a) on the date shown on the return receipt or in the courier's records as the date of delivery or (b) on the date of first attempted delivery, if actual delivery cannot for any reason be made.

23.12  Acknowledgment.  BEFORE SIGNING THIS AGREEMENT, FRANCHISEE SHOULD READ IT CAREFULLY WITH THE ASSISTANCE OF LEGAL COUNSEL. FRANCHISEE ACKNOWLEDGES THAT:

(A)  THE SUCCESS OF THIS BUSINESS VENTURE INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON FRANCHISEE'S ABILITY AS AN INDEPENDENT BUSINESS PERSON AND ITS ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS, AND

(B)  NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED, AND

(C)  NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS DOCUMENT AND IN ANY OFFERING CIRCULAR SUPPLIED TO FRANCHISEE, IS BINDING ON FRANCHISOR IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.

[Signatures on Following Page]

QUIZNO'S FA 1/2003
~CHGO1:30242059.v2 |

IN WITNESS WHEREOF, the parties have executed this Franchise Agreement as of the Effective Date shown on the first page hereof.

QUIZNO'S FRANCHISING LLC.

By: _____

Title: _____

Date: _____

FRANCHISEE:

Sign here if you are taking the franchise as an
**INDIVIDUAL(S)**
(Note: use these blocks if you marked on Exhibit 5
that you are an individual or a partnership but the
partnership is not a separate legal entity)

_____
Signature
Print Name: Jody L. Carter
Date: 11-20-03

_____
Signature
Print Name: DANIEL G. CARTER
Date: 11-20-03

_____
Signature
Print Name: Madeleine V. Carter
Date: 11-20-03

_____
Signature
Print Name: Daniel G. Carter Jr.
Date: 11-20-03

Sign here if you are taking the franchise as a
**CORPORATION, LIMITED LIABILITY
COMPANY OR PARTNERSHIP**

_____
Print Name of Legal Entity

By: _____
Signature

Print Name: _____
Title: _____
Date: _____

36



Exhibit  C

DLA Piper US LLP
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1293
www.dlapiper.com

Fredric A. Cohen

December 8, 2006

**Sent Via Overnight Delivery**

Daniel Carter, Sr.
Daniel Carter, Jr.
Jody Carter
Madeleine Carter
Carter Group LLC
19454 Willoway Drive
Macomb, Michigan 48044

Quiznos Sub
24955 Gratiot Avenue
Eastpointe, Michigan 48021

> RE: **Notice of Termination; Franchise Agreement dated September 27, 2002 ("Agreement") Between Carter Group LLC ("You") and QFA Royalties LLC, as successor in interest to Quizno's Franchising LLC ("Quizno's") for the Quiznos Sub No. 4199 Located at 24955 Gratiot Avenue, Eastpointe, Michigan 48021 ("Restaurant")**

Dear Messrs. Carter and Mss. Carter:

You are hereby advised that your franchise rights under the Agreement are terminated, effective five (5) days following receipt of this notice, pursuant to Section 18.2(c) of the Agreement, for engaging in conduct that, in the sole judgment of Quiznos, materially impairs the goodwill associated with the Marks, unless such conduct is cured within such five (5) day period.

Please refer to Section 18.7 of the Agreement regarding your continuing obligations upon termination. Such obligations include, but are not limited to:

1.    Pay Quizno's all royalties, other fees, and any and all amounts or accounts payable then owed Quizno's or its affiliates;

2.    Cease to identify yourself as a Quizno's franchisee and use any marks, trade secrets, signs, symbols, devices, trade names, and other materials of Quizno's;



December 6, 2006
Page Two

    3.    Immediately cease to identify the franchised location as being, or having been, associated with Quizno's, and immediately cease using any proprietary mark of Quizno's or any mark in any way associated with the marks and licensed methods;

    4.    Deliver to Quizno's all signs, sign-faces, advertising materials, forms and other materials bearing any of the marks or otherwise identified with Quizno's and obtained by and in connection with the Agreement;

