## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-02528-JLK-CBS

CHRISTOPHER BRAY, *et al.,*

     Plaintiffs,

v.

QFA ROYALTIES LLC,

     Defendants.

---

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

Defendant QFA Royalties LLC ("Quiznos"), by its attorneys, hereby responds to Plaintiffs' Motion for Preliminary Injunction, as follows.

### <u>INTRODUCTION</u>

Plaintiffs ask this court to enter the extraordinary and disfavored relief of a mandatory injunction. They ask this Court to force Quiznos to license the right to use its valuable trade marks, trade secrets and system to Plaintiffs and otherwise force the parties to do business with each other. They ask the court to impose this relationship notwithstanding their breach of their franchise agreements, Quiznos' right to terminate the franchise agreements and Quiznos' decision to do so.

Simply put, Quiznos had every right to terminate the franchise agreements in response to Plaintiffs publishing an alleged suicide note on their webpage stating that Quiznos killed a former franchisee. They did so notwithstanding their agreement not to engage in conduct that

Dockets.Justia.com

harms Quiznos and Quiznos' express right to terminate the contract if Plaintiffs engaged in conduct that, in Quiznos' sole judgment, hurt the Marks. Therefore, Plaintiffs cannot show a reasonable likelihood of success.

Moreover, Plaintiffs have an adequate legal remedy--damages--even if Quiznos wrongfully terminated their respective franchise agreements. As described below, Plaintiffs will not be able to satisfy the necessary elements to obtain the extraordinary relief of a mandatory injunction forcing Quiznos to license to Plaintiffs the right to use its valuable trademarks and system; the trademarks and system upon which the entire chain and its numerous mom and pop franchisees rely.

## **FACTS**

Plaintiffs comprise three franchisees in the Quiznos system.[1] The Bray Parties comprise Christopher Bray, Sabrina Bray and their wholly owned company, Training Pros, Inc. Training Pros was the franchisee on two franchise agreements for Store Nos. 370 and 838, both of which are located in Texas. The Brays individually guaranteed and assumed all obligations under the two franchise agreements.

The second plaintiff group, the "Fix Parties," include Brad Fix, Jan Fix and their limited liability company, BJ and F LLC. The Fix Parties are parties to three franchise agreements for Store Nos. 353, 701 and 707, all operating in Montana. Brad and Jan Fix are parties to the franchise agreement for Store 353, while BJ and F LLC is a party to the agreement for Store Nos.

---

[1] The original complaint was brought by eight plaintiff groups. Quiznos has reached a settlement with five of the plaintiff groups and those five groups are no longer moving for injunctive relief.

701 and 770, with Brad and Jan Fix as individual guarantors who guaranteed and assumed all obligations under both of those franchise agreements.

The Abid Parties are Alison Lundgren-Abid and Hakim Abid.  The Abid Parties are parties to two franchise agreements for Store Nos. 3652 and 3653, both located in Minnesota. Hakim Abid is the franchisee, while Alison Abid is an individual guarantor who guaranteed and assumed all obligations under both franchise agreements.

Chris Bray, Brad Fix and Alison Abid are members of the board of directors of the Toasted Subs Franchisee Association ("TSFA").  Chris Bray also acts as the president of TSFA and founded it.  TSFA has engaged in a campaign to harm Quiznos by reducing sales of new franchises (presumably to decrease competition).  TSFA operates a web page and uses that as a platform to disparage Quiznos, the Quiznos system and Quiznos management.  Quiznos has monitored the web page and made efforts to protect itself by, among other things, requesting that TSFA remove certain clearly false and derogatory content through written demand and, ultimately last Summer, by initiating certain litigation.

Then, on December 7, 2006, the TSFA posted statements in the wake of the suicide of a former franchisee.  Under the guise of publishing a "memorial" paragraph concerning this former franchisee's death, it published a letter it claimed was found on the decedent's body.  The letter was highly critical of Quiznos, suggested that Quiznos and its policies and litigation with him caused him to loose his stores and, ultimately, to commit suicide.  The posting accused Quiznos of causing the suicide.  It did not further in any way the purported purpose of establishing a memorial fund.

Quiznos concluded that this action, so clearly intended to harm Quiznos, could not be tolerated with respect to its current franchisees who were responsible for the posting. Therefore, it identified the current franchisees who served on the board of directors and exercised its right under the respective franchise agreements to terminate the same.

The Plaintiffs filed this action asking the Court to second guess Quiznos' business decision and judicially rescind the terminations and order Quiznos to continue to do business with them and force Quiznos to reinstate their license to use Quiznos' name, trademarks and system. For the reasons that follow, Plaintiffs are not entitled to this relief.

