**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 06-cv-02528-JLK-CBS

CHRISTOPHER BRAY, *et al.,*

    Plaintiffs,

v.

QFA ROYALTIES LLC,

    Defendants.

---

**DEFENDANT'S POST HEARING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

    Defendant QFA Royalties LLC ("Quiznos"), by its attorneys, hereby provides its Post Hearing Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, as follows.

### I.    Standard for the Requested Preliminary Injunction

    To obtain a preliminary injunction, the movant must establish that his right to the requested relief is "clear and unequivocal." *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005). This standard applies to all preliminary injunctions. *Id.* at 1259. However, certain injunctions are specifically disfavored and subject to an even higher standard: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O'Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (quotation and citations omitted).

1

33668-0077/LEGAL13040165.1

Dockets.Justia.com

On the first day of the hearing, the Court indicated from the bench that he considered the injunction sought by Plaintiffs as not within the categories of a disfavored injunction. The court recounted that the Plaintiffs seek to preserve the status quo ante immediately prior to the dispute (the posting of the Baber suicide note), and that the injunction would be preliminary and therefore would not afford the movants all of the relief they could recover at the conclusion of the full trial on the merits. While these statements may be true, the sought injunction is still of the disfavored type because it is mandatory.

A mandatory injunction is one that "affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991). As the Tenth Circuit acknowledged in *O'Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, "[a]lthough mandatory injunctions also generally alter the status quo, that is not always the case. It is not at all difficult to envision situations where a mandatory injunction would preserve the status quo and a prohibitory injunction would alter the status quo." 389 F.3d 973, 979 (10th Cir. 2004). It was for situations like the present case, where preserving the status-quo would require the issuance of a mandatory injunction, that the Tenth Circuit maintained three separate types of disfavored injunctions as opposed to only two. *Id*.

The Tenth Circuit had occasion to specifically address status-quo preserving but still mandatory injunctions in *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258-59 (10th Cir. 2005). There, the plaintiff, the former Chair of the Department of Medicine, filed suit against the University for wrongful termination of his chairmanship and sought an injunction to reinstate

him as Chair during the pendency of the case. *Id*. at 1258. The Court found that even though the preliminary injunction sought to restore the status-quo, "Dr. Schrier's requested relief nonetheless affirmatively requires the University to act in a particular way, that is, to reinstall him as Chair of the Department of Medicine," and was therefore mandatory in nature and disfavored. *Id.* at 1261 (quotations omitted). The Court stated that mandatorily returning Dr. Schrier to the position of the Chair of the Department of Medicine "would place the court in position where it may have to provide supervision" of the parties' ongoing relationship. *Id*.; see also O*riginal Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992) (denying a terminated franchisee's motion for a preliminary injunction seeking to enjoin the termination and citing "the continuing duty of supervision on the issuing court" necessary to maintain a "cooperative" relationship between a franchisor and franchisee by injunction as a reason to deny the mandatory injunction).

  Likewise, Plaintiffs here seek an injunction that would require Quiznos to recognize them as Franchisees, with all related rights and responsibilities, even though their respective Franchise Agreements have been terminated. Doing so would "affirmatively require [Quiznos] to act in a particular way"; further, given the intricacies of Quiznos' relationship with its franchisees pursuant to written franchise agreements, such an order "would place the court in position where it may have to provide supervision." *Schrier*, 437 F.3d at 1261.

  Other courts are in accord. O*riginal Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992); *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.*, 583 F.Supp. 691, 699 (N.D. Ill.1984)). *See also Virginia Airmotive, Limited v. Canair Corp.*, 393 F.2d 126, 127 (4th Cir. 1968) (labeling distributor's preliminary

injunction seeking reinstatement after termination as "mandatory"); *Valentine v. Mobil Oil Corp.*, 614 F.Supp. 33, 34 (D. Ariz. 1984) (describing as "mandatory," a motion for preliminary injunction against Mobil seeking to enjoin it from not renewing or terminating [plaintiff's] franchise); *Lutz v. Chrysler Corp.*, No. 73CV 183-W-2, 1973 WL 879 at *2 (WD Mo., Sept. 25, 1973) (denying franchisee's motion for preliminary injunction to restrain franchisor from terminating the plaintiffs' franchise and characterizing the requested injunction as mandatory, "[a] temporary mandatory injunction is a drastic remedy in any case, and in a case of this nature where the effect of the injunction sought would be to continue a day by day business relationship involving not only the sale of automobiles but adjustment of warranties, advertising expenses and the many other matters involved in the complex relationship between the manufacturer and a dealer, the seriousness of the sought remedy is magnified.").

