IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **06-cv-02528-JLK-BNB**

**CHRIS BRAY, et al.**,

        Plaintiffs,

v.

**QFA ROYALTIES LLC,**

        Defendant.

---

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

---

**Kane, J.**

This franchise termination dispute came before me for a three-day preliminary

injunction hearing on February 12, 2007.   Originally brought by eight franchisee

Plaintiffs or Plaintiff groups, five of those individuals or groups have resolved their

dispute with Quiznos.  The sole remaining Plaintiffs are the Texas-based "Bray Parties,"

comprised of Christopher Bray, Sabine Bray and their wholly owned company, Training

Pros, Inc.; the Montana-based "Fix Parties," which include Brad and Jan Fix and their

limited liability company, BJ & F LLC; and the Minnesota-based "Abid Parties,"

comprised of Allison Lundgren-Abid and Hakim Abid.  Plaintiffs seek an order

prohibiting Quiznos from implementing or enforcing notices of termination of their

toasted sandwich franchises pending the outcome of this lawsuit, which they initiated

challenging the propriety of those terminations under the applicable franchise agreements

(collectively "Franchise Agreements" or "Agreement").  In particular, Plaintiffs hope to

stave off Quiznos's threat to cut off all supplies of food product necessary to their operations.

After considering the evidence under all applicable legal standards, I GRANT the Motion.

### I.

### *Facts and Procedural History*

Eight sandwich shop franchisees filed this lawsuit on December 15, 2006, alleging wrongful termination of their franchise agreements by QFA Royalties LLC ("Quiznos"). The Plaintiffs each were officers or members of the Toasted Subs Franchisee Association, Inc. (TSFA), an advocacy group of Quiznos franchise owners with an acrimonious history with the company. Plaintiffs' franchises were terminated after TSFA posted on its website the suicide note of former Quiznos franchisee Bob Baber, who, after having been involved in protracted litigation with Quiznos, fatally shot himself in the bathroom of one of the company's California stores on November 27, 2006. The note attributed Baber's suicide to Quiznos and the litigation in which he and his wife had been engaged with Quiznos over their franchise. There is no dispute in this case that Quiznos had the Plaintiffs' franchise rights terminated as a direct result of the TSFA's actions in posting the Baber suicide letter.

The facts alleged and presented at the preliminary injunction hearing support the following chronology of events. Shortly after learning of Baber's death, Quiznos franchisee and TSFA board member Jehad Majed contacted Baber's widow. Mrs. Baber

located her husband's suicide letter on his computer and sent it to Majed.  Majed and

Chris Bray conducted a meeting by telephone with other members of the TSFA board,

and a decision was made to notify members of Baber's death and to establish a memorial

fund on the TSFA website for him.  Plaintiff Alison Abid, a board member, was out of

the country and did not participate in the meeting.

Following the meeting, Plaintiff Christopher Bray, who was TSFA's board

president, and Majed together determined what materials would be posted on the TSFA

website as part of the memorial to Bob Baber.  They decided to include on the website

several pictures of Baber, a story of Baber's suicide as published in the *Whittier News*,

and Baber's suicide note in its entirety.

Immediately upon learning of the publication on the TSFA website, general legal

counsel for Quiznos, Pat Meyers, directed Quiznos's outside counsel to identify and

terminate any franchisee affiliated with the TSFA board.  According to Meyers'

testimony at the preliminary injunction hearing, the posting was a "last straw" for the

thorn-in-the-side that the TSFA, and Bray in particular, had become for Quiznos.  While

termination is a "last resort" for any franchiser, Meyers viewed the posting as an

exploitative "direct attack" on the company, purporting to connect Quiznos to the

"heinous" conduct of "killing someone," and completely "unacceptable."  He made the

decision on the spot that Quiznos would have no relationship with anyone affiliated with

the TSFA.

The following day, Quiznos sent letters terminating the franchise rights of all of

the TSFA board members.  Hakim Abid's stores were included not because he was a TSFA officer (he was not) but because his wife, who was also his guarantor under his Franchise Agreements with Quiznos, was an officer.  In conjunction with the notices came the admonition that approved and exclusive vendors would be prohibited from supplying the targeted franchisees with any product.

The Brays and Fixes, who each owned stores at different locations in their respective home states of Texas and Montana, each had rights to one of their stores terminated "effective thirty (30) days following receipt of this notice" pursuant to Section 18.3 of the Agreement, "for failing to promote and operate the business in such a manner as to not detract from or adversely reflect upon the name and reputation of Quiznos and the goodwill associated with the Quiznos name and Marks as required under Section 11.1(a) of the Agreement, unless such conduct is cured within such thirty (30) day period."  Pl.'s Exs. 7 (Bray) & 9 (Fix), Mot. Prelim. Inj.  Another of these Plaintiffs' stores was terminated "effective immediately, pursuant to Section 18.2(b) of the Agreement, for engaging in conduct that, in the sole judgment of Quiznos, materially impairs the goodwill associated with the [Quiznos] Marks."   Exs. 8 (Bray) & 10 (Fix). The Fixes had franchise rights to a third store terminated pursuant to Section 18.2(b) for engaging in conduct impairing Quiznos goodwill, as well as pursuant to Section 18.2(k) for "repeated noncompliance."  Ex. 11.  This termination, too, was effective "immediately," with no opportunity to cure.  *Id.*

Hakim Abid also held franchise agreements to two different stores, with his wife

as guarantor.  Mr. Abid received letters for each store, purporting to terminate his

franchise rights "for engaging in conduct that, in the sole judgment of Quiznos, materially

impairs the goodwill associated with the [Quiznos] Marks."  Pls.' Exs. 5 & 6.  Mr. Abid's

terminations were effective 24 hours after receipt of the letters pursuant to Section

18.2(c) of his Agreements, "unless such conduct is cured within such twenty-four (24)

hours period."  *Id.*  Mr. Abid's letter included an addendum providing that "without

waiving the foregoing," Quiznos was also terminating his franchises effective within 90

days pursuant to § 18.1 of the Agreement for "repeated noncompliance."

 None of the letters, signed by Quiznos's outside co-counsel Frederic Cohen of

DLA Piper US, identified any specific misconduct or violations of Plaintiffs and none

mentioned the Baber suicide note. Those notices that invited a cure failed to identify

either the violation or what would be necessary to cure it.  Instead, they provided a

telephone number the franchisee could call should it "require further information with

respect to curing [its] conduct."[1]  Amid the confusion that followed the receipt of the

termination notices, Plaintiffs contend telephone calls to the given number and to Mr.