    5.    Immediately deliver to Quizno's the Operations Manual and all other information, documents and copies thereof which are proprietary to Quizno's;

    6.    Promptly take action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any marks;

    7.    Immediately notify the telephone company and all telephone directory publishers of the termination of your right to use any telephone number and any regular, classified or other telephone director listing associated with any Mark and to authorize transfer thereof to Quizno's or its designee; and

    8.    Abide by all restrictive covenants set forth in Section 20 of the Agreement.

    All capitalized terms not otherwise defined herein shall have their meanings as set forth in the Agreement. Please be reminded that as specified in the Agreement, all of your obligations which expressly or by their nature survive their termination of the Agreement, including the non-competition and non-disclosure provisions, will continue in full force and effect despite the Agreement being terminated.

    Please contact me at (312) 368-4000 should you require further information with respect to curing your conduct or, alternatively, ending your franchise operations.

Sincerely,

DLA Piper US LLP

Fredric A. Cohen

Exhibit


**DLA PIPER**

**DLA Piper US LLP**
203 North LaSalle Street, Suite 1900
Chicago, Illinois 60601-1263
www.dlapiper.com

Fredric A. Cohen

December 8, 2006

***Sent Via Overnight Delivery***

Daniel Carter, Sr.
Daniel Carter, Jr.
Jody Carter
Madeleine Carter
Carter Group Roseville LLC
19454 Willoway Drive
Macomb, Michigan 48044

Quiznos Sub
31931 Gratiot Avenue
Roseville, Michigan 48066

> RE:  **Notice of Termination; Franchise Agreement dated December 8, 2003 ("Agreement") Between Carter Group Roseville LLC ("You") and QFA Royalties LLC, as successor in interest to Quizno's Franchising LLC ("Quizno's") for the Quiznos Sub No. 6514 Located at 31931 Gratiot Avenue, Roseville, Michigan 48066 ("Restaurant")**

Dear Messrs. Carter and Ms. Carter:

You are hereby advised that your franchise rights under the Agreement are terminated, effective five (5) days following receipt of this notice, pursuant to Section 18.2(c) of the Agreement, for engaging in conduct that, in the sole judgment of Quiznos, materially impairs the goodwill associated with the Marks, unless such conduct is cured within such five (5) day period.

Please refer to Section 18.7 of the Agreement regarding your continuing obligations upon termination. Such obligations include, but are not limited to:

1.    Pay Quizno's all royalties, other fees, and any and all amounts or accounts payable then owed Quizno's or its affiliates;

2.    Cease to identify yourself as a Quizno's franchisee and use any marks, trade secrets, signs, symbols, devices, trade names, and other materials of Quizno's;



December 8, 2006
Page Two

3.    Immediately cease to identify the franchised location as being, or having been, associated with Quizno's, and immediately cease using any proprietary mark of Quizno's or any mark in any way associated with the marks and licensed methods;

4.    Deliver to Quizno's all signs, sign-faces, advertising materials, forms and other materials bearing any of the marks or otherwise identified with Quizno's and obtained by and in connection with the Agreement;

5.    Immediately deliver to Quizno's the Operations Manual and all other information, documents and copies thereof which are proprietary to Quizno's;

6.    Promptly take action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any marks;

7.    Immediately notify the telephone company and all telephone directory publishers of the termination of your right to use any telephone number and any regular, classified or other telephone director listing associated with any Mark and to authorize transfer thereof to Quizno's or its designee; and

8.    Abide by all restrictive covenants set forth in Section 20 of the Agreement.

All capitalized terms not otherwise defined herein shall have their meanings as set forth in the Agreement. Please be reminded that as specified in the Agreement, all of your obligations which expressly or by their nature survive their termination of the Agreement, including the non-competition and non-disclosure provisions, will continue in full force and effect despite the Agreement being terminated.

Please contact me at (312) 368-4000 should you require further information with respect to curing your conduct or, alternatively, ending your franchise operations.

Sincerely,

**DLA Piper US LLP**

Fredric A. Cohen