<u>**ARGUMENT**</u>

**A.    Standard of Review**

In this Circuit, in order to obtain a preliminary injunction, the moving party must establish four factors: (1) it will suffer irreparable harm if the injunction is not granted, (2) its threatened injury outweighs the harm caused to the opposing party as a result of the injunction, (3) the injunction is not adverse to the public interest, and (4) it has a substantial likelihood of success on the merits of the case. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004). However, the Tenth Circuit has also identified three types of specifically disfavored preliminary injunctions, namely: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colo.,* 427 F.3d 1253, 1259 (10th Cir. 2005) (*quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004)). Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case

support the granting of a remedy that is extraordinary even in the normal course." *Id.* (*quoting O Centro*, 389 F.3d at 975).

The injunction Plaintiffs seek in this case is a mandatory injunction and, therefore, disfavored. The Tenth Circuit characterizes an injunction as mandatory "if the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *Id.* (internal quotation omitted). Thus, in *Schrier*, the Court found that a motion seeking an order that a University reinstate the plaintiff as chair of its department of medicine, even though such relief would have merely re-established the status quo, requested a mandatory and, therefore, specifically disfavored, injunction. *Id.* at 1261.

Likewise, here the Plaintiffs seek a court order reinstalling them as Quiznos' franchisees, with all related rights and responsibilities. Doing so would "affirmatively require [Quiznos] to act in a particular way;" further, given the intricacies of Quiznos' relationship with its franchisees pursuant to written franchise agreements, such an order "would place the court in position where it may have to provide supervision." *See id.* *See also Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 277 (7th Cir. 1982). Consequently, Plaintiffs' motion seeks disfavored relief, and must be "even more closely scrutinized." *See id.* at 1259.

**B.    Plaintiffs Do Not Face Irreparable Harm.**

A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction" and therefore, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be

considered." *Dominion Video Satellite*, 356 F.3d at 1260 (quotation omitted).  It is not "an easy burden to fulfill."  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).  Plaintiffs' motion fails because they cannot show irreparable harm.

As long as a movant would be entitled to money damages if he prevails on the merits, he is not suffering irreparable harm.  *Heideman v. S. Salt Lake City*, 348 F.2d 1182, 1189 (10th Cir. 2003).  "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable."  *Hughes Network Systems, Inc. v. Interdigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  Thus, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."  *Heideman*, 348 F.3d at 1189.

If Plaintiffs were correct that Quiznos' termination of their respective franchise agreements constituted a breach of the same, their remedy would be money damages, not the right to be reinstated and continue operating their Quiznos restaurants.  The value of the lost business is calculable.  Indeed, valuation experts determine the value of businesses and lost profits everyday in the context of both transactions and litigation and courts regularly award damages for loss of business based on such expert testimony.

Plaintiffs cite to a single case for the proposition that the "inability to calculate damages, harm to a business' goodwill [and] diminishment of competitive positions in [the] marketplace" can support a finding of irreparable harm (Brief, ¶ 40) (and each Plaintiff mirrors this conclusion in their declaration without any factual support).  None of these harms are present here.

First, Plaintiffs cannot claim in good faith that their respective damages would be difficult to calculate. Such calculations are no more difficult than those in most contract cases and, therefore, defeat the issuance of a preliminary injunction, as the nature of claimant's loss is not too difficult to calculate damages were liability present. *See Walgreen Co. v. Sara Creek Property Co.*, 966 F.2d 273, 275 (7th Cir. 1992) ("damages are the norm [for a breach of contract], so the plaintiff must show why his case is abnormal."). Likewise, Plaintiffs loss of market position is not irreparable. To the contrary, the lost profits from the lost sales is the measure of damages (either through a discounted cash flow analysis or as a factor in valuing the business).

Second, Plaintiffs will not loose goodwill through the closure of their restaurants because the goodwill they each enjoyed while franchisees belonged to Quiznos'. The goodwill associated with each restaurant came from the public recognition of the name and trademark, Quiznos. The license to use the recognized trademark is a major benefit to a franchisee. But, there is no question that the trademark and the associated goodwill belong to the franchisor, in this case Quiznos, and the franchisees cannot point to this loss as belonging to them. To the extent Plaintiffs would claim they lost their own independently created goodwill, that can be factored into a calculation of the value of the lost business.