The following example demonstrates that the requested injunction would require on-going court supervision. If the injunction were entered and then one of the Plaintiffs failed their quality inspection in each of the next three months, Quiznos would have the contractual right to effectuate a termination. If under the requested injunction, Quiznos would need to return to court and the Court would need to evaluate whether the restaurant had failed to comply with Quiznos operational or quality standards. It would need to sit in the shoes of Quiznos with respect to Quiznos' business decisions.

Consequently, Plaintiffs' motion seeks disfavored relief in the form of a mandatory injunction, and must be "even more closely scrutinized." *See Schrier,* 427 F.3d at 1259. Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* (quoting

4

*O'Centro*, 389 F.3d at 975. This means that the movant must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ." *Id.* at 980. Moreover, if the requested preliminary injunction is one of the three disfavored types, the movant may not take advantage of the modified-likelihood-of-success standard.[1] *O Centro Espirita Beneficiente Uniao do Vegetal*, 389 F.3d at 975-76; *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258-59 (10th Cir. 2005); *Free Speech Coalition v. Gonzales*, 406 F.Supp.2d 1196, 1201 (D. Colo. 2005).

Plaintiffs failed to meet this rigorous standard with respect to each of the required elements.

## II.    Plaintiffs Did Not Prove Irreparable Harm.

A showing of irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction" and therefore, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite*, 356 F.3d at 1260 (quotation omitted). It is not "an easy burden to fulfill." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). Plaintiffs' motion fails because they did not show irreparable harm—let alone do so clearly and unequivocally, as required.

As long as a movant would be entitled to money damages if he prevails on the merits, he is not suffering irreparable harm. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir.

---

[1] In cases where the movant does not seek a disfavored preliminary injunction and demonstrates the other factors clearly and unequivocally, the Tenth Circuit uses a liberal definition of "probability of success": the plaintiff need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980) (quotations omitted). This lower standard is inapplicable when the requested preliminary injunction is of a disfavored category.

2003).  "Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable." *Hughes Network Systems, Inc. v. Interdigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).  *See also Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) ("a plaintiff's harm is not irreparable if it is fully compensable by money damages").  Thus, it is "well settled that simple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages." *Heideman*, 348 F.3d at 1189.

  Plaintiffs failed to meet their burden of establishing irreparable harm.  As Leslie Patten testified, all of the losses about which Plaintiffs presented evidence are compensable with money damages.

  Plaintiffs' primary argument appears to be that the closure of the business for the period of time between now and the full trial on the merits may cause them to loose some current customers if they are ultimately permitted to reopen.  They postulate that those customers may change their habits and find alternative restaurants to patronize in the interim.  Plaintiffs predict that these patrons would not return if the court grants a permanent injunction of specific performance at the conclusion of the trial on the merits; although they presented no evidence in this regard.  This argument is misplaced both legally and factually.

  It is wrong as a matter of law because if the Court finds their losses are compensable through money damages, they will not be entitled to specific performance in the form of a preliminary injunction.  That is, if they cannot show irreparable harm, they cannot obtain the requested preliminary injunction now or specific performance at the conclusion of the full trial.

To obtain specific performance, as opposed to money damages, a plaintiff must establish that it will suffer irreparable harm. *Brarnhardt v. Hamphill,* 878 P.2d 107, 113 (Colo. Ct. App. 1994). As noted above, irreparable harm does not exist where money damages can compensate the plaintiff for its losses. *Hughes Network Systems, Inc. v. Interdigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). If this court finds that plaintiffs' permanent loss of business is capable of being compensated through money damages, than they cannot get the relief of reinstatement at the conclusion of the full trial. The interim lost business is not relevant.