Cohen were not answered.  Plaintiffs assert the "cure" ultimately communicated to them,

---

 [1] At some point between December 8 and December 15, the Fixes and Mr. Abid
were informed that the Baber TSFA posting was the misconduct at issue and received information
as to what Quiznos would deem a "cure" of that conduct under Plaintiffs' Franchise Agreements.
The requisite "cure" would be comprised of the following four steps:  1) immediately taking the
material off the website; 2) posting on the TSFA website that the material violated the franchise
agreement, damaged the goodwill of Quiznos, and was "morally reprehensible"; 3) posting an
apology on the TSFA website to other franchisees; and 4) executing a written affirmation of
existing contractual obligations, including a general release of any and all claims against Quiznos.

moreover, was a disingenuous and unlawful attempt to coerce and curtail their free speech and association rights, contrived to create the appearance of providing a cure opportunity when none was actually intended.

While Quiznos contends Plaintiffs' failure to cure their misconduct within the requisite time-frames under the various December 8 letters operated under the cited sections of their individual Franchise Agreements to terminate their franchise rights, it is clear Quiznos also maintains it was authorized under the Franchise Agreements to terminate Plaintiffs effective immediately upon notice, without any opportunity to cure.

Plaintiffs filed suit on December 15, 2006, seeking a declaration that their terminations were unwarranted and wrongful under the Agreement as well as applicable state law, and requesting temporary and preliminary injunctive relief requiring Quiznos to abate their termination notices and supply them with product during the pendency of this litigation and seeking permanent injunctive relief and damages after a trial on the merits. Specifically, Plaintiffs contend both the notices and the nature and timing of the "cure" were unauthorized under the Agreement; violative, in the Abids' case, of Minnesota state law; unreasonable; and a breach of Quiznos's implicit duties of good faith and fair dealing. The parties negotiated a temporary restraining order allowing Plaintiffs to continue operations in the short term with continuing delivery of product by the approved vendors while certain limited discovery was conducted in preparation for the preliminary injunction hearing. That restraining order remains in effect pending my ruling on the request for preliminary injunctive relief.

II.

### *Legal Standard*

Plaintiffs seek an order requiring Quiznos to abide by the Agreement and continue supplying them with the goods and services necessary to conduct their operations in the manner required by and provided for in the Agreements during the pendency of their legal challenge to Quiznos's Notices of Termination.  The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  There has been niggling in this circuit regarding the proper standards for effecting this purpose, particularly where, as here, the injunction sought does not fall neatly within the preserving-the-status-quo versus altering-the-status-quo-dichotomy.

Generally speaking, a four-part test must be met before a preliminary injunction will issue: (1) the movant will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the movant will eventually prevail on the merits.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004)(applying standard articulated in *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980)).

In the typical case where the injunction sought is merely prohibitory – i.e., requiring the non-movant to stop acting in a manner that disturbs the status quo –  a

movant may be entitled to a lesser standard of proof on the likelihood-of-success-on-the-merits factor if it satisfies the first three of the *Lundgrin* requirements.  *See Walmer v. United States Dep't of Defense*, 52 F.3d 851, 854 (10th Cir. 1995).  Under those circumstances, the movant may establish the final factor simply by raising questions "so serious, substantial, difficult and doubtful as to make the issues ripe for litigation and deserving of more deliberative investigation."  *Id.*

For certain types of "disfavored" injunctions, however, this modified-substantial-likelihood-of-success standard is inapplicable.  Instead, a party seeking such an injunction is subject to "higher" scrutiny and "must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ."  *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 977 (10th Cir. 2004)(en banc)(reaffirming central holding in *SLC IFC v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) that injunctions that do more than prohibit actions that alter the status quo are subject to higher scrutiny and are not entitled to modified-likelihood-of-success-on-the-merits standard).  What precisely this "higher" scrutiny or "strong showing" entails, and what the characteristics of an injunction are that make it fall into one of the disfavored categories are questions which, in my view, *O Centro* obscured rather than illuminated.[2]  Nevertheless, my duty under these cases is clear:  I must first

---

[2]     *O Centro*, while ostensibly the Tenth Circuit's definitive en banc review and re-articulation of the standards used to evaluate the grant of preliminary injunctions, is a 58-page decision comprised of two *per curiam* decisions – one reaffirming the already high standard for granting preliminary injunctive relief and the "even higher" standard for disfavored injunctions,

determine whether the injunction sought falls, as Quiznos argues, into one of the

disfavored categories and then apply the standards for relief accordingly.

---

and the other affirming the particular preliminary injunction ordered by the trial court in that case, 389 F.3d at 975-76 – together with three separate opinions concurring in those decisions in part and dissenting in part (written by Murphy, Seymour, and McConnell, Circuit Judges, respectively) and a dissenting opinion by Circuit Judge Hartz. All three of the separately authored concurring/dissenting opinions are either joined in full by some of the remaining judges or are themselves partly concurred in and dissented to.

Not only is the Court's articulation of its position muddled because of the plurality of the opinions issued, but the "new" heightened preliminary injunction standard ultimately rearticulated is difficult to distinguish from the one that went before. Specifically, in *SCFC ILC* the Tenth Circuit held that preliminary injunctions of the three disfavored types would issue only upon a showing that the four *Lundgrin* factors weighed "heavily and compellingly" in movant's favor. *SCFC ILC*, 936 F.2d at 1098. In *O Centro*, the Tenth Circuit "affirmed [this] core holding"of *SCFC ILC* but "jettison[ed]" that part of it that described the showing the movant must make as "heavily and compellingly." 389 F.3d at 975. Instead, it articulated the standard in terms of overall "heightened" scrutiny, requiring a "strong [rather than 'heavy and compelling'] showing both with regard to the likelihoood of success on the merits and with regard to the balance of harms." *Id.* The only putatively affirmative change was the *en banc* court's assertion that movants seeking any of the three disfavored types of injunctions may not rely on the modified-likelihood-of-success-on-the-merits standard. *Id.* at 976.

Leaving the lesser or greater perspicacity of the *per curiam* opinion(s) in *O Centro* to the judgment of others, I confess an amount of puzzlement at the distinction, in practical terms, of a standard that requires a "strong," but not "heavy and compelling," showing on the *Lundgrin* factors before a disfavored injunction will issue. And because the modified-likelihood-of-success-on-the-merits standard was never, in my view, applicable to disfavored injunctions, it is unclear what, if anything, the rearticulation accomplished.