Plaintiffs attempt to overcome this dispositive problem by arguing that the irreparable harm they face is to their First Amendment rights. They cite to several cases for the proposition that loss of First Amendment rights constitutes irreparable injury. *See* ¶¶ 37 and 38 of Plaintiffs' Brief. These cases are totally inapposite because they all involve infringement of the Plaintiffs' First Amendment rights by state actors and do not involve a dispute between private parties.

Plaintiffs have provided absolutely no authority to support the proposition that one is irreparably harmed when through private action their ability to exercise speech is impacted. *See Wilcher v. City of Akron*, 2005 WL 114067*8 (N.D.Oh. May 13, 2005) (stating, "[s]ince plaintiff has not shown government action in relation to her First Amendment claim, Plaintiff has not shown irreparable injury under the First Amendment"). Because Plaintiffs' claim for violation of their First Amendment rights fails, Plaintiffs cannot point to this alleged loss as their irreparable harm – the irreparable harm element must be satisfied through harm caused by a claim with respect to which the movant has demonstrated a reasonable likelihood of success. *Id.*

In short, the only possible harm at issue is the closure of the respective restaurants and any damages from the alleged breach for improper termination would be readily calculable and do not warrant the issuance of a preliminary injunction. *See Bearing Distrbs., Inc. v. Rockwell Automation, Inc.*, 2006 WL 1174279*6-7 (N.D.OH. April 28, 2006) (denying distributor's motion for preliminary injunction to prevent termination of distribution agreement and holding money damages will fully compensate plaintiff for its injuries); *New England Surfaces v. E.I. DuPont De Nemocers & Co.*, 2006 WL 1554776*5 (D.ME. June 1, 2006) (denying preliminary injunction and finding loss of business from termination of contract, while likely substantial, would be quantifiable and, therefore, not irreparable harm); *RWJ Cos., Inc. v. Equilon Enterprises, LLC*, 2005 WL 3544295 (S.D. Ind. Dec. 28, 2005).

Equally important to this analysis are Quiznos' trademark rights and the harm to Quiznos if Plaintiffs could be awarded the mandatory injunction they seek. The respective franchise agreements provided a limited license to each franchisee to use and operate under Quiznos federally registered and highly valuable trademarks. It is well settled that one cannot use and

display trademarks that belong to another without a license to do so.  Once Quiznos chose to revoke the license, Plaintiffs lost their right to operate under and use Quiznos' trademarks.

It is well settled that a license holder's remedy for premature revocation of the license is money damages -- not the right to continue to use the trademark.  Thus, courts frequently grant franchisor's motions for injunctive relief requiring closure of the franchise after the franchisor has chosen to terminate the contract even when the franchisee asserts that the termination was improper.  *See*, *e.g.*, *Burger King Corp. v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) ("[A] terminated franchisee's remedy for wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor' s trademarks.").  *See also Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1005 (S.D. Fla. 1992) (holding that alleged wrongful termination of franchises did not prevent franchisor from being entitled to injunctive relief) and *Burger King Corporation v. Agad*, 911 F.Supp. 1499, 1504-05 (S.D.Fla.1995) (granting injunction to franchisor and holding that claim of wrongful termination is not defense to franchisor's action for trademark infringement).  *See also, SBR Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371, 375 (3rd Cir. 1992) (reversing district court 's denial of preliminary injunction to franchisor because dispute over the proprietary of the termination and related claims of former franchisee do not prevent granting injunction under Lanham Act); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 145-46 (3rd Cir. 1981) (holding that trademark infringer's claim of wrongful termination is simply "too far removed" from Lanham Act infringement issue to constitute a defense).

**C.     Plaintiffs Fail to Demonstrate a Substantial Likelihood of Success on the Merits.**

**1.     Plaintiffs make no effort to sustain their burden**

Plaintiffs devote a single tautological sentence in their effort to meet their burden of establishing a reasonable likelihood of success.  They simply state:  "[b]ased on the facts set forth above and discussion of relevant law, plaintiffs have established a likelihood of success on the merits."  Brief in Support of Motion for Preliminary Injunction and Request for Forthwith Hearing ("Brief"), p. 21, ¶ 41.  They offer no discussion of the elements of any of the claims they assert, nor suggest any evidence that might prove any one of those elements.  This is insufficient for a party to meet the burden of proof.  *See Murphy v. Gardner*, 413 F. Supp. 2d 1156, 1163 (D. Colo. 2006) ("The bare assertion of a fact in a brief by counsel, unaccompanied by evidence in the record, is insufficient to carry a party's burden of proof so as to avoid summary judgment.").  *See also Evolution, Inc. v. SunTrust Bank*, 342 F. Supp. 2d 943, 963 (D. Kan. 2004) (motion for partial summary judgment denied because "defendants' brief argument is inadequate to address the complexities raised in their counter claims").  This alone should defeat Plaintiffs' motion.