Plaintiffs cannot obtain specific performance for a second reason, as well. The franchise agreements are personal services contracts and specific performance is not an available remedy for breach of a personal services contract. "[T]here is absolutely no precedent for granting specific performance of a franchise agreement." *North American Financial Group, Ltd.*, 583 F.Supp. at 699. As the court stated in *North American*:

> A franchise agreement of the type contemplated here is at least partially a contract for personal services. "[T]he franchisee undertakes to conduct business or sell a product or services in accordance with methods and procedures prescribed by the franchisor and the franchisor undertakes to assist the franchisee through advertising, promotion, and other services."

*Id.* at 699 (quoting Glickman, Franchising § 2.01, p. 2-2.1 and rejecting request for specific performance of a franchise agreement); *see also Dunkin' Donuts of America, Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1574-75 (11th Cir. 1992) (Clark, J., concurring in part) ("Since a franchise contract is a personal services contract and may not be specifically enforced, [franchisee] could not as a matter of law have sought to have the franchise contracts extended since [franchisor] . . . was no longer willing to deal with her.").

The Plaintiffs franchise agreements are likewise service laden as the franchise agreement at issue in *North American Financial Group*, thus likewise precluding, as a matter of law, specific performance. *See also Boise Cascade Int'l Inc. v. Northern Minnesota Pulpwood Producers Assoc.*, 294 F.Supp. 1015, 1021 ("Insofar as the relief sought by plaintiff is an order for specific performance of . . . [a] personal service contract[], . . . the court should not, either directly or indirectly, by means of an injunction, compel the affirmative performance of any such contract[]."). Indeed, the parties specifically agreed that their respective franchise agreements were personal services contracts, "[f]ranchisee agrees that the rights and duties created by this Agreement are personal to Franchisee (or its shareholders, partners, members, or owners, if the Franchisee is a corporation, partnership, or limited liability company, or other business entity) and that Franchisor has entered into this Agreement in reliance upon Franchisor's perceptions of the individual or collective character, skill, aptitude, attitude, business ability, and financial capacity of Franchisee (or its shareholders, partners, members, or owners)." *See e.g.,* Franchisee Agreements § 16.1 (Exhibits 25-31).

Even if Plaintiffs could obtain specific performance in the form of the permanent injunction they seek after full a trial on the merits, they failed to demonstrate that the alleged lost business from a temporary closure is not compensable through money damages. The only evidence of what this harm would entail was presented by the expert, Leslie Patten, who testified that the interim lost business could be quantified as damages to a reasonable degree of professional certainty.

In their Pre Trial Brief, Plaintiffs also argued that the permanent loss of a business entails irreparable harm. They did not offer any evidence to support this legal conclusion. Moreover,

33668-0077/LEGAL13040165.1

the cases they cite are inapposite and distinguishable. A few courts have found that the permanent loss of a business can constitute irreparable harm. See e.g. *Semmes Motors, Inc. v. Ford Motor Company*, 429 F. 2d 1197 (2nd Cir. 1970). However, Plaintiffs failed to present any evidence that they are in the same situation as the unique facts of that case. They seem to suggest that the loss of a franchised business is per se irreparable harm and that they need not show any specific evidence.

In *Semmes,* the court focused on the length of time the business had been in existence (over 20 years) and the desire of the plaintiff dealer to remain in that business and, specifically, to pass the business on to his son. *Id.* 1205. It expressly limited its findings to those facts and admonished that its decision would not create precedent, "[w]e read the opinion as strictly limited to the facts of this case; any dealer who regards it as a Magna Carter for cheating Ford or any other manufacturer does so at its peril." *Id*. Accordingly, subsequent courts have refused to follow its findings in similar circumstances. *See e.g. Loveridge v. Pendleton Wollen Mills, Inc* , 788 F. 2d 914, 917 (2nd Cir. 1986); *Watkins Inc. v. Lewis*, 346 F. 3d 841, 844 (8th Cir. 2003); *New England Surfaces v. E.I. Du Pont De Nemours & Co.*, 2006 WL 1554776 (D. Me. June 1, 2006). Indeed, as other courts have discussed, a finding of irreparable harm in connection with a termination of a franchised business could only be appropriate where there is a reasonable expectation that the franchise agreement will continue indefinitely. *See RWJ Companies, Inc. v. Equilon Enterprises, LLC*, 2005 WL 3544295 *8 (S.D. Ind. December 8, 2005). *See also, Micro Data Base Systems, Inc. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1154, 1157 (7th Cir. 1990 (affirming denial of injunction to prevent termination of distributorship and recognizing that

9

courts "routinely tote up and award as damages the loss inflicted by wrongful terminations of distributorships").