In *Schrier v. University of Colorado*, 427 F.3d 1253, 1258-59 (10th Cir. 2005), a panel of the Court undertook to apply and clarify *O Centro*'s "heightened" standard for disfavored injunctions, declaring erroneous the trial court's application of the "heavily and compelling" standard for an injunction sought by a medical school professor seeking reinstatement as chair of the Department of Medicine during the pendency of his action challenging his removal from that post, but affirming denial of preliminary injunction. *Schrier* was less than helpful in illuminating the standard, however, based on the panel's determination that the professor's preliminary injunction request would be denied "regardless of the standard employed" and thus declining to apply the "heightened" standard articulated in *O Centro*. 427 F.3d at 1261-62 (Dr. Schrier's failure to establish required preliminary injunction factors rendered the magistrate judge's "erroneous application of the 'heavily and compelling' standard . . . of no legal consequence").

## **Mandatory versus prohibitive injunction**

The most instructive aspect of the *O Centro-Schrier* opinions stems from the *en banc* discourse in *O Centro* regarding what makes a proposed injunction fall into or out of the "disfavored" category.  *Compare O Centro*, 389 F.3d at 1000-1006 & n.1 (Seymour, C.J., concurring in part and dissenting in part)(cautioning that formulaic application of general maxim that "disfavored injunctions are those that alter the status quo" risks undermining fundamental purpose of preliminary injunction to protect availability of meaningful relief and dissenting from majority's view that movant for preliminary injunction must satisfy a heightened burden when the proposed injunction will alter the status quo but the injunction is not also mandatory) *with* 389 F.3d at 978-79 (Murphy, J., concurring in part and dissenting in part)(rejecting Judge Seymour's view and finding "good reason" to distinguish between mandatory injunctions and injunctions which alter the status quo and treat both as disfavored).

Judge Seymour tackled the issue again in *Schrier*, this time writing for a unanimous panel and reiterating that the distinction between mandatory and prohibitory injunctions "'cannot be drawn simply by reference to whether or not the *status quo* is to be maintained or upset'" because, "'[i]n many instances, this distinction is more semantical than substantive.'"  *Schrier*, 427 F.3d at 1260 (quoting from her concurring opinion in *O Centro*, 389 F.3d at 1006).   In *O Centro*, Judge Seymour agreed with a majority of the court that the district court did not abuse its discretion in granting the preliminary injunction at issue in that case, but dissented from the majority's conclusion

that the movant for a preliminary injunction must satisfy the higher "disfavored" injunction standard when the proposed injunction alters the status quo but is not also mandatory.  389 F.3d at 999.  Judge Seymour would have applied the lower preliminary injunction standard to the non-mandatory injunction sought in *O Centro*, and voted to uphold the district court's preliminary injunction order on that basis.  In *Schrier*, Judge Seymour again looked past the preserving-or-altering-the-status-quo dichotomy to find that the injunction sought by Professor Schrier, while it preserved the status quo, was, in fact, also mandatory and therefore subject to heightened scrutiny as a disfavored injunction.  427 F.3d at 1261 (injunction was mandatory because it "'affirmatively required the [University] to act in a particular way'")(quoting *O Centro*)).

Seizing on this language, Quiznos argues the heightened standard for disfavored injunctions applies to Plaintiffs' Motion for Preliminary Injunction in this case as well because it affirmatively requires Quiznos to act in a particular way, i.e., to continue to work with and supply Plaintiffs with product and services as required by the Agreement.

I agree with Judge Seymour's position through her opinions in *O Centro* to *Schrier* that an uncritical adherence to the preserving- or altering-the-status-quo formula for identifying disfavored injunctions invites semantic gamesmanship and loses sight of the fundamental purpose of preliminary injunctive relief under our Rules of Civil Procedure, which is "to 'preserve the relative positions of the parties until a trial on the merits can be held.'" *O Centro*, 389 F.3d at 999-1001 (Seymour, C.J.)(quoting *Camenisch*, 451 U.S. at 395).  I respectfully suggest, however, that a similar uncritical adherence to the

11

mandatory/prohibitory formulation invites the same anopia.

In the instant case, it is obvious that the injunction requested, as the injunction in *Schrier*, is of the preserving-the-status-quo-but "mandatory" type, because in requiring Quiznos to return to the status quo during the pendency of this litigation, it affirmatively, albeit temporarily, requires it to continue to supply and support Plaintiffs' Quiznos franchises. An uncritical application of *O Centro* and *Schrier* would place the proposed injunction into the "disfavored injunction" category. Considering the fundamental or "paramount" purpose underlying preliminary injunctive relief to preserve the relative positions of the parties so that meaningful relief is ultimately available, however, this case is readily distinguishable from *Schrier* and, I suggest, amenable to the "high" but not "higher" standard for non-disfavored injunctions.

The "paramount purpose" of preliminary injunctive relief is to assure that the non-movant does not take unilateral action which would prevent the court from providing effective relief to the movant should he ultimately prevail on the merits. *O Centro*, 389 F.3d at 977 (Murphy, J.)(citing 11A C. Wright et al., Federal Practice & Procedure § 2947, p. 123 (2d ed. 1995)). The remedy is temporary and finite in nature. When the nonmovant undertakes an action post-bellum that, if sanctioned, effectively obliterates the chance for meaningful relief after trial, the sanctioning of that action contravenes this paramount purpose. An order requiring the nonmovant to reverse its action, even if that "mandates" the nonmovant act affirmatively, is precisely what traditional preliminary injunctions do. By uncritically placing such injunctions in the "disfavored," highest

scrutiny category and therefore ensuring that many will be denied on that basis alone, we shortchange the ultimate goal of preliminary injunctive relief.  Certainly a category of mandatory and therefore "disfavored" injunctions exists, but their identification and categorization as such, without reference to their ultimate role in preserving the availability of meaningful relief, cannot be an end in itself.