Nonetheless, Quiznos will address the elements and the lack of support for them with respect to each cause of action Plaintiffs have plead.

**2.     Plaintiffs cannot prevail on their breach of contract claim**

Plaintiffs claim that Quiznos breached the franchise agreements when it terminated the franchise agreements or sent a notice with opportunity to cure the breach.  Because Plaintiffs' conduct permitted Quiznos to terminate each of the franchise agreements, the act of termination or sending a notice did not breach the contracts.  Plaintiffs will not be able to establish otherwise.

Each of the franchise agreements at issue contain similar prohibitions on the franchisee regarding conduct that would harm the goodwill associated with Quiznos and the trademarks upon which the entire system relies.  For example, five of the franchise agreements at issue, two with the Abid Parties, one with the Bray Parties and two with the Fix Parties provide:

> Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery to Franchisee of a termination notice, upon the occurrence of any of the following events:
>
> . . .
>
> If Franchisee . . . engages in conduct that, in the sole judgment of Franchisor, materially impairs the goodwill associated with the Marks.

3652, 3653 and 701 Franchise Agreements, § 18.2(c) and 770 and 8383 Franchise Agreements § 18.2(b).  Likewise, the franchise agreements with the Fix Parties for Store No. 353 and Bray Parties Store No. 370 provide:

> 10.1.  <u>Business Operations</u>.  The Franchisee acknowledges that it is solely responsible for the successful operations of its QUIZNO'S Restaurant and that the continued successful operation thereof is, in part, dependent upon the Franchisee's compliance with this Agreement and the Operations Manual.  In addition to all other obligations contained herein and in the Operations Manual, the Franchisee covenants that:
>
> a.    The Franchisee shall maintain clean, safe, and high quality QUIZNO'S Restaurant operations and shall promote and operate the business in accordance with the Operations Manual and in such a manner as not to detract from or adversely reflect upon the name and reputation of the Franchisor and the goodwill associated with the QUIZNO'S name and Marks.

353 and 370 Franchise Agreements, § 10.1.a.  Breach of this provision permitted Quiznos to terminate the agreement on 30 days notice:

> 18.3.  <u>Termination by Franchisor – Thirty Day Notice</u>.  The Franchisor shall have the right to terminate this Agreement (subject to any state laws to the contrary, where state law shall prevail), effective upon 30 days written notice to

the Franchisee, if the Franchisee breaches any other provision of this Agreement, including but not limited to, if the Franchisee fails to substantially comply with the Operations Manual, and fails to cure the default during such 30 day period. In that event, this Agreement will terminate without further notice to the Franchisee, effective upon expiration for the 30 day period.

353 and 370 Franchise Agreements, §18.3.

The TSFA webpage postings regarding the suicide of Bob Baber harmed and detracted from the goodwill associated with Quiznos' trademarks. The posting in the manner suggests that Quiznos caused Bob Baber's death and the letter is highly critical of the Quiznos. In fact, the posting of the letter served absolutely no purpose other than to harm Quiznos. The letter Plaintiffs chose to publish stated, among other things:

Quiznos has killed me.

. . .

STAY FAR, FAR AWAY FROM THE QUIZNOS CORPORATION. THEY ARE CRIMINAL IN WHAT THEY DO.

Excerpts from "Bob's Final Note to the Media," as posted on the TSFA Website (emphasis in original).

It appears that Abid and Fix will claim that they were not involved in the decision to post the information and, therefore, they are not responsible for publishing these statements and cannot be deemed to have breached their respective franchise agreements. They are wrong. Their protestations notwithstanding, these Plaintiffs are responsible for the posting regardless of the purported lack of affirmative participation in the decision to make the posting. Corporations act through the decisions of their board of directors. *McCoy v. Pastorius*, 246 P.2d 611, 614-15 (Colo. 1952); *see also Warren v. Warren Equip. Co.*, 189 S.W.3d 324, 328 (Tex. Ct. App. 2006) ("Only the directors of a corporation are empowered to act on its behalf . . ."); *Higgins v. SPX*

*Corp.*, 2006 WL 3694628 at *5 (D. Mich. 2006) ("Under the intra-conspiracy rule, a corporation cannot conspire with its own board of directors, officers, or employees, for the reason that a corporation acts only through those persons").  Thus, TSFA's decision to publish the purported Baber suicide letter may be deemed a decision of the members of TSFA's board of directors. Further, it is the board members who had the authority and ability to ensure the corporation removed the content.  Those board members who may not have been involved in the decision to post the material had an affirmative duty to get involved and insure that the posting was removed as soon as they were aware of it.  Their failure to do so is an acquiescence or ratification of the original decision and, therefore, they are responsible for the posting.  *See Hoover Co. v. National Labor Relations* Board, 191 F.2d 380, 391 (6th Cir. 1951) (finding that board members who did not disassociated themselves from the board action acquiesced in the actions of the board even though they did not vote for it).