Here, the only evidence presented contradicts a finding that any of the plaintiffs were desirous of remaining in this business or passing their stores onto their family. None of plaintiffs testified to any such interest. In fact, the only question posed to any witness in this regard was the question to Mr. Fix inquiring whether he had any desire to pass the business on to his child. He flatly answer "no." And, there could be no reasonable expectation that the franchise agreements would continue indefinitely, as they provide for a 15 year term with the right to one additional optional term only if certain conditions are present. *See e.g.,* Franchise Agreements, §§ 17.1 and 17.2 (Exhibits 25-31).

Nor was there sufficient evidence to support a finding that the loss of the stores could not be quantified. The only evidence presented in this regard came from the testimony of valuation and damages expert, Leslie Patten, who opined that the businesses could be valued and the plaintiffs fully compensated through money damages if the termination of the franchise agreements were ultimately concluded to be improper. Not only did he address how such a valuation could be done in the normal course, he also testified that the potential changes in market place circumstances (like the development of a hospital near one of Allison Abid's stores and the return of military personnel to Ft. Hood near one of Chris Bray's stores) could be factored into the valuation.

The other argument Plaintiffs presented in their Pre Trial Brief related to Allison Abid only. They argued that under a Minnesota statute, irreparable harm is presumed. Specifically, they argued that "[t]he applicable Minnesota statute…is unequivocal in directing a court that

irreparable harm must be presumed." (Brief at 16). They misstate the clear language of the statute, which actually provides "[i]rreparable harm to the franchisee will be presumed if there is a violation of this section by a person who is required to register under section 802.02, but who fails to do so." Plaintiffs have not asserted that Quiznos did not register its franchise opportunity in Minnesota nor did they present any evidence to that effect (nor could they). Therefore, this argument is totally misplaced and must be rejected. *See NOVUS du Quebec v. NOVUS Franchising, Inc.,* CCH Business Franchise Guide ¶9252 (D. Minn. Dec. 5, 1995) (rejecting argument that franchisee was entitled to presumption of irreparable harm under act when franchisor had registered).

The only other testimony regarding any theory of irreparable harm was Fix's conclusory statement that he might file for bankruptcy protection if his stores closed. This, of course, was too speculative to constitute sufficient evidence for him to meet his burden of proof nor would filing for bankruptcy protection qualify under any theory of irreparable harm. The estate could pursue the claim for damages.

### III.    Plaintiffs Did Not Prove That The Harm They will Experience Without the Injunction Is Greater Than the Harm to Quiznos if the Injunction Were Granted

The Plaintiffs were also required to prove that the potential injury to them without the requested injunction would outweigh the harm Quiznos would experience if the court issues the injunction. The evidence demonstrated the opposite--the requested injunction would place a greater burden on Quiznos than its denial would place on Plaintiffs.

The evidence regarding the harm to Quiznos was uncontested. Michael Daigle, Quiznos' former general counsel and current head of development, testified that the granting of the motion would harm Quiznos' relationships with existing franchise owners. It would create the

11

perception within the Quiznos franchise community that Quiznos is not able to enforce its contracts and protect its brand. Conversely, the message to the system if the injunction is denied is that those who engage in harm that Quiznos determines harms the goodwill associated with Quiznos' marks will not be permitted to stay in the system.[2]

Quiznos must be able to enforce its contracts and protect its brand by terminating the contracts of franchisees who engage in conduct that in Quiznos' judgment harms the goodwill associate with the marks. Not only does Quiznos rely on its brand, so too do all of the franchisees.