In the end, the entire exercise of dividing preliminary injunctions into categories of "non-disfavored" and "disfavored," and requiring the application of only nominally different standards to each, lacks utility and I would scrap it entirely.[3]  The decision of whether to grant or deny a request for a preliminary injunction involves a calculation, undertaken with care and as much information as can be confidently amassed under the time constraints that exist in a given situation, of how best to preserve the availability of meaningful relief without visiting greater harm on the entity being restrained if the

---

[3]      In my view, the discordant voices recorded in the *en banc O Centro* decision led right to the precipice of this conclusion but stopped short of the jump.  All preliminary injunctions are disfavored, but two (Judge Seymour, joined by Chief Judge Tacha and Judges Porfilio, Henry, Briscoe and Lucero) or three (Judge Murphy, joined by Judges Ebel, Kelly, Hartz, O'Brien, McConnell, and Tymkovich) categories of them are even "more" disfavored than others.  And while all preliminary injunctions are "extraordinary" and should be granted only if the right to relief is "clear and unequivocal," these super-disfavored injunctions are an undefined quantum "more" extraordinary and the right to them must be some quantum "more" clear and unequivocal. *Schrier*, 427 F.3d at 1258 (preliminary injunctions must be granted with caution and only in cases where the necessity for it is clearly established and disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course").  Ultimately, the articulation of a standard requiring "heightened" scrutiny and a "strong showing" on all four of the *Lundgrin* factors was an implicit acknowledgment of the nonutility of distinctions previously drawn in the treatment of disfavored and nondisfavored injunctions.  The Court's adherence to a two-tiered standard turning on these distinctions further entrenched, rather than alleviated, the problem.

calculation is wrong.  It is an educated wager, of sorts, guided by a balancing and grading

of relative harm.  As Judge Seymour observed in quoting Professor Dobbs in *O Centro*:

> '[T]he gist of the standards is probably easy to understand in common sense
> terms even if the expression is imperfect: the judge should grant or deny
> preliminary relief with the possibility in mind that *an error might cause
> irreparable loss to either party.  Consequently, the judge should attempt to
> estimate the magnitude of that loss on each side and also the risk of error*.

389 F.3d at 999 (quoting Dan B. Dobbs, Law of Remedies § 2.11(2) at 189 (2d ed.

1993)(emphasis Circuit Judge Seymour's)).

The standards for reviewing requests for preliminary injunctive relief have been

shaded and graded beyond practical application to the exigencies and constraints of

demands for immediate relief in the trial court.  As long as a trial judge is mindful that the

ultimate ("paramount") purpose of a preliminary injunction is to preserve the availability

of meaningful relief while preventing or reducing the risk of irreparable harm to either

side, a reasoned application of the original four *Lundgrin* factors dictates a flexible

standard of review that will ebb and flow in accord with the circumstances, and lead to

the proper result.[4]  However, so as to apply the law as it currently exists in this circuit, I

---

[4]     Judge Seymour came close to this conclusion in *O Centro*, when she cautioned, in
the context of a situation in which there were arguably two status quos created by the co-
existence of different applicable federal statutes (the Controlled Substances and Religious
Freedom Restoration Acts), that the general maxim that the status quo should be preserved
should not be taken "merely at face value or become a goal in and of itself."  389 F.3d at 1001.
"Rather," she wrote, "the very purpose of preserving the status quo by the grant of a preliminary
injunction is to prevent irreparable harm pending a trial on the merits."  *Id.*  "Given the essential
role prevention of irreparable harm plays in the grant of preliminary injunctive relief, district
courts should consider the question of altered status quo in light of how it impacts the balance of
harms between the parties and the public interest, as well as considering what attendant
institutional costs may accompany the grant of such relief."  *Id.* at 1001-02.  Unfortunately, Judge

14

will engage in the required categorization and apply a "high" or "higher" standard accordingly.

## The Proposed Preliminary Injunction in this Case

The proposed injunction in this case seeks to undo or abate Quiznos's termination decision pending a trial on the merits of Plaintiffs' claim that termination would be unlawful.  Strict adherence to the preserving/altering the status quo dichotomy would place this injunction in the non-disfavored category, because it clearly preserves that state of affairs that existed before the dispute over the TSFA postings developed.  The *O Centro* and *Schrier* opinions instruct us, however, to look beyond the preserving/altering the status quo question and consider whether such an injunction, even if it preserves the status quo pending trial, nevertheless falls into a disfavored category because it also "mandates" that the nonmovant act in a particular way.   If it does both, *Schrier* instructs that it is a "mandatory" injunction mandating the highest level of scrutiny regardless of its overall purpose in preserving or returning matters to the status quo ante bellum.

My initial impulse is to draw the obvious distinction between the injunction sought by the professor in *Schrier* and that sought by the Plaintiffs in this case.  The "mandatory" injunction sought by Dr. Schrier would have required the Department of Medicine at the CU medical school to continue being governed by a chairman who was suing the university through the duration of the parties' litigation.  The "risk" of "getting

Seymour did not take her analysis to its conclusion and suggest abandoning the palaver of nondisfavored/disfavored/high scrutiny/higher scrutiny for preliminary injunctions generally.

it wrong" in denying Dr. Schrier's request for temporary reinstatement would be that, if Dr. Schrier ultimately won on the merits of his claim, he would have been deprived of his chairmanship and any tangible or intangible benefits attendant to it for that period of time.  Dr. Schrier's loss would be real, but perhaps not irreparable (he could be returned to his position after prevailing on the merits and compensated for any loss of remuneration attendant with service as chair), and that aspect of his loss that was irreparable at least did not threaten the availability, ultimately, of meaningful relief.  In contrast, compelling the medical school to continue working with and allow its largest department to be governed by a chairman who is suing it risks harm, if ultimately shown to be unwarranted, more rather than less irreparable without any attendant benefit to the preservation of meaningful relief.  In *Schrier*, the "mandatory" and disfavored nature of the injunction outweighed its utility in terms of preserving the availability of meaningful relief and supports the application of a heightened standard before it would issue.

In the instant case, the risk of "getting it wrong" in denying the preliminary injunction sought is far greater than the risk attendant with mistakenly denying Dr. Schrier's request to remain chair of the Department of Medicine pending the outcome of his lawsuit.  If Quiznos is allowed to proceed with its terminations and cease supplying Plaintiffs, and it is ultimately determined that some or all of the terminations were unlawful, Plaintiffs will likely have lost or so compromised their businesses that the availability of meaningful relief is illusory.  Indeed, Plaintiffs could not operate at all under the required terms of the Agreement because the supplier must be either Quiznos or

16

a Quiznos-directed vendor.