Further, as a matter of established tort theory, board members are individually liable for torts in which they participated, even if they were done in the name of the corporation.  *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 247 (Del. Ct. App. 1993) ("Every individual is liable for his or her own torts, and there is no exception for corporate officers.  Corporate officers cannot be shielded from tort liability by claiming that the actions were done in the name of the corporation."); s*ee also Scott v. Shook*, 249 P. 259, 261 (Colo.1926) ("In other words, as joint tort-feasors, defendants were held responsible for their own acts, and they are not absolved from liability merely because the corporation also did wrong, nor because the conversion was committed in the corporate name."); *AIM International Trading LLC v. Valcucine SPA, IBI, LLC*, 2003 WL 21203503 (SDNY 2003) ("In the case at bar, [defendants'] respective companies

were not parties to the contract with which these two defendants allegedly interfered. . . . [Defendants] can be held liable for tortuous interference even if they were acting in their official capacities.").

Moreover, the board members cannot insulate themselves from liability under the contractual provisions by acting indirectly through a corporate entity--a party to a contract may not do indirectly that which it is prohibited from doing directly. *See Pan American Airways v. United States*, 81 F.Supp. 231, 233-34 (U.S. Ct. of Claims 1948) ("It appears manifest that plaintiff is seeking to do by indirection what it was not entitled to do directly under the terms of the contract. . . . Plaintiff cannot do indirectly what the contract expressly prohibited it from doing directly."); *see also Webb v. John Hancock Mut. Life Ins. Co.*, 69 N.E. 1006, 1011 (Ind. 1904) ("It is an ancient legal maxim that, when anything is prohibited directly, it cannot be done indirectly . . . ."). Colorado law recognizes this principle. *See Catlin v. Christie*, 63 P. 328, 329 (Colo. Ct. App. 1900) ("It is a well-known principle requiring no discussion that what a public officer is prohibited by law from doing directly he cannot do indirectly."). In applying this rule, courts have disregarded organizational form. *See Clougherty Packing Co. v. Comm'r Internal Rev.*, 84 T.C. 948, 960-61 (U.S. Tax Ct. 1985) (Whitaker, J. concurring) ("It is too obvious for discussion that generally a taxpayer cannot be allowed to do indirectly through a wholly-owned subsidiary that which it is prohibited from doing directly.").

The non-board member Plaintiffs cannot defeat Quiznos' right to terminate the franchise agreements based on the board members' material breaches of the same. Even though they may not have breached the respective franchise agreements, their non-breach does not absolve the breach by the cosignatory TSFA board member. Quiznos' right to terminate the respective

franchise agreements flows from the board members' breach and the non-board members' loss as a result of their partners' breach cannot take away Quiznos' rights. The board members may be liable to the non-board members.

The Abid and Fix Parties will be unable to prove a substantial likelihood of success on their breach of contract claim with respect to three of the stores for another reason, as well. Both of the Abids' restaurants and one of the Fix Parties' restaurants had repeatedly failed to comply with Quiznos' operational standards. The franchise agreements clearly and without any ambiguity permit Quiznos to terminate the franchise agreement on this basis.

For example, both of the Abids' franchise agreements provide:

> Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted Franchisee, without affording Franchisee any opportunity to cure any default (subject to any state laws to the contrary, in which case state law shall prevail), effective upon delivery to Franchisee of a termination notice, upon the occurrence of any of the following events:
>
> (l) <u>Repeated Noncompliance</u>. If Franchisee has received (3) notices of default form Franchisor within a twelve (12) month period, regardless of whether the defaults were cured by Franchisee . . .

Franchise Agreement, § 18.2(l).

The Abids failed numerous operations inspections at both stores and Quiznos sent many more than three notices of default for failing these periodic inspections in a twelve (12) month period. Those notices and the associated failed inspection reports will be presented at the hearing. Because of this repeated noncompliance and clear contract language, the Abids cannot establish a reasonable likelihood of success on their breach of contract claim – Quiznos had the right to terminate the contract.