In addition, the mandatory nature of the requested injunction would place extra burdens on Quiznos. "Mandatory injunctions are more burdensome than prohibitory injunctions because they affirmatively require the nonmovant to act in a particular way . . . ." *SCFC ILC, Inc.*, 936 F.2d at 1099. Granting a mandatory injunction in this case would result in the "real though unquantified harm to [Quiznos] of being forced to continue doing business with" franchisees that repeatedly violated their respective contracts. *See Original Great American Chocolate Chip Cookie Co.,* 970 F.2d at 277. More specifically, Quiznos would be placed in the disfavored position of being required "to provide personal, specialized services to Plaintiffs for an unspecified time." *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.*, 583 F.Supp. 691, 699 (N.D. Ill. 1984).

Equally important to this analysis are Quiznos' trademark rights and the harm to Quiznos if Plaintiffs were awarded the mandatory injunction they seek. The respective franchise agreements provided a limited license to each franchisee to use and operate under Quiznos'

---

[2] Paying money damages would not permit franchisees who are clearly intent on harming the brand from remaining in the system and enjoying the credibility that comes with the status of current franchisee.

federally registered and highly valuable trademarks.  It is well settled that one cannot use and display trademarks that belong to another without a license to do so.  Once Quiznos chose to revoke the license, Plaintiffs lost their right to operate under and use Quiznos' trademarks.

It is well settled that a license holder's remedy for premature revocation of the license is money damages -- not the right to continue to use the trademark.  Thus, courts frequently grant franchisor's motions for injunctive relief requiring closure of the franchise after the franchisor has chosen to terminate the contract even when the franchisee asserts that the termination was improper.  *See*, *e.g.*, *Burger King Corp. v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) ("[A] terminated franchisee's remedy for wrongful termination is an action for money damages, and not the continued unauthorized use of its franchisor's trademarks.").  *See also Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1005 (S.D. Fla. 1992) (holding that alleged wrongful termination of franchises did not prevent franchisor from being entitled to injunctive relief) and *Burger King Corporation v. Agad*, 911 F.Supp. 1499, 1504-05 (S.D.Fla.1995) (granting injunction to franchisor and holding that claim of wrongful termination is not defense to franchisor's action for trademark infringement).  *See also, SBR Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371, 375 (3rd Cir. 1992) (reversing district court 's denial of preliminary injunction to franchisor because dispute over the proprietary of the termination and related claims of former franchisee do not prevent granting injunction under Lanham Act); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 145-46 (3rd Cir. 1981) (holding that trademark infringer's claim of wrongful termination is simply "too far removed" from Lanham Act infringement issue to constitute a defense).

13

The Court's refusal to enter the injunctive relief will not harm Plaintiffs because if they were ultimately successful, they would be fully compensated through money damages, as shown above.

## IV.  Plaintiffs Did not Establish a Reasonable Likelihood of Success

Plaintiffs did not show a reasonable likelihood of success with respect to their breach of contract or breach of the implied covenant of good faith and fair dealing claims.  As set forth in Quiznos' Response Brief, the franchise agreements at issue contain a clear and unequivocal right for Quiznos to terminate it if plaintiffs engage in conduct that in Quiznos' sole judgment harms the goodwill associated with its marks.  As Patrick Meyers testified, posting the suicide note accusing Quiznos of killing Mr. Baber and calling Quiznos criminal qualified in Quiznos' judgment as conduct that harmed the goodwill associated with Quiznos' marks.

Each of the three plaintiffs is responsible for the posting.  All three sit on the board of directors.  While only Chris Bray admitted to making the decision to post the suicide note, neither Fix nor Abid disavowed or otherwise tried to reverse the decision once it was made.[3]

Plaintiffs' reliance on the implied covenant of good faith and fair dealing does not overcome the clear terms of the franchise agreement.  First, Quiznos' decision was undertaken in good faith.  Patrick Meyers' testimony was clear and undisputed.  The posting harmed the

---

[3] Alison Abid attempted to create the false impression that she had tried to effectuate removal of the note by sending a short fax to Chris Bray at the TSFA office (Exhibit 14). However, the evidence demonstrated that to the extent she did send the fax, it was a ruse created to convince Quiznos to reinstate the franchise agreement and not a true attempt to effectuate a change. She admitted that she did not truly believe there was anything wrong with the posting and that she had not followed up in any way. Rather, she sent a draft to her lawyers to use to convince Quiznos she was trying to cure the default (Exhibit A-10). And, there are serious questions going to the timing and whether she sent the fax, as neither she nor Bray produced a copy of the fax in discovery or at the hearing (Exhibit 14 was attached to the email from Abid's counsel for Quiznos. *Id.*

goodwill associated with Quiznos' trademarks and Quiznos' judgment was reasonable and undertaken in good faith and understood to be consistent with the contract terms.