Quiznos argues that any harm from having been wrongly terminated during the pendency of this litigation is fully compensable and therefore not irreparable, but the argument relies on an exclusively economic model that trivializes concepts such as ownership, family business, and uninterrupted operation under valid agreements. Even if some aspects of a wrongful termination during the pendency of the litigation prove compensable, others clearly are not, and the risks to the ultimate goal of preserving meaningful relief suggests the "mandatory" aspects of the injunction sought pale in comparison to its role in preserving the status quo. Accordingly, I distinguish *Schrier* and hold that while the professor's request in that case may properly be viewed as more "mandatory" than "prohibitive" because the relative ultimate harm in wrongly maintaining the altered status quo was less than the ultimate harm in wrongly having forced the Department of Medicine to remain under the chairmanship of an individual who may not be able to act in what the higher authority had determined to be in the university's best interest, the Plaintiffs' request in this case is not. I disagree, therefore, that *Schrier* compels me to apply the "higher than high" *O Centro* standard for disfavored preliminary injunctions to Plaintiffs' request that the implementation of the termination notices by Quiznos on December 8, 2006 be abated during the pendency of this litigation. In my view, a characterization of the proposed preliminary injunction in this case as an ordinary, prohibitive injunction subject only to the "high" standard applicable to any request for injunctive relief is consistent with *O Centro* and *Schrier*.

17

In an abundance of caution, however, and in light of the minimal difference, in my view, between the articulated standards, I will consider whether Plaintiffs have made a "strong showing" on all four *Lundgrin* factors, but alternatively apply the modified-substantial-likelihood-of-success-on-the-merits standard for regular preliminary injunctions to see if that makes any difference to the outcome.

III.

***Discussion***

**<u>Irreparable Injury</u>**

The demonstration of irreparable harm in the absence of relief is the single most important prerequisite for obtaining a preliminary injunction and must be established first, before consideration of the other *Lundgrin* factors is necessary. *Dominion Video*, 356 F.3d at 1260. All three Plaintiff groups point to the real or threatened loss of their businesses, and concomitant loss of business goodwill and competitive positions, as examples of the irreparable harm that would befall them if Quiznos were permitted to implement its challenged termination decisions during the pendency of this litigation. Quiznos has already demonstrated its willingness to disrupt or decline to provide supplies necessary to Plaintiffs' day-to-day operations in the wake of its terminations, actions which were the subject of a temporary restraining order issued shortly after Plaintiffs filed suit. Upon expiration of that TRO and in the absence of a preliminary injunction continuing the restraint, Quiznos would be free to refuse to supply and to demand the immediate shut-down of Plaintiffs' stores without having a trial on the merits of

18

Plaintiffs' claims that such action is unlawful.[5]  Quiznos would, in effect, be given the full benefit of its defense to such claims without having prevailed on the merits.

Courts have recognized that the threatened loss of a franchise business before the lawfulness of a termination can be determined constitutes irreparable harm sufficient to warrant injunctive relief.  *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1207 (2d Cir. 1970)(having run the business for 20 years, family's loss of car dealership was not entirely measurable in monetary terms).  Quiznos responds that because the value of Plaintiffs' lost businesses, should it come to that, is calculable, Plaintiffs cannot establish irreparable harm, citing *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir 2003).

The Second Circuit in *Semmes* rejected precisely this argument.  In a persuasive and sensitive passage, Judge Friendly wrote:

> Ford's contention that Semmes failed to show irreparable injury from termination is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his

---

[5]    The Abids and Fixes also contend an injunction is necessary to avoid the irreparable harm attendant Quiznos's demands that they cure their "violations" of the Franchise Agreements by posting speech on the TSFA website acknowledging their conduct was "morally reprehensible."  Mot. Prelim. Inj. at 19-20.  They contend Quiznos's demand constitutes a coercive infringement on their First Amendment rights, which would constitute a per se irreparable injury unless enjoined.  Plaintiffs' First Amendment-based theory of irreparable harm is ill-suited to the instant request for injunctive relief.  Plaintiffs are not "obligated" to cure, have not done so, and, therefore, will not be irreparably harmed by Quiznos's cure demand in the absence of an injunction.  I note Plaintiffs have asserted a separate cause of action based on Quiznos's alleged coercive infringement of their free speech and any harm attendant with such an infringement is best left to the merits, *vel non*, of that claim.

> son had recently entered is not measurable entirely in monetary terms; the
> Semmes want to sell automobiles, not to live on the income from a damages
> award. *See Madsen v. Chrysler Corp*., 261 F. Supp. 488, 507 (N.D.
> Ill.1966), *vacated as moot*, 375 F.2d 773 (7 Cir. 1967). Moreover, they
> want to continue living. As Judge Goodrich said, a 'judgment for damages
> acquired years after his franchise has been taken away and his business
> obliterated is small consolation to one who, as here, has had a Ford
> franchise' for many years, *Bateman v. Ford Motor Co.*, 302 F.2d 63, 66 (3
> Cir. 1962).

*Semmes*, 429 F.2d at 1260.  In the instant case, where Plaintiffs' operation of Quiznos

stores was a livelihood and not just a job, this same analysis obtains.[6]

Moreover, the *Heideman* case on which Quiznos relies is not a franchise case and

is wholly distinguishable.  In *Heideman*, exotic dancers sought preliminary injunctive

relief against the enforcement of an ordinance banning nude dancing.  There the existence

of irreparable harm turned on the viability of plaintiffs' First Amendments claims of

freedom in artistic expression, not the availability of monetary relief.   348 F.3d at 1189-

90.  While *Heideman* recited as part of its overview of the applicable legal standard that

"simple economic loss usually does not, in and of itself, constitute irreparable harm," 348

F.3d at 1189 (citing Wright & Miller, *supra*, § 2948.1, at 152-53), that unchallenged

platitude is inapplicable here, where the risk of harm from a denial of injunctive relief

---

[6]    Moreover, there is a way of looking at the facts in the instant case where Plaintiffs'
injury in being terminated in retaliation for the posting of the Baber letter does not merely flow
*from* the alleged breach, but *is* the breach.  *See Wisdom Import Sales Co. LLC v. Labatt Brewing
Co. LTD*, 339 F.3d 101, 114 (2d Cir 2003)(money damages were inadequate remedy for the loss
of a contractual right to control a business).  Where a franchisee's right to continue,
uninterrupted, in business is terminated in retaliation for the acts of other franchisees, the
interruption and "black eye" of termination itself is an injury that cannot adequately be remedied
by damages, and further supports the finding of irreparable harm in this case.

goes beyond "simple economic loss."[7]  Ultimately, the court in *Heideman* analyzed the

preliminary injunction question in terms of harm plaintiffs might suffer from the

enforcement of the ordinance during the pendency of the litigation (i.e., having to "wear

pasties and G-strings") and whether that "will have irreparable effect in the sense of

making it difficult or impossible to resume their activities or restore the status quo ante in

the event they prevail."  *Id.*  at 1189.  Reasoning that circuit precedents "dictate that we

treat alleged First Amendment harms gingerly," the court found a sufficient element of

artistic enterprise in plaintiffs' unexpurgated performance that plaintiffs had, for purposes

of preliminary injunctive relief, established the existence of irreparable harm.