Likewise, the franchise agreement with the Fix Parties for Store No. 353 provides:

18.2.   <u>Termination by Franchisor – Effective Upon Notice</u>.  The Franchisor shall have the right, at its option, to terminate this Agreement and all rights granted the Franchisee hereunder, without affording the franchisee any opportunity to cure any default (subject to any state laws to the contrary, where state law shall prevail), effective upon receipt of notice by the Franchisee, addressed as provided in Section 23.11, upon the occurrence of any of the following events:

* * *

(h)    <u>Repeated Noncompliance</u>.  If the Franchisee has received three notices of material default from Franchisor within a 12 month period, regardless of whether the defaults were cured by the Franchisee . . .

Franchise Agreement, §18.2(h).

The Fix Parties failed multiple operations inspections at Store 353 and Quiznos sent more than three notices of default in a twelve (12) month period.

Because Quiznos had every right to terminate the franchise agreements with respect to these three stores, Plaintiffs cannot establish that Quiznos breached the respective agreements when it did so.  Thus, Plaintiffs cannot show a reasonable likelihood of success.

**3.    Plaintiffs cannot prevail on their breach of the implied covenant of good faith and fair dealing claim**

Plaintiffs do not address the merits of their claim for breach of the implied covenant of good faith and fair dealing in their Brief at all.  The only hint at how they perceive to have this claim is in the complaint, where plaintiffs allege that Quiznos interpretation of the franchise agreement's termination provisions was "unwarranted" and "unreasonable" and, therefore, the termination of the franchise agreements violated this implied covenant.  Complaint, ¶ 60.

Plaintiffs' theory manifests a complete misunderstanding of Colorado law.  The implied covenant cannot be used to alter express terms of the contract and it does not provide a separate cause of action for breach of express terms.  Simply put, if Quiznos breached the agreements when it terminated them, it breached an express provision, not an implied one.  *See Bayou Land*

*Co. v. Talley*, 924 P.2d 136, 155 (Colo. 1996) ("[T]he implied covenant of good faith and fair dealing cannot be invoked to bar a party from bringing a claim based on a disagreement regarding contract terms.").

Not only does this claim fail for the simple reason that the only alleged breach is of an express provision, but also because Plaintiffs agreed to confer Quiznos the discretion they now ask this Court to second guess.  The parties agreed to confer discretion to Quiznos to decide when the franchisee engaged in conduct that harmed the marks and justified termination of the franchise agreement.  "If Franchisee . . . engages in conduct that, <u>in the sole judgment of Franchisor</u>, materially impairs the goodwill associated with the Marks."  *See, e.g.,* Franchise Agreements 701, 3652, 3653, §18.2(c) and 770 and 838 §18.2(b) (emphasis added).

While contractual provisions providing one party with discretion concerning performance terms often give rise to a duty of good faith and fair dealing in their exercise, *see Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995), such a duty is "irrelevant" where "the contract is drawn so as to leave a decision to the uncontrolled discretion of one of the parties."  *Flight Concepts LP v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994) (quotation omitted); *see also Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984) (Scalia, J.) ("[I]t is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant."); *Larese v. Creamland Dairies, Inc.*, 767 F.2d 716, 718 (10th Cir. 1985) (holding that franchise agreements may be drawn to grant absolute rights to the franchisor).

"This kind of provision occurs, for example, when either party is given an unconditional power to terminate the contract . . . by merely giving written notice within a specified time."  *Big*

*Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1267 (10th Cir. 1988). "In such a case, the parties contracted to allow one of the unconditional right to act, and an implied promise to deal fairly has no purpose." *Flight Concepts LP*, 38 F.3d at 1157. Thus, courts have routinely held the implied covenant of good faith cannot "block use of terms that actually appear in the contract." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990); *see also Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359 1363 (Colo. Ct. App. 1994) ("the duty of good faith and fair dealing does not obligate a party to . . . assume obligations that vary or contradict the contract's express provisions."). In short, the duty of good faith "in contract law is a gap-filling approach designed for an issue that could not have been contemplated at the time of drafting, and which, therefore, was not resolved explicitly by the parties." *L.A.P.D., Inc. v. General Elec. Corp.*, 132 F.3d 402, 404 (7th Cir. 1997). It is not "an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document." *Kham & Nate's Shoes No. 2, Inc.*, 908 F.2d at 1357.