Second, the implied covenant cannot be used to alter the clear terms of the contract. *Bayou Land Co. v.* Talley, 924 P.2d 136, 154 (Colo. 1996). The parties agreed when they signed the agreements that Quiznos had the right to terminate the contracts if Plaintiffs engaged in conduct that in Quiznos sole judgment harmed the marks. Now, Plaintiffs argue that they disagree with Quiznos' judgment and therefore, they want to re-write the contract to say that Quiznos could not terminate the contract if they engaged in conduct that they do not agree harmed the marks. As more fully set forth in Quiznos' Response, this principle is especially applicable when the parties agreed to provide one party with the authority to act in its sole judgment.

Moreover, the evidence was undisputed that Quiznos had the right to terminate three of the Franchise Agreements for repeated non-compliance. The record is clear that the Abids received[4] more than three notices of default for both of their stores in a 12 month period and that Fix received three or more notices of default for store 770 in a 12-month period. Bryan testimony and exhibits A-1 through A-6; A-8 and A-11.

On re-direct, Plaintiffs attempted to imply that Quiznos agreement in June 2006 to withdraw the termination of both of the Abid's stores "resolved" their repeated non-compliance up to that point. While Quinzos did agree to reinstate the franchise agreements at that time after

---

[4] There was some question as to whether all of the notices were mutually received by the Abids. However, the testimony was undisputed that all of the notices identified and admitted into evidence were sent on the date indicated, to the address and in the manner reflected on each letter. The Franchise agreements (Exhibit 25 and 26) clearly provide that as long as the notices were sent via certified mail to the notice address, they are deemed to have been delivered, even if the Abids did not sign for all of them. *See* § 23.11.

15

negotiation with the Abid's counsel, it did so expressly reserving its rights to terminate the franchise agreements in the future on this basis. There was no release or waiver; in fact the opposite and Quiznos clearly and unequivocally expressed this intent (Exhibit A-8, p.2).

**V.    Plaintiffs Did Not Prove that the Public Interest Weights in Favor of Granting Their Motion**

For the reasons set forth in Quiznos' response to Plaintiffs' Motion for Preliminary Injunction [Doc. No. 31), pp. 22-23, the public interest will be better served through the denial of Plaintiffs' Motion than through the granting of that motion. Certainly, Plaintiffs have failed to meet their burden of showing that the public interest weighs in favor of granting the motion.

**VI.   Conclusion**

For the above-stated reasons, as well as the reasons and arguments presented in Quiznos' Response to Plaintiffs' Motion for Preliminary Injunction [Doc. No. 31], which is incorporated herein by reference, Quiznos respectfully requests that the Court deny Plaintiffs' Motion for Preliminary Injunction.

Dated this 20th day of February, 2007.

Respectfully submitted,

s/ *Leonard H. MacPhee*
Leonard H. MacPhee
Attorney for Defendant
Perkins Coie LLP
1899 Wynkoop Street, Suite 700
Denver, CO 80202
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
Email: lmacphee@perkinscoie.com

33668-0077/LEGAL13040165.1

**CERTIFICATE OF SERVICE**

  I hereby certify that on February 20, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

**Fredric Adam Cohen**
fredric.cohen@dlapiper.com

**Justin M. Klein**
justin@marksklein.com,david@marksklein.com,joanne@marksklein.com

**Gregory Robert Stross**
gstross@earthlink.net


              s/ Leonard H. MacPhee
              Leonard H. MacPhee
              Attorney for Defendant
              Perkins Coie LLP
              1899 Wynkoop Street, Suite 700
              Denver, CO 80202
              Telephone:  (303) 291-2300
              Facsimile:  (303) 291-2400
              Email:  lmacphee@perkinscoie.com

33668-0077/LEGAL13040165.1