In the instant case, by contrast, there is ample evidence in the record regarding the

likelihood that the immediate terminations ordered by Quiznos would effectively close

Plaintiffs' stores completely pending trial, resulting in a loss of customer base and

---

[7]        Defendant's corollary to this argument is that Plaintiffs cannot demonstrate
irreparable harm because their remedy if they prevail on the merits of their wrongful termination
claim would be money damages for the loss of the business.  The assertion is tautological:  The
denial of preliminary injunctive relief obliterates the equitable or intangible benefits of the status
quo and limits Plaintiffs to monetary damages for the loss of their businesses should they
ultimately prevail.  This limitation then justifies the denial of preliminary injunctive relief because
Plaintiffs' "loss" is no longer quantifiable in anything but monetary damages.  The argument
rewards and encourages the nonmovant who undertakes unilaterally to alter the status quo so to
destroy it completely, because doing so will preclude entry of preliminary injunctive relief and
ensure that all he will be liable for in the end is damages reflecting only those tangible losses
plaintiff can quantify and not those intangibles he cannot.  The nonmovant may well factor this
risk into its calculus *ex ante*, arriving at a rational decision as to whether acting potentially
unlawfully to destroy the status quo may inure to its benefit irrespective of any resulting liability in
doing so. *See Home Shopping Club, Inc. v. Roberts Broadcasting Co. of Denver*, 961 P.2d 558,
562 (Colo. App. 1998)(where claims for damages are premised on breaches of contracts, damages
that are speculative or impossible of ascertainment cannot be recovered).  As a matter of principle
and of reason, I reject the corollary.

community goodwill going beyond "simple economic loss."  *See Semmes*, 429 F.2d at 1260.  I find that each of the three Plaintiff groups has made a strong showing that they face irreparable injury unless the injunction issues.

<u>**Balance of Harms in Issuing Injunction**</u>

Balancing Plaintiffs' risk of injury in the absence of an injunction against the injury the proposed injunction may cause Quiznos requires quantifying, in some respect, Quiznos's harm in being compelled to do business with franchisees it doesn't like or believes are intent on harming it.  Quiznos itself makes no effort to quantify this harm, instead standing on its assertion, now rejected, that no irreparable harm can befall Plaintiffs from a lack of injunctive relief and that the harm to Quiznos in being forced to do business with Plaintiffs is simply "obvious."  Quiznos relies heavily on Judge Posner's opinion in *Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 277 (7th Cir. 1992), to argue a franchisor's harm in being forced to continue doing business with a franchisee it has grounds to terminate is both real and irreparable.

*Original Cookie* was an action brought by a frustrated franchisor after years of dealing with what, on the record, appeared to be a hapless and hopeless cookie franchisee.  The franchisee had been terminated based on a series of material breaches of the franchise agreement, yet continued using the franchisor's name and trademarks to sell inferior, non-franchisor approved fare.   The franchisor sued for breach of contract and trademark infringement.  The franchisee counterclaimed that the termination was

22

wrongful and obtained, at the trial level, a preliminary injunction compelling the franchisor to restore the franchise and maintain a cooperative relationship with the franchisee pending a ruling on the merits of the parties' claims.

Writing for a panel of the Seventh Circuit Court of Appeals, Judge Posner reversed the preliminary injunction order. While it is true Judge Posner determined the harm of being "forced to continue doing business with a franchisee" outweighed the franchisee's "showing of irreparable harm," he did so after finding (1) that on the record before the panel, the franchisee's showing of irreparable harm was "dubious" because it had an offer on the table to assign the franchise for consideration that would allow the franchisee and his wife to recover all or more than their investment in the store and they had "only themselves to blame if they dallied in taking up" the offer; and (2) the franchisee had, in his view, no chance of prevailing on the merits of their counterclaim. 970 F.2d at 277 (being forced to continue business with a franchisee "who not only committed rampant violations of the franchise agreement but also infringed the franchisor's trademarks" outweighed franchisees' "dubious showing of irreparable harm").

While implying that the *Original Cookie* franchisee and his wife had no chance of prevailing on the merits, Judge Posner posited simply they had a "much worse" than "50-50" chance of doing so. 970 F.2d at 278. He described a litany of infractions, apparently undisputed in the record, including a failure to maintain insurance, a history of late payments, bounced checks, and having "flunked several inspections by the company's representatives," who found "oozing cheesecake, undercooked and misshapen cookies,

23

runny brownies, chewing gum stuck to counters, and ignorant [sic] and improperly dressed employees." *Id.*   Judge Posner derided the franchisee's temerity in seeking injunctive relief after "defrauding" the Cookie Company by continuing to use its mark in selling cookies made with non-Cookie Company batter.  *Id.* at 281 (equitable relief is "costly to the judicial system" and "[i]t would make no sense to incur that cost on behalf of someone who was trying to defraud the person against whom he was seeking the court's assistance").

Neither the egregious infractions nor the unclean hands at issue in *Original Cookie* exists in this case, or, if they do, Quiznos has certainly failed to develop the record in that regard. While there is some back and forth in the record regarding inspections problems and defaults at stores owned by Mr. Abid and the Fixes, the evidence is disputed and, with the exception of the notice of termination sent to the Fixes, none of those problems was cited as a basis for termination.  Most significantly, Plaintiffs are not putting the Quiznos mark on non-Quiznos fare as the franchisees in *Original Cookie* were doing.  In the absence of any evidence that Plaintiffs' continued operation will infringe on the Quiznos mark,[8] I reject the analogy to *Original Cookie* and the assertion that the temporary continued operation and supplying of Plaintiffs' stores harms Quiznos more than termination would harm Plaintiffs.