In this case, the parties agreed that Quiznos had the right, in its "sole discretion" to determine whether a franchisee's conduct constituted harm to its goodwill and trademarks, which are relied upon not only by the corporation, but all franchisees as well. Because the parties agreed to this express right of termination, Quiznos is not limited by the covenant of good faith in its exercise of that right. *Continental Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7th Cir. 1992) (good faith has "nothing to do with the enforcement of terms actually negotiated.").[2]

---

[2] Nor, absent an express contractual or statutory obligation to do so, must Quiznos provide to the Franchisees a detailed summary of the reasons or criteria used in deciding whether to exercise its right. *See L.A.P.D., Inc.*, 132 F.3d at 404 ("One party need not reveal to the other the criteria that will lead it to terminate the relation, when the contract allows *any* reason (or none) to suffice.").

Even if the phrase "sole discretion" did not grant Quiznos unfettered discretion as to the termination of franchisees whose conduct impairs Quiznos' goodwill, it would at least confer on Quiznos the "discretion to determine the existence or nonexistence of the various factors that would reasonably justify" the exercise of its discretionary right. *Tymshare, Inc.*, 727 F.2d at 1154.

Moreover, assuming a covenant of good faith does adhere to Quiznos' exercise of the discretion conferred by section 18.2 of the franchise agreements, Quiznos has acted consistent with such a duty. Quiznos' actions in this case are not, as implied by the plaintiffs, a pretext or based on marginally damaging conduct. Quiznos terminated the respective franchise agreements based on the conduct of individuals who were parties to the agreements and who published in a public forum a letter accusing Quiznos of killing its former franchisee, including an accusation that Quiznos was responsible for the death of Bob Baber. Few actions could be more plainly encompassed by the prohibition in section 18.2 against conduct that materially impairs the goodwill and intellectual property of Quiznos.

### 4. Plaintiffs cannot prevail on their "Coercion of First Amendment Free Speech Rights"

In their second claim for relief, Plaintiffs claim that Quiznos violated their First Amendment right of speech when it terminated the franchise agreements or required them to affirmatively retract the harmful posting. Plaintiffs' claim fails for a number of reasons. Most clearly, a claim for violation of Constitutional rights is only available where state action is involved. For the reasons set forth in Quiznos' Motion for Partial Summary Judgment, which is incorporated herein by reference, it is undisputed that Plaintiffs cannot establish sufficient state action. While this failure should result in summary judgment on this claim (and, perhaps

sanctions for a frivolous pleading) for purposes of this response it is clear Plaintiffs cannot show

a reasonable likelihood of success on this claim.

    **5.**    **The Abids Cannot Show a Reasonable Likelihood of Success with Respect to Their Claim under a Minnesota State Statute.**

All of the franchise agreements at issue contain a clear choice of law clause calling for

the contract to be interpreted and governed by Colorado law.  Even if the Minnesota Franchise

Act applied to these contracts, the Abid Plaintiffs' claims still fail.  Under the Act, "good cause"

means "failure by the franchisee to substantially comply with the material and reasonable

franchise requirements imposed by the franchise agreement."  Minn. Stat. Ann. § 80C.14.  The

Statute permits franchisors to terminate franchise agreements for good cause, which includes the

failure by a franchisee to substantially comply with the material and reasonable requirements

imposed by the franchisor.  And, when a franchisee fails to cure a default that "materially

impairs the goodwill associated with the franchisor's trade name, trademarks, service marks,

logo type or other commercial symbol," a franchisor may terminate after providing 24 hours

notice.  *See* §80C.14(3)(a)(1).

Here, the operational defaults at both stores qualify for the 24 hour notice and the

repeated non-compliance demonstrates the failure to cure.  *See, e.g., NOVUS Franchising, Inc.*,

4-95-702, US-DIST-CT, Business Franchise Guide ¶ 9252 (Dec. 5, 1995) (finding that

persistent failure of area developer to enforce uniformity and quality standards harmed the

franchisor's mark and system thereby not only constituting good cause but also justifying

termination without even 24 hour notice because futile to give opportunity to cure); *Video*

*Update, Inc. v. Malaske*, No. C6-94-787 , 1984 WL523837 at *3 (Minn.Ct.App. September 27,

1994) (finding that the franchisee's persistent "mismanagement of funds and failure to pay taxes

and debts had impaired [franchisor's] goodwill" to the extent that the franchisor's demand letter served more than 24 hours prior to the termination complied with the statutory requirements); *Great Licks, Inc. v. Moorhead*, Civil 4-88-479, US-DIST-CT, Business Franchise Guide ¶ 9252 (repeated failure to comply with franchise agreement terms demonstrated failure to cure).

### D.    The Balance of Harms Favors Quiznos

Before awarding the requested preliminary injunction, the Court must weigh any potential injury to Plaintiffs without the requested injunction against the offsetting burden that would be placed on Quiznos by the issuance of the injunction. Here, the requested injunction would place a greater burden on Quiznos than its denial would place on Plaintiffs.