I pause briefly to address Quiznos's assertion that the mere posting of the Baber

---

[8]         *See infra*, n. 10.

24

suicide letter on the TSFA website "harmed" the goodwill associated with the Quiznos mark, and that any continued relationship with Plaintiffs, however temporary, in the wake of that posting risks further "harm" to that mark.  Not only is the connection between Plaintiffs' continued operation of Quiznos's stores and any continued "harm" not evident, but the fact of "harm," itself, is not as "obvious" as Quiznos contends.

Based on the evidence received, it is clear the TSFA is something of a "Potemkin village" non-profit organization.  There are no regular meetings of membership, no elections, and no mission other than to provide a sort of web log ("blog") for Quiznos franchisees to vent their frustrations and exchange ideas for furthering their interests and bettering their bottom line.  While theoretically accessible to the web-surfing public at the time of the Baber posting,[9] no evidence was presented at the hearing or in Quiznos's submissions that any consumer or member of the public saw the letter and thought ill of Quiznos, or declined to purchase Quiznos's products as a result.  As franchise operators, it seems reasonable to assume TSFA members have little incentive to disparage the Quiznos mark to the purchasing public as that would hurt their own earnings and revenue streams.  The fact of Mr. Baber's suicide, moreover, and his letter blaming Quiznos for it, were in the public domain and available to potential consumers via news reports before and independently of the TSFA posting.

Quiznos house counsel Meyers made clear in his testimony that Quiznos's actions

---

[9]    The site is no longer accessible to the public without joining TSFA and obtaining a password.

in terminating TSFA board members' franchises were purely punitive. Whether the

Quiznos Franchise Agreement permits unilateral termination on that basis is for me to

consider on the merits of Plaintiffs' claims. Absent any evidence to the contrary,

however, having to wait to execute these punitive terminations until consideration of their

legality can be made, is not "harm" sufficient to reject the proposed preliminary

injunction.

### Adverse to the Public Interest

Plaintiffs argue that it is in the public interest to grant the preliminary injunction in

order to have uninterrupted commerce in their communities. Quiznos emphasizes

freedom of contract, the policy against specific performance, and the cost of supervision

imposed on the court. None of these factors is particularly salient or persuasive. In the

absence of any evidence – or even a compelling argument – that the proposed injunction

somehow harms the consuming public, however, this factor does not support denial of the

relief requested.

### Subtantial Likelihood of Success on the Merits

This leaves us with the likelihood that Plaintiffs will succeed on the merits of their

claims. Having made a strong showing on the first three *Lundgrin* factors, the lower

standard for preliminary injunctions that fall outside any of the disfavored categories

requires Plaintiffs to do nothing more than raise questions going to the merits "so serious

as to make the issues ripe for litigation and deserving of more deliberative investigation."

*Walmer*, 52 F.3d at 854. Applying the heightened standard, however, would prohibit

26

Plaintiffs from taking advantage of the modified-likelihood-of-success-on-the-merits standard and require them to make a "strong showing" on the fourth *Lundgrin* factor as well.

*Plaintiffs' Claims*

The facts adduced during three days of hearing and admitted on the record by Quiznos demonstrate unequivocally that Plaintiff franchisees were terminated on the basis of their status as or affiliation with TSFA board members in retaliation for the board's decision to post the Baber suicide letter on its website. The decision was made by Meyers and issued immediately upon his learning of the posting. Myers undertook no investigation into the source of the posting and instead, simply directed outside counsel to send overnight notices of termination to any franchisees who were members of the TSFA board.

In Quiznos's own words, the action of posting the letter

> so clearly intended to harm Quiznos [that it] could not be tolerated with respect to its current franchisees who were responsible for the posting. Therefore, [Quiznos] identified the current franchisees who served on the board of directors and exercised its right under the respective franchise agreements to terminate the same.

Resp. to Mot. Prelim. Inj. at 4. Meyers' testimony at the preliminary injunction hearing was completely consistent with this statement.

In his testimony, Meyers had no explanation for why the termination notices neither mentioned the Baber posting nor informed Plaintiffs what specific actions or conduct formed the grounds for Quiznos's decision to terminate them. He simply

27

reiterated Quiznos's position that the Franchise Agreements give the company the

unfettered right to terminate franchisees who engage in conduct the company, in its sole

judgment, deems damaging.

The source of this unfettered right, apparently, is § 18.2 of the form Franchise

Agreement:

> 18.2 **Termination by Franchisor - Effective Upon Notice**.  Franchisor
> shall have the right, at its option, to terminate this Agreement and all rights
> granted Franchisee, hereunder, without affording Franchisee any
> opportunity to cure any default (subject to any state laws to the contrary, in
> which case state law shall prevail), effective upon delivery to Franchisee of
> a termination notice, upon the occurrence of any of the following events:
>
> \*   \*   \*
>
> (c) **Fraud or Conduct Affecting the Marks**.  If Franchisee commits fraud
> in connection with the purchase or operation of the Restaurant *or otherwise*
> *engages in conduct that, in the sole judgment of Franchisor, materially*
> *impairs the goodwill associated with the Marks* . . . .

Franchise Agreement (emphasis added).  Plaintiffs deny § 18.2(c) applies and deny the

Franchise Agreement allows Quiznos to terminate their franchises for the reasons stated.

To the extent they were in violation of any contractual obligations under the Agreement,

Plaintiffs contend they were entitled to actual notice and a meaningful opportunity to cure

and that Quiznos violated the terms of the Agreement by failing to provide them with

either.  Plaintiffs also claim Quiznos's actions violated duties of good faith and fair

dealing implied generally in any contract, including their Franchise Agreements.  The

Abids assert an additional claim for violation of § 80C.14 of Minnesota's Franchise Act

requiring "good cause" and a reasonable opportunity to cure before a franchisor may

unilaterally terminate a franchisee.

*Legal Standards Applicable to Franchise Relationship*

Generally speaking, a franchisor has the power to terminate the relationship with a franchisee whenever the terms of the franchise agreement are violated. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1307 (11th Cir. 1998)(citing *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371 (3d Cir. 1992)). That right exists independently of any claims the franchisee may have against the franchisor and, accordingly, the right is broad. *See id.* It is not, however, unbounded. The question, then, is whether the Quiznos Franchise Agreement authorized Quiznos to terminate, immediately and without investigation, Plaintiffs' individual franchise rights in the manner and method it did on December 8, 2006. Under the facts adduced both before and during the preliminary injunction hearing, I conclude it did not.