The mandatory nature of the requested injunction would place extra burdens on Quiznos. "Mandatory injunctions are more burdensome than prohibitory injunctions because the affirmatively require the nonmovant to act in a particular way . . . ." *SCFC ILC, Inc.*, 936 F.2d at 1099. Granting a mandatory injunction in this case would result in the "real though unquantified harm to [Quiznos] of being forced to continue doing business with" franchisees that repeatedly violated their respective contracts. *See Original Great American Chocolate Chip Cookie Co.*, 970 F.2d at 277. More specifically, Quiznos would be placed in the disfavored position of being required "to provide personal, specialized services to Plaintiffs for an unspecified time." *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.*, 583 F.Supp. 691, 699 (N.D. Ill. 1984).

The Court's refusal to enter the injunctive relief will not harm Plaintiffs because if they were ultimately successful, they would be fully compensated through money damages, as shown above.

**E.      The Public Interest Does not Weigh in Favor of Granting Plaintiffs' Motion.**

The mandatory preliminary injunction requested by Plaintiffs runs afoul of the public interest, as well.  Mandatory or regulatory injunctions "impose[] a continuing duty of supervision on the [court]."  *Original Great American Chocolate Chip Cookie Co.*, 970 F.2d at 277.  "Courts should be, and generally are, reluctant to issue 'regulatory' injunctions, that is, injunctions that constitute the issuing court an ad hoc regulatory agency to supervise the activities of the parties" *Id.*; *see Board of County Com'rs of Adams Cty. v. City and County of Denver*, 40 P.3d 25, 33-34 (Colo. Ct. App. 2001) (declining to issue an injunction that would impose on it a burden of supervision.)  Thus, "the cost . . . of regulatory decrees to the judiciary is a factor weighing against the grant of equitable relief in this case."  *Original Great American Chocolate Chip Cookie Co.,* 970 F.2d at 277-78.  *See North American Financial Group, Ltd.*, 583 F.Supp. at 699 ("If specific performance were granted, the arbitrator would be placed in the untenable situation of a long-term supervisor, judging the quality of training and overseeing the breadth and efficacy of [services, such as] advertising and the public would be impacted by any subsequent enforcement efforts.  For that reason, it is hornbook law that a contract for personal services will not be specifically enforced as contrary to public policy."); *Boise Cascade Int'l Inc. v. Northern Minnesota Pulpwood Producers Assoc.*, 294 F.Supp. 1015, 1020 (D. Minn. 1968) ("From time immemorial, courts of equity have recognized the impossibility of enforcing a contract where personal services are involved and have refused to do so.").  For these reasons, public policy concerns weigh against the issuance of a mandatory injunction ordering the performance of a service contract such as JBM Resources' ADMA.

Moreover, the enforcement of the terms of freely negotiated contracts is in the public interest. *See Groen, Laveson, Goldberg & Rubenstone v. Kancher*, 827 A.2d 1163, 1171 (N.J. Super. Ct. 2003) ("[T]he enforcement of freely-made contracts is itself in the public interest."); *Home Shopping Club, Inc. v. Roberts Broadcasting Co.*, 989 S.W.2d 174, 180 (Mo. Ct. App. 1998) (citing "the public interest in preserving the ability of parties freely to enter contracts and to seek judicial enforcement thereof"). Therefore, granting Plaintiffs relief in the form of a preliminary injunction would frustrate the public policy in favor of the enforcement of the plain terms of a contract.

## CONCLUSION

In conclusion, Plaintiffs have provided no demonstration that any of the applicable factors under Fed. R. Civ. P. 65 supports an order for the mandatory injunction of requiring Quiznos to reinstate them as franchisees. Consequently, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated this 1st day of February 2007

Respectfully submitted,

s/ *Leonard H. MacPhee*
Leonard H. MacPhee
Attorney for Defendant
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
Email: lmacphee@perkinscoie.com

CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2007, I electronically filed the foregoing with the Clerk of Court using the **CM/ECF system** which will send notification of such filing to the following email addresses:

- **Fredric Adam Cohen**
  fredric.cohen@dlapiper.com

- **Justin M. Klein**
  justin@marksklein.com,david@marksklein.com,joanne@marksklein.com

- **Gregory Robert Stross**
  gstross@earthlink.net

s/ *Leonard H. MacPhee*
Leonard H. MacPhee
Attorney for Defendant
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone:  (303) 291-2300
Facsimile:  (303) 291-2400
Email:  lmacphee@perkinscoie.com