Section 18.2(c) provides for the immediate termination of a Quiznos franchisee, without opportunity to cure, for committing fraud or for engaging in conduct that, in the "sole *judgment*" of Quiznos, materially impairs the goodwill associated with the Quiznos trademark. The operative word is "judgment." Although the Franchise Agreement allows Quiznos to terminate franchisees it concludes acted to impair the goodwill associated with its marks, it must exercise judgment in assessing this.[10] In exploring the parameters

---

[10]    Under the doctrine of *ejusdem generis*, moreover, the term "judgment" is further restricted in its application to those matters specified in the section. That is, the "conduct" at issue must be related to goodwill associated with the Quiznos "Mark." It is not at all clear that the posting of the Baber letter affected that specific goodwill that is associated with the "Quiznos"

of what the term "judgment" means within the plain language of the Agreement, I am certain that it does not mean the entirely impulsive and retaliatory reaction described by Mr. Meyers.[11]

Every applicable definition of the term "judgment" describes a deliberative or cognitive process involving the gathering up of facts and the exercise of a discriminatory mind upon them.[12]  Judgment is the result of the exercise of reason and thus differentiated from instinct, imagination or emotional impulse such that it is objectively trustworthy.

Plaintiffs have provided evidence, essentially conceded by Quiznos, demonstrating that the decision to terminate their franchises was made without any investigation or

_____

mark, or Quiznos goods and services.  What the public may think of a company is not the same as the goodwill associated with that company's trademark.

[11]     While I find no ambiguity in the term "sole judgment of Franchisor," the Agreements were prepared entirely by Quiznos and must be construed accordingly.  To substitute "belief" or "feeling" or "discretion" would add words and meaning to the Agreements that are, quite simply, not there.

[12]     "Judgment."

"The formation of an opinion or notion concerning something by exercising the mind upon it."  "The faculty of judging; ability to form an opinion; that function of the mind whereby it arrives at a notion of anything; the critical faculty; discernment."  – The Oxford English Dictionary, vol. V (Oxford University Press 1933).

"[T]he mental or intellectual process of forming an opinion or evaluation by discerning and comparing." – Webster's Third New International Dictionary (Unabridged) (G & C Merriam Co. 1976).

"A sense of knowledge sufficient to comprehend nature of transaction.  An opinion or estimate. The formation of an opinion or notion concerning some thing by exercising the mind upon it." – Black's Law Dictionary (5th ed. West Publishing 1983).

consideration, to punish that swath of franchisees affiliated with the TSFA board regardless of whether those franchisees actually participated in the decision to post the Baber letter.  In the absence of any evidence that anyone on behalf of Quiznos investigated or considered the impact of the TSFA's posting (as opposed to the newspaper accounts, which were already in the public domain) on the "Quiznos" mark, or even investigated which members of the TSFA board actually participated in the decision (Alison Abid, as previously noted, was out of the country at the time the decision was made and did not participate in the meeting), it is substantially likely that Plaintiffs will prevail on their claim that their terminations under the circumstances presented fall outside the authority given Quiznos under § 18.2 of the Franchise Agreement.

Plaintiff Hakim Abid has an additional claim for relief under Minnesota's statute governing franchise relationships.  Minnesota Statutes § 80C.14 severely limits the grounds for immediate termination of a franchise and would not allow Quiznos to terminate his franchise rights, absent reasonable notice and reasonable opportunity to cure, even upon the exercise of the "judgment" described above.  In Minnesota, the only grounds for termination effective immediately upon notice are the voluntary abandonment of a franchise, the conviction of a franchisee for an offense directly related to the business, or the failure to cure a default under the agreement after proper notice and opportunity.  *See id.* § 80C.14(3)(a)(2) and (3)(b)(5).  Quiznos invoked none of these

circumstances or categories in its December 8, 2006 termination notices.[13]

It is unnecessary for me to reach the merits of Plaintiffs' additional claims that Quiznos's actions breached the covenant of good faith and fair dealing implied in their respective agreements under state law, and I decline to do so. I conclude that Plaintiffs have each established a likelihood of success on the merits sufficient to support their request for preliminary injunction under either applicable Tenth Circuit standard.

IV.

### Conclusion

Based on the foregoing, I find Plaintiffs will each suffer irreparable injury unless they are permitted to continue operating under the terms of their respective Franchise Agreements until a trial on the merits of their wrongful termination claims can be had. I further find that the threatened injury to Plaintiffs in the absence of such an injunction outweighs whatever harm the proposed injunction may cause Quiznos and I reject any contention that injunction, if issued, is adverse to the public interest.

On the documentary evidence before me and the witness testimony adduced at the

---

[13] As previously noted, the Abids had a history of inspections problems and default notices, up to and including notices of termination (which Quiznos revoked after the Abids retained counsel), that are evidenced in the record. *See* Def.'s Exs. A1 - A8. I do not, in making my findings on the availability of preliminary injunctive relief in this case, intend to suggest that the Abids (or the Fixes, who also had inspection problems) are not subject to termination under the Franchise Agreement or, in the Abids' case, under Minnesota franchise law, on the basis of these compliance problems. My decision is based entirely on the determination that it is substantially likely that Quiznos's actions in terminating these franchisees on December 8, 2006, for the reasons and in the manner it did, ran afoul of proper procedures and violated both the terms of the Franchise Agreement and Minnesota law.

preliminary injunction hearing, I find and conclude that each of the Plaintiff groups is substantially likely to succeed on the merits of their claims that Quiznos's actions in terminating their franchises in retaliation for the TSFA's posting of the Baber suicide letter, without any investigation into Plaintiffs' actions or role in that posting, breached the terms of their Franchise Agreement and, in Hakim Abid's case, also violated Minn. St. § 80C.14.   Accordingly,

The temporary retraining order currently in place in this case is converted to a preliminary injunction.  Quiznos will maintain the status quo that existed before the terminations of Plaintiffs' franchise rights pending a trial on the merits of Plaintiffs' claims.  In this regard, Quiznos will stay enforcement of Plaintiffs' terminations and will not take any action, without court approval, to change that status quo ante or otherwise prevent the ongoing operation of the stores.

Dated May 3, 2007.                    **s/John L. Kane**
                                      SENIOR U.S. DISTRICT JUDGE